UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII, JUDGE

```
UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )   No. 11-CR-324-AWI
                             )
vs.                          )   JURY TRIAL
                             )      DAY 1
SHAWN JOSEPH McCORMACK,      )
                             )
          Defendant.         )
_____)
```

Fresno, California                 Tuesday, April 7, 2015

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume 1, Pages 1 through 251, inclusive

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:        United States Attorney's Office
                          BY: **PATRICK R. DELAHUNTY**
                          and **MEGAN A.S. RICHARDS**
                          2500 Tulare Street
                          Suite 4401
                          Fresno, California 93721

                          U.S. Department of Justice
                          BY:  **MAUREEN C. CAIN**
                          1400 New York Avenue
                          Suite 600
                          Washington, D.C. 20540


For the Defendant:        **CARL M. FALLER**
                          Attorney at Law
                          Post Office Box 912
                          Fresno, California 93714

3

1                              <u>INDEX</u>

2    <u>GOVERNMENT'S WITNESSES</u>:

3     PAUL KRAWCZYK                                        200
      DIRECT EXAMINATION BY MR. DELAHUNTY                  200
4

5                              * * * * *

6

7

8

9

10                             EXHIBITS

11   <u>GOVERNMENT'S</u>                                   Received
      81, 82, 84, 86 and 155                               200
12    1                                                    210
      2 and 14                                             212
13    3                                                    214
      4 and 5                                              220
14    13 and 18                                            221
      19 and 20                                            225
15    7, 8, 9 and 17                                       228
      6                                                    239
16    11                                                   240
      21 and 22                                            244
17    10                                                   245

18

19

20                             * * * * *

21

22

23

24

25

4

1   Tuesday, April 7, 2015                    Fresno, California

2   8:35 a.m.

3          THE CLERK:  Court calls case 1:11-CR-00324.  United

4   States versus Shawn Joseph McCormack.  Jury trial.

5          THE COURT:  Good morning.  If I could just have your

6   appearances for the record, please.

7          MR. FALLER:  Good morning, Your Honor, Carl Faller on

8   behalf of Mr. McCormack, who is present in custody.

9          MR. DELAHUNTY:  Good morning, Your Honor, Patrick

10  Delahunty along with Megan Richards and Maureen Cain for the

11  United States.  I'd also like to note that sitting at counsel

12  table for the government is case agent Veronica Pike with HSI.

13         THE COURT:  If I could have the spelling of the

14  agent.

15         AGENT PIKE:  It's V-E-R-O-N-I-C-A P-I-K-E.

16         THE COURT:  All right.  I note the government has

17  submitted an amended witness list.  And as I indicated

18  yesterday, I'm going to go ahead and read the names, just the

19  names.  And there is a footnote with respect to the parents.

20  If the parties agree, once I get to those -- their names, I

21  can just read that footnote.

22         Mr. Faller, do you have any thoughts on that?

23         MR. FALLER:  No, Your Honor.

24         THE COURT:  All right.  Then that's what I'll do when

25  we get down to Andrew and Ashley Karen.

1          Now, the jurors might -- the reason I read the

2    witness list, obviously, is to see whether or not the jurors

3    know anybody.  If I only give their first names, that's not

4    going to be particularly helpful.  Are the names -- first

5    names of the minors, I assume they're going to be referred to

6    during the course of the trial?

7          MR. DELAHUNTY:  That's correct, Your Honor.  Their

8    names are Ben and Elizabeth.  It may be helpful, for purpose

9    of voir dire, to identify the parents as being the parents of

10   Ben and Elizabeth.  For example, Karen who has two young

11   children named Ben and Elizabeth.

12         THE COURT:  Okay.  What I could do is just indicate

13   for privacy purposes, I'm only reading the first name of the

14   father Andrew and the first name of the mother Ashley Karen.

15   They are parents of Ben and Elizabeth.  And that hopefully, if

16   any -- now, at the time they were living in Bakersfield; is

17   that correct?

18         MR. DELAHUNTY:  That's correct.  Currently they are

19   in the San Luis Obispo, Paso Robles area.

20         THE COURT:  I'll just indicate their first names, the

21   first names of the children and at the time of this incident

22   they lived in Bakersfield.  And obviously if we have any

23   prospective jurors from Kern County, that would at least give

24   them, I think, enough information that they would know whether

25   or not they are acquainted with the family.

1          All right.  Aside from that, then, are there any

2    issues that we should take up before we have the jury panel

3    come in at nine o'clock?

4          First on behalf of the plaintiff government side.

5          MR. DELAHUNTY:  Nothing from the government at this

6    time, Your Honor.

7          THE COURT:  Defense, Mr. Faller?

8          MR. FALLER:  No, Your Honor.  I do have one question.

9    Is -- we do have a witness exclusion order.  Is it permitted

10   for prospective witnesses to sit through the jury selection

11   process?

12         THE COURT:  I suppose they could.  I've never had

13   that issue come up.  I don't know if there's anything -- we

14   will be asking -- I will be reading a statement of the case.

15   And we will be asking jurors questions, I assume, regarding

16   any issues relating to sexual abuse or anything like that.  I

17   don't know if that would have an impact on any of the

18   prospective witnesses.

19         MR. DELAHUNTY:  Your Honor, the government would seek

20   to continue exclusion throughout this trial.  Potential

21   witnesses, apart from the case agent who I think is treated

22   differently in this situation, should not -- the government

23   feels should not be part of the voir dire.  I think statements

24   will be made about the case, specific questions that might

25   foreshadow testimony in the case will probably be asked by the

7

1   government.  So that would be the government's position on

2   that.

3          THE COURT:  Okay.  Mr. Faller, I think out of an

4   abundance of caution, I would exclude all prospective

5   witnesses during the entire course of the trial, including the

6   jury selection.

7          Okay.  Anything else for defense then?

8          MR. FALLER:  No.

9          THE COURT:  All right.  Let me just -- why don't I do

10  this.  I'll come back on the bench at nine.  The jury panel is

11  checked in, they've got to go through some check-in processes.

12  Hopefully they'll get that done by nine o'clock.  I'll come

13  back on the bench.  If for whatever reason they're a little

14  delayed, we'll let you know.  But I would like to, once I get

15  on the bench, have the panel come in and we can go ahead and

16  start the jury selection process.  But right now we'll be in

17  recess until nine o'clock.

18          (Recess.)

19          (The jury panel entered the courtroom.)

20          (Jurors are identified by number only.  Any reference

21          to personal identifiers regarding jurors has been

22          redacted.  Actual personal information requires a

23          motion and Court order.)

24          THE CLERK:  The Court calls case 1:11-CR-00324.

25  United States versus Shawn Joseph McCormack.  Jury trial.

1       THE COURT:  Good morning.  The record will reflect

2   that the jury panel is present in court, in the courtroom.  On

3   behalf of the Court, we thank you for appearing here for jury

4   service.

5       We're going to start the jury selection process in

6   just a moment, but I would like to do a few things

7   preliminarily.

8       First of all, just make some introductions and

9   mention some individuals by name.  I don't expect you to

10  remember all the names I'm going to mention, including the

11  prospective witnesses.  What we are, of course, interested in

12  is whether or not you know anybody that we mention by name.

13      First of all, my name is Tony Ishii, I'm the judge

14  who will be presiding over this particular case.

15      Two of my staff members that I would like to

16  introduce, who are sitting in front of me.  To my right and

17  your left is the courtroom deputy, Ms. Renee Gaumnitz.  She

18  will be working with the Court, with the parties during the

19  course of the trial, with the witnesses, the exhibits, et

20  cetera.

21      Sitting to my left and your right is Ms. Karen

22  Hooven, she's the court reporter.  I would like to say a

23  couple of things about her role.  First of all, she has to

24  take down every word that's spoken in court.  And that

25  generates a couple of basic rules.

1       First of all, only one person at a time can speak.

2  So, for example, during the course of the trial, when a

3  witness is being asked questions, the attorney will ask a

4  question and then stop and then the witness will answer the

5  question and stop, et cetera.  And that is important,

6  obviously, so that our court reporter can take down everything

7  that's spoken.

8       The other thing is, of course, we need to keep our

9  voices up.  So, first of all, everyone in the courtroom can

10  hear what a person has to say.  But secondly, so that Ms.

11  Hooven can go ahead and take down what is spoken.

12       During the course of the trial, that's not really an

13  issue or problem.  As you can see, we have microphones

14  throughout the courtroom.  But during the jury selection

15  process, we do not have microphones set up in the jury box.

16       So if you're selected to be seated in the jury box

17  and you're answering some questions that we pose to you, just

18  make sure that you have the microphone in front of you.  Ms.

19  Gaumnitz will hand the microphone to you and explain to you

20  it's a very fussy sort of an instrument so you need to be

21  careful when you use it.

22       In every lawsuit, whether it's a criminal lawsuit or

23  a civil lawsuit, there are parties and we designate them

24  legally, both in the state court and the federal court, as

25  plaintiffs, that is a party who brings a lawsuit, and the

1    defendant or the defendants is the person or the persons

2    against whom the lawsuit is brought.

3            In this case, this is a criminal law matter, so it is

4    being prosecuted by the United States Attorney's Office.  We

5    designate the plaintiff's side in this case as the United

6    States government.  Those of you who have seen or been

7    involved in the state court system, you've heard the phrase

8    "People of the State of California."  That's the title that's

9    used just as the plaintiff governmental entity.  Here, in the

10   federal system, it is the United States government.

11           So representing the plaintiff's side, United States,

12   seated at counsel table are the attorneys, Mr. Patrick

13   Delahunty, Ms. Megan Richards and Ms. Maureen Catherine Cain,

14   who are seated at counsel table.  Also at the counsel table is

15   Special Agent Veronica Pike.

16           The defendant in this case is Mr. Shawn Joseph

17   McCormack, who's seated with his attorney Mr. Carl Faller.

18           Now I'm going to read to you a number of names of

19   individuals who might be called as witnesses.  And I'm not

20   sure if I'm going to get the first name, the detective's name,

21   is it Krawczyk?

22           MR. DELAHUNTY:  Krawczyk, Your Honor.

23           THE COURT:  First Paul Krawczyk.  Scott Hall.  Bryan

24   Rogers.  Greg Squire.  Adam Hime, H-I-M-E.  Joe Caporale.

25   Kamlesh Shihora.  Robert Robles.  Adam Romine.

1          And then there are two individuals that I'm only

2    going to introduce by first name.  They are the parents of two

3    minor children that will be heard during the course of the

4    trial.  And there are legal requirements with respect to

5    minors regarding their last names.  So I'm only going to

6    mention the first names of the parents.  The father is Andrew,

7    the mother is Ashley Karen.  They were at the time of this

8    incident a couple of years ago living in Bakersfield,

9    California.  Their children are Ben and Elizabeth.

10          And the reason I mention -- go in a little more

11    detail on that is since you don't know what their last name

12    is, that further information is to assist you in case you

13    might know of individuals of those names from the Bakersfield

14    area.

15          Moving on then with the witnesses.  Osiel Garza.

16    Marsha McCormack and Scott McCormack.  And again, I don't

17    expect you to remember all these names.  But again, if any of

18    them sound familiar to you, please mention that when you come

19    forward.

20          Now, I've asked the parties in this case to submit a

21    statement of the case.  Now, I'm going to read this to you.

22    It is not evidence in the case.  You are not to consider it as

23    evidence.  The reason I'm going to read this to you is for two

24    purposes.  First, so you understand what the case is about.

25    Second, so that you'll understand why we're going to be asking

1    certain questions of you during the jury selection process.

2            This case involves allegations that the defendant

3    Shawn McCormack knowingly produced sexually explicit images of

4    a male minor and a female minor in the Eastern District of

5    California and kidnapped the male minor on two occasions.

6            You'll be asked to decide six counts in the

7    indictment.  Count One alleges that the defendant knowingly

8    used, persuaded, induced, enticed or coerced a minor, who will

9    be identified at trial as Elizabeth, to engage in sexually

10   explicit conduct for the purpose of producing a visual

11   depiction of such conduct between on or about January 2007 to

12   on or about January 2009.

13           Count Two, Count Three and Count Four allege that the

14   defendant knowingly used, persuaded, induced, enticed or

15   coerced a minor, who will be identified at trial as Ben, to

16   engage in sexually explicit conduct for the purpose of

17   producing a visual depiction of such conduct.

18           The allegations in Counts Two and Four occurred

19   between on or about March 2008 to on or about July 2010.  The

20   allegations in Count Three occurred between on or about March

21   27th, 2009 to on or about July 2010.

22           Count Five alleges that on or about March 27th, 2009,

23   the defendant willfully and unlawfully seized, confined,

24   inveigled, decoyed, kidnapped, abducted and carried away a

25   minor, Ben, and that the defendant, who was over the age of 18

1   at the time and who had no legal custody or family

2   relationship with Ben, traveled in interstate or foreign

3   commerce and used any means, facility and instrumentality of

4   interstate commerce in committing and in furtherance of the

5   commission of the kidnapping and held Ben for ransom, reward

6   and other benefit.

7          Count Six alleges that on or about November 6, 2009,

8   the defendant willfully and unlawfully seized, confined,

9   inveigled, decoyed, kidnapped and abducted and carried away a

10  minor, Ben, and that the defendant who was over the age of 18

11  at the time who had had no legal custody or family

12  relationship with Ben, traveled in interstate or foreign

13  commerce and used any means, facility and instrumentality of

14  interstate commerce in committing and in furtherance of the

15  commission of the kidnapping and held Ben for ransom, reward

16  and other benefit and attempted to do so.

17         Now, the defendant in this case, Mr. McCormack, has

18  entered not guilty pleas to each of the charges.  The

19  government has the burden of proving beyond a reasonable doubt

20  each of the elements of the charges contained in the

21  indictment.

22         All right.  Now, at this time we're going to go ahead

23  and start the jury selection process.  And Ms. Gaumnitz is

24  going to be calling a number of you to come forward into the

25  jury box.  And I'll sort of give you an idea of where you

14

1   would be seated as you come forward.

2          THE JURY:   Juror 001.

3          THE COURT:   Juror 001, if you could just come forward

4   through the gate there.  And I'm going to ask you to come all

5   the way forward to the jury box here and then go up to the top

6   row.  And all the way back to the audience area.  And that

7   first seat there is seat number 1.

8          THE CLERK:   Juror 002.

9          THE COURT:   And Juror 002, if you could come forward

10  and have a seat next to Juror 001, and that will be seat

11  number two.

12         THE CLERK:   Juror 003.  Juror 004.  Juror 005.  Juror

13  006.  Juror 007.

14         THE COURT:   And Juror 007, when you come forward, I'm

15  going to have you start a new row in that row just in front of

16  the other prospective jurors.

17         THE CLERK:   Juror 008.

18         THE COURT:   All the way to the front.  That will be

19  seat number seven.

20         And Juror 008, if you can come forward and have a

21  seat next to Juror 007, that will be seat number eight.

22         THE CLERK:   Juror 009.  Juror 010.  Juror 011.  Juror

23  012.  Juror 013.

24         THE COURT:   Okay.  Now, Juror 013, if you could have

25  a seat then in that row right in front of the jury box.  That

1   first seat there.  That's seat number 13.

2           THE CLERK:  Juror 014.

3           THE COURT:  Juror 014, if you could have a seat next

4   to Juror 013, and that will be seat number 14.

5           THE CLERK:  Juror 015.  Juror 016.  Juror 017.  And

6   Juror 018.

7           THE COURT:  Okay.  Now, for those jury panel members

8   who are still in the audience area, you're still very much a

9   part of the jury selection process.  If any of the 18 are

10  excused, then Ms. Gaumnitz will call another name to come

11  forward.  So what we're going to do is we're going to focus

12  our attention on the 18 prospective jurors in the jury area

13  here.

14          But what I'd like you to do out in the audience area

15  is listen carefully to the questions that I ask and then

16  ultimately that the lawyers ask.  And as you're sitting there,

17  imagine yourself in the jury box and that you're being asked

18  that question specifically.  And think in your own mind what

19  your answer would be.  And then also then listen very

20  carefully to the answers given by your fellow prospective

21  jurors.

22          That way if you're called forward to replace any of

23  the 18 in the jury box, rather than us having to repeat all

24  the questions all over again, we can simply ask you if you

25  heard and understood all the questions that were asked, if you

1  formed an answer in your own mind, if you were able to hear

2  the answers of the other prospective jurors and then if any of

3  your answers would have been any different than what you've

4  heard or if there's anything further that you wish to mention,

5  you would have that opportunity.

6          So if you're not able to hear or understand the

7  questions that I ask, please speak up and let me know.  And

8  then if you're not able to hear any of the other prospective

9  jurors' answers, please speak up.  And I'm going to remind you

10  folks, make sure you keep your voices up so everyone in the

11  courtroom can hear what you have to say and also so that Ms.

12  Hooven can take down what you're saying.

13          Now, we do have a hand held microphone that Ms.

14  Gaumnitz is going to hand to you in just a moment.  And what

15  I'm going to ask you to do is if you're speaking, make sure

16  you have the microphone in hand.  And if you have the

17  microphone and someone else is speaking, make sure you pass

18  the microphone to them.  Okay?  That will help the process.

19          We'll go ahead and just start off.  And Juror 001,

20  we'll just hand the microphone to you.  Now, so basically I'm

21  going to be asking a number of questions.  After I'm done, the

22  attorneys are going to be asking a number of questions also.

23          The answers will not designed to embarrass you, put

24  you on the spot, argue with you about your own beliefs, et

25  cetera, et cetera.  The purpose of these questions are to get

1    you thinking in your own mind whether or not in this

2    particular case you can be fair and impartial to both sides.

3            Now, we use the phrase "fair and impartial" pretty

4    liberally here.  And we all understand that in your own lives,

5    you're all fair and impartial people.  But we also understand

6    that everyone comes in this courtroom with your own life

7    experiences which might affect how you view a particular case.

8            Let me give you an example.  Now, as you've heard

9    from the brief statement, this is what we call a criminal law

10   case.  But if this were a civil law case, let's say it was a

11   traffic collision and you're deciding who is liable.  It was a

12   collision that occurred at an intersection.  But just in the

13   last week or so you or a family member had been involved in a

14   traffic collision.  You had to talk to the police, you had to

15   talk to your insurance company, you had to go to the hospital,

16   et cetera.  And that might still be in your mind and still

17   bothering you, upsetting you to the extent that a case

18   involving a traffic collision, especially with injuries, is

19   not the kind of case that you would be able to hear.

20           And that's just an example of how one's life's

21   experiences might affect your service as a juror.  Doesn't

22   mean you're not fair and impartial.  Just means that something

23   in your life has caused you to be concerned about being able

24   to be fair and impartial.  Fair and impartial basically means

25   that you can look at both sides and say, look, I haven't heard

1    any of the evidence, I have an open mind on this and I'm

2    willing to hear all of the evidence presented and then make a

3    rational decision.  And that's basically what we're asking.

4         So if I ask you a question and you're not sure what

5    I'm asking, just ask me to repeat or rephrase it.  If I ask

6    you a question that you prefer not to answer in front of all

7    your fellow prospective jurors, then when we take our next

8    break, you can go ahead and answer it out of the presence of

9    the other prospective jurors.  I'll try to give you an idea of

10    the areas that I'm asking so you'll understand why I'm asking

11    these questions.

12         And I'm going to start off first, just a basic

13    question.  Have any of you heard anything about this case?

14    I'm not saying there's any reason why you should have, but is

15    there anyone who's heard about this case?

16         Okay.  Now, I've mentioned a number of names so far,

17    I've made some introductions, I've read off the witness list.

18    Are any of you acquainted with or related to anybody that I've

19    mentioned by name so far?  Do any of those names sound

20    familiar to any of you?

21         Okay.  The next area that I'm going to get into is

22    I'm going to ask you a little bit about -- a little background

23    information on yourselves.  It's pretty rudimentary and I'm

24    just going to go ahead and go through the questions I'm going

25    to ask and I'll explain why I'm asking them.

1          And for the first three of you, I'm just going to ask

2    each question individually.  Juror 004, by the time I get to

3    you and the other prospective jurors, I'm just going to ask

4    you to give me the background information.

5          Now, this is what I'm going to be asking you.  First

6    of all, I'm going to be asking where you live.  I don't want

7    your home address, I just want the community you live in.  So

8    if you live in Bakersfield or you live in Modesto or two miles

9    outside of Lemoore or whatever, that's all I need to know.

10         The reason that I ask the residence question is

11   sometimes cases are location specific.  For example, my

12   traffic collision scenario, if it happened to occur in the

13   city where you live and you pass by that intersection every

14   day, it's just something we need to be made aware of.

15         The next question I'm going to ask you is employment.

16   I'm going to ask you a number of employment questions.  And

17   the reason I ask employment questions is that sometimes cases

18   involve a matter for which you might have some familiarity

19   because of your employment situation.

20         For example, on my traffic collision scenario, if the

21   key question was what happened in the emergency room and you

22   happen to work in the medical field, we just need to know

23   that.  Okay?  If you're retired, what your last job was.  If

24   you had not been employed outside the home, just let us know.

25   If you're a student, just let us know that.  And if you have a

1    major or emphasis in school, you can let us know that.  If

2    you're self-employed, just very briefly what it is that you

3    do.

4            The next question I'm going to ask then is your

5    marital status.  Married or not.  And the reason I ask the

6    marital status question is the followup question, which is the

7    employment question.  Whether or not your spouse is employed

8    outside the home.  And again, that goes to the question of

9    whether or not there might be some familiarity with something

10   that might be involved with the case.  For example, on my

11   traffic collision scenario, you might not be involved in the

12   medical area, but your spouse might be.

13           The next question relates to children.  Whether or

14   not you have children.  Two things, of course.  One if you

15   have school age children, you can just let us know that.  For

16   example, I have a son 8 and a daughter 6.

17           I'd be also interested, though, if you have adult

18   children and they're employed outside the home, you can just

19   let me know.  Okay.  I have a son, you know, he's in whatever

20   area, he's in education or whatever.  And again, that's the

21   employment question regarding whether or not your children

22   might be employed in some area that might have something to do

23   with the case.

24           The next question is whether or not you have any

25   other adults living in your household.  A roommate, your

1   parents, significant other, whatever.  And again, that's the

2   employment question.  Other adults living in your household,

3   whether or not they're employed outside the home.

4           And then the last question is educational background.

5   Just your highest level of formal education.  Okay?  So those

6   are the basic background questions I'm going to be asking and

7   I'm going to ask the first three of you.  I'm going to go over

8   each one of these questions individually so that all the

9   jurors can hear the questions and be thinking of what their

10  answer would be.

11          Okay.  So Juror 001, I'm going to start with you.

12  First of all, where do you live?

13          PROSPECTIVE JUROR SEAT NUMBER ONE:  I live in

14  Lemoore, California.

15          THE COURT:  And do you work outside the home?

16          PROSPECTIVE JUROR SEAT NUMBER ONE:  I do.  I work at

17  Akers School, it's a K-8 school near Naval Air Station

18  Lemoore.

19          THE COURT:  And what's your job title or --

20          PROSPECTIVE JUROR SEAT NUMBER ONE:  Clerk.

21          THE COURT:  All right.  And your marital status?

22          PROSPECTIVE JUROR SEAT NUMBER ONE:  I'm married.

23          THE COURT:  Does your husband work outside the home?

24          PROSPECTIVE JUROR SEAT NUMBER ONE:  No, he's retired

25  military.

1      THE COURT:  All right.  And how long has he been

2  retired from the military?

3      PROSPECTIVE JUROR SEAT NUMBER ONE:  About eight

4  years.

5      THE COURT:  Was that career military, I assume?

6      PROSPECTIVE JUROR SEAT NUMBER ONE:  Yes.

7      THE COURT:  How many years was he in the --

8      PROSPECTIVE JUROR SEAT NUMBER ONE:  30.

9      THE COURT:  Great.  Any children?

10      PROSPECTIVE JUROR SEAT NUMBER ONE:  I have three

11  adult children.

12      THE COURT:  Do any of them work outside the home?

13      PROSPECTIVE JUROR SEAT NUMBER ONE:  They all do.

14      THE COURT:  What do they do very briefly?

15      PROSPECTIVE JUROR SEAT NUMBER ONE:  My oldest is an

16  HR for a Silgan Containers.  My second daughter is a

17  psychologist, she works for Aegis Medical.  And my son works

18  for Cal Water.

19      THE COURT:  Okay.  Any other adults living in your

20  household?

21      PROSPECTIVE JUROR SEAT NUMBER ONE:  No.

22      THE COURT:  All right.  And your educational

23  background?

24      PROSPECTIVE JUROR SEAT NUMBER ONE:  I'm an

25  accountant.

1          THE COURT:  Okay.  Good.  And for that, did you have

2     a degree or training --

3          PROSPECTIVE JUROR SEAT NUMBER ONE:  I do.  I have a

4     bachelors.

5          THE COURT:  Great.  Thank you very much.  If you

6     could pass the microphone then to Juror 002.

7          And Juror 002, first, where do you live?

8          PROSPECTIVE JUROR SEAT NUMBER TWO:  Fresno.

9          THE COURT:  Do you work outside the home?

10         PROSPECTIVE JUROR SEAT NUMBER TWO:  Yes.

11         THE COURT:  What do you do?

12         PROSPECTIVE JUROR SEAT NUMBER TWO:  I'm a computer

13    operator for the Internal Revenue Service.

14         THE COURT:  Okay.  And how long have you worked for

15    the IRS?

16         PROSPECTIVE JUROR SEAT NUMBER TWO:  23 years.

17          THE COURT:  Your marital status.

18         PROSPECTIVE JUROR SEAT NUMBER TWO:  I am single but

19    partnered.

20         THE COURT:  All right.  And let me ask you.  Does

21    your partner work outside the home?

22         PROSPECTIVE JUROR SEAT NUMBER TWO:  Yes.  He works

23    for -- computer related in the medical field.

24         THE COURT:  Okay.  Great.  Any children?

25         PROSPECTIVE JUROR SEAT NUMBER TWO:  No.

1              THE COURT:  Any other adults living in your

2     household?

3              PROSPECTIVE JUROR SEAT NUMBER TWO:  No.

4              THE COURT:  And your educational background?

5              PROSPECTIVE JUROR SEAT NUMBER TWO:  Some college.

6              THE COURT:  Did you have a major or emphasis in

7     college?

8              PROSPECTIVE JUROR SEAT NUMBER TWO:  No.

9              THE COURT:  Okay.  Great.  If you could pass the

10    microphone down to Juror 003 then.

11             First of all, Juror 003, where do you live?

12             PROSPECTIVE JUROR SEAT NUMBER THREE:  Modesto.

13             THE COURT:  Do you work outside the home?

14             PROSPECTIVE JUROR SEAT NUMBER THREE:  Yes, I do.

15             THE COURT:  What do you do?

16             PROSPECTIVE JUROR SEAT NUMBER THREE:  I'm a business

17    manager for Sylvan Eye Associates.

18             THE COURT:  And what do they do?

19             PROSPECTIVE JUROR SEAT NUMBER THREE:  It's seven

20    doctors, seven eye doctors, ophthalmologists and optometrists.

21             THE COURT:  Great.  Thank you.  And your marital

22    status?

23             PROSPECTIVE JUROR SEAT NUMBER THREE:  Yes, married.

24             THE COURT:  Does your husband work outside the home?

25             PROSPECTIVE JUROR SEAT NUMBER THREE:  He does.

1          THE COURT:  What does he do?

2          PROSPECTIVE JUROR SEAT NUMBER THREE:  He's a

3   journeyman pressman for Pentacle Solutions.

4          THE COURT:  Any children?

5          PROSPECTIVE JUROR SEAT NUMBER THREE:  Two married

6   daughters.

7          THE COURT:  Do they work outside the home?

8          PROSPECTIVE JUROR SEAT NUMBER THREE:  They both do.

9   In the real estate area.

10          THE COURT:  Any other adults living in your

11   household?

12          PROSPECTIVE JUROR SEAT NUMBER THREE:  My grandson.

13          THE COURT:  Is he school age or adult?

14          PROSPECTIVE JUROR SEAT NUMBER THREE:  He's adult.

15          THE COURT:  Does he work outside the home?

16          PROSPECTIVE JUROR SEAT NUMBER THREE:  Yes, he does.

17          THE COURT:  What does he do?

18          PROSPECTIVE JUROR SEAT NUMBER THREE:  In the oil

19   industry.  He's actually an accountant in the office.

20          THE COURT:  And then your educational background?

21          PROSPECTIVE JUROR SEAT NUMBER THREE:  High school

22   diploma.

23          THE COURT:  Great.  Thank you.  If you could pass the

24   microphone down.

25          And Juror 004.  Can you give us some background

1   information on yourself?

2              PROSPECTIVE JUROR SEAT NUMBER FOUR:  Yes.  I live in

3   Clovis.  I'm a retired college professor.  I'm not married.

4   Let's see.  What else?  I have two adult children, but they

5   live out of the state.  Both employed.  What else do I need to

6   say?

7              THE COURT:  What do they do?

8              PROSPECTIVE JUROR SEAT NUMBER FOUR:  My son is an

9   auto mechanic.  My daughter is a nanny.

10              THE COURT:  Okay.  Any other adults living in your

11   household?

12              PROSPECTIVE JUROR SEAT NUMBER FOUR:  No.

13              THE COURT:  What area did you teach or were you

14   involved in?

15              PROSPECTIVE JUROR SEAT NUMBER FOUR:  Art.

16              THE COURT:  Okay.  Great.  And then your educational

17   background?

18              PROSPECTIVE JUROR SEAT NUMBER FOUR:  I have a masters

19   degree from UCLA.

20              THE COURT:  And that was in art?

21              PROSPECTIVE JUROR SEAT NUMBER FOUR:  Art.  Sculpture

22   actually.

23              THE COURT:  Great.  Thank you.  If you could pass the

24   microphone down then to Juror 005.

25              And can you give us some background information on

1    yourself.

2              PROSPECTIVE JUROR SEAT NUMBER FIVE:  Yes.  I live in

3    Fresno.  I'm a retired teacher.  I have been retired for one

4    year.  I taught primarily third grade and seventh grade

5    language arts and social studies.  I'm single.

6              I have two adult children, one's 35 and works in

7    sales and marketing for a software company.  I have a daughter

8    who's 33, she owns her own business, a pedicab business and

9    teaches piano.  I live alone.

10             THE COURT:  Educational background?

11             PROSPECTIVE JUROR SEAT NUMBER FIVE:  Teaching

12   credential.

13             THE COURT:  Okay.  Good.  Thank you very much.

14             Juror 006.

15             PROSPECTIVE JUROR SEAT NUMBER SIX:  I live in

16   Bakersfield.  I am totally blank.

17             THE COURT:  Okay.  That's not a problem.  This will

18   help out everybody else too.  First of all, do you work

19   outside the home?

20             PROSPECTIVE JUROR SEAT NUMBER SIX:  I am retired.

21   I'm retired from -- I was a deputy sheriff for LA County.  I

22   am married.  My husband is also retired and he's a deputy

23   sheriff for LA County.  We have -- he has two grown daughters.

24   One is getting her degree in Chinese medicine.  The other one

25   does not work.  I have a BA from Cal State Northridge and some

1   postgraduate work.

2           THE COURT:  Great.  How long have you been retired

3   from the Sheriff's Department?

4           PROSPECTIVE JUROR SEAT NUMBER SIX:  I've been retired

5   for 16 years.  My husband has been retired for five.

6           THE COURT:  What was your last assignment?  Just in

7   general.

8           PROSPECTIVE JUROR SEAT NUMBER SIX:  I worked

9   transportation the last time I worked.

10          THE COURT:  Okay.  And then your husband's last

11  position?

12          PROSPECTIVE JUROR SEAT NUMBER SIX:  He was also -- he

13  was a driver trainer for transportation.

14          THE COURT:  Okay.  Thank you.  I'm going to have you

15  pass the microphone all the way over then to Juror 007 there

16  in the front row.  You can just pass it down.  Thank you.

17          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  I live in

18  Vallecito.  I've been retired from the phone company for 15

19  years.  Married.  Three adult children.  Two -- one's an

20  engineer, one works for the telephone company.  My wife is

21  retired too.  Been retired about 16 years.  What else?

22          THE COURT:  What did she do before she retired?

23          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Supply store as

24  a clerk.

25          THE COURT:  Okay.  Great.  And then you have three

1    grown children?

2         PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Three grown

3    children.

4         THE COURT:  Two of them work in --

5         PROSPECTIVE JUROR SEAT NUMBER SEVEN:  One's an

6    engineer, engineering firm.  And the other works for a

7    telephone company.

8         THE COURT:  And the other?

9         PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Housewife.

10        THE COURT:  Your educational background?

11        PROSPECTIVE JUROR SEAT NUMBER SEVEN:  High school.

12        THE COURT:  Perfect.  Great.  Any other adults living

13   in your household?

14        PROSPECTIVE JUROR SEAT NUMBER SEVEN:  No.

15        THE COURT:  If you could pass the microphone down

16   then to Juror 008.

17        PROSPECTIVE JUROR SEAT NUMBER EIGHT:  I am married.

18   My husband is retired, as I am also retired.  He's retired

19   from the University of California as a farm advisor.  I am

20   retired educator.  I taught school for a number of years.  And

21   then when I received my masters degree, it was in education

22   with an emphasis in school counseling.  So I worked as an

23   elementary school counselor for a number of years until I

24   retired ten years ago.

25        I have two adult children and one adult stepdaughter.

1   And through our stepdaughter, we have two grandchildren.  One

2   is 12 and one is 9.  My two daughters are -- thankfully

3   they're all employed.  And they -- one is an executive with a

4   handbag company in New York City and the other works with the

5   Regional National Park Service in Washington D.C.  I live in

6   Mariposa, up near Yosemite.  I forgot what else you need to

7   know.

8          THE COURT:  Let's see.  Your educational background?

9          PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Oh, I have a

10  masters of education with an emphasis in school counseling.

11         THE COURT:  Your stepdaughter, does she work outside

12  the home?

13         PROSPECTIVE JUROR SEAT NUMBER EIGHT:  Yes.  She is a

14  teacher, science teacher in Albuquerque.

15         THE COURT:  Good.  Thank you.  If you'd pass the

16  microphone down to Juror 009.

17         PROSPECTIVE JUROR SEAT NUMBER NINE:  I live in

18  Clovis.  And I'm married.  My wife is a teacher.  And we have

19  two school age daughters, age 6 and 8.  And I work for the

20  County of Fresno as a job specialist.

21         THE COURT:  All right.  And your educational

22  background?

23         PROSPECTIVE JUROR SEAT NUMBER NINE:  Bachelors.

24         THE COURT:  And then what area is your wife involved

25  in in terms of education?

1          PROSPECTIVE JUROR SEAT NUMBER NINE:  She's a

2     kindergarten teacher.

3          THE COURT:  Great.  If you could pass the microphone

4     down to Juror 010.

5          PROSPECTIVE JUROR SEAT NUMBER TEN:  Live in Modesto,

6     California.  I'm a truck driver for Safeway.  Married.  My

7     wife's not working at the current time.  Got two adult

8     children.  Twin boys, one's a warehouseman and the other is in

9     the coffee industry.  No other adults living in the home.

10    High school education.

11         THE COURT:  Okay.  Now, how long has your wife been

12    retired?

13         PROSPECTIVE JUROR SEAT NUMBER TEN:  She's not

14    retired.  She was in the banking field, so --

15         THE COURT:  Okay.  Thank you.  And Juror 011.

16         PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I live in

17    Modesto.  I retired about a year and a half ago from the phone

18    company.  I worked there for 35 years.  My husband works for

19    Chevron in finance.  I have two adult children.  One is a

20    farmer and the other is a nurse.  We have no other adults, no

21    one else living in our home.

22         THE COURT:  Education.

23         PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  High school

24    diploma.

25         THE COURT:  Perfect.  Thank you very much.

1          And Juror 012.

2          PROSPECTIVE JUROR SEAT NUMBER TWELVE:  I live in

3   Clovis.  My high school -- I have some college education.  I

4   work for a payroll company in administration.  My -- I'm

5   married, my husband works in baseball.  I have a daughter.

6   She's five months.  I don't know what else you need.

7          THE COURT:  Okay.  That's great.  Let's see.  Did you

8   have a major or emphasis when you were in college?

9          PROSPECTIVE JUROR SEAT NUMBER TWELVE:  I did not.

10         THE COURT:  Okay.  Good.  Thank you.  We're going to

11  have you pass the microphone down the way down to Juror 013 in

12  the front row.

13         PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I live in

14  Ceres, California.  I'm currently unemployed, but my last job

15  was with Amazon in Tracy.  I don't have children and I'm

16  single.  I have some college.  My emphasis was going to be

17  education.  Anything else?

18         THE COURT:  Any other adults living in your

19  household?

20         PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

21         THE COURT:  Okay.  Thank you.  And Juror 014.

22         PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Okay.  I'm

23  single.  I live in Fresno.  A recent college graduate with a

24  bachelors degree.  I work for PG&E as a business analyst.

25  Single like I said.  No other adults in the house.  Anything

1  else?

2          THE COURT:  Okay.  That's perfect.  Good.  Thank you.

3          And Juror 015.

4          PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  I'm married.

5  I work as an LVN and my husband is a retired field supervisor.

6  I have three adult children living in the house.  I have a son

7  who is in the CO academy.  One of my sons is in the Air Force.

8  And two were in the Navy.

9          THE COURT:  All right.  And what company does your

10  husband work with?  Or does he work for a public agency?

11          PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  He's a

12  retired field supervisor for BPC.

13          THE COURT:  And your educational background?

14          PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  Just an LVN.

15          THE COURT:  Perfect.  And let me ask you when.  You

16  said "CO," is that correctional officer training?

17          PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  Yeah.

18          THE COURT:  And he's in training right now?  Okay.

19  Thank you.  And Juror 016.

20          PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  I live in

21  Bakersfield.  I'm single.  I work for Wal-Mart as a sales

22  associate.  I have one year of college.  My field was video

23  game design.  Is that it?

24          THE COURT:  Any other adults living in your

25  household?

1          PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  I live with

2    my parents, my brother and my niece.  My mother works with the

3    WIC Program.  My father is retired.  His last job was heavy

4    construction.  My brother works as a construction laborer and

5    my niece is a manager at an ice cream shop.

6          THE COURT:  Great.  Perfect.  Thank you.  All right.

7    Juror 017.

8          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  I'm

9    married.  My husband is retired in retail.  He did that for 42

10   years.  He's now disabled.  With Parkinsons.  I have three

11   children.  They're all full time working.  I have a daughter

12   that works for a TV station in Arizona.  And I have a son that

13   works for the USA as a supervisor, that's the Underground

14   Service Alert.  He works for -- my other son works for -- as

15   an IT supervisor in Union City.  And I have 8 grandchildren,

16   ages 2 to 12.  I am retired bookkeeper and I just have a high

17   school education.  Other than that --

18          THE COURT:  Great.  Thank you.

19          All right.  And Juror 018.

20          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  I live in

21   Bakersfield, California.  I retired four months ago.  And I

22   work for Kern County Department of Human Services under Child

23   Protective Services.  And I did the typing for them.  I have a

24   grown daughter.  She works for a pediatrician.  And I have an

25   AA degree from a community college.  And no one lives with me.

1    I'm divorced.

2          THE COURT:  All right.  Thank you.

3          Now, the next thing I'm going to ask you is -- and

4    probably something you're all very interested in, is the

5    duration of the trial.  How long is this trial going to last.

6          Now, I checked with the attorneys, they've given me

7    their best estimate.  But unlike a movie that has a finite

8    time frame or television, trials are very dynamic.  Sometimes

9    they go a little quicker depending on some witnesses may

10   not -- may be quicker on a witness.  Sometimes it takes a

11   little bit longer.  So they can only give you an estimate.

12         The best estimate is going to be as follows:  They

13   believe that the trial itself could be concluded -- and I'm

14   going to give you an outside estimate.  Okay.  By next week.

15   Either Tuesday the 14th or Wednesday the 15th at the very

16   latest.  It's likely it will be done before then but we want

17   to make sure that we don't give you a narrow time frame and

18   then it spills over to another day and you're not able to

19   remain because we didn't tell you you might have to be

20   committed to a little bit of time next week.

21         Our court hours for the jury, nine to noon with a

22   morning recess break.  And then 1:30 to 4:30.  We

23   will -- today is obviously Tuesday.  We will go Tuesday

24   through Friday.  And then possibly next Tuesday and maybe next

25   Wednesday.  We would give you an update on Thursday or so how

1   the attorneys feel that the case is progressing.

2          But with that -- and we recognize that we have very

3   limited abilities to excuse people.  We will, to a very

4   limited extent, try to accommodate any scheduling issues that

5   you might have.  But let me just -- let's see.  The microphone

6   is in the front row, so let me start in the front row.

7          Are there any scheduling issues that we need to be

8   aware of for the next couple of days.  Anything that I've

9   mentioned.

10          Yes.  Juror 017.

11          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  My husband

12   has doctors appointments with the VA that I cannot change.

13          THE COURT:  Okay.  And when are his appointments?

14          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  He has one

15   this Thursday, Friday and next Tuesday.

16          THE COURT:  And what time are the appointments?

17          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Ten a.m. in

18   Palo Alto on Thursday.  He has one at one o'clock on Friday in

19   Modesto.  And then he has one on next Tuesday in Stockton at

20   10:30.

21          THE COURT:  All right.  And you indicated he does

22   have medical issues.  So --

23          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes.

24          THE COURT:  I assume you're the sole --

25          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes.  He

1   cannot drive or anything.

2        THE COURT:  Is this pretty much an ongoing --

3        PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Oh, yes,

4   it's been the last eight years.

5        THE COURT:  The only thing I can do at least at this

6   point in time is I'll excuse you from this particular trial.

7   You can check with -- if I excuse anyone from the trial, if

8   you need to check with the jury clerk downstairs if you need a

9   note indicating you were here for whatever purpose, you can do

10  that.  Otherwise you will have to call that 800 number after

11  five o'clock on Friday and see if there's another assignment.

12        Otherwise, in your situation, maybe when he goes to

13  see the doctor on this week, maybe you can get some kind of

14  medical information that you can relay back to us.

15        PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Okay.

16        THE COURT:  All I can do at this point is I'll excuse

17  you from this particular trial.  You'll need to call that 800

18  number after five o'clock on Friday.  But you can check with

19  the jury clerk downstairs.

20        PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  All right.

21  Thank you.

22        THE COURT:  And then I'm going to ask Ms. Gaumnitz to

23  fill seat number 17.

24        THE CLERK:  Juror 019.

25        THE COURT:  Juror 019, why don't you take the

1    microphone there.  Let me get you up to speed.

2              First of all, do you know anything about this case?

3              PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No.

4              THE COURT:  Do you know anybody we've mentioned by

5    name so far?

6              PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No.

7              THE COURT:  Can you give us some background

8    information on yourself.

9              PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Live in

10   Sanger.  Retired from PG&E and employed by CANUS Corporation

11   as an inspector to PG&E right now.  Married.  Wife is not

12   working.  She used to be an office manager at Sanger

13   Elementary School.  No other adults living in the house.

14   Education, two years of junior college, industrial arts.

15   That's all.

16             THE COURT:  Great.  Very good.  Thank you.  And then

17   let me get back to the front row then.  Any scheduling matters

18   that we need to address?

19             Okay.  Let me check in the -- what I'm going to call

20   the middle there, front row there of the jury box.  Any

21   scheduling issues we need to address?

22             Okay.  Juror 019, if you'd pass the microphone down

23   to Juror 007 there.

24             PROSPECTIVE JUROR SEAT NUMBER SEVEN:  My father,

25   who's 95, is having surgery next Tuesday the 14th.  And I have

1   no -- my brother passed away, so it's just me.  My mom is 88.

2   So to get him to the surgery.

3           THE COURT:  Okay.  Now, so if it spills over

4   to -- what time is the appointment then?  Does he have pre-op

5   stuff he has to do?

6           PROSPECTIVE JUROR SEAT NUMBER SEVEN:  The pre-op

7   stuff is done.  The surgery is in Walnut Creek next Tuesday.

8           THE COURT:  Okay.  So obviously you're just not

9   available next week at all.

10          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  I need to be

11  there Tuesday to take him to the surgery.

12          THE COURT:  Sure.  Absolutely.  All right.  I'll

13  check with the attorneys on that.

14          Anybody else in the middle row?  Any other scheduling

15  issues?

16          All right.  How about the back row, any scheduling

17  issues we need to address?

18          Okay.  A couple of them.  Let's pass the microphone

19  back to Juror 003 there.

20          PROSPECTIVE JUROR SEAT NUMBER THREE:  I do have a

21  surgery scheduled for the 13th.  I do believe I can postpone

22  it probably to the next week.

23          THE COURT:  Well, that would be great.  And if you're

24  able to do that, then you would be able to serve if we happen

25  to spill over to next week.

1      PROSPECTIVE JUROR SEAT NUMBER THREE:  Yes.

2      THE COURT:  Thank you very much.  And then Juror 006.

3      PROSPECTIVE JUROR SEAT NUMBER SIX:  I don't have

4  scheduling per se.  I have a dog that was just diagnosed with

5  cancer.  And I have scheduled an appointment, first one I

6  could get in to the specialist is in Fountain Valley and

7  that's on Thursday.  We have five horses with just my husband

8  and I and there's no way he can take care of the dog and -- I

9  mean, take care of the horses and take the dog down to

10  Fountain Valley at the same time.

11      THE COURT:  Now, that's this Thursday?

12      PROSPECTIVE JUROR SEAT NUMBER SIX:  That's this

13  Thursday.  That's at 12:30.  So to get from Bakersfield down

14  to Fountain Valley and -- so that day is just shot.

15      THE COURT:  Is this a specialist or --

16      PROSPECTIVE JUROR SEAT NUMBER SIX:  It's a

17  specialist.  He's been to the vet locally.

18      THE COURT:  All right.  I'm not going to ignore that.

19  I just want to consult with the attorneys at some point in

20  time, Juror 007 and Juror 006.  Anybody else?

21      All right.  Let me just very briefly, would you like

22  to do a real quick sidebar on Juror 007 and Juror 006?  Maybe

23  you can just consult with each other without --

24      (There was a discussion between the Court and counsel

25      at sidebar, not reported.)

1          THE COURT:  All right.  I've consulted with the

2    attorneys.  So Juror 007, we'll go ahead and excuse you from

3    this particular case.  You will need to call that 800 number

4    after five o'clock on Friday for the next court assignment

5    then.  We'll go ahead and fill that seat.

6          THE CLERK:  Juror 020.  Did I pronounce your name

7    correctly?

8          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Juror 020.

9          THE CLERK:  Juror 020.  Thank you.

10          THE COURT:  If we can get the microphone then to

11   Juror 020.  And I'm going to get you up to speed to everybody

12   else.  First of all, do you know anything about this case?

13          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  No.

14          THE COURT:  Do you know anybody we've mentioned by

15   name so far?

16          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  No.

17          THE COURT:  Can you give us some background

18   information on yourself?

19          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  I live in

20   Fresno.  I have two children.  A 19 year old son who is a

21   computer programmer and a five year old daughter.  I work for

22   the County of Fresno.  I'm a CPA.  I do auditing.

23          THE COURT:  Educational background?

24          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  I have a

25   masters in business.

1       THE COURT:  Any other adults living in your

2  household?

3       PROSPECTIVE JUROR SEAT NUMBER SEVEN:  My mom, who is

4  retired secretary.  And my girlfriend who's a -- she's not

5  retired, she's an unemployed bartender.

6       THE COURT:  Okay.  Any scheduling issues?

7       PROSPECTIVE JUROR SEAT NUMBER SEVEN:  No.

8       THE COURT:  All right.  And then the other, Juror

9  006, we'll go ahead and excuse you from this particular case.

10  You need to call that 800 number after five o'clock on Friday

11  for the next assignment.

12       THE CLERK:  Juror 021.

13       THE COURT:  Okay.  And Juror 021, we'll get the

14  microphone to you, get you up to speed also.  Do you know

15  anything about this case?

16       PROSPECTIVE JUROR SEAT NUMBER SIX:  No, I do not.

17       THE COURT:  Do you know anybody we've mentioned by

18  name so far?

19       PROSPECTIVE JUROR SEAT NUMBER SIX:  No.

20       THE COURT:  Can you give us some background

21  education.

22       PROSPECTIVE JUROR SEAT NUMBER SIX:  I work as a clerk

23  in Exeter.  My highest education is GED.  What else?

24       THE COURT:  Marital status?

25       PROSPECTIVE JUROR SEAT NUMBER SIX:  Single.

1          THE COURT:  Any adults living in your household?

2          PROSPECTIVE JUROR SEAT NUMBER SIX:  I live with my

3    mom and dad.

4          THE COURT:  Do they work outside the home?

5          PROSPECTIVE JUROR SEAT NUMBER SIX:  Yes.

6          THE COURT:  What do they do?

7          PROSPECTIVE JUROR SEAT NUMBER SIX:  My mother and

8    father work at a supplement store selling supplements and my

9    father is also a pastor.

10         THE COURT:  Any children?

11         PROSPECTIVE JUROR SEAT NUMBER SIX:  No.

12         THE COURT:  Scheduling issues that we need to

13   address?

14         PROSPECTIVE JUROR SEAT NUMBER SIX:  No.

15         THE COURT:  All right.  What I'm going to do next is

16   just basically describe some of the legal principles that are

17   involved that really control how a criminal law trial is

18   conducted.  I don't expect you to know everything I'm going to

19   mention, but I am going to mention certain words and phrases

20   that you're going to be familiar with.  And what I'm going to

21   do is put it into the context of this particular case.

22         There are three basic principles that guide how we

23   handle a criminal law case.  This is true both in state court

24   and federal court.  And they're as follows:

25         First of all, the basic principle, as a person who's

44

1  charged with an offense or offenses, in this case, Mr.

2  McCormack, is presumed by law to be innocent.

3          And obviously the practical question to you is as

4  you're sitting there now, are you affording him that

5  presumption of innocence?  If you're sitting there thinking,

6  "well, he's here, he must be guilty of something.  I guess my

7  only job is to figure out what he is guilty of."  Then you are

8  not affording him that presumption of innocence.

9          Anybody have any questions, concerns or anything

10  about that?

11          Is there anyone who is not affording Mr. McCormack

12  that presumption of innocence?

13          Yes.  Okay.  Juror 018.  Pass the microphone down.

14  All the way down to the front row.  I'm sorry.  All the way

15  down.  Front row.  Front row.  Yes.  Go ahead.  Did you --

16          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  What's the

17  question?

18          THE COURT:  The question is if you're not affording

19  him the presumption.  In other words, if you figure he's

20  guilty of something already.

21          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  I do -- I

22  work for Child Protective Services so I kind of feel if he's

23  here, he's done something.

24          THE COURT:  Okay.  And how long were you with CPS?

25          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  20 years.

45

1          THE COURT:  Did you have any court appearances or

2     matters that you appeared as a witness or --

3          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No.

4          THE COURT:  What was your last role or title with

5     CPS?

6          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Legal

7     processing.

8          THE COURT:  Okay.  So did you work with the County

9     Counsel's Office or the District Attorney's Office?

10          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  We typed the

11     petitions and the court reports --

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  -- up for

14     Child Protective Services, social workers.

15          THE COURT:  All right.  And obviously you had 20

16     years of experience.  Now, let me ask you this:  And I

17     understand what you're saying.  But if I were to tell you, and

18     this is true with all of you, there is this presumption of

19     innocence and the example that some judges and some lawyers

20     like to use is if you -- if I said, okay, you're all jurors in

21     this case.  And Juror 018, you're a juror in this case.  And

22     you're to vote whether or not Mr. McCormack is guilty or not

23     guilty.  The answer that should be given is "not guilty"

24     because no evidence has been presented against him.

25          If, however, any of you, anything you, Juror 018, are

1    thinking, "okay, if I were to vote now, I would vote guilty or

2    I'm leaning towards voting guilty" then you're not affording

3    Mr. McCormack that presumption of innocence which is he

4    entitled to.

5         So Juror 018, do you think -- not do you think, is

6    that your position at this time, if I were to say, "All right,

7    Juror 018, you're a juror, you're going to vote guilty or not

8    guilty what's your verdict?"  If you're sitting there thinking

9    "I'm leaning towards guilty," then you're not affording him

10   that presumption of innocence.  So that's the bottom line.

11        And again, all these questions that I'm asking, the

12   lawyers are going to be asking really have you exploring in

13   your own mind whether or not when I have Ms. Gaumnitz

14   administer the oath to the jury, that you're all sitting there

15   comfortably being able to look at both sides and say, "I have

16   an open mind, I'm not leaning one way or the other."  But if

17   you are leaning one way or the other, then obviously that's a

18   problem for both sides in this particular case.

19        So Juror 018, in that vein, then, do you think in

20   this particular case, based upon your background, that you

21   would not be fair and impartial to both sides?

22        PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  I think I

23   wouldn't.

24        THE COURT:  Okay.  And I recognize your experience in

25   a system where you've had a lot of exposure to types of cases.

1   So I'll go ahead and excuse you from this particular case.

2   You will have to call that 800 number after five o'clock

3   Friday for your next assignment though.  But I'll excuse you

4   from this case.  Thank you very much.

5               THE CLERK:  Juror 022.

6               THE COURT:  All right.  Juror 022, let's bring you up

7   to speed.  First of all, do you know anything about this case?

8               PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No.

9               THE COURT:  Do you know anybody we've mentioned by

10  name so far?

11              PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No.

12              THE COURT:  Can you give us some background

13  information on yourself?

14              PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  I'm

15  unemployed right now.  My last job, I was a maintenance clerk

16  at a distribution warehouse.  I'm married.  My husband is a

17  handyman.  He's self-employed.  We have one adult child, she

18  goes to school -- college part time and she's a barista.  And

19  there's no other adults in the home.  And my highest education

20  is high school diploma.

21              THE COURT:  Okay.  Did your daughter have an emphasis

22  or major in college?

23              PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Well, she's

24  doing general studies right now.  But she wants to major in

25  business management.

1        THE COURT:  Great.  Thank you.  Any scheduling issues

2   we need to address?

3        PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No.

4        THE COURT:  Let me get back to the basic presumption

5   of innocence.  Anyone else, any questions or concerns?

6        Juror 002, back in the back row there.

7        PROSPECTIVE JUROR SEAT NUMBER TWO:  I have an issue

8   because I was molested as a child.

9        THE COURT:  Okay.  And that experience, do you think

10  that would cause -- of course I read you a statement that

11  just, again, it was only to let the jury know what kind of a

12  case it was.  It's not evidence in the case.

13       But as you heard that and you listen now, do you

14  think that that situation would cause you to not be able to

15  set aside that experience and address this case strictly on

16  the merits, that is what you see and hear in court, or do you

17  think that experience would cause you to tend to lean for or

18  against one side or the other already before we even started

19  the trial?

20       PROSPECTIVE JUROR SEAT NUMBER TWO:  I think it would

21  make me not be fair.

22       THE COURT:  All right.  That's understandable.  All

23  right.  What I will do then, I'll excuse you from this

24  particular case.  You'll have to call that 800 number after

25  five o'clock Friday for the next assignment.  But I will again

1   go ahead and excuse you from this case.

2          And again, just a reminder.  If anybody needs to

3   check with the jury clerk before you leave, you can do that.

4   But otherwise, you're of course free to leave.

5          THE CLERK:  Juror 023.

6          THE COURT:  All right.  We'll get the microphone to

7   you.  And we'll get you up to speed.

8          First of all, do you know anything about the case?

9          PROSPECTIVE JUROR SEAT NUMBER TWO:  No, I do not.

10         THE COURT:  Do you know anybody we've mentioned by

11  name so far?

12         PROSPECTIVE JUROR SEAT NUMBER TWO:  No.

13         THE COURT:  Can you give us some background

14  information on yourself.

15         PROSPECTIVE JUROR SEAT NUMBER TWO:  I'm from Fresno.

16  I am working as a registered nurse and also as a tissue

17  recovery technician.  I am married and my husband works for

18  the Sacramento Fire Department as a paramedic.  I have one

19  daughter who is two years old.  And my education is -- I have

20  a bachelors in biology physiology and an associates in

21  nursing.

22         THE COURT:  Great.  Okay.  Any scheduling issues we

23  need to address?

24         PROSPECTIVE JUROR SEAT NUMBER TWO:  No.

25         THE COURT:  Let me get you back up to speed then.  As

```
 1   far as the presumption of innocence, any issue that you have
 2   relating to that?
 3            PROSPECTIVE JUROR SEAT NUMBER TWO:  No.
 4            THE COURT:  Okay.  Again, I saw a couple of hands.
 5   We'll go down to the very front row.
 6            Let me start off first with Juror 013.
 7            PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I too was
 8   sexually molested.
 9            THE COURT:  Okay.  Now, let me ask you this:  Is that
10   something that would cause you to lean for or against one side
11   or the other or do you -- would you be able to separate that
12   out from what you might see and hear in this trial itself?
13            PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.
14            THE COURT:  All right.  Well, I'll go ahead and
15   excuse you from this particular case.  Call that 800 number
16   after five o'clock on Friday about the next assignment.  Okay?
17   Thank you very much.
18            THE CLERK:  Juror 024.
19            THE COURT:  All right.  Juror 024, do you know
20   anything about this case?
21            PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.
22            THE COURT:  Do you know anybody I've mentioned by
23   name so far?
24            PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.
25            THE COURT:  Can you give us some background
```

1  information on yourself.

2          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I live in

3  Fresno.  I'm working Foster Farms.  I'm a high school in

4  India.  I'm living with my parents.  I have a seven year old

5  daughter.  So I'm not understanding too much English and

6  speak.

7          THE COURT:  All right.  Do your parents work outside

8  the home?

9          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yeah.

10         THE COURT:  What do they do?

11         PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  My mom is

12 working Foster Farms and my dad is truck driver.

13         THE COURT:  Now, we haven't gotten too far into this,

14 but were you able to understand all the questions that were

15 asked so far?

16         PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.  Some

17 questions but not all of them.

18         THE COURT:  Are there any -- is there anything that

19 I've asked so far that you weren't sure what I was asking?

20         PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I don't

21 know.

22         THE COURT:  Were any of the answers that you didn't

23 understand?  Language wise?  I mean, understand that this is

24 not a real comfortable situation and I'm going to be throwing

25 out legal terms and I'll try to explain those.  But what I'm

1   more concerned about is if you have an actual language barrier

2   that's not allowing you to hear and understand what's being

3   said.  Because that's obviously important during the trial.

4           Okay.  So you had high school education in India.

5           PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes, sir.

6           THE COURT:  When did you come to the United States?

7           PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Almost 15

8   years.

9           THE COURT:  All right.  Do you have -- now, let me

10  ask you this:  Do you have a language difficulty that is an

11  ongoing issue with you?

12          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Uh-huh.

13  Yeah.  Uh-huh.  At the house we speak Punjabi.

14          THE COURT:  Okay.  I'm sorry.  You work with Foster

15  Farms.

16          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.

17          THE COURT:  How long have you worked with them?

18          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  15 years.

19          THE COURT:  Do you communicate with the supervisor

20  and the other employees?

21          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

22          THE COURT:  You don't talk to them at all?

23          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Not too

24  much.  Little bit.

25          THE COURT:  All right.  Now, as we go along here, if

1    there's something you're not able to understand language-wise,

2    I want you to immediately raise your hand so we'll know what

3    it is that you're not able to understand.  Right now it seems

4    like you're okay.  You have not pointed out anything you are

5    not able to understand language-wise.

6              But if there is something, please, even if I'm

7    speaking or another juror is speaking, as soon as we're done,

8    raise your hand and say "I did not understand those words."

9    Okay?  And then that will give me some idea of whether or not

10   there will be a problem language-wise.  Okay?  Because you're

11   obviously still entitled to serve as a juror in this case as

12   long as you're able to understand obviously what's happening

13   in court.  Okay?

14             Anything else as you were sitting there that you

15   disagreed with or had a question about?

16             PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I'm sorry,

17   I'm not agree.

18             THE COURT:  I'm sorry?

19             PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I'm not

20   agree.

21             THE COURT:  You're not?

22             PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I'm not

23   angry.  Agree.

24             THE COURT:  Okay.  So we're going to continue on, but

25   I want you to stop me, okay, if there's any word that's spoken

1    that you do not understand what that word means.  Okay?

2              PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Okay.

3              THE COURT:  All right.  So basically the first

4    principal that I've mentioned, of course, is the presumption

5    of innocence.

6              The next basic principal is what we call the burden

7    of proof.  In every dispute someone has the burden of proof,

8    whether it's a dispute that you're trying to resolve, someone

9    comes to you, your family members, your children, family

10   members' friends, maybe at work.  Before you take some action,

11   before you decide what to do, whether disciplining a child or

12   telling a neighbor or friend, you know, "you're right, the

13   other person is wrong," et cetera, someone has to prove

14   something to you.  You know, tell you this is what happened,

15   et cetera.

16             And that's common.  We do that all the time.

17   Whenever we make a decision, no matter what it is, it's a

18   business decision, personal decision, whatever, you have to be

19   convinced before you move forward and take some action whether

20   it's to buy a product, resolve a dispute or whatever.  And

21   that is the burden of proof.

22             The same thing is true in a court proceeding, a party

23   has the burden of proof to prove something to the jury.  In a

24   criminal law case, the burden of proof is on the plaintiff.

25   In this case, the government's side has the burden of proving

1   that in this case Mr. McCormack is guilty.

2          And the unique aspect of a criminal law case is that

3   the burden of proof in a criminal law case is solely on the

4   plaintiff, the government.  What that means is the defendant

5   and the defense doesn't have to present anything.  And that's

6   because the potential consequence to someone charged with a

7   crime or crimes is so serious that both in state and federal

8   courts, it has been established throughout our history that

9   the burden of proof is solely on the government to prove their

10  case.

11         Now, so at the end of the government's case, after

12  they've presented all the evidence to you, in this case after

13  consulting with his attorney, Mr. McCormack can just say "I

14  don't think the government has proven its case."  He doesn't

15  have to testify and he doesn't have to put on any evidence.

16         Now, that doesn't mean his attorney is not going to

17  be participating because the attorney will be cross-examining

18  witnesses, that is questioning any witnesses that are called,

19  make an opening statement, closing argument, may or may not

20  call witnesses.

21         But that's what we call in the criminal system the

22  burden of proof and the corollary rule that a person charged

23  with a crime has no burden at all.

24         So if you're selected to serve as a juror in this

25  case, you heard all the evidence and you weren't convinced the

1    government has not met its burden of proof but another juror

2    tells you, "well, I'm not sure they've met their burden of

3    proof but Mr. McCormack didn't testify."  Your response to

4    that is, "He doesn't have to.  We don't consider that."

5    Either the government has proven its case or it hasn't.

6            Is everyone okay with that?  That the burden of proof

7    is on the plaintiff's side, which it always is, that is the

8    government, the burden of proof is solely on the government,

9    the defense does not have to put on any evidence and Mr.

10   McCormack does not have to testify.  Is everyone okay with

11   that?

12           Okay.  The third principal is what we call the

13   standard of proof.  That is, okay, if one side has the burden

14   of proof, what is that measure of proof, the standard of

15   proof?  And it is, in the criminal law arena, what we call

16   beyond a reasonable doubt.

17           Okay.  Now, unfortunately, I can't quantify that for

18   you.  I can't have an imaginary scale and say it tipped so far

19   or if it were a ruler, how far it has to go.  It is that state

20   of the case when you're fully satisfied that the government

21   has proven each and every element as to the various charges

22   beyond a reasonable doubt.  And it's only in that situation

23   that you can find someone guilty.

24           If the government does not prove its case beyond a

25   reasonable doubt, then a defendant is entitled to a not guilty

1  verdict even though the government has presented some evidence

2  to you of possible guilt.  If there's a reasonable doubt in

3  your mind, then you must vote for an acquittal, not guilty.

4          Let me give you an example of -- the government is

5  not required to prove its case beyond all possible doubt

6  because everything in life is subject to some doubt, either

7  real or imaginary.

8          If, after the government has presented its case, and

9  while you are deliberating, you're discussing the case amongst

10  your fellow jurors and there's something that's raised that

11  caused you to think, well, you know, the -- I have a question

12  about this issue here.  I have some doubt as to whether or not

13  the government has proven this charge or this element, et

14  cetera.  Then you have to discuss that.  Let me give you an

15  example of how that -- it's something of a simplistic example,

16  but hopefully it will convey to you that something of the

17  notion of possible doubt.

18          Let's say your job in this case, you're the jury to

19  decide whether or not the United States landed a man on the

20  moon.  And so the plaintiff 's side, the side that's going to

21  try to prove to you that the government did -- we did indeed

22  land someone on the moon, they bring in their scientist, they

23  bring in the astronaut, they bring in some rocks that they say

24  are moon rocks, et cetera.  And from that, you can decide,

25  determine whether or not we did land someone on the moon.

1          If, however, the other side who is contesting that

2     shows you a video clip.  Of course this was years ago, so

3     technology is much better.  But they show you a video clip of

4     looking like someone is landing on the moon.  But then they

5     disclose to you, no, this was done in our studio.  And you can

6     see that -- of course, many of us have seen movies now,

7     especially in more recent times, where you're really going to

8     look like people are in outer space, right?

9          So they say, so, the fact that the proponent has

10    shown you a recording of the astronaut setting foot on the

11    moon doesn't mean that it occurred, it could have been done in

12    a studio.  Moon rock, how do we know that's really a rock from

13    the moon?  It could be from someplace at all, we really don't

14    know that.  Just because they say it's from the moon doesn't

15    mean it's from the moon.

16         Okay.  So now you're back in the jury room, you're

17    deliberating, you say, wow, hmm, I wonder if that was really a

18    staged landing.  That they did that in some studio.

19    Technology is so good, even back then it was pretty good.  And

20    that rock, how do we really know?  I mean, their expert says

21    it's a moon rock and the other side's expert says it's not a

22    moon rock.  How do we know?

23         Okay.  That would create possibly some doubt in your

24    mind as to whether or not we landed someone on the moon.  Then

25    you discuss is that doubt reasonable or not?  And if you

1   decide it is reasonable doubt that we landed someone on the

2   moon, then you would vote that the proponent didn't prove

3   their case, they didn't prove that we landed on the moon.

4         If, however, you look at those aspects and say, yeah,

5   I understand I have some doubt in my mind -- after discussing,

6   I have some doubt.  But it's not reasonable.  Okay.  The

7   evidence presented by the proponent was much better and I do

8   have some questions about the other side's presentation of

9   evidence.  So I considered it, I have some doubt in my mind,

10  but I don't find it to be reasonable and therefore I am going

11  to vote for the proponent that we did land someone on the

12  moon.

13        That's just a simplistic sort of example of how

14  someone -- you might have some doubt in your mind about

15  something and it could persuade you that the proponent has not

16  proven its case or you may consider that other information

17  besides, no, it's really under all the circumstances not

18  reasonable and therefore I'm going to find that the proponent

19  has proven its case.

20        So that's sort of the dynamics that a jury employs in

21  terms of standard of proof beyond a reasonable doubt and

22  deciding is there some doubt in my mind as to whether or not

23  the government has proven a case, a charge, an element.  And

24  then you decide is that doubt reasonable or not?  If it's

25  reasonable, then the government has not proven its case.  If

1   it's not reasonable, if there's not a reasonable doubt, then

2   otherwise the government has proven its case.

3           Anyone have any questions?  Three basic principles,

4   presumption of innocence, burden of proof, defendant has no

5   obligation to testify or present evidence and finally the

6   standard of proof is beyond a reasonable doubt.  Is everyone

7   okay with that?

8           Okay.  Now, the next area that I'm going -- I'm

9   sorry, and again, Juror 024, if there's anything -- as I'm

10  going along, if you go, now, some of these things are a little

11  confusing because they're -- I'm throwing in some legal

12  principles which I don't expect the jury really to understand.

13  That's not the purpose of the trial to give you a mini

14  education, just to try to give you some indication.

15          But what I'm concerned about, Juror 024, is there any

16  words that I spoke that you said I don't even know what you're

17  saying, not much that I don't understand it, I don't know what

18  you're saying.

19          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I'm

20  understanding a little bit, but not too much.

21          THE COURT:  All right.  Okay.  As we go along, then,

22  Juror 024, I'm going to keep coming back to you on this

23  because so far it's pretty basic and I think you've spoken

24  with our jury clerk already and you filled out the form and

25  apparently spoke very well.  So unless you tell me there's

1  something that you just -- you can't just say "I don't

2  understand" to get out of jury service.  You can't do that.

3      PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yeah.  I'm

4  not understanding.

5      THE COURT:  All right.  Okay.  Now I'm going to back

6  up a little bit then and what I'm going to ask you next is

7  basically what you know about the Court system.  Okay?  There

8  are a number of possibilities.

9      I'm going to ask specifically three of them.  One, if

10  you ever served as a juror before.  Two, whether or not you've

11  ever been a plaintiff -- I'm sorry, a party or witness to any

12  legal proceedings.  And finally, if there's any other aspect

13  of the Court system or maybe the legal arena that we have not

14  had a chance to mention regarding some exposure or experience

15  you might have had with the legal system.

16      So I'm going to start -- since the microphone is in

17  the front row, I'm going to ask in the front row, have any of

18  you ever served as a juror before in the front row?  Three of

19  you have.  So let me pass the microphone down to Juror 016

20  first.

21      Now, before I ask you some questions about jury

22  service.  Generally you will have served as a juror in one of

23  two types of cases.  One, a criminal law case where you're

24  asked to find someone guilty or not guilty of a crime or

25  crimes.  And the other is a civil case, usually when someone

1    or an entity or whatever is suing another person or entity,

2    usually for money damages.

3            So with that little bit of background, first, Juror

4    016, how many times have you served as a juror.

5            PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  Just one.

6            THE COURT:  Was it a criminal law case or civil law

7    case?

8            PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  It was

9    criminal.

10           THE COURT:  Do you know what kind of a case it was?

11           PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  Actually, I

12   was dismissed after the plaintiff -- or the prosecutor

13   dismissed me after a while.

14           THE COURT:  Okay.  So you were -- were you actually

15   in the jury box then?

16           PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  Yeah.

17           THE COURT:  But you didn't actually sit through the

18   trial?

19           PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  No.

20           THE COURT:  Anything about that experience that would

21   affect your service as a juror here?

22           PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  No.

23           THE COURT:  You can totally disregard that experience

24   for the purpose of this case?

25           PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  Yes.

1          THE COURT:  All right.  And how long ago was that?

2          PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  It was in, I

3   believe, October.

4          THE COURT:  Okay.  Thank you.  All right.  And then

5   Juror 019.

6          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  I've been

7   on two.  One was criminal.  One was drunk driving.  Served on

8   a jury on both of them.  Throughout the case.  So -- but the

9   criminal one was probably 30 years ago.  The drunk driving was

10  probably closer to 20 years ago.  And then I've been on juries

11  like now two other times.

12         THE COURT:  All right.  During the selection process,

13  but not actually selected to serve as a juror.

14         PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Uh-huh.

15         THE COURT:  Is there anything about any of those

16  experiences that would affect your service as a juror here

17  today?

18         PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  I don't

19  think so.

20         THE COURT:  Okay.  Now, some of that, especially the

21  trials you were involved in were quite a while ago.  But for

22  the purpose of this case, you have to totally disregard

23  whatever you might remember about those cases for the purpose

24  of this case.  You understand?

25         PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes, that's

64

1   fine.

2          THE COURT:  Did you indicate, were verdicts reached

3   in either or both of those cases?

4          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes.  They

5   were.

6          THE COURT:  All right.  And then I believe, then,

7   Juror 022, you had served as a juror before.

8          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Yeah, on two

9   criminal cases.  Burglary.  And one we didn't reach a verdict

10  and the other one was not guilty.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Or actually,

13  it was guilty to a lesser charge.

14         THE COURT:  Okay.  All right.  And then how long ago

15  were those experiences?  The most recent one.

16         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Maybe like

17  two years ago.

18         THE COURT:  Okay.  Anything about either one of those

19  experiences that would affect your service as a juror here

20  today?

21         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No, not

22  those.

23         THE COURT:  Okay.

24         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  But, Your

25  Honor, I had raised my hand when you --

1          THE COURT:  That's right.  You did.

2          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  -- talked

3     about the presumption of innocence I think it was.

4          THE COURT:  Yes.

5          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  And I wanted

6     to tell you that I have two family members in my home now that

7     have been molested.  And I honestly do not feel that I can be

8     impartial.

9          THE COURT:  Okay.  And then I don't want any

10    detail -- what are the ages of the people in your household?

11    Just age.  I don't want names.

12         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Now?

13         THE COURT:  Or at that time.  If you can recall.

14         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  When the

15    incidents happened?

16         THE COURT:  Uh-huh.  Yeah.

17         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Both of them

18    were about five years old.

19         THE COURT:  All right.  And would that spill over --

20    that's totally understandable, that would spill over and

21    affect you in terms of the kind of case this is?

22         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  (Nods head.)

23         THE COURT:  And they're living in your household now?

24         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Yes.

25         THE COURT:  I'll go ahead and excuse you from this

1    particular case.  You'll need to check -- call that 800 number
2    after five o'clock Friday for your next assignment.  And
3    if -- again, if you need to stop by the jury clerk's office,
4    you can do that.  Otherwise you are free to leave.
5         THE CLERK:  Juror 025.
6         THE COURT:  All right.  Juror 025, I'm going to get
7    you up to speed also.  First, do you know anything about this
8    case?
9         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No, I don't.
10        THE COURT:  Do you know anybody we've mentioned by
11   name so far?
12        PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No, I don't.
13        THE COURT:  Can you give us some background
14   information on yourself?
15        PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  I live in
16   Firebaugh.  Currently working as a process manufacturing
17   manager.  Married.  My wife works seasonally in the same
18   place.  I have two kids, one 16 year old and a 5 year old.
19        THE COURT:  And then your education?
20        PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  High school
21   and some college.
22        THE COURT:  Did you have a major in college or
23   emphasis?
24        PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Psychology.
25        THE COURT:  And what company is it that you work

1    with?

2          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  The Neil

3    Jones Food Company, Tomatek.

4          THE COURT:  Okay.  Any scheduling issues we need to

5    address?

6          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No, I don't.

7          THE COURT:  Okay.  Anything we've mentioned by

8    name -- anything we've said so far, any of the questions that

9    were asked or answers that were given that you would have said

10   anything different about or said anything more about?

11         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No.

12         THE COURT:  All right.  Again, prior jury service

13   front row?  Did we cover everyone?

14         Juror 025, have you ever served as a juror?

15         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Yes.  Once.

16   About three years ago.  I did not reach the verdict.  It was

17   dismissed.

18         THE COURT:  All right.  Anything -- do you remember

19   what kind of a case it was?

20         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  It was a

21   criminal case.

22         THE COURT:  And anything about that case that would

23   affect your service as a juror here today?

24         PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No.

25         THE COURT:  Okay.  So you were excused before

1   the -- before they started the trial.

2           PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Yes.

3           THE COURT:  Okay.  Thank you.  All right.  I'm going

4   to have the mike to the middle row then.  Anyone in the middle

5   row ever serve as a juror before?

6           Okay.  One of you have.  A couple.  Let's go ahead

7   and start off, Juror 011, how many times?

8           PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  One time.

9   It's about 25 years ago, federal court in Sacramento.

10          THE COURT:  Do you know what kind of a case it was?

11          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  It was a bank

12  robbery by gunpoint and the person on trial for that

13  particular time was the one who drove the get away car.

14          THE COURT:  Anything about that experience that would

15  affect your experience as a juror here today?

16          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  No, sir.

17          THE COURT:  Can you disregard whatever you might

18  remember about that case for the purposes of this case?

19          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I can.

20          THE COURT:  Was a verdict reached?

21          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  No.

22          THE COURT:  So it was what we call hung jury?

23          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  Yes.

24          THE COURT:  All right.  Thank you.  Who else did we

25  have?  Juror 009.

1           PROSPECTIVE JUROR SEAT NUMBER NINE:  I made it a

2    little further in the jury box than this with prosecutor and

3    defense attorney questioning me and then I was excused.

4           THE COURT:  All right.  How long ago was that?

5           PROSPECTIVE JUROR SEAT NUMBER NINE:  Within the last

6    year and a half.

7           THE COURT:  Anything about that experience that would

8    affect your service as a juror here?

9           PROSPECTIVE JUROR SEAT NUMBER NINE:  No.  It was a

10   DUI case.

11          THE COURT:  Thank you very much.  And then we

12   had -- yes.  Juror 020.

13          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  I served as a

14   juror on a criminal case, county.  It was drunk driving.  And

15   a verdict was reached.

16          THE COURT:  Okay.  Anything about that experience

17   that would affect your service as a juror here today?

18          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  No.

19          THE COURT:  Anybody else in that middle row that we

20   missed?

21          How about the top row then, anybody ever serve as a

22   juror before on the top?

23          One of you have.  All right.  And Juror 003.

24          PROSPECTIVE JUROR SEAT NUMBER THREE:  Actually it was

25   probably 40 -- I served twice.  40 years ago, maybe 45.  And

1   honest to God, I can't remember what they were even about.

2   I'm sorry. I know that there were verdicts reached, but --

3          THE COURT: Great. Okay. Well, anything about

4   either one of those experiences that would affect your service

5   as a juror here today?

6          PROSPECTIVE JUROR SEAT NUMBER THREE: No.

7          THE COURT: Okay. Great. Perfect. Thank you very

8   much. Anybody else in the back grow?

9          The next question we'll start with the back row.

10  Have any of you ever been a party to, a witness to a legal

11  proceeding? Could be you were a plaintiff, a defendant, could

12  have been a small claims case, could have been a traffic

13  ticket that you went to contest or whatever. And if you're

14  not sure, go ahead and raise your hand and you can ask me,

15  well, does this count. Anybody in the back row?

16         All right. A couple of you folks.

17         All right. Juror 003, without getting into great

18  detail, can you tell us a little bit about that experience?

19  Was it a party or --

20         PROSPECTIVE JUROR SEAT NUMBER THREE: I was actually

21  the victim, a young man burglar ized my home and I saw him.

22  And went to court --

23         THE COURT: Okay.

24         PROSPECTIVE JUROR SEAT NUMBER THREE: -- as a

25  witness.

1          THE COURT:  Did it actually go to trial in front of a

2    jury?

3          PROSPECTIVE JUROR SEAT NUMBER THREE:  It was a jury

4    trial.  However, they didn't prosecute.  He was a juvenile

5    and --

6          THE COURT:  Oh, right.

7          PROSPECTIVE JUROR SEAT NUMBER THREE:  Got nothing.

8          THE COURT:  Did you go to juvenile court then to

9    testify?

10          PROSPECTIVE JUROR SEAT NUMBER THREE:  Yes.

11          THE COURT:  Was there anything about that experience

12    that would affect your experience as a juror here today?

13          PROSPECTIVE JUROR SEAT NUMBER THREE:  No.

14          THE COURT:  How long ago was that?

15          PROSPECTIVE JUROR SEAT NUMBER THREE:  That was

16    probably 15, 20 years ago.

17          THE COURT:  Okay.  Great.  And was there anything

18    about that experience that would cause you to be dissatisfied

19    with the process, the outcome or anything like that that might

20    affect your service as a juror?

21          PROSPECTIVE JUROR SEAT NUMBER THREE:  No.  Not

22    really.  It was -- when you're a juvenile, you're pretty much

23    protected.

24          THE COURT:  Yeah.  But would that spill over and

25    affect your service as a juror?

1          PROSPECTIVE JUROR SEAT NUMBER THREE:  No.

2          THE COURT:  Thank you.  Then we had another person

3     there.  Juror 005.

4          PROSPECTIVE JUROR SEAT NUMBER FIVE:  In 1975, went to

5     small claims court against a real estate company.  The verdict

6     went in our favor and I don't think it would affect me making

7     a decision today.

8          THE COURT:  Great.  Thank you very much.  Anybody

9     else in the back row?

10          All right.  We'll go to the middle row.  Any of you

11     ever been a party to or a witness to any legal proceeding?

12     Anybody in the middle row?

13          Couple of folks.  Okay.  We'll start then with Juror

14     009.

15          PROSPECTIVE JUROR SEAT NUMBER NINE:  In 1996, I was

16     called as a witness for a shopping lifting case.  But I never

17     had to go to court.

18          THE COURT:  Okay.  Anything about that experience

19     that would affect your service as a juror?

20          PROSPECTIVE JUROR SEAT NUMBER NINE:  No.

21          THE COURT:  Thank you.  We had another hand, Juror

22     012.

23          PROSPECTIVE JUROR SEAT NUMBER TWELVE:  I had to

24     submit a victim witness statement.  I worked for a bank and I

25     was robbed and held at gunpoint.  And so I had to provide

73

1    information regarding that situation.  But nothing that

2    happened during that situation would affect my services here.

3              THE COURT:  Good.  How long ago was that?

4              PROSPECTIVE JUROR SEAT NUMBER TWELVE:  I think 12 or

5    13 years ago.

6              THE COURT:  So you never actually had to go into

7    court then?

8              PROSPECTIVE JUROR SEAT NUMBER TWELVE:  I didn't.

9              THE COURT:  Thank you.  Anybody else in the middle

10   row?

11             How about the front row, ever been a party to or a

12   witness to any legal proceedings?  Anybody in the front row?

13             No.  Okay.  All right.

14             Now, the next area that I'm going to get into very

15   quickly before I take a break is this.  And that is what's

16   your role as a juror in this case.  You have obviously a key

17   role, no matter what I do, no matter what the lawyers do.  You

18   decide what the facts are in the case.  And you decide that

19   from the witnesses who appear on the witness stand and the

20   exhibits.  That is documents, papers, photos, whatever, that

21   are presented to you.

22             Now, the key thing with respect to witnesses is every

23   witness who appears to testify, you have to decide credibility

24   or believability.  You have to decide whether or not to

25   believe all of a witness' testimony, part of a witness'

1  testimony or none of the witness' testimony.  You have a right

2  to do that and that's, frankly, your obligation.

3          Is there anyone who has any moral, religious, ethical

4  or other issues that would not allow you to decide credibility

5  or believability?

6          All right.  Juror 021.  If we can have the microphone

7  up there.

8          PROSPECTIVE JUROR SEAT NUMBER SIX:  Yes.  I grew up

9  in a very religious family.  Like I said, my father was a

10 pastor.  And so I believe that that wouldn't allow me to look

11 at the evidence equally.  Because of my religious beliefs.

12         THE COURT:  Okay.  Now, let me ask you this:  Would

13 it relate to not being able to decide -- someone comes on the

14 witness stand, is it your religious belief that would cause

15 you to say I can't -- sometimes they use "I can't judge this

16 person" in terms of believability or is it broader than that,

17 that your religious background would cause you some concern

18 about this kind of a case?  Or is it a combination?

19         PROSPECTIVE JUROR SEAT NUMBER SIX:  It's my religious

20 background that gives me a concern about this kind of case.

21         THE COURT:  Not so much the witness but the kind of

22 case this is that you have --

23         PROSPECTIVE JUROR SEAT NUMBER SIX:  Uh-huh.

24         THE COURT:  All right.  And -- okay.  All right.

25 Now, all you've heard so far is I've given a general statement

1   about the kind of case that this is.  You heard a little bit

2   of the Q and A so far with you and your fellow jurors.  So I

3   guess the bottom line question for you and maybe, if you want,

4   you can listen to some of the questions, but is it such that

5   you are already leaning for or against one side or the other

6   or is it just the decision process making that you're not --

7                PROSPECTIVE JUROR SEAT NUMBER SIX:  I'm already

8   leaning towards one side.

9                THE COURT:  And regardless of what I said in terms of

10  burden of proof, presumption of innocence, et cetera, based

11  upon your religious background and belief that essentially you

12  could not be fair and impartial to both sides because you're

13  already leaning one way or the other.  Is that correct?

14               PROSPECTIVE JUROR SEAT NUMBER SIX:  (Nods head.)

15               THE COURT:  Is that --

16               PROSPECTIVE JUROR SEAT NUMBER SIX:  That is correct.

17               THE COURT:  I'll go ahead and excuse you from this

18  particular case.  You'll have to call that 800 number after

19  five o'clock on Friday for the next assignment, but I'll go

20  ahead and excuse you from this particular case.

21               THE CLERK:  Juror 026.  Did I pronounce your last

22  name correctly?

23               PROSPECTIVE JUROR SEAT NUMBER SIX:  Juror 026.

24               THE CLERK:  Juror 026.  Thank you.

25               THE COURT:  Okay.  Just one seat over, Ms. Juror 026.

1   If we can get the microphone to you and I'll get you up to

2   speed.  Do you know anything about this case?

3           PROSPECTIVE JUROR SEAT NUMBER SIX:  No.

4           THE COURT:  Do you know anybody I mentioned by name

5   so far?

6           PROSPECTIVE JUROR SEAT NUMBER SIX:  No.

7           THE COURT:  Can you give us some background

8   information on yourself.

9           PROSPECTIVE JUROR SEAT NUMBER SIX:  Okay.  I live in

10  Fresno.  I'm married.  I'm retired from London Properties.  I

11  worked at the condominiums.  And I have a high school

12  education.

13          THE COURT:  All right.

14          PROSPECTIVE JUROR SEAT NUMBER SIX:  And that's it.

15          THE COURT:  Any other adults living in your

16  household?

17          PROSPECTIVE JUROR SEAT NUMBER SIX:  No.  Just my

18  husband.

19          THE COURT:  Does he work outside the home?

20          PROSPECTIVE JUROR SEAT NUMBER SIX:  Yes.  He's -- he

21  works for an insurance company.

22          THE COURT:  All right.  And any children?

23          PROSPECTIVE JUROR SEAT NUMBER SIX:  No children.

24          THE COURT:  And your educational background?

25          PROSPECTIVE JUROR SEAT NUMBER SIX:  It's high school.

1          THE COURT:  And any scheduling issues that we need to

2   address?

3          PROSPECTIVE JUROR SEAT NUMBER SIX:  Well, I can't sit

4   too long.

5          THE COURT:  Okay.  I understand.  We'll be taking a

6   break, in fact, we're going to be taking a break in a few

7   minutes.  Every hour and a half we're going to be taking a

8   break.  And also I've allowed jurors, sometimes they have back

9   issues or whatever and they need to stand up, even during the

10  course of the trial we have witnesses, someone has to just

11  stand up to stretch, that's okay.  And also, on -- we don't

12  like to do it very often, but if someone has an issue that

13  just all of a sudden flares up or whatever, we can always take

14  a break outside of the normal process, although we try not to

15  do that obviously because it does then extend out the trial.

16         Okay.  All right.  Let me ask you:  As far as the

17  basic principles, presumption of innocence, burden of proof,

18  standard of proof, et cetera, any qualms or concerns about

19  that?

20         PROSPECTIVE JUROR SEAT NUMBER SIX:  I can't hear you.

21         THE COURT:  Oh, I'm sorry.  The presumption of

22  innocence, burden of proof, standard of proof, those basic

23  legal principles, any concerns, questions about those?

24         PROSPECTIVE JUROR SEAT NUMBER SIX:  No.

25         THE COURT:  Okay.  Have you ever served as a juror

1   before?

2           PROSPECTIVE JUROR SEAT NUMBER SIX:  No, I haven't.

3           THE COURT:  Ever been a party to or a witness to any

4   legal proceedings?

5           PROSPECTIVE JUROR SEAT NUMBER SIX:  No, sir.

6           THE COURT:  All right.  Anything else that either the

7   questions I asked -- and I'm not going to repeat all of them.

8   But as you were sitting out there, the questions that I asked

9   or the answers that were given, anything stick out in your

10  mind that you would have said anything differently about or

11  said anything more about?

12          PROSPECTIVE JUROR SEAT NUMBER SIX:  No.

13          THE COURT:  Okay.  What we're going to do, before I

14  get into more about your role in determining credibility or

15  believability of witnesses, we'll go ahead and take a morning

16  recess for 15 minutes.

17          Now, those of you in the jury box, remember your seat

18  because those are assigned seats, you're going to have to

19  return to the seat that you're sitting in now.  Those of you

20  in the audience area can -- when you come back in, you can go

21  ahead and have a seat anywhere that you feel comfortable.

22          We'll take a 15-minute break and then we'll come back

23  and continue with the jury selection process.  Please return

24  in 15 minutes.

25          (The jury panel left the courtroom.)

1          THE COURT:  All right.  Yes, Juror 024.

2          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I have a

3   question.  Is it I go home, I can go home.  I'm not going to

4   understand.

5          THE COURT:  Why don't you just wait outside for a

6   moment.  Let me talk to the attorneys about this.  Okay?

7          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Okay.  Thank

8   you.

9          THE COURT:  Okay.  There are no prospective jurors

10  present.  I just want to cover a couple of things very

11  quickly.

12          First of all, we did have an unreported sidebar with

13  respect to Juror 007 who had family member surgery on the

14  14th.  The question really was did we think we'd be done this

15  week.  There's some concern that we might not.

16          And then Juror 006, the dog having cancer and it was

17  pointed out by counsel that she did seem somewhat emotional

18  about that.  So the agreement was that I would excuse both of

19  them.

20          Anything further with respect to the unreported

21  sidebar that either side wishes to place on the record?

22          MS. CAIN:  No, Your Honor.

23          MR. FALLER:  No, Your Honor.

24          THE COURT:  All right.  Now I've been excusing some

25  folks without discussing with counsel.  It just seemed like

1    they would not be good jurors.

2           Is there anything any party wishes to raise with

3    respect to any of the individuals that were excused for cause

4    so far?

5           MR. FALLER:  No, Your Honor.

6           MS. CAIN:  No, Your Honor.

7           THE COURT:  Okay.  Now, Juror 024 has asked to be

8    excused.  We did get a note from Heather, our jury clerk, that

9    she -- Juror 024 apparently filled out the form.  Her thought

10   maybe she was -- understands more than she's letting on.  But

11   I don't know, I'll leave it to you folks.  I'll certainly keep

12   her on.  She obviously does not want to be a juror.  I don't

13   know if any of you have any thoughts about that.  I have no

14   problem with keeping her on, but I would also have no problem

15   with just releasing her.  So I don't know if you want to chat

16   about that first or whatever.

17          MR. FALLER:  I think the one thought I have is I

18   believe when the Court was asking her about legal principles,

19   including the presumption of innocence and/or the burden of

20   proof that I believe what she was saying is that she didn't

21   agree.  It sounded like she's -- it sounded like "angry"

22   versus "agree."  And I thought she was saying she did not

23   agree --

24          THE COURT:  Okay.

25          MR. FALLER:  -- with the Court's principles.  I don't

1   know what the opinion of other counsel is.  That's what I

2   heard.

3          THE COURT:  Yeah, I guess the bottom line question

4   for you folks is do you want to keep her on?  And I don't have

5   a problem with that.  Or if you want to excuse her, I don't

6   have a problem with that either.  I just want you folks to

7   sort of give some indication of what you want to do.

8          MR. FALLER:  I think she will be a problem at some

9   point.  I'd just as soon get rid of her now.

10         MS. CAIN:  And Your Honor, the government agrees.  We

11   have no problem dismissing her.

12         THE COURT:  All right.  So when they come back in,

13   I'll go ahead and excuse her.  We'll fill that seat, we'll

14   continue on with the jury selection process.

15         MR. FALLER:  Thank you, Your Honor.

16         THE COURT:  We'll take our 15 minutes from now.

17         MR. FALLER:  Great.  Thank you.

18         MS. CAIN:  Thank you.

19         (Recess.)

20         THE COURT:  All right.  We'll continue with the

21   questions.  The area that I want to again get back to is your

22   role as jurors to decide the facts in this case.  Certainly

23   you decide credibility or believability -- I'm sorry.  Let me

24   back up a second.

25         All right.  Juror 024, during the break I did consult

1    with the attorneys.  I'll go ahead and excuse you from this

2    particular case.  You're not excused completely.  You'll still

3    have to call that 800 number after five o'clock for your next

4    assignment.  You'll be excused from this particular case only.

5            PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Thank you.

6            THE CLERK:  Juror 027.

7            THE COURT:  If we could get the microphone over to

8    Juror 027.  Let me get you up to speed.  Do you know anything

9    about this case?

10           PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

11           THE COURT:  Do you know anyone we've mentioned by

12   name so far?

13           PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

14           THE COURT:  Can you give us some background

15   information on yourself?

16           PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I live in

17   Oakdale.  I am self-employed.  I own a CrossFit gym there.  My

18   husband is employed.  He works for the FBI.  He's a special

19   agent.  We have three school age children.  Ages 11, 9 and 8.

20   And I have a college degree, business management.

21           THE COURT:  All right.  Any scheduling issues we need

22   to address?

23           PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

24           THE COURT:  And so far -- well, let me -- have you

25   ever served as a juror before?

1        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

2        THE COURT:  Ever been a party to or a witness to any

3   legal proceedings?

4        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

5        THE COURT:  Is your husband assigned within the

6   Eastern District of California, do you know?

7        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.

8        THE COURT:  Where is his duty station?

9        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  He works out

10  of the Modesto RA in Salida, but he's also on the gang task

11  force out of Ceres.

12       THE COURT:  Okay.  As far as the questions that I've

13  asked the other prospective jurors, were you able to form an

14  answer in your own mind as to the various questions?

15       PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.

16       THE COURT:  Anything that I asked or the jurors

17  answered that you would have answered any differently or said

18  anything more about?

19       PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

20       THE COURT:  All right.  Let me just go ahead then and

21  pick up back then on credibility of witnesses.

22       In terms of credibility or believability, it's

23  difficult for jurors because you're going to see people on

24  this witness stand that you've never seen before in your lives

25  and will never see again.  You'll see them on the witness

1    stand for five minutes or five hours, whatever.  In that time

2    frame, again, you're going to have to decide whether to

3    believe all of their testimony, just a part of their testimony

4    or none of their testimony.  And I'll give you a few -- in the

5    jury instructions, I give you some basic guidelines.  But

6    we're really looking at your own common sense and you

7    individually and the jury as a whole in making that

8    credibility determination.

9         There are a few things that I can tell you that you

10   should not consider in terms of credibility or believability.

11   One, of course, is whether or not the plaintiff's side calls a

12   witness or defense side calls a witness so that they might be

13   labeled a plaintiff's witness or defendant's witness.  That

14   really has no bearing on their credibility or believability.

15   It really doesn't matter who calls a witness.  You just have

16   to decide, once they get on the witness stand, the issue of

17   credibility.

18        The other thing that you should not consider in terms

19   of credibility or believability is job title.  Just the job

20   title itself.  Because there may be some occupations,

21   professions or whatever that you really like and respect.  For

22   example, the educational field.  Or maybe that you're involved

23   in, the medical field, whatever.  But you don't automatically

24   give more or less weight to someone because they happen to be

25   in the same profession or occupation or whatever that you or a

85

1   family member are involved in or that you happen to

2   particularly like or respect.  Is everyone okay with that?

3           All right.  And that's generally not an issue in any

4   case as far as any particular witness is concerned or type of

5   witness.  Except sometimes it becomes an issue when the

6   witness' job title shows that that witness is in law

7   enforcement.  Okay.  And the same basic ground rules apply.

8   If someone were to appear on the witness stand and say I'm a

9   police officer or sheriff's officer or Highway Patrol officer,

10  whatever.  You can't automatically give that witness more

11  weight than anybody else simply because of their job title.

12  Okay?

13          Is there anyone who has any qualms or concerns about

14  that?

15          Okay.  And I'm going to get into that in a little bit

16  more detail with some questions.  And I recognize that there

17  are two sides to this.  It may well be that you, a family

18  member or close friend have had a bad experience relating to

19  law enforcement.  It might be something as simple as you got

20  pulled over one time for a traffic violation and the officer

21  was rude or you didn't think you deserved the ticket or

22  whatever.  Or it could be even more serious, that you, a

23  family member or close friend were actually arrested and

24  prosecuted for something.

25          And I won't go into any great detail on that, but I

1    do want to have you explore in your own mind whether or not

2    you could be fair and impartial to witnesses just based on

3    their job title.  Okay?  And by fair and impartial in this

4    regard, the question would be for you to think, in your own

5    mind, would you automatically give more weight to someone who

6    testifies, who comes on the witness stand and simply

7    identifies himself as being with a law enforcement agency?

8    Would you give more weight or credence to the party that

9    happened to call more individuals relating to law enforcement?

10           And then finally, if you are selected to serve as a

11   juror in this case and you heard all of the evidence, you were

12   discussing it with your fellow jurors and you were not

13   convinced beyond a reasonable doubt that the government had

14   proven its case, but then you're thinking, you know, this

15   weekend, I have a social occasion with my relative, my friend,

16   my neighbor, my fellow church goer, whatever, who happens to

17   be in law enforcement.  If I told him I found someone not

18   guilty, they might be a little bit upset with me.  And so even

19   though the government has not proven its case beyond a

20   reasonable doubt, I think I better vote guilty so I don't run

21   into problems with my family or my friend or whatever.  So

22   those are sort of the dynamics as far as concerns relating to

23   job title as far as law enforcement.

24           Now, I'm not talking about quality of testimony.

25   Okay?  We're really talking about once someone starts to

1    testify regarding -- regardless of their job title, you have
2    the right to believe everything they have to say.  You also
3    have the right to not believe everything they have to say.
4           But, again, simply job title.  And I'm just going to
5    explore this a little bit with you in a little bit more
6    detail.  And then at the end of this discussion, you can sort
7    of figure in your own mind, okay, am I going to give more or
8    less weight automatically to a witness or a party simply
9    because that person identified themself as being involved in
10   law enforcement.
11          So I'm going to start off first, let's just start in
12   the back row.  No, I'm sorry, we'll start in the front.  I
13   forgot where the mike was.  In the front row.  If you're
14   related to or closely acquainted with someone in law
15   enforcement.
16          I'm going to start on that end.  You've already
17   indicated your husband is with the FBI.  Do you think that
18   that relationship or maybe you also socialize with some of his
19   contemporaries, do you think that that aspect, your
20   relationship and knowledge of individuals in law enforcement,
21   do you think that would affect your service as a juror in this
22   particular case?
23          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I don't
24   think so.  I mean, I can see both sides but I would like to
25   think -- I think that I can be fair in looking at the

1    credibility of people.

2           THE COURT:  Okay.  And you would not feel -- or would

3    you feel any pressure if you were to serve as a juror in this

4    case and the government had not proven its case, do you think

5    you would feel any sort of pressure or -- not pressure, but

6    any thoughts of, oh, you know I really should vote guilty in

7    this case.  Do you think that that would be a problem for you?

8           PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

9           THE COURT:  Okay.  Great.  Now, let me ask in the

10   front row there, anybody else related to or acquainted with

11   closely anyone in law enforcement?

12          Not in the front row.  Okay.  Let me go then to the

13   next row up.  And we'll go ahead and give the mike to Juror

14   020.  But if you are related to or acquainted with in law

15   enforcement.  I don't need to know their name.  I have a

16   cousin in the Highway Patrol or my next door neighbor is with

17   the police department or whatever.

18          And really the bottom line question is -- once you've

19   indicated that you are acquainted with or related to someone

20   in law enforcement, the bottom line question for you would be

21   whether or not it would affect your service as a juror in this

22   case.  If you're not related to or acquainted with anyone in

23   law enforcement, you can just go ahead and pass the mike down.

24          So we'll go ahead and start with Juror 020.  And if

25   you are related or acquainted with law enforcement, let us

1 | know.  Otherwise just pass the mike down.

2 |         PROSPECTIVE JUROR SEAT NUMBER SEVEN:  I have a couple

3 | of cousins who are correctional officers.

4 |         THE COURT:  All rightie.  And have you discussed some

5 | of their experiences or whatever that they do?

6 |         PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Not really.

7 | They're more distant than anything.

8 |         THE COURT:  Okay.  Would those relationships affect

9 | your service as a juror here today?

10 |         PROSPECTIVE JUROR SEAT NUMBER SEVEN:  No.

11 |         THE COURT:  Great.  Thank you.  Please pass the mike

12 | down.

13 |         PROSPECTIVE JUROR SEAT NUMBER EIGHT:  I have no

14 | relationships.

15 |         THE COURT:  Thank you.  Juror 008.

16 |         PROSPECTIVE JUROR SEAT NUMBER NINE:  I have no

17 | relations.

18 |         THE COURT:  Thank you, Juror 009.

19 |         PROSPECTIVE JUROR SEAT NUMBER TEN:  I have two

20 | cousins.  Both retired.  Ones currently an investigator for

21 | the DA in Monterey County.

22 |         THE COURT:  And have you chatted with them about some

23 | of their experiences or whatever?

24 |         PROSPECTIVE JUROR SEAT NUMBER TEN:  Yeah, but just

25 | general.  Just generally.

1          THE COURT:  And would that affect your service as a

2    juror here today?

3          PROSPECTIVE JUROR SEAT NUMBER TEN:  I don't think so.

4          THE COURT:  Okay.  Good.  Thank you.

5          PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  I have none.

6          THE COURT:  Okay, Juror 011.  And Juror 012.

7          PROSPECTIVE JUROR SEAT NUMBER TWELVE:  I used to be

8    married to a Fresno Police Officer, but that wouldn't affect

9    me serving on this jury.

10          THE COURT:  Great.  Thank you very much, Juror 012.

11    We'll pass the microphone down.

12          PROSPECTIVE JUROR SEAT NUMBER SIX:  My father-in-law.

13    He was chief of police for 35 years in San Benito.

14          THE COURT:  All right.  And then when did he retire

15    from being --

16          PROSPECTIVE JUROR SEAT NUMBER SIX:  Let's see, I

17    think it was in the '80s.

18          THE COURT:  All right.  Would that relationship

19    affect your service as a juror here today?

20          PROSPECTIVE JUROR SEAT NUMBER SIX:  I'm not sure

21    about that.

22          THE COURT:  All right.  Well, let me ask if someone

23    were to appear to testify and they said, "Well, I'm a police

24    officer," whatever, do you think you'd say, "Ah, okay, well,

25    I'll believe you."  Regardless of what the evidence is.  And

1   there might even be another law enforcement officer might

2   contradict what they have to say.  But there's some basic

3   standards.  You know, you look at a witness objectively.  You

4   look at their ability to see what was happening, whether or

5   not they had any bias or interest in the proceedings.  Whether

6   or not other evidence supports or refutes what they have to

7   say, et cetera.  So there's a lot of dynamics that go on in a

8   trial.

9           But for all of you, the bottom line question for this

10  aspect is if someone appeared to testify and said "I'm a

11  police officer," would you say, oh, police officer, just like

12  my relative, okay, I'll believe everything you have to say,

13  just start talking.  That's very simplistic, but that's sort

14  of what --

15          PROSPECTIVE JUROR SEAT NUMBER SIX:  Probably so.  I

16  don't know.  Because, you know, my father-in-law was a chief

17  of police and I knew a lot of stuff that went on.

18          THE COURT:  Uh-huh.

19          PROSPECTIVE JUROR SEAT NUMBER SIX:  So --

20          THE COURT:  Okay.  And you heard very little about

21  the case.  But --

22          PROSPECTIVE JUROR SEAT NUMBER SIX:  Yes.

23          THE COURT:  Do you think, understanding in most

24  criminal law cases there's going to be someone from law

25  enforcement testify.  I will tell you in this case there will

1    be a number of law enforcement officers testify.  They're

2    required to.  If I told you that, do you think you'd say, wow,

3    you know, based upon the fact my father-in-law was the chief

4    of police, it's almost like I'd be doing him a disservice if I

5    voted -- if I didn't just automatically believe what the

6    officers have to say.  Something like that.  Do you think that

7    would be such that you could not be, in that sense, fair and

8    impartial to both sides?

9         PROSPECTIVE JUROR SEAT NUMBER SIX:  It's hard to

10   answer.

11        THE COURT:  All right.  Well, all you can do is

12   imagine yourself being a juror in this case.  Someone appears

13   to testify.  You've never seen them before in your life.  But

14   the person says -- identifies himself as the chief of police

15   of name a city in this county or whatever, Fresno.  I'm the

16   Chief of Police of Fresno.  Do you think, just that, that's

17   all you heard, nothing else, do you think you'd say, well,

18   I'll believe everything you have to say.

19        PROSPECTIVE JUROR SEAT NUMBER SIX:  Maybe not

20   everything.  Okay?

21        THE COURT:  Okay.  Fair enough.  I mean, the bottom

22   line objectively is -- once they've identified themselves,

23   whatever.  I mean, there are a number of witnesses they'll

24   identify themselves as, you know, whoever happens to be a

25   witness in the particular case.

And so the question for you and the other jurors is -- and I have to back up a little. This is not an issue of whether or not you respect law enforcement or you like law enforcement, this isn't -- that's not what these cases are about. We're not voting to see whether or not we support law enforcement and are we doing a disservice to law enforcement if we treat them like any other witness or -- sometimes we vote not guilty. That's just the way the system is set up. That's why we have juries.

So this is not a matter of respect, disrespect or whatever. This is a matter of looking at a person, once they've gotten their title out of the way, then you have to look at their testimony. If you think, you know, they're believable based on what they have to say and all the evidence, you're certainly entitled to believe them.

But if they testify and they say, you know, somebody else said something differently or I'm not sure if that other person really did see what he saw or whatever. I mean, you know, it's just one of those things where you do the same analysis for every witness no matter what their job title happens to be.

But again, this is going to be an issue for you, we just need to know right at the outset whether you can judge every witness by basically the same standard, no matter what the title is. Just listen to what they have to say and base

1    it on what they have to say and all the evidence.  Would you

2    be able to do that?

3              PROSPECTIVE JUROR SEAT NUMBER SIX:  Yes.

4              THE COURT:  That's really all we're asking of all the

5    jurors.  When you look at a witness, you know, you don't

6    automatically just start believing or disbelieving them, you

7    just listen to what they have to say, assess it with all the

8    other evidence and then you're entitled to believe all, part

9    or none of their testimony.  Okay?

10             We'll pass the mike down then.  Acquainted or related

11   to law enforcement?

12             PROSPECTIVE JUROR SEAT NUMBER FIVE:  Yes.  My former

13   brother-in-law was a sheriff for Tulare County.  My former

14   father-in-law was -- worked for the federal correctional

15   institution.  I've been divorced for 25 years and I don't

16   think that would -- I know it won't affect any decision.

17             THE COURT:  Okay.  Thank you.

18             PROSPECTIVE JUROR SEAT NUMBER FOUR:  I have none.

19             THE COURT:  Thank you, Juror 004.

20             PROSPECTIVE JUROR SEAT NUMBER THREE:  My brother just

21   retired from Corcoran, correctional officer.  My nephew is a

22   correctional officer in Texas.  My brother-in-law is retired

23   from probation officer here in Fresno.  I don't think that

24   would have any affect.

25             THE COURT:  Great.  Thank you very much.

1          PROSPECTIVE JUROR SEAT NUMBER TWO:  I don't know any.

2          THE COURT:  All right.

3          PROSPECTIVE JUROR SEAT NUMBER ONE:  My son-in-law is

4    a CHP officer and part of the gang task force in Kings County.

5    My middle daughter was a police officer before she got her

6    doctorate, she worked here in Fresno and in Ventura County in

7    the DA's office.  And my daughter-in-law works at Pleasant

8    Valley Institute, the correctional institute in Coalinga.

9          THE COURT:  Would any of those relationships affect

10   your service as a juror here today?

11         PROSPECTIVE JUROR SEAT NUMBER ONE:  I don't think so.

12         THE COURT:  Great.  Anybody else?

13         Okay.  Now, I'm going to ask you the flip side of

14   this law enforcement question.  I really don't want any detail

15   on this.  But what I need to know is whether or not you, a

16   family member or close friend have had any what we might call

17   just a bad or negative involvement with law enforcement.

18   Again, it could be a traffic ticket that you got that you

19   didn't think you deserved or it could be an actual arrest and

20   prosecution.

21         Again, I don't need to know whether it was you or

22   anybody else.  You could just say someone in the family was

23   actually arrested, went to prison or whatever.  I mean, that's

24   not uncommon.  So but again, once you disclose that, the

25   question is whether or not that would affect your service as a

1 juror.

2     That is, when you see someone come on the witness

3 stand and they identify themselves as a law enforcement

4 officer, would you automatically discount, disregard or

5 disbelieve the witness simply because of that job title

6 because maybe a bad experience that you, a family member, a

7 close friend have had.

8     And I will tell you this.  I've had a number of

9 prospective jurors disclose that they've actually had

10 relatives or whatever that were arrested and prosecuted and it

11 had no impact at all.  And so, you know, we understand that.

12 This arena here, the question I'm asking is really whether or

13 not it might affect your service as a juror.

14     So let me just start off in the back row.  You could

15 pass the microphone down.  But what I'm looking for -- and

16 maybe I shouldn't call it a bad experience.  Maybe if you, a

17 family member or close friend have ever been arrested or

18 prosecuted for a criminal offense?  And again, I don't need to

19 know any detail, I just need to know what it was.  I'll ask

20 you a couple of followup questions and then the bottom line,

21 of course, is whether or not it would affect your service as a

22 juror.

23     So let me start off in the back row.  Any of you, a

24 family member or close friend ever actually been arrested and

25 prosecuted for any criminal offense?

1          We've got one, two.  Okay.  Let's start with Juror
2    003.  Again, no detail.  But was it a relative or a friend?
3          PROSPECTIVE JUROR SEAT NUMBER THREE:  Relative.
4          THE COURT:  Okay.  And how long ago was that?
5          PROSPECTIVE JUROR SEAT NUMBER THREE:  He served 12
6    years.  And he was just released two years ago.
7          THE COURT:  Okay.  Now, the actual court proceedings
8    that went before that, did you attend any of those?
9          PROSPECTIVE JUROR SEAT NUMBER THREE:  No, I did not.
10         THE COURT:  Okay.  Was there anything -- did you have
11   a chance to talk to that person about his or her experiences?
12         PROSPECTIVE JUROR SEAT NUMBER THREE:  Yes.
13         THE COURT:  Is there anything about that that would
14   affect your service as a juror today?
15         PROSPECTIVE JUROR SEAT NUMBER THREE:  No.
16         THE COURT:  Okay.  Thank you.
17         All right.  And Juror 005.
18         PROSPECTIVE JUROR SEAT NUMBER FIVE:  I had a brother
19   who went to prison numerous times for drug cases.  And he was
20   guilty, no negative experiences.
21         THE COURT:  Okay.  Thank you very much.  Anybody else
22   in the back row?
23         How about the middle row then?  Pass the microphone
24   down.  Yes, Juror 011.
25         PROSPECTIVE JUROR SEAT NUMBER ELEVEN:  A family

1   member, it's a DUI.  Pleaded guilty.  No bad dealings.  No

2   impact.

3           THE COURT:  Great.  Thank you very much.  And we have

4   some more down the --

5           PROSPECTIVE JUROR SEAT NUMBER TEN:  I had a nephew.

6   That wouldn't affect me.

7           THE COURT:  Okay.  So he was prosecuted for

8   something?

9           PROSPECTIVE JUROR SEAT NUMBER TEN:  Yeah.

10          THE COURT:  Okay.  Thank you.

11          PROSPECTIVE JUROR SEAT NUMBER EIGHT:  I had a former

12  brother-in-law who was charged and found guilty and served for

13  about five years.  This was about 25 years ago.  But I don't

14  think it would have any affect on behind.

15          THE COURT:  Thank you very much.  Anybody else in the

16  middle row there?

17          We'll go to the front row.  Pass the microphone down.

18  Anybody in the front row?

19          Okay.  One person.  Juror 016.

20          PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  I was

21  arrested for drunk in public.  Other than that, my father was

22  arrested several times for DUIs.  My brothers also.  But

23  nothing that was like a bad experience or anything like that.

24          THE COURT:  Okay.  Even your own personal experience

25  was not something that --

1          PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  No.  I was

2    guilty.

3          THE COURT:  Okay.  How long ago was that?

4          PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  I believe

5    three years ago.

6          THE COURT:  All right.  And none of that would affect

7    your service as a juror?

8          PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  No.

9          THE COURT:  Thank you.  Anybody else?

10         All right.  What I want to do next is to get into

11   what kind of the case this is.  As you've already heard some

12   of the prospective jurors have been excused because of things

13   that occurred in their life.  I'm going to tell you right now

14   this is not a pleasant case to be a juror on, but very few

15   are.  We subject -- we take you out of your own personal lives

16   and subject you to things that are not pleasant.

17         For example, if this were a -- a traffic collision

18   scenario that I described to you and there were horrific

19   injuries, you would probably have to hear testimony about the

20   nature of those injuries.  You would probably see -- you'd

21   probably hear the doctors testify, you would probably see

22   photos of the individuals.  And that could be very difficult.

23   If there were a death involved, you might -- there might be an

24   autopsy report, there might be some showing of the decedent's

25   body, just to show you the kinds of injuries that were

1    suffered.

2            If this were a case involving assaultive type

3    conduct, let's say where someone was shot and maybe even

4    killed, you would, again, hear the autopsy report, you would

5    hear testimony regarding the injuries, you might see the

6    autopsy photos, et cetera.  So unless this is a business type,

7    not that those are real pleasant, but jurors are subjected to

8    very graphic sorts of cases, whether it's a civil law case or

9    a criminal law case.

10           This one does involve minors.  Now, a number of you

11   have indicated either you've been in the educational arena or

12   field where you've dealt with young people.  A number of you

13   have -- either have now or have had young children.  And so it

14   could be somewhat difficult for you folks.  But again, most of

15   the cases are not easy, this is certainly not an easy case.

16   None of the parties here are going to claim to you that it is

17   an easy case for you to have to deal with.  And you are going

18   to hear pretty graphic testimony.

19           So you can understand, this is a case involving

20   some -- I'm going to just use generalizations, you'll get jury

21   instructions -- sexual abuse, sexual molestation, et cetera.

22   And we're talking about obviously very young children involved

23   in this particular case.

24           And so when I read that description to you, were any

25   of you concerned to the extent that because of the kind of

1   case that this is, that you could not be fair and impartial?

2   Is there anyone who had that thought?

3          And again, we've excused a couple of folks because of

4   their own life experiences which you've heard about.  And one

5   other aspect -- I didn't see a hand raised.

6          One other aspect in this case is that we're here in

7   court because a jury has to make a determination whether or

8   not the government can prove its case beyond a reasonable

9   doubt.  Now, as you can see, there are a number of what we

10  call counts, charges, various different charges.  There were

11  six all together.

12         And in every kind of criminal case, there are

13  different what we call elements.  Let me give you an example.

14  If this were -- if this were what were commonly called a

15  battery case, where someone unlawfully touched someone else.

16  If someone were to come up to you and hit you, that person

17  could be charged with a battery.  And the elements of the

18  battery are the unlawful touching, that is when they struck

19  you.  There's also a mental state element, which is they have

20  to intend to do it.  And that intent aspect is what

21  distinguishes touching that you don't want.

22         For example, if you were just minding your own

23  business and someone came up and they just said "I don't like

24  your looks" and hit you, then that -- the person said, "I'm

25  going to hit you" so you could find that they had the intent

1   to hit you.

2          If, on the other hand, you're in the grocery store,

3   you're shopping, you're minding your own business, someone

4   comes around the corner with their shopping cart and hits you.

5   Well, you didn't want to be touched.  That's an unlawful

6   touching.  Is it a crime?  And the other person would say,

7   "I'm sorry, I didn't mean to hit you."  And so you'd look at

8   the intent.

9          It may well be in that situation that you didn't want

10  to be hit, it certainly hurt you, but it wasn't a criminal

11  offense because they really didn't intend to hit you.  They

12  were just coming around the blind corner and maybe they should

13  have gone a little slower.  But the necessary criminal intent

14  wasn't there.

15         Okay.  So, you look at different types of cases and

16  charges and they all have different what we call elements.

17  And that's simplistic example of a battery, basically two

18  elements of physical act, which is the unlawful touching and

19  the other is the mental state.  That is, did they intend to

20  strike you or was it, quote, accidental.

21         Some criminal charges are much more complex than

22  that.  So there are different what we call elements that have

23  to be proven.  There is the mental state, the knowledge, the

24  intent, what it was, the physical act, et cetera.

25         The reason that I mention that to you is that it

1    isn't sort of a cut and dried situation.  The jury has to look

2    at each and every count separately.  And just because they

3    find someone guilty on one count doesn't then mean they

4    automatically find the person guilty of the other counts.  And

5    same is true if they find the person not guilty of one count,

6    that doesn't mean they automatically find them not guilty on

7    the other counts.  Each and every count stands on its own.

8         In this case -- and the reason I mention that, in

9    this case you're going to hear some pretty graphic testimony.

10   The parties agreed, we met before this trial.  Everyone

11   agrees, you know, that they're going to be pretty graphic.

12   You're going to hear both testimony and probably some images,

13   video or still photos of young people.  But you still have to

14   be objective as a juror.  Okay?

15        First of all, you can't say, well, okay, I'll be a

16   juror but I don't want -- I don't want to see any pictures.

17   Don't show me any picture.  As a juror, you have to see all of

18   the evidence because the jury decides uniformly together on

19   all the evidence that's presented.

20        Also, you might find that this is a situation where,

21   oh, this is awful, those poor children.  And you think that

22   someone ought to pay for that.  But the government has not

23   proven in this case that Mr. McCormack was the one that was

24   involved.  You can't sit there and go, okay, well, the

25   government has proven all of the elements as far as what

1    occurred, I'm not so sure it was Mr. McCormack though.  That's

2    an element.  That's sort of the who done it, who was

3    responsible for it.

4         And even though the government might prove all of the

5    elements other than the who done it, who's responsible, you

6    can't say, well, you know, the government has proved this is a

7    horrible case, the government has proved the various elements,

8    they really haven't proven beyond a reasonable doubt that it

9    was Mr. McCormack.  But what are we going to do?  This is

10   horrible.  These poor children.  The family members.  All this

11   work that went into it.  And Mr. McCormack is the only one

12   here.  And if we vote not guilty he walks away and we have no

13   idea whether they'll ever find the real perpetrator.  Okay.

14   That's not the role of the jury to speculate on that.

15        If the government does not prove all the elements,

16   including the who done it part of it, Mr. McCormack is

17   entitled to an acquittal.  You can't say well, he's the only

18   one here.  I'm not sure it's him but we got to find somebody

19   guilty.  He's the only one so we're going to find him guilty.

20   You cannot do that.  Is everyone okay with that?  Everyone

21   understand?

22        Okay.  Is there anything about the nature of this

23   case, again, and I'll just -- I don't want to overemphasize

24   it, that cause any of you concern about being able to be fair

25   and impartial to both sides?  That is objectively see and hear

1  all of the evidence in the case and make the verdict or

2  determination objectively based on what you see and not

3  emotion -- what we call prejudice, passion, et cetera.  Is

4  everyone okay with that?  Anyone have a concern about that?

5         Okay.  Now, I think a couple of you might have

6  mentioned some relationship with either yourself or a family

7  member or close friend that has been involved with the

8  government, whether it's with the FBI or the IRS or whatever,

9  or any other agency.

10        Is there anyone who has some relationship with the

11  federal government in terms of employment, either you, family

12  member, close friend, that you think might have some impact or

13  influence on your service as a juror?  Anybody?

14        Have any of you had any disputes with any agency of

15  the federal government, it could be anything, it could be you

16  were upset -- not upset, but maybe you had some concern or

17  issue with the IRS or maybe a federal agency sometimes.  You

18  may be a property owner or something and there may be some

19  federal issues involving the environment or whatever.

20        But have any of you ever filed a claim against some

21  agency or entity of the federal government?  Anybody?

22        Okay.  Now, in this case, you're going to see and

23  hear information regarding computers, the internet, et cetera.

24  Do any of you that you have not mentioned so far have any

25  other specific training or emphasis in relation to computers?

1          Now, most of us who have computers, we've had some

2    obviously background on how to operate it.  But in terms of

3    formal type classes that you have taken relating to computers,

4    computer technology, any of you that you have not mentioned?

5          Okay.  Yes.  Uh-huh.  If we could pass the microphone

6    up to Juror 020 in the corner there.

7          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  I've taken

8    classes in computer programming in several various languages

9    as well as computer forensic classes.

10         THE COURT:  All right.  And have you put that to use

11   in terms of your job or personal computer work or how did

12   you -- is that something that you've been able to use in your

13   work capacity?

14         PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Well, I do do

15   auditing for the county, and so I do use a little bit of that.

16   Such as how to use the programming, I can do databases and

17   things of that nature.

18         THE COURT:  All right.  How long ago was your last

19   class or course?

20         PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Probably about

21   three years.

22         THE COURT:  Okay.  And did you have any specific

23   training regarding the internet, the use of the internet, all

24   of the features that are available on the internet that you

25   can access short of people like me who can just do -- just get

1    on the internet if I'm lucky?

2              PROSPECTIVE JUROR SEAT NUMBER SEVEN:  A little bit.

3              THE COURT:  Now, the reason I'm asking that is you're

4    going to hear evidence here regarding computers, the internet,

5    et cetera.  And if you've had any specific training or

6    experience in that area specifically, you have to totally

7    disregard it for the purpose of this case.

8              In other words, if someone were to testify about how

9    computers operate or how you get on the internet or different

10   programs, et cetera, and you say, "Hmm, that's not what I

11   remember in my classes."  You have to rely on what's here in

12   open court.

13             Now, if you have any questions -- that's true with

14   anything.  If any of you have any questions about any of the

15   testimony, you can always write a note.  And it could be, you

16   know, this witness testified this about computer access or

17   file sharing and that sort of thing.  And I recall in my class

18   that there was something different, you can always write a

19   note.  Can you clarify what he or she meant regarding

20   computers, internet, file sharing, websites, et cetera.  But

21   other than that, you have to disregard what you might know

22   outside of the courtroom and rely essentially on what is being

23   presented to you in court.

24             Are you okay with that, Juror 020?

25             PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Yes.

1              THE COURT:  Again, if you have any questions or

2      concerns based upon your own knowledge, you can always write

3      down a question and the lawyers will take those up.  Okay.

4              Anybody else, any kind of training beyond the -- yes.

5      Okay.  Juror 009.

6              PROSPECTIVE JUROR SEAT NUMBER NINE:  I work on a help

7      desk for the county on a computer system that 18 counties use

8      troubleshooting.

9              THE COURT:  Okay.  And you've had, I assume,

10     specialized training or courses in that?

11             PROSPECTIVE JUROR SEAT NUMBER NINE:  It was on the

12     job.

13             THE COURT:  All right.  And again, as far as

14     testimony, you're likely to hear testimony regarding

15     computers, the internet, files, file sharing, names, et

16     cetera.  And again, you have to disregard whatever you might

17     know about all of the technology systems and rely on what's in

18     court.  But again, you can always write a note if you have a

19     question or concern about something that you might be aware of

20     that you'd like the attorneys to follow up on.  Are you okay

21     with that?

22             PROSPECTIVE JUROR SEAT NUMBER NINE:  Yes.

23             THE COURT:  Okay.  Anybody else?  Any kind of

24     specialized training or anything else?  Computers, the

25     internet, et cetera.

1    Okay.  Let me ask -- oh one other thing.  Let me get

2    back to witnesses.  Now, in some instances a witness can be

3    qualified as what we call an expert witness.  When a person is

4    designated -- or qualifies as an expert witness, sometimes

5    they are part of the process, that is they are personally

6    there present and sometimes they're relying on information

7    presented.

8    For example, on my traffic collision scenario,

9    someone might have been -- happened to be present, a law

10   enforcement officer, who is trained in accident

11   reconstruction.  And so that officer might be able to tell the

12   jury what he or she saw.

13   It's also possible that in that accident, if you were

14   trying to determine the point of impact or whatever, they

15   might call in a person who qualifies as an expert in accident

16   reconstruction.  That person was not even at the scene, what

17   they're relying on is all the information that was presented

18   to them after that, including witness statements, photographs,

19   et cetera.  And that person can give testimony.

20   The purpose of an expert witness is really to assist

21   the jury in determining issues in the case, facts in the case.

22   But an expert witness still is under the same requirements for

23   the jury as any other witness.  You can believe all of an

24   expert witness' testimony, a part of a witness' testimony or

25   none of the expert witness' testimony.  Again, you just treat

110

 1  them like any other witness in terms of believability or
 2  credibility.  Okay?
 3        Now, some people might think, well, okay, but if one
 4  side calls an expert and they're qualified as an expert, who
 5  am I to doubt that?  I'll just automatically believe what he
 6  or she has to say.  You don't do that.  You, again, same
 7  criteria, you can, if you choose, based on all the evidence
 8  and his or her testimony, believe everything they have to say
 9  or you don't have to as long as there's a rational reason for
10  not believing what they have to say.  Is everyone okay with
11  that?
12        Also sometimes people are skeptical of expert
13  witnesses.  They think, well, you know, you can hire
14  someone -- you can pay someone to say anything that you want
15  them to say.  And so they say, well, this person is qualified
16  as an expert but I'm going to discount what they have to say
17  because they've probably been paid or something like that.  So
18  again, you don't make that assumption.  Again, you look at the
19  quality of their testimony in deciding what, if anything, to
20  believe that they have to say.  Is everyone okay with that?
21        Okay.  Let me ask counsel if you have any followup
22  questions for me to ask, I'm certainly more than happy if you
23  just jot them down if you want to.  Okay.  Otherwise what I'm
24  going to do folks, is I've indicated to the attorneys that I'm
25  going to give them an opportunity to ask questions.

1          Again, the same ground rules apply.  If they ask you

2     a question and you're not sure what they're asking, just ask

3     them to repeat or rephrase it.  If they ask you questions you

4     don't want to answer in front of all the other prospective

5     jurors, we can take a break just before noon or right after

6     noon and take that up.  Or after lunch.

7          But other than that, again, their purpose is the

8     same.  They really want you to get thinking about whether or

9     not you could be, quote, fair and impartial in this case.

10          So I'm going to start off with the plaintiff's side

11    and give plaintiff's counsel, the government an opportunity to

12    ask questions of you.

13          MS. CAIN:  Your Honor, do you prefer I stand at the

14    podium or the table?

15          THE COURT:  Either way.  As long as you keep your

16    voice up so everyone can hear.  Sometimes it's easier at

17    counsel table if you have the materials there.  But let me

18    just indicate.  For counsel, sometimes they'll present at the

19    podium and sometimes they'll present at counsel table.  Either

20    way, it makes no impact on what they're doing.  Sometimes it's

21    more convenient to ask questions of witnesses, for example, at

22    counsel table and sometimes not.  The only criteria is, of

23    course, they keep their voices up so you can hear what they

24    have to say.  All right.  Go ahead.

25          MS. CAIN:  Good morning.  So to followup on one of

1    Judge Ishii's questions about your experience with computers

2    and the internet, I kind of want to do the inverse question.

3    Is there anyone here who has never used email?  Everyone has

4    some capacity using email?

5            Okay.  Anyone here who doesn't use the internet in

6    general to look at the news or you just use the internet for

7    email alone and that's it?

8            Okay.  Anybody here who has experience in chatrooms?

9    Anyone going to chatrooms ever?  And if so, raise your hand,

10   please.

11           Okay.  Anyone here who doesn't know what a chatroom

12   is?  You don't know what a chatroom is.  Okay.

13           PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  I've heard

14   of them, but --

15           MS. CAIN:  Okay.  That's all right.  Anyone here who

16   has experience with peer-to-peer software?  Like Limewire,

17   FrostWire, GigaTribe.  Okay.  Anyone with specific experience

18   with Gigatribe?  No?

19           Okay.  Juror 019, am I pronouncing that right?  You

20   mentioned earlier today, and I may just have missed some of

21   what you were saying.  But my notes indicate that you were

22   involved in two previous trials as a juror.  Is that correct?

23           PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes.

24           MS. CAIN:  And I think you mentioned one was a DUI.

25   And then you also mentioned some sort of criminal case.  What

1   was the criminal case?

2           PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Assault.

3           MS. CAIN:  Assault.  Okay.  And what was -- based on

4   the evidence that was presented in that particular case, was a

5   verdict reached?

6           PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes.

7           MS. CAIN:  And what was the verdict?

8           PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Guilty.

9           MS. CAIN:  Okay.  And then with respect to the DUI

10  case, was that a criminal case as well?

11          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No.

12  Just -- I don't know, no, there was no criminal intent

13  involved.  They just pulled him over for drunk driving.

14          MS. CAIN:  Okay.  And did you have to deliberate on

15  whether someone was liable or whether someone was guilty or

16  not?

17          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Whether he

18  was guilty or not, yes.

19          MS. CAIN:  Okay.  And based on the evidence that was

20  presented in that particular case, what was the outcome?

21          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Not guilty.

22          MS. CAIN:  And then I'm going to mispronounce your

23  name.  Juror 020.

24          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Juror 020.

25          MS. CAIN:  Okay.  I was close.  You mentioned also

114

1    being involved in a DUI trial.

2           PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Correct.

3           MS. CAIN:  Was that a criminal case?

4           PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Actually I

5    don't recall.  I think so, but I don't really recall.

6           MS. CAIN:  Okay.  And whether it was civil or

7    criminal, based on the evidence that was presented in that

8    particular case, was the jury able to reach a verdict?

9           PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Yes.

10          MS. CAIN:  And what was that verdict?

11          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  It was guilty.

12          THE COURT:  Okay.  I can hear easily, but make sure

13   we have the microphone.  I'm not sure where it is.

14          PROSPECTIVE JUROR SEAT NUMBER SIX:  Can you talk

15   louder?

16          MS. CAIN:  Yes.  I'm sorry.

17          Juror 020, one more question.  If we can pass the

18   microphone.  I apologize.  Your Honor.

19          THE COURT:  That's fine.

20          MS. CAIN:  You mentioned earlier that you had some

21   training with computer forensics.

22          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Correct.

23          MS. CAIN:  What kind of training did you receive?

24          PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Community

25   college classes in how to -- encryption and how to try to

1    break encryption and things of that nature.

2         MS. CAIN:  Okay.  Did you learn anything about EnCase

3    or --

4         PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Yes.

5         MS. CAIN:  Oh, you did.

6         PROSPECTIVE JUROR SEAT NUMBER SEVEN:  EnCase is one

7    of the software programs we used.

8         MS. CAIN:  And was this computer forensics for

9    purposes of some sort of criminal investigations or antifraud

10   or what was it for?

11        PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Antifraud.  I

12   also have a -- well, one of my other certifications is

13   certified fraud examiner.  And as a CPA, you always have to do

14   continuing education, especially in fraud.  And so that was

15   how I got some of my CE.  Pretty much just because I wanted to

16   learn about it.

17        MS. CAIN:  Okay.  And then after taking those

18   classes, have you ever been employed in that capacity doing

19   anything with the forensics?

20        PROSPECTIVE JUROR SEAT NUMBER SEVEN:  The

21   forensics --

22        MS. CAIN:  Encryption and EnCase and that sort of

23   thing?

24        PROSPECTIVE JUROR SEAT NUMBER SEVEN:  No.

25        MS. CAIN:  And was your computer forensics, were you

116

1   pursuing it as a hobby or was it as some sort of other work,

2   job that your employer had you do?

3        PROSPECTIVE JUROR SEAT NUMBER SEVEN:  Complete hobby.

4   My work was not involved.

5        MS. CAIN:  I have nothing further, Your Honor.

6        THE COURT:  And on behalf of defense.

7        MR. FALLER:  Thank you, Your Honor.

8        Good morning again, ladies and gentlemen.  As the

9   Court told you a little bit earlier, my name is Carl Faller.

10  I'm a lawyer here in Fresno.  And I represent Mr. McCormack in

11  this case.

12       Now as the Court also told you, that as Mr. McCormack

13  sits there -- I want to make sure everyone's still clear on

14  that.  As he sits there, if you were asked to raise your hand

15  and vote whether he's guilty or not guilty, your verdict would

16  have to be not guilty.  Is everyone clear about that?  Because

17  you haven't heard any evidence.

18       Now, also one of the things that the Court mentioned

19  to you is when you are functioning as a jury, that the Court

20  will give you the legal parameters of what we're doing in

21  here.  But you are judges too, you're going to be the judges

22  of the facts.

23       And is everybody comfortable with the idea that you

24  will eventually have to perhaps decide between one or more

25  people who say different things about an event and you're

1    going to have to decide who's actually telling the truth?  Is

2    everybody -- everybody comfortable making that determination?

3            Because as part of that, you're obviously going to

4    have to decide someone is truthful but someone else is

5    untruthful.  And it may be uncomfortable to make that

6    decision, depending on who they happen to be as part of the

7    case.  Is everybody comfortable in being able to decide that

8    someone is untruthful?

9            It's possible -- and I'm not telling you it's going

10   to happen.  It's possible that someone you think is being

11   untruthful might be the parents of one of the children

12   involved here.  Can everybody assure me that you will not be

13   blinded by some of the horrific things that you are likely to

14   see and hear, that you'll still clearly listen to what is said

15   even by people that might be close to the children involved

16   and be able to make a determination of whether they're

17   actually telling you the truth?  Can everybody promise me

18   that?

19           Okay.  Now, I also will -- and then the Court has

20   addressed it on a couple of different occasions.  You're going

21   to hear and -- see and hear about some pretty horrific things.

22   There's no way to sugarcoat that.  I anticipate that you're

23   going to see children being victimized by someone.

24           And can everybody assure me that despite the fact

25   that you are going to see those things and know that someone,

1    a child was hurt in this case, that you are going to be able

2    to step back from that and impartially judge whether the

3    person involved in that was Mr. McCormack?  Because that is

4    going to be your job.

5          Can everybody promise me that you're willing to do

6    that?  Because I can tell you, it's common -- it's human

7    nature that when you see something horrendous happen to

8    somebody, especially a child, the idea is somebody's got to

9    pay.  I think you would agree with me that's a natural

10   inclination.  Okay?  And you realize that as we sit in this

11   courtroom, there's only one person here available to be made

12   to pay and that's Shawn McCormack.

13         And can you please assure me that despite all of the

14   things that you may hear and see, that you will judge

15   impartially whether the evidence and the evidence alone shows

16   that Mr. McCormack is responsible for what happened.  Can you

17   assure me of that?  Can you promise me that?  Because that's

18   really the bottom line --

19         PROSPECTIVE JUROR SEAT NUMBER ONE:  I don't know if

20   I'm comfortable with that.  With seeing evidence of a child

21   being hurt and I don't know.  As a mother and a grandmother, I

22   don't know.  I've been sitting here wrestling with that all

23   morning.  To be honest.

24         MR. FALLER:  And are you concerned that -- and you're

25   Ms. --

119

1        PROSPECTIVE JUROR SEAT NUMBER ONE:  Juror 001.

2        MR. FALLER:  Juror 001.  Are you concerned that the

3   things that you might see might put you in a position to make

4   a decision that --

5        PROSPECTIVE JUROR SEAT NUMBER ONE:  I don't know if

6   I'm comfortable seeing the evidence.  I'm afraid that I would

7   be emotional and I would react on an emotional level rather

8   than an impartial level.

9        MR. FALLER:  Well, and I think what the Court will

10  tell you is that what jurors are here to do is to make a

11  decision based solely on the evidence.

12       PROSPECTIVE JUROR SEAT NUMBER ONE:  I understand

13  that.  I just -- I just can't say that my emotional side won't

14  take over.  My mother side won't take over.

15       MR. FALLER:  Uh-huh.  And I think --

16       PROSPECTIVE JUROR SEAT NUMBER TWO:  I'm the same way.

17  I'm a big mama bear, so when it comes to kids, I'm just --

18       PROSPECTIVE JUROR SEAT NUMBER ONE:  I work at a

19  school.

20       PROSPECTIVE JUROR SEAT NUMBER TWO:  Pulls at the

21  heart strings.

22       MR. FALLER:  Would the Court like to ask some

23  additional questions perhaps?

24       THE COURT:  Okay.  Yeah, again, this would apply.

25  And I think Mr. Faller has pointed out to all of you the

1  circumstances I mentioned earlier.  But I think he's added

2  greater detail with respect to what you might see.

3       There are a couple of things that you need to be

4  aware of.  First of all, it is your duty as a juror, as I

5  indicated, that you have to see everything.  In other words,

6  you can't say "I can be a juror, but I don't want to see this

7  stuff."  You have to see all the stuff.  I mean, that's it.

8       Now, so if any of you are saying I will not look

9  at -- if I think something is offensive to me, I'm not even

10  going to look at it.  That's a concern.  The other concern is,

11  well, okay, I'll look at it but it's going to upset me so

12  much.

13       But then what does that do?  I mean, when you're

14  upset, is it -- and the key thing here is are you going to be

15  upset to where you just can't function as a juror.  You know,

16  let me out of here, I've seen enough, I need to go home.

17       Or is it going to be, okay, I'll look at the stuff,

18  it disgusts me, no matter what I'm going to find Mr. McCormack

19  guilty.  Somebody's got to pay.  He's the only one in the

20  courtroom.  I'm sorry, but, you know, this is only -- we're

21  just getting into the trial itself, I haven't heard anything

22  else, but I've seen some pictures.  He's guilty, period, let's

23  get this over with.

24       So those are the sorts of things.  And again, those

25  are sort of graphic ways of sort of describing how

1    this -- there's no question that there's got to be an

2    emotional response by people.  For example, again, I'll get

3    back to the issue regarding -- or the scenario of the traffic

4    collision where somebody is horrifically injured.

5          Let me give you a real life example.  I had a jury

6    trial where a woman went into a hospital and apparently got

7    infected with some super bug and her skin just peeled off.

8    She swoll up, her skin peeled off.  And they had to put her

9    under sedation for weeks as she tried to heal, get healed up.

10   And the pictures of her with just her skin just exploding,

11   just was horrific.

12         And those are the sorts of things that sometimes

13   jurors have to see.  And I'm not equating that with what you

14   might see in this case.  But what I did mention earlier is

15   that jurors are going to see some things that you're just not

16   normally accustomed to seeing.

17         And the question is whether or not, understanding

18   what you've heard about the case from the statement and what

19   you've heard from the attorneys, is this the kind of case that

20   is going to affect you to the extent that you cannot be fair

21   and impartial to both sides?  That you can't see and hear all

22   the evidence that even though there might be some emotional

23   reaction, that you can then steady yourself and say, okay,

24   I've seen it.  It's horrific.  They told me it was horrific

25   and it was.  Okay.  Now here's the law.  These are the

1    elements, et cetera, including the who done it part and I'm

2    going to base this strictly on the evidence.

3        Or are you going to shut down at some point and say,

4    "I'm not going to look at the stuff.  I'll look at it but I'm

5    done with this trial."  Or "I've looked at it and he's guilty

6    no matter what."  Those are some of the concerns.

7        And so it is not improper for the jurors to see and

8    hear evidence and be emotionally affected.  The question is,

9    for the jury, can you then sit down and do your job, which is

10   to decide what the facts are no matter how horrific the

11   evidence might be.

12       So Juror 001, Juror 023, for all of you that's the

13   bottom line question.  Nobody expects you to sit there just

14   stone face and go, "Hm, okay, molestation, okay, seen it every

15   day."  We're not asking that of you.  But we are asking you

16   once you decide the case, that you decide it based on the

17   evidence and not because you're so emotionally overwhelmed,

18   upset, whatever, that you would not decide it on the evidence.

19       So that's really what we're looking at.  I think it

20   is those aspects.  And so for all of you, that would be a

21   bottom line question as to whether or not you ultimately could

22   be fair and impartial to both sides no matter what the

23   evidence is.

24       So -- and again, I'll allow both counsel, both sides

25   to follow up on that because this is something that we need to

1  certainly address with all of you to make sure that everyone

2  is clear on what we'll be able to hear.

3       So Mr. Faller can ask some followup and I'll

4  certainly allow government counsel to ask some followups too

5  in this area.  And then Juror 001, Juror 023, anyone else, you

6  can give us your thoughts on that.  We'll go ahead and

7  continue then.

8       MR. FALLER:  Juror 001, I'm afraid I'm going to

9  continue to pick on you a little bit.  You've heard what the

10 judge said about the particular roles that we have here and

11 about the necessity of a jury being able to objectively view

12 evidence and make a decision based only on the evidence.

13      Do you feel that because of the type of charges,

14 because of your own feelings, that you may not be able to have

15 that objectivity, that you could judge the evidence

16 objectively and dispassionately?

17      PROSPECTIVE JUROR SEAT NUMBER ONE:  I would like to

18 think that I could.  But even just sitting here now, I'm about

19 to cry and I have no idea what the evidence is.

20      MR. FALLER:  So you think your emotional reaction

21 might be so great that that would --

22      PROSPECTIVE JUROR SEAT NUMBER ONE:  That I'll be a

23 crying mess up here?  Probably.

24      MR. FALLER:  And perhaps cloud your judgment about

25 what the evidence truly shows.

1          PROSPECTIVE JUROR SEAT NUMBER ONE:  It could.

2          MR. FALLER:  Juror 023, what is your frame of mind

3     right now?

4          PROSPECTIVE JUROR SEAT NUMBER TWO:  For me, it's not

5     so much -- I want to say it's partially the evidence.  As a

6     nurse and as a tissue recovery technician, I see a lot.  I've

7     seen a lot.

8          MR. FALLER:  Sure.

9          PROSPECTIVE JUROR SEAT NUMBER TWO:  But this is a

10    topic that I'm not really familiar with.  I don't know anyone

11    who's been molested or -- I don't know.  But when it just

12    comes to the whole children being hurt or something done

13    against their will, I -- I don't know, I guess that's the mom

14    in me that comes out because I'm very, very protective.

15          But again, also I would like to think that I can sit

16    here and listen to all the evidence that's brought forth and

17    with a clear mind make that decision.  I'm not saying that my

18    emotions aren't going to get me because I am a mom, they

19    probably will.

20          MR. FALLER:  Sure.

21          PROSPECTIVE JUROR SEAT NUMBER TWO:  But I would like

22    to think that they wouldn't.

23          MR. FALLER:  And as far as both of you are

24    concerned -- and I think the Court would back me up on this --

25    nobody's expected to be a computer when they sit as a juror.

1   We don't expect that.  And none of us do.

2          And I have an eight month old grandson.  If somebody

3   hurt him, I mean, I'd want to track them down and kill them

4   myself.  But the law doesn't allow me to do that.  And in the

5   same way that I hope you understand that the law doesn't allow

6   you to let your emotions carry you away to the point that you

7   can't evaluate the evidence and make determinations based upon

8   the evidence.

9          And so that's really what we're asking you is if, in

10  your own good conscience, can you promise the Court, promise

11  the parties that you will be able to set these emotions aside

12  when evaluating the evidence and give Mr. McCormack, Shawn

13  McCormack, the benefit of your intellect and your common sense

14  separate and aside from whatever your emotions might be about

15  the subject matter?  And you're the only ones that can tell

16  us.

17          PROSPECTIVE JUROR SEAT NUMBER TWO:  I believe so.

18          MR. FALLER:  You believe so?  How about you, Juror

19  001?

20          PROSPECTIVE JUROR SEAT NUMBER ONE:  You want me to

21  promise something that I have no idea if I can promise.  I

22  don't know if I could set my emotions aside.  In honesty.

23          MR. FALLER:  That's all we're asking for.  That's all

24  we're asking for here.

25          PROSPECTIVE JUROR SEAT NUMBER ONE:  Because I do want

126

1   him to have a fair shake.  And I don't know if I could do that

2   if my emotions take over.

3          MR. FALLER:  Okay.  All right.  Let's let you off the

4   hot seat for a while.  And you can sit there and relax a

5   little bit.

6          You are going -- I anticipate that you will hear that

7   Shawn McCormack has -- if he didn't do the things that he's

8   accused of here, he may have done other things that you would

9   not approve of.  He may -- you may hear that he searched

10  internet sites that you would not approve of.  You may hear

11  that he viewed a type of photographic material that you will

12  not approve of, that may make you angry.  The judge will give

13  you specific instructions on how to approach and how to

14  evaluate that kind of evidence.

15         Can -- and again, can each of you individually assure

16  us that you will not judge Mr. McCormack guilty of these

17  particular charges just because he may have done other things

18  that you may not agree with and that you would never do

19  yourself and you may even think should be and possibly is

20  illegal.

21         Can you promise us that you can evaluate the evidence

22  in that way and follow whatever instructions the Court gives

23  you?

24         All right.  Because you may very well hear that.  And

25  in the end, you are the only people that can make a

1    determination of what's in your minds and what's in your

2    hearts about this case.  And how you are willing to approach

3    it.

4          And other than what these two folks have told us very

5    honestly about their own thoughts, is there anybody else,

6    because of what you're going to see and what you may hear,

7    that you will not be able to set aside your emotions and

8    objectively evaluate the evidence and decide what the facts

9    are and what actually happened and who is responsible?

10          Because in the end, no one is going to -- there won't

11    be anything on the verdict form where you're able to say this

12    is awful.  This never should have happened to these children.

13    This never should have happened to anybody.  There's no place

14    to put that.  And there's no place to put that you're angry

15    about it.  The only thing that you can put on that verdict

16    form to express outrage is that Shawn McCormack is guilty of

17    the charges.

18          Can you promise me that you will not let your outrage

19    carry you away so that you find him guilty if you have

20    reasonable doubt whether he is the responsible party?  And

21    that's something that all of us want.  And that's something

22    that you have to be able to do as jurors.

23          And other than these two folks, is everybody

24    comfortable with that role, believe you can fulfill that duty

25    according to the judge's instructions?

1          All right.  Thank you very much, ladies and

2    gentlemen, for being willing to serve in this particular

3    difficult role.  Some of you probably won't end up actually

4    having to do this.  But both Mr. McCormack and I appreciate

5    your willingness to take on this endeavor.  Thank you.

6          That's all I have, Your Honor.

7          THE COURT:  Okay.  Let's see.  If I can just have a

8    brief sidebar.

9          (The following proceedings were held at sidebar

10         between the Court and counsel:)

11         THE COURT:  Okay.  Just very briefly.  Do you want to

12   have a cause hearing?  If you do, I'm going to send the jury

13   out.  If there are any other issues that we need to address.

14   Because the next step is peremptory challenges.

15         MR. FALLER:  I would like to have a cause hearing

16   regarding Juror 001.

17         THE COURT:  Okay.  I don't know if there's much more

18   that can be done on that one.

19         MR. FALLER:  The other one, I think she answered

20   sufficiently enough that I think she gets by.

21         THE COURT:  Okay.

22         MR. FALLER:  And so I'm not challenging her, but I am

23   going to challenge Juror 001 for cause.

24         THE COURT:  Do you want to be heard on that on the

25   record?  I mean, we're on the record.

1          MS. CAIN:  May I confer with them briefly?

2          THE COURT:  Sure.

3          (Discussion between government counsel,

4          not reported.)

5          MS. CAIN:  Okay.  We don't oppose the cause

6   challenge.

7          THE COURT:  So what we'll do, I'll excuse her.  We'll

8   take the next one up.  We'll probably take the noon break and

9   then we can chat a little bit more.

10         MS. CAIN:  Okay.  Thank you.

11         MR. FALLER:  Thank you.

12         (The following proceedings were held in open court:)

13         THE COURT:  All right.  What we'll do, Juror 001,

14  we'll go ahead and let you go from this particular case.  You

15  know, we'll have you call that 800 number after five o'clock

16  on Friday for the next assignment.  We will excuse you from

17  this particular case.

18         THE CLERK:  Juror 028.

19         THE COURT:  Juror 028, if you can take seat number

20  one there.  All the way up to the front.  And we'll get the

21  microphone to you.  You got it there?

22         Let me get you up to speed with everyone else.  First

23  of all, do you know anything about this case?

24         PROSPECTIVE JUROR SEAT NUMBER ONE:  Well, my name is

25  Juror 028, I'm from Bakersfield.  And I remember something in

1    our local paper about this.  But I may be wrong.

2                THE COURT:  Okay.

3                PROSPECTIVE JUROR SEAT NUMBER ONE:  But I don't

4    remember what the details were.

5                THE COURT:  All right.  If you happen to remember

6    whatever it is, even during the course of trial, you have to

7    totally disregard it for the purpose of this case.  Do you

8    understand that?

9                PROSPECTIVE JUROR SEAT NUMBER ONE:  Yes.

10               THE COURT:  You okay with that?  Now, if it turns out

11   during the course of the trial, if you're selected to serve as

12   a juror and maybe from the evidence, you go, "oh, I do

13   remember something," you just need to let us know and then we

14   can followup on it.

15               Okay.  But regardless, whatever you might have seen

16   or heard, especially in the news media, they don't always get

17   everything correct.  So this is really where you will

18   determine the facts.  You okay with that?

19               PROSPECTIVE JUROR SEAT NUMBER ONE:  Yes.

20               THE COURT:  Perfect.  Do you know anybody we've

21   mentioned by name so far?

22               PROSPECTIVE JUROR SEAT NUMBER ONE:  No.

23               THE COURT:  Can you give us some background

24   information on yourself?

25               PROSPECTIVE JUROR SEAT NUMBER ONE:  I work as a

1  mechanic.  I've been employed with a construction company for
2  27 years now.  Retiring this year.  I have -- I'm married, I
3  have five adult children.  You want to hear about them all?
4        THE COURT:  Yeah.  Just if they're employed outside
5  the home, yes, I'd love to hear.
6        PROSPECTIVE JUROR SEAT NUMBER ONE:  My oldest son
7  works for Halliburton, he's a directional driller out of
8  Bakersfield.  My oldest daughter, she's in commercial sales
9  for Ford dealership in Bend, Oregon.  My next daughter, she
10  owns a hair salon and works that in Corvalis, Oregon.  My
11  youngest daughter, she works for Geico in Houston, Texas.  And
12  my youngest son, my golden child, is in his 11th month at Teen
13  Challenge right now.
14        THE COURT:  All right.  And any other adults living
15  in your household?
16        PROSPECTIVE JUROR SEAT NUMBER ONE:  No.
17        THE COURT:  Okay.  Educational background?
18        PROSPECTIVE JUROR SEAT NUMBER ONE:  11th grade.
19        THE COURT:  All right.  Any scheduling issues we need
20  to address?
21        PROSPECTIVE JUROR SEAT NUMBER ONE:  Not unless it
22  gets into June.
23        THE COURT:  Perfect.  Thank you.  It will not.  Have
24  you ever served as a juror before?
25        PROSPECTIVE JUROR SEAT NUMBER ONE:  Yes.

1          THE COURT:  How many times?

2          PROSPECTIVE JUROR SEAT NUMBER ONE:  Just one time and

3     it was here.

4          THE COURT:  Okay.  Was it criminal or civil case?

5          PROSPECTIVE JUROR SEAT NUMBER ONE:  Civil.

6          THE COURT:  Do you remember what kind of a case it

7     was?

8          PROSPECTIVE JUROR SEAT NUMBER ONE:  A woman was suing

9     the City of Corcoran.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR SEAT NUMBER ONE:  And she didn't

12    get anything.

13          THE COURT:  All right.  Anything about that

14    experience that would affect your service as a juror here

15    today?

16          PROSPECTIVE JUROR SEAT NUMBER ONE:  No.

17          THE COURT:  Ever been a party to or witness to any

18    legal proceedings?

19          PROSPECTIVE JUROR SEAT NUMBER ONE:  No.

20          THE COURT:  All right.  Any other exposure to the

21    legal system or the Court system or anything like that?

22          PROSPECTIVE JUROR SEAT NUMBER ONE:  No.

23          THE COURT:  Okay.  All right.  You heard what your

24    role is in terms of credibility of witnesses, including issues

25    relating to job titles such as law enforcement.  Is there

1   anything in your own background, either knowing law

2   enforcement or maybe someone who had a bad experience with law

3   enforcement, that you need to mention to the parties here?

4           PROSPECTIVE JUROR SEAT NUMBER ONE:  No.

5           THE COURT:  Okay.  As far -- I won't ask all

6   the -- repeat all the questions, I know you've heard them all.

7   But was there any question that I asked or the lawyers asked

8   and any answers that were given by any of the other

9   prospective jurors that, sitting out in the audience area, you

10  would have said something more about or something different

11  than what's been said so far?

12          PROSPECTIVE JUROR SEAT NUMBER ONE:  No.  I -- the

13  only thing I really have to say is I'm like a lot of the

14  jurors that's been up here, you know, I'm kind of real

15  uncomfortable with the whole topic.  But --

16          THE COURT:  Yes.  And I would be surprised if people

17  weren't uncomfortable.  I mean, it's not an easy topic.  Very

18  few topics are easy, even your own prior jury service.  Even

19  though that's probably a civil rights case, there's nothing

20  particularly pleasant about that.  I'm not trying to compare

21  that to this case.

22          But understanding that, is there anything about the

23  kind of case that this is that makes you feel -- and of course

24  you've sat in the audience area all morning to think about it,

25  that would cause you not to be able to be fair and impartial

1  to both sides in this case?

2         PROSPECTIVE JUROR SEAT NUMBER ONE:  I think -- I

3  think I would be a good juror.  I would like to see this guy

4  get a -- you know, a fair trial.  I think it's going to be

5  hard for somebody not to be biased, you know, with this.  I

6  would hope that the guy is not guilty.

7         THE COURT:  Okay.  Yeah.  And let me make it clear.

8  I think Mr. Faller has made it clear to you during the

9  questioning that this is not going to be pleasant, but we're

10  not asking the jury, as Mr. Faller said, to be computers,

11  robots or whatever.  There are emotional aspects in every

12  case.  Or most cases, anyway, certainly that I have presided

13  over.  And I do not expect jurors just to be totally so

14  objective that they don't see something and not be emotionally

15  affected by it.  But then it's a matter, again, of taking that

16  deep breath and then deciding the facts of the case.  You

17  think you'd be able to do that?

18         PROSPECTIVE JUROR SEAT NUMBER ONE:  Yes.

19         THE COURT:  Okay.  Anything else that was asked,

20  maybe something that was not asked yet that you feel you have

21  not had a chance to respond to simply because we just haven't

22  asked the right question?

23         PROSPECTIVE JUROR SEAT NUMBER ONE:  No.

24         THE COURT:  All right.  Prospective members of the

25  jury, it is 12 o'clock now.  What we'll do is when we come

1    back in, we'll continue on with Juror 028.  I'm going to allow

2    the attorneys to ask questions of you if they choose to do so

3    and then we'll continue on with the jury selection process.

4             Now, remember when you come back, those of you in the

5    jury box, the 18 of you, you need to be seated back where you

6    are now.  Those of you in the audience area obviously can be

7    seated anywhere that's comfortable for you in the audience

8    area.  We will resume at 1:30 this afternoon.  We'll finish up

9    the jury selection this afternoon and begin the case.

10            So, all right.  I need to mention one thing to you.

11   And you probably saw this on the break.  Now, the parties in

12   this case, the lawyers especially, really there's too many of

13   you for them to recognize all of you.  But they probably

14   recognize most of you.  They cannot talk to you.  They can't

15   even say hello.  Maybe they can nod, acknowledging you.

16            But the thing that they're concerned about is even if

17   you went up to one of them and said "is there a good place to

18   have lunch here" or "wow, is it raining," or whatever, someone

19   else looking at that might say look at that lawyer, he's

20   trying to influence or she's trying to influence that juror

21   and then we have some problems.

22            So in order to alleviate that, they're not going to

23   talk to you.  Again, they may nod or something like that.  But

24   don't be upset or offended if they don't acknowledge you.

25   They pretty much know who most of you are, but not everyone.

1    They're not allowed to communicate with you.  This is a big

2    building, but you're going to bump into the lawyers, the

3    witnesses during the course of the trial simply because the

4    common areas are pretty small.  The hallway, the restrooms,

5    the cafe downstairs, the elevators, et cetera.

6            So if you run across anybody who's chatting about the

7    case for whatever reason during your lunch break, let me know

8    when you come back and we'll try to put a stop to that.  But

9    again, don't try -- try not to have that happen.

10           Okay.  We'll see you at 1:30 this afternoon.  We'll

11   finish up the jury selection this afternoon.

12           (The jury panel left the courtroom.)

13           THE COURT:  All right.  The jury has left for its

14   break.  We'll break in just a minute.  You can have a seat if

15   you wish.  Are there any matters that we need to take up

16   before we take our lunch break, plaintiff's side?

17           MS. CAIN:  Your Honor, may I just ask one question

18   about the peremptory challenge phase and how you work it.

19   When it comes to this alternating of peremptory challenges,

20   can they only be used on people in the back two rows in the

21   box, they can't be used on the front row?

22           THE COURT:  Correct.  Anything else for plaintiff?

23           MS. CAIN:  No.

24           THE COURT:  Anything for the defense?  Now let me go

25   ahead and explain how we're going to do this.  Obviously, once

1   we wrap this up, we will have -- if there's a challenge issue,

2   probably what I'll do with Juror 028, we did have -- and

3   actually, that was reported, that sidebar.  If there are any

4   cause issues, I'll send the jury out.  We'll deal with cause

5   issues.  Once we resolved all the cause issues, we'll go right

6   into peremptory challenge.

7           Now, on the peremptory challenge, yes, you're

8   focusing on the 12 in the box.  That's your jury.  The six in

9   the front row, starting with number 13 would be the

10  replacements if you exercise a peremptory.  So you know who

11  your next six jurors are going to be in that order, 13 through

12  18.  What we do is that --

13          THE CLERK:  We have a prospective juror here, judge.

14  I'm sorry.

15          THE COURT:  Glad you mentioned it.  So because the

16  government has six and the defense has ten, we go plaintiff's

17  peremptory, defense peremptory, plaintiff's peremptory,

18  defense, defense, plaintiff, defense, defense.  Et cetera

19  until we get down to the end where it will be plaintiff's

20  peremptory, defense peremptory.

21          Now, you can pass tactically and preserve all of your

22  peremptories that you have remaining.  But if you pass

23  tactically, or you pass regardless, and the other side passes

24  behind you, it's over.  Okay.  So be careful about passing

25  tactically because if you pass tactically and the other side

138

1    passes behind you, don't get up and say, "yeah, I made a

2    mistake, changed my mind," whatever.  It's over.  It's too

3    late.  So you exercise your -- that tactical aspect to your

4    own peril.  Okay?

5         Now, we'll go ahead -- and it will go pretty quickly.

6    The first seven peremptories, because that will take care of

7    the six in the front row and one in the box.  So that once

8    seven peremptories have been exercised, there will be one

9    opening in the jury box and six in the front.  Ms. Gaumnitz

10   will then call seven names.  The first name called will fill

11   the box, the next six will go 13 through 18.

12        We'll continue on with the voir dire of the new seven

13   only and we'll go through that process.  Any cause issues.

14   And then once we finish the cause issues for those new seven,

15   we'll continue on with the peremptories right where we left

16   off and go on.  And again, focusing on the 12 in the box.  You

17   know that your next six are going to be 13 through 18.  And

18   we'll continue that process until you both pass or you run out

19   of peremptories.

20        Then we'll do the alternate jurors.  You get one

21   additional peremptory each that can only be exercised on an

22   alternate juror.  We'll have alternate juror number one and

23   alternate juror number two.  Whoever is -- assuming we still

24   have people in that front row, whoever is up next would be the

25   first alternate juror subject to peremptories and we'll keep

139

1    going down the row until we get the first and second alternate

2    jurors.  So anyway, that's the process.

3             We'll see you at 1:30 this afternoon.

4             MR. FALLER:  Thank you, Your Honor.

5             MS. CAIN:  Thank you, Your Honor.

6             (Lunch recess.)

7             THE COURT:  Meeting outside the presence.  Anything

8    we need to take up before we have the jury panel come in?

9             MS. CAIN:  Not from the government, Your Honor.

10            THE COURT:  Just one thing.  What we'll do is I'll

11   allow counsel, of course, to ask questions of Juror 028.

12   We'll do another sidebar with respect to cause matters, if

13   necessary.  And then proceed on from there.

14            Are there any -- before the jury panel comes back,

15   are there any cause matters that we should at least consider

16   so that I'll know whether to send the jury back out?

17   Depending, of course, on the followup responses from Juror

18   028.

19            MS. CAIN:  Not from the government's perspective,

20   Your Honor.

21            MR. FALLER:  Not on my behalf, Your Honor.

22            THE COURT:  All right.  Depending on how he responds,

23   then, I may just ask you would you wish a sidebar.  If you say

24   no, then that basically means you pass for cause and we'll

25   start the peremptory challenge stage.

1        MR. FALLER:  Yeah.

2        MS. CAIN:  Okay, Your Honor.

3        MR. FALLER:  That makes sense.

4        MS. CAIN:  Thank you.

5        THE COURT:  Anything before we have the panel come

6    back in?  Let's have the panel come on in.

7        (The jury panel entered the courtroom.)

8        THE COURT:  All right.  The record will reflect that

9    the jury panel has returned.  Before we continue on, let me

10   ask:  Juror 028, over the noon hour, have you thought of

11   anything that you might -- that you have not had a chance to

12   mention regarding your service as a juror that you would like

13   to mention at this point?

14       PROSPECTIVE JUROR SEAT NUMBER ONE:  No.

15       THE COURT:  All right.  I'm going to allow the

16   attorneys to ask questions if they wish.  First on behalf of

17   plaintiff's side.  Questions?  Of Juror 028?

18       MS. CAIN:  No questions, Your Honor.

19       THE COURT:  Defense.

20       MR. FALLER:  No questions, Your Honor.

21       THE COURT:  Okay.  Then with respect to -- either

22   party wish a sidebar again for cause?

23       MS. CAIN:  Not from the government, Your Honor.

24       MR. FALLER:  No, Your Honor.

25       THE COURT:  Okay.  Those of you on the jury panel,

1   basically the question that I asked the attorneys was on a

2   sidebar for cause.  What that means is was there any reason

3   why they felt from a legal standpoint, based upon your

4   responses or otherwise, that you should not serve as a juror

5   in this case.  And they both indicated no.  What that means is

6   that all 18 of you are really qualified to serve as jurors.

7          We're going to start next, the next phase, which is

8   what we call the peremptory challenge phase.  Now, as

9   mentioned to you a little bit earlier, a little side note that

10  I want to tell you that the jury in this case will be 12.  The

11  reason we seat 18 of you is it's almost as easy to ask

12  questions of 18 as it is 12.

13         On the peremptory challenge portion now, the parties

14  are entitled by law -- and this is true in both state and

15  federal court -- to exercise what we call peremptory

16  challenges.  That is that they can ask to thank and excuse any

17  one of you.  They won't give a reason, they're not allowed to.

18  But it's obviously not based on what you had said or not said,

19  it's really based on their subjective opinion regarding

20  looking at you in terms of individually and a jury as a whole,

21  age, background, geographic location, et cetera.

22         Now, and we're going to focus of the 12 in the jury

23  box.  And if any of you are excused, then, of course, those of

24  you on the front row will begin to take their places as we'll

25  continue on.

142

1          Now, if we do exhaust the six in the front row and

2     then one in the box, then of course we're going to call up

3     some more of you to come and take their place.  So those of

4     you in the jury panel still in the audience area, you're still

5     very much a part of the jury selection process.

6          Okay.  So with that, once -- if you are excused, you

7     can go ahead and leave.  If you need to check with the jury

8     clerk for a note indicating you're here or whatever, you can

9     do that.  Otherwise you're free to leave.  You will need to

10    call that 800 number after five o'clock Friday to see if there

11    is another assignment coming up.  But otherwise you would be

12    excused with our thanks.  It goes fairly quickly, but we

13    obviously appreciate you coming in and your willingness to

14    serve as jurors in this case.

15         Okay.  So we'll start the peremptory challenge stage,

16    we're going to start with the plaintiff side.  And the

17    plaintiff government may exercise its first peremptory.

18         MS. CAIN:  Thank you, Your Honor.  Number seven,

19    Juror 020.

20         THE COURT:  Juror 020, you are excused with our

21    thanks.  And thank you very much.

22         And so we'll have Juror 027, if you can go ahead and

23    take that please, seat.   And we'll move to the defense, it is

24    the defense peremptory.

25         MR. FALLER:  Thank you, Your Honor.  We'd ask the

143

1    Court to thank and excuse Juror 023.

2              THE COURT:  Number two, Juror 023, you are excused

3    with our thanks.  And thank you very much.

4              Juror 014, if you can go ahead and take that seat,

5    please.  That's seat number two.

6              We'll move back to the plaintiff's side.  Plaintiff's

7    next peremptory.

8              MS. CAIN:  We're going to pass, Your Honor.

9              THE COURT:  All right.  And we'll move next to the

10   defense side.  It is the defense peremptory.

11             MR. FALLER:  Yes, Your Honor.  Thank you.  We'd ask

12   the Court to thank and excuse Juror 027.

13             THE COURT:  Juror 027, you are excused with our

14   thanks.  Thank you very much.

15             Juror 015, if you can go ahead and take that seat.

16   That's seat number 7 there, all the way to the end.

17             Okay.  And it is still the defense peremptory.

18   Defense next peremptory.

19             MR. FALLER:  Thank you, Your Honor.  We'd ask the

20   Court to thank and excuse Juror 009.

21             THE COURT:  All right.  Juror 009, you are excused

22   with our thanks.  Thank you very much.

23             And Juror 016, you can go ahead and take that seat,

24   please.

25             All right.  Move back to the plaintiff's side.  It is

144

1   the plaintiff's next peremptory.

2          MS. CAIN:  The United States passes, Your Honor.

3          THE COURT:  All right.  And the next defense

4   peremptory.

5          MR. FALLER:  Yes.  We'd ask the Court to thank and

6   excuse Juror 026.

7          THE COURT:  All right.  Juror number six.

8          PROSPECTIVE JUROR SEAT NUMBER SIX:  Me?

9          THE COURT:  Yes.  You are excused with our thanks.

10  Thank you very much.

11         All right.  Juror 019, if you can go ahead and take

12  that seat.  It's on the top row there.

13         Still defense peremptory.  Defense next peremptory.

14         MR. FALLER:  May I have just one moment, Your Honor?

15         THE COURT:  Sure.

16         MR. FALLER:  Your Honor, the defense passes.

17         THE COURT:  It is the plaintiff's peremptory.

18         MS. CAIN:  Your Honor, the government thanks and

19  excuses number six, Juror 019.

20         THE COURT:  Juror 019, you are excused with our

21  thanks.  Thank you very much.

22         Juror 025, if you could please take that seat,

23  please.

24         All right.  It is the defense peremptory.

25         MR. FALLER:  Your Honor, the defense passes.  Thank

145

1    you.

2         THE COURT:  Back to the plaintiff.  It is plaintiff's

3    next peremptory.

4         MS. CAIN:  The United States passes as well, Your

5    Honor.

6         THE COURT:  Very well.  Both sides have passed

7    consecutively.  All right.  Those of you in the jury box, you

8    would now be the jury in this case.  So if there's any reason

9    why you cannot serve as a juror in the case, now is the time

10   to let us know.

11        Okay.  No response.  If you'd please sit

12   right -- stand right where you're at, the clerk will

13   administer an oath to you.

14        (The jury was sworn.)

15        THE COURT:  Please be seated.  All right.  Now, we're

16   going to select two alternate jurors.  So the jury is set now,

17   but we are going to seat alternate jurors.  So what we're

18   going to do is just go ahead and fill the front row.

19        THE CLERK:  Juror 029, how do you correctly pronounce

20   that?

21        PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Juror 029.

22        THE CLERK:  Juror 029.  Thank you.  Juror 030.

23        THE COURT:  Juror 029, if you can just take that

24   first seat there, the very front.

25        THE CLERK:  Juror 031.  Juror 032.  Juror 033.  Juror

146

1    034, how do you say your last name?

2              PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:   Juror 034.

3              THE CLERK:   Thank you.

4              THE COURT:   Okay.   Now, for the six of you who have

5    just joined us.   I'll tell you right now, you sat through all

6    the morning.   You heard all the questions and all the answers

7    given so far.   So I'm not going to repeat all the questions

8    all over again.

9              Of course there are some that are unique to you that

10   I am going to ask you specifically.   But the fact that I don't

11   ask a question that was asked this morning or the lawyers

12   don't ask the same exact questions doesn't mean they're not

13   important.   We just recognize that you've heard the questions

14   and answers.   And I am going to urge you very seriously, even

15   though we don't ask you the specific question or we didn't ask

16   you a question -- we didn't ask the other prospective jurors

17   questions that you feel are significant or important to

18   mention to us, please I'm going to urge you to speak up.

19             But I'll just go ahead first and ask you each a

20   number of questions.   I'm not sure where the microphone wound

21   up.

22             Great.   Yeah.   If you could just go ahead and pass

23   that down to Juror 029.   But I'm going to first start out by

24   asking you a number of general questions to all six of you.

25             First of all, have any of the six of you heard

1    anything about this case at all?

2           All right.  Have any of you -- are any of you

3    acquainted with or related to anybody that we've mentioned by

4    name so far, including the prospective witnesses?

5           Okay.  I'm going to go ahead and ask you to give us

6    some background information.  And Juror 029, because it's been

7    a while, I'm going to go through each question with you again

8    and then, Juror 030, by the time I get to you and the rest of

9    you I'll just ask for the background information.

10          So let me ask:  First of all, Juror 029, first, where

11   do you live?

12          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Merced.

13          THE COURT:  Do you work outside the home?

14          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.

15          THE COURT:  What do you do?

16          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Do

17   instrumentation for Modesto Irrigation District.

18          THE COURT:  All right.  And your marital status?

19          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Married.  My

20   wife also works outside the home.  She's Deputy Board Clerk

21   for Merced County.

22          THE COURT:  Okay.  Clerk for?

23          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Deputy Board

24   Clerk for Merced County.

25          THE COURT:  For the board of supervisors then?

1          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Yes.

2          THE COURT:  Perfect.  And any children?

3          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  22 year old

4    and he works outside the home as a construction.

5          THE COURT:  All right.  Any other adults living in

6    your household?

7          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  No.

8          THE COURT:  Your educational background?

9          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  Associates

10   degree in electronics.

11         THE COURT:  Okay.  Good.  Thank you.  If you'd just

12   pass the microphone down.

13         Then Juror 030, if you can give us some background

14   information on yourself.

15         PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  I'm from

16   Kingsburg.  I'm a respiratory therapist.  I'm married.  My

17   husband is a correctional officer.  We have two children, ages

18   6 and 3.  And I have an associates degree.

19         THE COURT:  Okay.  Perfect.  If you'd pass the mike

20   down then to Juror 031.

21         PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  Hi.  I'm from

22   Madera.  I live with my girlfriend, her son and her brother.

23   I have one daughter and two grandchildren.  I work in

24   printing.

25         THE COURT:  Who do you work for in the printing

149

1   business?

2          PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  FTB, Fresno

3   Trade Bindery here in town.

4          THE COURT:  Does your girlfriend or any of the adults

5   living in the household, do they work outside the home?

6          PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  Yes, just one

7   is employed.  My girlfriend.  She works at Taco Bell.

8          THE COURT:  And your educational background?

9          PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  High school

10  graduate.

11         THE COURT:  Thank you.  Pass the microphone down then

12  to Juror 032.

13         PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  I live in

14  Porterville.  I'm employed as a high school math teacher.  I

15  live with my dad and stepmom.  My dad is a history teacher,

16  high school level.  And my stepmom was an elementary school

17  teacher for like 20 years and this year she's a substitute.

18  And educational background, I have my bachelors in computer

19  science.  And did I miss something?

20         THE COURT:  No, that's good.  Any other adults living

21  in the house?

22         PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  Just my

23  parents.

24         THE COURT:  And Juror 033.

25         PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  I live here

1    in Fresno.  I'm just recently medically disabled so I don't

2    work anymore.  My husband works for the -- he's a correctional

3    officer.  And high school.

4              THE COURT:  Any other adults live in your household?

5              PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No.

6              THE COURT:  Okay.  Great.  Thank you.  Juror 034.

7              PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Yeah.  I'm

8    divorced.  I have two sons, 28 and 26.  I'm a computer

9    operator at the -- at Department of Treasury.  I live with my

10   mom.  And she's retired.

11             THE COURT:  What did your mom do before she retired?

12             PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  She worked

13   for the Department of Treasury also.

14             THE COURT:  And the grown children, do they work

15   outside the home?

16             PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Yeah.

17             THE COURT:  What do they do?

18             PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  My son -- my

19   older son, he works at Edwards and he also has his own

20   business.  And he goes to college also.  And my younger one,

21   he goes to college only.  Doesn't work.

22             THE COURT:  Okay.  Do they have majors or emphasis in

23   college?

24             PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  No.

25             THE COURT:  So just general education in college

1    then?

2           PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Uh-huh.

3           THE COURT:  All right.  And then your educational

4    background is?

5           PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  Some

6    college.

7           THE COURT:  All right.  And how long have you worked

8    for the Treasury Department?

9           PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  34 years.

10          THE COURT:  And I'm sorry, what's your job

11   classification there?

12          PROSPECTIVE JUROR SEAT NUMBER EIGHTEEN:  I'm a

13   computer operator.

14          THE COURT:  Great.  Thank you.  Do we have any

15   scheduling issues for the six of you that we need to address?

16   Okay.  Yes.  Juror 033.

17          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  I have -- I

18   get infusions and I have one on the 13th.  They don't

19   reschedule because they have to do them in a timely -- they

20   have a set time that they're done.

21          THE COURT:  And what time -- that's --

22          PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  It's on the

23   13th.  But what I mean is I've had three already and they do

24   them like every two weeks, then six weeks and then eight

25   weeks.  So this next -- so that's the time schedule.

1        THE COURT:  And that's this Friday; right?

2        PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes.

3        THE COURT:  What time is it?

4        PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  It's at

5   11:30.

6        THE COURT:  So this is something you have to keep on

7   a schedule then?

8        PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Yes.

9        THE COURT:  You can't move it a day or week.

10       PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No.

11       THE COURT:  Okay.  I'll excuse you from this

12   particular case, but you'll have to call that 800 number after

13   five o'clock on Friday to see if there's a new assignment for

14   you.

15       PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Okay.

16       THE COURT:  We'll go ahead and fill that seat.

17       THE CLERK:  Juror 035.

18       THE COURT:  All right.  Juror 035, let's go ahead and

19   get you up to speed.  First, do you know anything about the

20   case?

21       PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No, sir.

22       THE COURT:  Do you know anybody we've mentioned by

23   name so far?

24       PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No, sir.

25       THE COURT:  Can you give us some background

1    information on yourself?

2              PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  Sure.  I

3    live in Copperopolis.  I am a full time real estate agent and

4    a notary public.  Married.  Two children.  20 year old son

5    going to Cal Fire.  14 year old daughter.  We have our foster

6    nieces that will probably be coming back with us and they are

7    two and six.

8              THE COURT:  Are they with you now?

9              PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  They were

10   with us for a year.  They went back with their parents for

11   four months and now it sounds like they're headed back our way

12   in two weeks.

13             THE COURT:  Two weeks from now.  And does your

14   husband work outside the home?

15             PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  He does.

16   He's a heavy equipment operator for Tygart & Son Construction.

17             THE COURT:  Any scheduling issues?

18             PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No.

19             THE COURT:  All right.  Now, for the six of you, some

20   of you had given some responses related to people in the law

21   enforcement area, correctional officers, et cetera and some of

22   you have computer skills which we'll probably get into a

23   little bit.

24             But aside from that, I'm going to ask you some

25   specific questions and we'll get into a little bit of those,

1    won't get into great detail.  But I would like you to

2    volunteer some information if you think it might be helpful

3    based on what you've heard of the other questions that were

4    asked and the answers that were given.

5            So let me ask:  Have any of the six of you ever

6    served as jurors before?

7            Okay.  Two of you, three of you have.  Let me start,

8    Juror 035, how many times have you served as a juror?

9            PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  I didn't

10   actually serve.  I was one of the last ones in the panel box

11   and was excused.  I was nine months pregnant, due like any

12   second and it was a long trial that they were looking at so I

13   was excused.

14           THE COURT:  Okay.  How long ago was that?

15           PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  20 years

16   ago.

17           THE COURT:  All right.  Anything about that

18   experience that would affect your service as a juror here

19   today?

20           PROSPECTIVE JUROR SEAT NUMBER SEVENTEEN:  No.

21           THE COURT:  Good.  Thank you.  Pass the microphone

22   down.  We had a couple of others who had served.  Yes, Juror

23   031.

24           PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  I served

25   about a year and a half ago.  It was a criminal case.  Guy on

1    parole got busted with a gun trying to use it on somebody and

2    got intervened by the police officer.  We found him guilty.

3            THE COURT:  All right.  Anything about that

4    experience that would affect your service as a juror here

5    today?

6            PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  No, sir.

7            THE COURT:  Can you set aside whatever you might

8    remember about that case for deciding this case?

9            PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  Yes.

10           THE COURT:  Great.  Perfect.  Thank you.  I think one

11   other person.  Juror 030.

12           PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Once.

13   Criminal case.  And it was a hung jury.

14           THE COURT:  How long ago was it?

15           PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  About five,

16   six years ago.

17           THE COURT:  What kind of a case was it?

18           PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Criminal.

19           THE COURT:  I mean, was it --

20           PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Aiding and

21   abetting type of case.

22           THE COURT:  All right.  Anything about that

23   experience that would affect your service as a juror here

24   today?

25           PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  No.

156

1          THE COURT:  All right.  And can you set aside, put

2     aside whatever you might remember about that case for the

3     purposes of deciding this case?

4          PROSPECTIVE JUROR SEAT NUMBER FOURTEEN:  Yes.

5          THE COURT:  All right.  Have any of you been a party

6     to or witness to any legal proceedings?  Any other experience

7     or relationship with the legal process, lawyers or the Courts

8     by any of you?

9          All right.  Now, I had mentioned earlier the basic

10    principles that guide this type of a case, the presumption of

11    innocence, the burden of proof, the fact that defendants do

12    not have to testify nor put on any evidence.  The standard of

13    proof is what we call beyond a reasonable doubt.

14         As you were listening to the exchanges regarding

15    those principles and, of course, the fact that Mr. McCormack

16    must be presumed at this point to be, in fact, not guilty.

17    Any of you have any questions, qualms, concerns about either

18    the principles or the application to this particular case?

19         All right.  In terms of credibility or believability,

20    again, that's totally within your province.  I give you some

21    basic instructions.  But other than that, we rely upon your

22    common sense and the common sense of your fellow jurors.

23         Is there anything about that aspect that would cause

24    you any concern about deciding credibility or believability of

25    witnesses?  Any of the six of you.

1          Okay.  Now, there was some discussion about

2     job -- what you would not consider in terms of deciding

3     credibility or believability.  One of them, of course, is job

4     title.  And a couple of you indicated that you have relatives

5     that are in law enforcement, correctional officers, whatever.

6     You've heard the questions and answers that were given so far.

7          Do any of the others of you, if you have not

8     mentioned so far, are acquainted with or related to people in

9     law enforcement?  Any of you that -- okay, yes.

10          PROSPECTIVE JUROR SEAT NUMBER FIFTEEN:  I got a

11     friend that's a probation officer and also works for a judge.

12          THE COURT:  All right.  Anybody else?  Other than

13     what you've mentioned so far.  Yes.  Juror 029.

14          PROSPECTIVE JUROR SEAT NUMBER THIRTEEN:  I have a

15     very good friend who's a sheriff.  Kern Sheriff right now.

16          THE COURT:  Anybody else?

17          Do any of those relationships, including those that

18     mentioned relationship with correctional officers, would that

19     have any impact or bearing on your ability to be what we call

20     fair and impartial in this case?  Any concerns by any of you

21     on that?

22          Now the flip side of that, of course, is what I call

23     possibly bad experiences.  You, a family member, close friend

24     ever been arrested or prosecuted for any offenses?  Again, I

25     don't want any detail, but does that apply to any of the six

1   of you?  Anything like that at all?

2          Okay.  Now, the other thing -- and we've talked

3   fairly extensively about it, but you've had a chance in the

4   audience there to think about it.  Is there anything about the

5   nature of this case, the kind of case that this is, it's been

6   explained to you as much as we possibly can between myself and

7   the attorneys what kind of a case this is, what you might sort

8   of anticipate.  Whether that causes you a concern about being

9   able to hear the case.

10         Obviously you have to listen to and see all of the

11  evidence.  We're not claiming that there wouldn't be, like

12  most cases, some emotional reaction from you, you're human, we

13  expect that.  But the bottom line is once you are then back

14  into your juror role, you need to be fair and impartial to

15  decide this not on emotions, but based on the facts and the

16  law in the case.

17         Is there anything about the kind of case that this is

18  that causes any of the six of you to have a concern about

19  being able to be a juror in this particular case with this

20  kind of a case?  Anybody at all?

21         Okay.  Is there anything else -- and again, I haven't

22  asked all the questions specifically, but is there anything

23  else, the questions that I ask, the questions the lawyers ask,

24  again, maybe questions we didn't ask that might have some

25  impact on your service as a juror or that you feel that you

1   should disclose to the parties in this case?  Any of the six

2   of you, something that you have not had a chance to mention

3   regarding your possible service as jurors in this case.

4   Anything else?

5            All right.  Any reason why any of the six of you

6   could not serve as jurors in this case?  Any concerns at all?

7            Okay.  I'm going to allow the attorneys to ask you

8   questions.  We'll start off with the plaintiff's side and

9   government counsel may ask questions of the new six.

10           MS. CAIN:  Yes, Your Honor.  Just one quick question.

11           Juror 032, you said that you had a bachelor in

12   computer science.

13           PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  Yes.

14           MS. CAIN:  Did your education and experience with

15   that involve anything with computer forensics?  EnCase?

16   Looking at digital devices, that sort of thing?

17           PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  No.  I was

18   just in software development basically.  So architecture and

19   assembly and building programs.

20           MS. CAIN:  Thank you.  That's all from the

21   government, Your Honor.

22           THE COURT:  All right.  And for the defense.

23           MR. FALLER:  Juror 032, which high school in

24   Porterville do you teach?

25           PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  I teach at

1    Granite Hills.

2          MR. FALLER:  I graduated from Porterville High before

3    you were born.

4          PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  I went to

5    Monache.  My dad works at Monache.

6          MR. FALLER:  Okay.  Porterville people are

7    everywhere.

8          PROSPECTIVE JUROR SEAT NUMBER SIXTEEN:  Yeah.

9          MR. FALLER:  I'm sure that you folks heard some of

10   the discussions I had with the other jurors this morning

11   regarding the type of case this is and the way that the Court,

12   the law requires you to approach your duties.

13          Is there anything that any of you think that I should

14   know in trying to evaluate whether you can judge the evidence

15   fairly despite the type of case this is?

16          And I won't go through everything I talked about this

17   morning.  But it is a sensitive issue.  And if you were in my

18   position, knowing yourself as you do, is there anything that

19   you think that I need to know in order to be able to decide if

20   you'll be able to fulfill that particular role as a juror in

21   this case?

22          Okay.  I very much appreciate your willingness to

23   serve and those of you who may be selected, we'll be talking

24   again.

25          THE COURT:  All right.  As to the new six that have

1    been seated, are there any cause matters for either side?
2    Plaintiff's side?
3          MS. CAIN:  Not from the government, Your Honor.
4          THE COURT:  Defense?
5          MR. FALLER:  No, Your Honor.
6          THE COURT:  All right.  As with the other prospective
7    jurors, when I ask for cause issues, that means is there any
8    legal reason why the six of you could not serve as alternate
9    jurors and ultimate jurors in this case.  Both sides have
10   indicated there are no cause issues.
11         So we're going to continue on with the peremptory
12   challenge stage.  And again, this will be for the first and
13   second alternate jurors.  And at this point in time, then, the
14   first alternate juror would be Juror 029 and it's still the
15   defense peremptory.
16         MR. FALLER:  Thank you, Your Honor.  We'd ask the
17   Court to thank and excuse Juror 029.
18         THE COURT:  All right.  Juror 029, you are excused
19   with our thanks.  Thank you very much.
20         Okay.  So the first alternate moves to Juror 030.
21   Will move to the government side.  Plaintiff's peremptory.
22   First alternate, Juror 030.
23         MS. CAIN:  United States passes, Your Honor.
24         THE COURT:  All right.  First alternate, Juror 030.
25   Defense.

1        MR. FALLER:  Ask the Court to thank and excuse Juror
2   031.
3        THE COURT:  Oh, I'm sorry.  We're doing Juror 030 now
4   for first alternate.  Juror 030.
5        MR. FALLER:  Oh, I'm sorry.  Yes, I'd ask the Court
6   to thank and excuse Juror 030.
7        THE COURT:  All right.  Juror 030, you are excused
8   with our thanks.  Thank you very much.
9        Okay.  And then it's still the defense peremptory.
10  Defense next peremptory.
11       MR. FALLER:  Yes.  Ask the Court to thank and excuse
12  Juror 031.
13       THE COURT:  All right.  Juror 031, you are excused
14  with our thanks.  Thank you very much.
15       And first alternate now Juror 032.  And plaintiff's
16  peremptory.
17       MS. CAIN:  United States passes, Your Honor.
18       THE COURT:  All right.  And first alternate juror,
19  Juror 032.  Defense peremptory.
20       MR. FALLER:  Defense passes, Your Honor.
21       THE COURT:  Very well.  Juror 032, if you could stand
22  right where you're at, you would be the first alternate juror.
23  If you stand right where you're at, the clerk will administer
24  an oath to you.
25       (The first alternate juror was sworn.)

1        THE COURT:  And Juror 032, what I'm going to ask you

2   to do is if you can go up to the top row and have a seat up

3   there.

4        Okay.  Second alternate juror would be Juror 035.

5   Plaintiff's peremptory.

6        MS. CAIN:  United States passes, Your Honor.

7        THE COURT:  Second alternate juror, Juror 035.

8   Defense peremptory.

9        MR. FALLER:  We'll pass, Your Honor.

10       THE COURT:  Juror 035, you would then be the second

11   alternate juror.  If you could please stand right where you're

12   at, the clerk will administer an oath.

13       (The second alternate juror was sworn.)

14       THE COURT:  And Juror 035, if you can have a seat up

15   in the jury box in the front row there.

16       All right.  And counsel, let me ask before I excuse

17   Juror 034 and the rest of the panel members, is there anything

18   further with respect to the jury panel before I discharge the

19   remaining prospective jurors on the plaintiff's side?

20   Anything?

21       MS. CAIN:  Nothing from the government, Your Honor.

22       THE COURT:  Defense side?

23       MR. FALLER:  Nothing, Your Honor.

24       THE COURT:  All right.  Juror 034, you're excused

25   with our thanks.  We do have the jury and the alternates.

1        For those of you in the audience area again, we have

2   our jury and alternates picked.  We completed the jury

3   selection process.  You are free to go with our thanks.  You

4   have to call that 800 number after five o'clock on Friday.

5   Otherwise you're free to go.  If you need to check with the

6   jury clerk downstairs, you can do that.  Otherwise you are

7   excused with our thanks.  Thank you so much for coming in.

8        (The remaining jury panel left the courtroom.)

9        THE COURT:  All right.  Members of the jury, let me

10  just indicate the process now.  I'm going to have you go back

11  into the jury room.  My staff will take you back there, give

12  you note pads, pencils to take notes if you wish to do that.

13  We'll give you the badges to allow you to get in and out of

14  the jury room.  We do want to get you acquainted with the jury

15  room itself.

16       If you have any questions that you have regarding

17  jury service itself that my staff can answer, they'll do that

18  or they'll get the jury clerk up here to answer any questions

19  you might have.  And then what I'm going to do is I'll be

20  meeting with the attorneys.  And what will happen is when you

21  come back out here, we'll start the trial.

22       Now, the trial itself -- and I'll explain this in a

23  jury instruction but very briefly for you.  When you come in,

24  I'll read you preliminary jury instructions, then the parties

25  are entitled to give an opening statement.  An opening

1   statement is not evidence in the case, it is what they believe

2   the evidence will or will not show.  They're not required to

3   give an opening statement, they can if they choose to do so.

4   Defense can reserve an opening statement to their case in

5   chief if he chooses to do that.  Then we start the evidence.

6   The plaintiff side will then begin presenting witnesses and

7   exhibits to you to start the actual trial itself.

8         Now, I do need a few minutes to talk to the attorneys

9   about those preliminary jury instructions, make sure that they

10  are correct.  Whether I need to make any changes.  If there

11  are any other legal matters that we need to address, we'll go

12  ahead and address those.  As soon as we're ready to have you

13  come in, we'll have you come back out.

14        It shouldn't take too long.  We'll keep you informed.

15  It will be at least 15 minutes, but we'll let you know how

16  much time and then obviously when you come out here, we'll go

17  ahead and start the trial itself.

18        Now, there is an admonition I'm going to read you in

19  detail, but it's essentially don't form or express an opinion

20  of the case, don't talk about the case to anyone, including

21  your fellow jurors, and no outside communication regarding the

22  case itself.  I'll give you a more detailed instruction when

23  you come back in.

24        But with that, we'll go ahead and have you go back

25  into the jury room and as soon as we're ready to go, we'll

1    have you come back out here.  Thank you very much.

2              (The jury left the courtroom.)

3              THE COURT:  All right.  The jury has left for a

4    break.  Let me just ask.  Go ahead and have a seat.  Are there

5    any matters that we should take up before we have the jury

6    come in?

7              And let me just mention the jury instructions.  I'm

8    not sure if Mr. Sowards, my law clerk, gave you a copy of the

9    preliminary jury instructions.

10             Of course you folks had prepared those.  But I don't

11   know if you've had a chance to take a look at them.

12   Obviously, if not, we'll take a break and you can take a look

13   at them.  Make sure they are correct.

14             The only thing that I'm sort of thinking about doing

15   on the instruction 1.2 is I'm not sure if I'm going to use the

16   code you have in here.  IMG_1119.jpg, et cetera.  That comes

17   up in the first page at line 21 and then there's some other

18   references at the second page at lines 8 and 15.

19             I'm not sure if I would just indicate "visual

20   depictions" and not go through that.  I don't know if that's

21   important or not.  If it is, I'll go ahead and do that.  I

22   really don't have any problem, it's not going to take that

23   much more time.  But otherwise I'd just indicate visual

24   depiction.

25             MR. DELAHUNTY:  Your Honor, the government would ask

1   that those be read.  I think they do -- those file names are

2   important and will be drawn attention to by several witnesses.

3          THE COURT:  Okay.  No problem.  I'll go ahead and

4   read those.  Again, I'm going to take a quick break before we

5   get started to give you a chance to look over the proposed

6   preliminary jury instructions.  And if you have any questions

7   or concerns, obviously we'll go ahead and address those.

8          Separate and apart from the preliminary jury

9   instructions then, are there any issues that we should take up

10  first on behalf of plaintiff's side, the government, any

11  issues?

12         MR. DELAHUNTY:  Not at this time, Your Honor.

13         THE COURT:  Defense, any issues?

14         MR. FALLER:  I just have one inquiry of whether,

15  during opening statement, if the government was planning

16  making use of any visual aids, any slides, any PowerPoint or

17  anything like that?

18         MR. DELAHUNTY:  The government is not.  No

19  demonstratives or slides.

20         THE COURT:  Okay.  And just as a reminder, if you're

21  going to use any visuals or aids during your opening

22  statement, and again, just as a quick reminder, on closing

23  arguments, just make sure you show it to the other side

24  beforehand so if there are any issues we can go ahead and

25  address those.  It appears the government is not going to be

1  using any visuals during opening statement.

2         The one question I have, Mr. Faller, are you

3  proposing to give an opening statement right after the

4  government or are you going to reserve it or how do you want

5  to deal with that?

6         MR. FALLER:  My inclination right now is that I'm

7  going to give one.  If that changes, I'll just -- when the

8  Court calls on me, I'll just indicate that we're reserving.

9         THE COURT:  Okay.  That's fine.  So I'm going to take

10  a break.  Take a look at the preliminary jury instructions.

11  I'll come back in 15 minutes.  And if you have any issues, go

12  ahead and raise them.

13         Otherwise when I come back in here and the jury comes

14  in, I'll read the preliminary jury instructions.  We'll go

15  right over to the plaintiff's side, the government may make an

16  opening statement.  Right after the government is done, I'll

17  turn to you, defense side, Mr. Faller, and then you can

18  indicate whether you're going to give an opening or reserve

19  it.

20         Okay.  Anything else before we take a break then?

21  Let's take a 15-minute recess.  We'll come back in and we'll

22  start the trial itself.

23         MR. DELAHUNTY:  Thank you, Your Honor.

24         (Recess.)

25         THE COURT:  Back on the record outside the presence

1   of the jury.  Anything with respect to, first of all, the

2   preliminary jury instructions?

3         MR. DELAHUNTY:  Nothing from the government, Your

4   Honor.

5         MR. FALLER:  No, Your Honor.

6         THE COURT:  All right.  I'll go ahead and read those.

7   And I will include those references, specific references to

8   the images.  Anything else before we have the jury come in?

9         MR. DELAHUNTY:  No, Your Honor.

10        MR. FALLER:  No, Your Honor.

11        THE COURT:  All right.  We'll have the jury come in.

12        (The jury entered the courtroom.)

13        THE COURT:  The jury is present.  Please be seated.

14        All right.  Members of the jury, we'll go ahead and

15  start the case.  As I indicated before the break, I'm going to

16  read you the preliminary jury instructions.  Now, I literally

17  have to read the instructions to you because if I misstate a

18  word or phrase, it could throw the entire instruction off.  So

19  I will attempt to vary the cadence, tone, pitch, et cetera of

20  my voice so it doesn't come across as a flat monotone; but by

21  doing that, I'm not attempting to emphasize or de-emphasize

22  any particular word or phrase.  They're all important.  Same

23  thing will apply when I read the concluding instructions.

24        Members of the jury, you are now the jury in this

25  case and I want to take a few minutes to tell you something

1   about your duties as jurors and to give you some preliminary

2   instructions.

3         At the end of the trial, I will give you more

4   detailed instructions that will control your deliberations.

5   When you deliberate, it will be your duty to weigh and to

6   evaluate all the evidence received in the case and, in that

7   process, to decide the facts.  To the facts as you find them,

8   you will apply the law as I give it to you whether you agree

9   with the law or not.

10         You must decide the case solely on the evidence and

11   the law before you and you must not be influenced by any

12   personal likes or dislikes, opinions, prejudices or sympathy.

13   Please do not take anything I may say or do during the trial

14   as indicating what I think of the evidence or what your

15   verdict should be.  That is entirely up to you.

16         This is a criminal case brought by the United States

17   government.  The government charges the defendant with four

18   counts of sexual exploitation of a child, specifically the

19   production of child pornography, and two counts of kidnapping.

20         The charges against the defendant are contained in

21   the second superseding indictment, hereinafter I will refer to

22   them throughout the trial as "the indictment."  The indictment

23   simply describes the charges the government brings against the

24   defendant.  The indictment is not evidence and does not prove

25   anything.

1          The defendant has pleaded not guilty to the charges

2    and is presumed innocent unless and until the government

3    proves the defendant guilty beyond a reasonable doubt.  In

4    addition, the defendant has a right to remain silent and never

5    has to prove innocence or to present any evidence.

6          In order to help you follow the evidence, I will now

7    give you a brief summary of the elements of the crimes which

8    the government must prove to make its case.

9          It is charged in Count One of the indictment that

10   from on or about January 2007 to on or about January 2009 in

11   the Eastern District of California and elsewhere, the

12   defendant, Shawn Joseph McCormack, knowingly employed, used,

13   persuaded, induced, enticed or coerced a minor, referred to

14   during the course of the trial as victim one or Elizabeth, to

15   engage in any sexually explicit conduct for the purpose of

16   producing any visual depiction of such conduct, to wit,

17   IMG_1119.jpg and IMG_1204.jpg, and such visual depiction was

18   transported or transmitted using any means of facility of

19   interstate or foreign commerce or in or affecting interstate

20   commerce.

21         It is charged in Count Two of the indictment on or

22   about March 2008 to on or about July 2010, the defendant Shawn

23   Joseph McCormack in the Eastern District of California and

24   elsewhere knowingly employed, used, persuaded, induced,

25   enticed or coerced a minor, referred to in the trial as victim

1    2 or Ben, to engage in any sexually explicit conduct for the

2    purpose of producing any visual depiction of such conduct, to

3    wit, P-I-C-T or PICT0276.jpg, PICT0277.jpg, PICT0278.jpg and

4    PICT0279.jpg, and such visual depiction was transported in

5    interstate or foreign commerce.

6         It is charged in Count Three of the indictment that

7    from on or about March 27th, 2009 to on or about July 2010,

8    the defendant, Shawn Joseph McCormack, in the Eastern District

9    of California and elsewhere, knowingly employed, used,

10   persuaded, induced, enticed or coerced the minor, victim 2

11   Ben, to engage in any sexually explicit conduct for the

12   purpose of producing any visual depiction of such conduct, to

13   wit, PICT0301(2).avi, PICT0281.jpg, PICT0301.avi and

14   PICT -- that's P-I-C-T -- 0283.avi, and such visual depiction

15   was transported in interstate or foreign commerce.

16        It is charged in Count Four of the indictment that

17   from on or about March 2008 to on or about July 2010, the

18   defendant Shawn Joseph McCormack, in the Eastern District of

19   California and elsewhere, knowingly employed, used, persuaded,

20   induced, enticed or coerced a minor, victim two Ben, to engage

21   in any sexually explicit conduct for the purpose of producing

22   any visual depiction of such conduct, to wit PICT0303.jpg,

23   PICT0304.jpg, PICT0307.jpg and PICT0308.jpg, and such visual

24   depiction was transported in interstate or foreign commerce.

25        It is charged in Count Five of the indictment that

1   from on or about March 27th, 2009, the defendant Shawn Joseph

2   McCormack, in the Eastern District of California and

3   elsewhere, willfully and unlawfully seized, confined,

4   inveigled, decoyed and kidnapped, abducted or carried away

5   victim 2 Ben, an individual who had not attained the age of

6   18; and McCormack traveled in interstate commerce or used any

7   means, facility or instrumentality of interstate or foreign

8   commerce in committing or in furtherance of the commission of

9   the offense and held victim 2, Ben, for ransom, reward or

10  other benefit while defendant was over the age of 18 years old

11  and had no legal custody or familial relationship with victim

12  2 Ben.

13          It is charged in Count Six of the indictment that

14  from on or about November 6, 2009, the defendant, Shawn Joseph

15  McCormack, in the Eastern District of California and

16  elsewhere, willfully unlawfully seized, confined, inveigled,

17  decoyed, kidnapped, abducted or carried away victim 2, Ben, an

18  individual who had not attained the age of 18; and McCormack

19  traveled in interstate commerce or used any means, facility or

20  instrumentality of interstate or foreign commerce in

21  committing or in furtherance of the commission of the offense

22  and held victim 2, Ben, for ransom, reward or other benefit

23  while the defendant was over the age of 18 years old and had

24  no legal custody or familial relationship with victim 2, Ben,

25  or attempted to do so.

174

1        The evidence you are to consider in deciding what the

2   facts are consist of, one, the sworn testimony of any witness;

3   two, the exhibits which are to be received in evidence; and

4   three, any facts to which all the lawyers stipulate.

5        The following things are not evidence and you must

6   not consider them as evidence in deciding the facts of this

7   case:  One, statements and arguments of the attorneys; two,

8   questions and objections of the attorneys; three, testimony

9   that I instruct you to disregard; and four, anything you may

10  see or hear when the Court is not in session even if what you

11  see or hear is done or said by one of the parties or by one of

12  the witnesses.

13       Evidence may be direct or circumstantial.  Direct

14  evidence is direct proof of a fact, such as testimony by a

15  witness about what that witness personally saw or heard or

16  did.  Circumstantial evidence is indirect evidence that is

17  proof of one or more facts from which one can find another

18  fact.

19       You are to consider both direct and circumstantial

20  evidence, either can be used to prove a fact.  The law makes

21  no distinction between the weight to be given to either direct

22  or circumstantial evidence.  It is for you to decide how much

23  weight to give to any evidence.

24       I'm going to step away from the instructions for just

25  a moment because the authors of the jury instructions have

1    suggested that trial judges give a very simple example of

2    direct and circumstantial evidence.  With the admonition to

3    the jury that although it may seem very technical sounding,

4    you use direct and circumstantial evidence every day in your

5    own life, you just don't think about it as such.

6            For example, and this is probably a good time to use

7    this example.  If the issue was whether it rained last night,

8    if a witness were to come into court, swear under oath that

9    they went outside last night and raindrops were falling on

10   that person, you can conclude from the direct evidence, that

11   is what that person saw, felt or did, that it rained last

12   night.

13           If, on the other hand, the witness would appear in

14   court, testify under oath that that evening they heard on the

15   weather report it was supposed to rain that night.  They

16   looked outside and it wasn't raining, but there were storm

17   clouds overhead, the person went to bed, the next morning woke

18   up, opened the shades in the bedroom and lo and behold the

19   ground was wet.  If you believe the witness and all of those

20   facts, you can conclude from circumstantial evidence that it

21   rained last night.

22           Now, of course, there are other explanations for why

23   the ground is wet.  Maybe the sprinklers went on or whatever.

24   But again, that's just a fairly simple example of direct and

25   circumstantial evidence.

1        All right.  I'll continue with the instructions.

2  There are rules of evidence which control what can be received

3  into evidence.  When the lawyer asks a question or offers an

4  exhibit into evidence and a lawyer on the other side thinks it

5  is not permitted by the rules of evidence, that lawyer may

6  object.

7        If I overrule the objection, the question may be

8  answered or the exhibit received.  If I sustain the objection,

9  the question cannot be answered and the exhibit cannot be

10  received.  Whenever I sustain an objection to a question, you

11  must ignore the question and must not guess what the answer

12  would have been.

13        Sometimes I may order that evidence be stricken from

14  the record and that you disregard or ignore the evidence.

15  That means that when you're deciding the case, you must not

16  consider the evidence which I told you to disregard.

17        In deciding the facts in this case, you may have to

18  decide which testimony to believe and which testimony not to

19  believe.  You may believe everything a witness says or part of

20  it or none of it.

21        In considering the testimony of any witness, you may

22  take into account:  One, the witness' opportunity and ability

23  to see or hear or know the things testified to; two, the

24  witness' memory; three, the witness' manner while testifying;

25  four, the witness' interest in the outcome of the case, if

1   any; five, the witness' bias or prejudice, if any; six,

2   whether other evidence contradicted the witness' testimony;

3   seven, the reasonableness of the witness' testimony in light

4   of all the evidence; and eight, any other factor that bears on

5   believability.  The weight of the evidence as to a fact does

6   not necessarily depend on the number of witnesses who testify

7   about it.

8          During this case, you will hear the attorneys,

9   witnesses and the Court refer to the alleged victims and their

10  parents by first name only.  While it may seem unusual to

11  address individuals in court on a first name basis only, this

12  is being done in order to preserve the confidentiality and

13  privacy interest of the alleged victims and their family.

14         I'll now say a few words about your conduct as

15  jurors.  First, keep an open mind throughout the trial and do

16  not decide what the verdict should be until you and your

17  fellow jurors have completed your deliberations at the end of

18  the case.

19         Second, because you must decide this case based only

20  on the evidence received in the case and on my instructions as

21  to the law that applies, you must not be exposed to any other

22  information about the case or to the issue it involves during

23  the course of your jury duty.

24         Thus, until the end of the case or unless I tell you

25  otherwise, do not communicate with anyone in any way and do

not let anyone else communicate with you in any way about the merits of the case or anything to do with it.

This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging or an internet chatroom, blog, website or other feature.

This applies to communicating with your fellow jurors until I give you the case for deliberation.  And it applies to communicating with everyone else, including your family members, your employer, the media or press and the people involved in the trial.

Although you may notify your family and your employer that you have been seated as a juror in the case.  But if you are asked or approached in any way about your jury service or anything about the case, you must respond that you've been ordered not to discuss the matter and to report the contact to the Court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict, do not read, watch or listen to any news or media account or commentary about the case or anything to do with it.  Do not do any research, such as consulting dictionaries, searching the internet or using other reference materials.  And do not make any investigation or in any other way try to learn about the case on your own.

1          The law requires these restrictions to ensure the

2     parties have a fair trial based on the same evidence that each

3     party has had an opportunity to address.  A juror who violates

4     these restrictions jeopardizes the fairness of these

5     proceedings and a mistrial could result that would require the

6     entire trial process to start over.  If any juror is exposed

7     to any outside information, please notify the Court

8     immediately.

9          At the end of the trial, you will have to make a

10    decision based on what you recall of the evidence.  You will

11    not have a written transcript of the trial.  I urge you to pay

12    close attention to the testimony as it is given.

13         If you wish, you may take notes to help you remember

14    the evidence.  If you do take notes, please keep them to

15    yourself until you and your fellow jurors go to the jury room

16    to decide the case.  Do not let note taking distract you from

17    being attentive.  When you leave the Court for recesses, your

18    notes should be left in the jury room.  No one will read your

19    notes.

20         Whether or not you take notes, you should rely on

21    your own memory of the evidence.  Notes are only to assist

22    your memory.  You should not be overly influenced by your

23    notes or those of your fellow jurors.

24         The next phase of the trial will now begin.  First,

25    each side may make an opening statement.  An opening statement

1    is not evidence.  It is simply an outline to help you

2    understand what that party expects the evidence will show.  A

3    party is not required to make an opening statement.

4           The government will then present evidence and counsel

5    for the defendant may cross-examine.  Then defendant may

6    present evidence and counsel for the government may

7    cross-examine.  After the evidence has been presented, the

8    attorneys will make closing arguments and I will instruct you

9    on the law that applies to the case.  After that, you will go

10   to the jury room to deliberate on your verdict.

11          All right.  At this time I'm going to invite the

12   parties to make an opening statement if they choose to do so.

13   First we'll start with the plaintiff's side.  Government may

14   make an opening statement.

15          MR. DELAHUNTY:  Thank you, Your Honor.

16          On June 5th, 2010, a Toronto Police Service detective

17   was conducting an undercover investigation.  This undercover

18   investigation was being done at his desk on his computer while

19   he was online using a network that he knew was commonly used

20   to trade files and images and movies and that it was utilized

21   by people seeking to trade images and files of child

22   pornography.

23          On this particular day, he made contact with an

24   individual who went by the user name "Toddlers."  Detective

25   Krawczyk began to interact with that user name.  He saw images

1    that user was sharing, began downloading some of those images.
2    And he began a chat with that individual.

3         On this particular network, users could chat with one
4    another and write things back and forth in realtime.  The chat
5    started out just with introductions, and then as part of that
6    chat developed, the user, Toddlers, said that he had, quote,
7    "a private image."  The word "private" meant something to
8    Detective Krawczyk in this context.  It meant that the user
9    Toddlers had an image that he took himself.

10        Detective Krawczyk then asked about it.  Toddlers
11   responded in describing what the image was, saying it's,
12   quote, "My friend's son I take at night."

13        Detective Krawczyk then asked to the effect, "Does
14   the toddler stay over at your house very often?"

15        Toddlers responded, quote, "No.  When I visit, I take
16   him out late in the night to a hotel room."

17        Detective Krawczyk responded, "How the heck do the
18   parents let you take him out at night?"

19        Toddlers responded, quote, "They don't.  They're
20   asleep when I do it."

21        Then in the chat, Toddlers made available to
22   Detective Krawczyk a new series of images and made them
23   available to Detective Krawczyk to download.  They images
24   showed a young boy in sexually explicit positions.  All of
25   them was the same boy, he was about two or a little younger

1  than that.

2          Later on in the chat, Detective Krawczyk asked what

3  the name of the boy was.

4          Toddlers responded "His name is Ben."

5          Also in the chat, Detective Krawczyk asked when were

6  those images made.  Toddler responded "about a year ago."

7  Meaning to Detective Krawczyk sometime in 2009.

8          At this point, Detective Krawczyk had three

9  questions.  First, who was Toddlers?  Second, was the name of

10 the boy in the images actually Ben?  And three, was Toddlers

11 doing the things that he said he was doing to Ben?

12         Ladies and gentlemen, at the end of this trial, the

13 evidence will answer all of those questions for you.

14         The evidence will show that Toddlers was the

15 defendant Shawn McCormack.

16         The evidence will also show who that young boy was.

17 His name was Ben.  He was from the Bakersfield, California

18 area.

19         And most importantly, the evidence will show that

20 Toddlers, Shawn McCormack, was telling the truth about what he

21 was doing to Ben.  He was making those images of Ben.  He was

22 taking him out late at night.  He was taking him to a hotel.

23         In fact, the evidence will show that's not all that

24 Shawn McCormack did to Ben.  The evidence will also show that

25 he made other images of Ben.  Those were taken at or near

1   Ben's house at the time.

2          The evidence will also show even more of what Shawn

3   McCormack did.  The evidence will show that Shawn McCormack

4   produced sexually explicit images of Ben's young sister named

5   Elizabeth.

6          So how did law enforcement officers figure this out?

7   Well, it involved -- and you'll hear from all of

8   them -- multiple law enforcement agencies, multiple law

9   enforcement investigations.  Sometimes these investigations

10  and law enforcement officers were working separately of each

11  other, other times they were working closely with each other.

12  But ultimately, all of these investigations and officers were

13  working towards identifying the same person, Shawn McCormack.

14         So let's go back to Detective Krawczyk and what

15  happened next.  You'll hear from Detective Krawczyk, when he

16  finished interacting with Toddlers, he wanted to figure out

17  what was Toddlers IP address.  And you'll learn what that is

18  in this trial.

19         An IP address is a unique number that's assigned to a

20  computer that's online at a given time.  It's analogous or

21  like a license plate number or a phone number.  With that

22  number, Detective Krawczyk was able to learn what company was

23  providing internet access to that particular IP number.  It

24  was a company called Qwest, which is a Colorado company.

25         Detective Krawczyk was also able to figure out which

184

1    part of the country that IP address was being used.  That is,

2    where was that IP address getting on the internet.  He learned

3    that it was in Colorado Springs.  So he took this information

4    and he gave it to law enforcement officers in Colorado

5    Springs.

6            Once they had it, federal and state law enforcement

7    officers continued the investigation.  They took that number

8    that Detective Krawczyk gave them and they asked the company

9    that was providing internet access to it, Qwest, who the

10   subscriber was.  And as you'll see, Qwest told them that there

11   was one subscriber to that number, his name, the defendant

12   Shawn McCormack.  And Qwest gave law enforcement officers the

13   address of Shawn McCormack, 14275 Vessey Circle Road in

14   Colorado Springs.

15           So these law enforcement officers then did an

16   investigation of that house.  They got a search warrant.  They

17   searched it.  When they searched it, they seized items within

18   it, including a laptop belonging to the defendant.  They then

19   began a detailed review and analysis of that laptop.

20           Meanwhile, separately, and on the other side of the

21   country, federal agents in Boston were doing another

22   investigation.  This investigation also started out

23   independent and separate of what was going on in Colorado.

24           These federal agents had seized a laptop and they too

25   were doing a review and analysis of it.  When they did their

185

1   review, they found a file on it that caused them concern.  And

2   it was a movie.  It was a movie that was three to about three

3   and a half minutes long.  The movie depicted -- and you'll see

4   it in this trial -- the movie depicted a young boy less than

5   the age of two in a hotel room being anally raped by a male.

6         The male in the video, however, was wearing a ski

7   mask or what's sometimes called a balaclava.  These are a

8   particular type of ski hat or knitted hat that has only eye

9   holes, a nose hole and a mouth hole.  It otherwise covers up

10  the face.

11        So this is what the law enforcement officers had.

12  They next needed to figure out who was in the video.  Who was

13  the perpetrator, who was the victim, where was it made, when

14  was it made.

15        So to do that, they focused on clues in the video

16  that they could see.  They could hear some background noise

17  and they could also see other objects in the hotel room.

18        They started with the background noise.  The video

19  had audio and in the background of it, the officers could hear

20  a television being played.  And they were able to identify

21  what was on that television during the time of the video.

22  What they heard was a television program called Family

23  Matters.  It's a sitcom from the 1990s, had a very distinct

24  character in it.  The law enforcement officers could hear

25  specific and distinct dialogue in that television program.

186

1    Looking at that dialogue, it identified the episode number of
2    that television show.

3          They could also hear a cookie commercial from
4    Pepperidge Farms.  They listened to that closely.  They
5    identified the specific cookie commercial.

6          They then asked the owners of both the television
7    show and the commercial when those two had aired between 2007
8    and 2009.  And they got records back from those two companies
9    that owned both that they showed that the commercial and the
10   TV show aired together only on one time.  And what the network
11   called their programming date, which spans from March 28 to
12   March 29th.  And that it aired around three a.m. on March
13   29th.  This was the time frame that law enforcement officers
14   had to work with.  They focused on the March 28th to March
15   29th time period.

16         Focusing on that time period -- well, let me also
17   add.  They looked in -- they also looked for clues as to where
18   the video was made.  They looked in the background of the
19   video and saw that in the hotel room, it had a certain carpet
20   pattern, certain furniture in the hotel room.  There was a
21   particular bedspread.  There was also in the background of the
22   video, a granite countertop with a distinct pattern on it.

23         So the officers focused on these things to try to
24   determine where the video was made.  They determined the kind
25   of furniture that was used and the kind of carpet.  The carpet

1   had a distinct swirl pattern.  And the officers began to refer

2   to this video as the "swirl carpet video" based on that

3   carpet.

4          So looking at the carpet manufacturer, the furniture

5   manufacturer, and asked those companies what motels and hotels

6   did you sell these products to?  The manufacturers gave them a

7   list.  And this gave the law enforcement officers a manageable

8   group of hotels to further focus on.

9          So they began looking at those hotels and seeing if

10  they had similar rooms to what they saw in the swirl carpet

11  video.  They got a short list.

12         One of the most likely candidates they saw was in

13  Bakersfield, California.  So they asked one of their

14  colleagues in Bakersfield, Veronica Pike, another federal

15  agent, to go to that hotel and further investigate.

16         When Agent Pike got to this hotel or motel, which was

17  the California Best Inn in Bakersfield, she saw that the rooms

18  did match the layout of the room in the swirl carpet video.

19  But she and her colleagues needed to determine which room was

20  in the video.  So she focused on that granite countertop and

21  the distinct pattern that it had.

22         And focusing on that, and comparing it to the granite

23  countertop in each of the rooms, she saw that there was only

24  one match.  There's only one match between the granite

25  countertops in all the rooms and the granite countertop in the

1   video.  It was room 221.

2          At this point, law enforcement officers were

3   confident that they had the right room, the right hotel, they

4   knew the right days to focus on.

5          So the next thing in the investigation, as Agent Pike

6   will tell you, was to determine who had stayed in that room

7   around March 28th and March 29th.  She asked the motel owners

8   for the records.  And you'll hear from the motel owner about

9   those records.  And they will show you that there's only one

10  guest in that room on the night of March 28th and March 29th.

11  And that guest is the defendant, Shawn McCormack.

12         There was no one in that room for several days before

13  that and there was no one in that room for several days after

14  that.  In fact, the hotel had taken the defendant Shawn

15  McCormack's license -- driver's license and made a copy of it

16  when they checked him in.

17         Agent Pike was able to work with the information on

18  that to further her investigation.  At this point she had the

19  right place, she had the right time, she had the right person,

20  the last piece of the puzzle was who is the victim in the

21  video.

22         So she looked at that information about Shawn

23  McCormack and compared it to police reports and other

24  investigation paperwork and police files that might relate to

25  Shawn McCormack.  When she looked at those records, she saw

1    that he had been involved in an incident in Bakersfield,

2    California in November of 2009.  This is about a year and a

3    half prior to where she was in the investigation.  She saw

4    this incident happened back in November 2009.

5           When she saw what happened had involved a young

6    family, she went to meet with that family to ask them more

7    about what happened.  And you will hear from that family.  You

8    will hear from both parents and they will tell you what

9    happened that night.

10          They will tell you that from time to time, a high

11   school friend of the father's would call with not much notice

12   and tell the family that he needed a place to stay.  Being a

13   high school friend, the parents would allow this friend of

14   theirs to stay the night.  He would often arrive fairly late

15   at night and leave the next day.  He would stay up with the

16   father, they would catch up and go to bed fairly late.

17          On this particular night, that's what happened.

18   Their friend showed up around -- showed up late, stayed up

19   with the father, they caught up for a while.  Around 1:30,

20   they both went to bed.  Their guest that night is the

21   defendant, Shawn McCormack.

22          What was different about this night, though, was that

23   after the father went to bed, he went to check in on his young

24   children.  When he checked in on them, Ben and Elizabeth, who

25   shared the same room, Ben wasn't in his crib and the window

1    leading out of Ben's room was wide open.

2            At this point, Ben's father woke up Ben's mother and

3    the two started to fear the worst, that their young soon had

4    gotten outside, that they didn't know where he was.  And they

5    started to worry that he had fallen into their swimming pool.

6    They went outside, they continued to look.  They became more

7    and more frantic.  They couldn't find Ben.

8            And in the process realized that the person who was

9    also supposed to be at the house wasn't there.  Shawn

10   McCormack was not there either.  They tried to reach him.

11   Called him.  Couldn't get through.

12           At this point the parents are outside, frantic,

13   attempt to call 911.  They don't get through.  Then an officer

14   is driving by in his police car and they're able to flag him

15   down.  You'll hear from that officer too.  The officer learned

16   what was going on, assisted the parents and helped them call

17   Shawn McCormack.  This time Mr. McCormack answered.  When he

18   did, he said that he would come back and that he had Ben.

19           When he arrived, there was Ben inside of Shawn

20   McCormack's vehicle that he drove at the time.  Ben was in the

21   car.  Not in a car seat.  Wearing only a diaper.  The parents

22   had not given Shawn McCormack permission to take Ben outside

23   of their house that night.  In fact, they had not given him

24   permission to do that at any point in time.

25           After Agent Pike learned about this, she was

1    confident who was in the video.  It was Shawn McCormack and it

2    was Ben.  But she asked Ben's family to identify the boy in

3    the video by showing them a small portion of the video.  Ben's

4    parents were able to do that.  And they identified that as

5    their son.

6           With this information, Agent Pike and other federal

7    agents got in contact with the investigation that was going on

8    in Colorado.  It had also been continuing and they had been

9    working to further their investigation.  They had completed a

10   search of the laptop they had seized.  They had gotten a

11   search warrant for Shawn McCormack's email.  They had gotten a

12   search warrant of his house and gone back to it again and

13   searched it.  They had gotten a search warrant for his truck

14   and looked at that.

15          And here's what they found.  When they searched his

16   computer, they found that exact same video that had been

17   investigated by the federal agents beginning in Boston and

18   then in Bakersfield.  They found other images of Ben in

19   sexually explicit positions with similar file names to the

20   file names that Detective Krawczyk had been investigating and

21   seen online.  They saw pictures of Ben in positions near his

22   house and in his yard, all on the defendant's computer.

23          When they searched the defendant's house, they found

24   items of clothing that matched the items of clothing worn by

25   the person in all those pictures and movies.  They found four

1   black ski masks, all the same type, balaclavas, no eyes, no

2   nose, no mouth, otherwise covers the face.  Found a black

3   belt; matched the black belt in some of the pictures.  They

4   found a pair of boxer shorts; matched the pair of boxer shorts

5   in some of the pictures.  Found T-shirts that matched the

6   T-shirts in the pictures.  And you'll see this evidence.

7           They also went and looked at his emails.  Some of

8   those emails, the defendant Shawn McCormack was emailing

9   pictures.  Some of the pictures that he emailed were of Ben's

10  sister Elizabeth being sexually assaulted inside of a vehicle.

11  Also very young at the time.

12          The vehicle -- it was just the interior of the

13  vehicle was all they could see, but they could see the car

14  seat.  When they did a search of the defendant's truck, they

15  saw the car seat and the pictures of Elizabeth matched the car

16  seat of the defendant.

17          They also found internet chats on the defendant's

18  computer.  And like the chat that Detective Krawczyk had with

19  Toddlers, these chats were also of Toddlers and they too also

20  contained statements bragging about what had been done to Ben

21  in making the videos.

22          At the end of this trial, when you've heard all of

23  this evidence and you've heard all of the witnesses, we'll

24  show two things beyond a reasonable doubt.

25          We'll show that, first, the defendant produced

1    sexually explicit images of Ben and Elizabeth.

2           And two, we'll show that the defendant, in order to

3    produce those images, kidnapped Ben on at least two occasions.

4    The November 6, 2009 incident and on March -- on the night of

5    March 28th and March 29th, 2009 when the hotel video was made.

6           As a result, the government will ask you to find the

7    defendant is guilty of all six counts in the indictment, four

8    counts of production of child pornography and two counts of

9    kidnapping.  Thank you.

10          THE COURT:  And does defense counsel wish to make an

11   opening statement now or reserve?

12          MR. FALLER:  I'll make it now, Your Honor.  Thank

13   you.

14          THE COURT:  Opening statement on behalf of defense.

15          MR. FALLER:  Ladies and gentlemen, Shawn McCormack

16   has things to answer for.  And they are things that happened

17   in Colorado.  He became involved in internet relationships

18   having to do with images of children that are prohibited by

19   law.  They were on his computer.  He used his computer to do

20   that.  And he needs to answer for that.

21          But that's not what he's charged with here.  When the

22   judge read you the charges against Shawn McCormack in this

23   courtroom, in this case, what he is charged with is producing

24   those images.  Not possessing them, not sending them,

25   producing them.  And that is what the government has chosen to

1 | charge him with here and that is what they must prove.

2 |        Now, everything that the prosecutor just told you

3 | sounds very clear and very cut and dried when he says it.  But

4 | as the evidence comes in, you will hear that much of what he

5 | has told you is not as straight forward or as cut and dried as

6 | he would have you believe.

7 |        Let's talk about what you're going to hear concerning

8 | this TV program in the motel.  Because that really is the

9 | center of the government's case.  And they will -- I believe

10 | that there will be evidence about the motel records.  You will

11 | hear evidence that the motel records themselves are

12 | inconsistent internally.

13 |        You will hear evidence that it is very difficult, if

14 | not impossible, to determine from the records who actually was

15 | staying in room 221 back in '09.  You will hear that some of

16 | the records as far as who was there and when the room was

17 | cleaned and when people checked out don't agree with one

18 | another.

19 |        You will hear that originally the investigation

20 | supposedly discovered that this particular program and this

21 | particular commercial that you can hear in the background

22 | aired at three o'clock in the morning eastern time on March

23 | 28th.  And you will hear that that's what the government

24 | believed happened.  And you will hear that that's what they

25 | set out to prove.  You will hear then that they set out to

1   prove and thought they could prove that Shawn McCormack was in

2   Room 221 at California Best Inn at 12 o'clock a.m. midnight to

3   three o'clock a.m. in that range on March 28th.

4           Then you're going to hear that it appeared that that

5   may not be what the evidence shows.  Maybe he needs to be

6   there because when they actually -- when the program actually

7   aired, it might have been the following day earlier in the

8   morning.  So then the evidence has to show that Shawn

9   McCormack was there on that day.

10          You will hear all about the motel records, you will

11  hear what they saw and you will hear not what they try to make

12  them prove, but what they actually prove.  And we'll have a

13  time to discuss what that means later.

14          You will also hear that -- first of all, let me say

15  again, as I said during jury selection, the two people in this

16  entire event that are absolutely innocent and blameless are

17  Ben and Elizabeth.  Okay?  They are absolutely blameless in

18  this series of events.  They are victims.  You will hear that

19  there is no argument about that.  There is no doubt about

20  that.

21          You are also going to hear, as the prosecutor said,

22  from Ben and Elizabeth's two parents.  Their role in this

23  affair and their version of how all of these events transpired

24  may not be quite so innocent.  You will hear that their

25  stories have evolved over time.  You will hear that some facts

1   were hidden from the police until just recently.

2          You will hear that the husband finally admitted a

3   couple of weeks ago that the night when Ben was supposedly

4   taken without permission, that he was drinking and smoking

5   marijuana with Shawn that evening.  He had hidden that from

6   the police until then.

7          You will recall that the Court gave you instructions

8   on how to judge the credibility of witnesses.  When we have an

9   opportunity to speak together later in the case, we will talk

10  about those factors involving credibility you need to consider

11  regarding the two parents in this case.  Again, no doubt that

12  Ben and Elizabeth are absolutely innocent.  But everyone else

13  has things that they must answer for.

14         You will hear that when Shawn returned immediately

15  with Ben the night of November 6th, you will hear that when

16  the police contacted him at the house, when he voluntarily

17  came back and he brought Ben, you will hear that there was no

18  evidence that anything bad had happened to Ben.

19         You will also hear that there was no apparent

20  evidence on the part of Ben of being traumatized to be in

21  Shawn's presence or acting fearful toward him or in any way

22  acting like someone had been so brutally victimized by this

23  person that he was with.

24         At some point you will be asked is that reasonable?

25  Because what, according to the prosecutor, the evidence is

197

1   going to show is that Shawn McCormack took Ben on multiple

2   occasions in the middle of the night from his parents' house

3   without anybody making any noise to disturb anyone, took him

4   away, brutally assaulted him, brought him back and then on a

5   later occasion, some few months later, was in his presence

6   with no reaction on the part of the child.  We will talk

7   about, at a later time, what that may mean.

8         Again, the whole center around which this case really

9   evolves is the events on March 28th and/or 29th of 2009.  The

10  California Best Inn.  You will hear that Shawn was indeed a

11  friend of Ben's father.  You will hear that he did come

12  through and stay at their house on multiple occasions.  You

13  will hear that he usually slept on the couch.  And you will

14  hear that, according to the parents, nothing unusual seemed to

15  be going on when Shawn was there.

16        You are also going to hear that on March 28th and

17  29th, Shawn was not in Bakersfield.  Whoever checked in that

18  that motel room, whoever they checked -- whoever gave his

19  driver's license was not Shawn McCormack because he was in

20  southern California with his mother and his brother doing work

21  on his mother's pickup.  You will see some documentation to

22  that effect.

23        You will hear that his pickup had been impounded

24  because of his failure to pay some traffic tickets.  He did

25  not have that available.  And that was what he usually drove

1    when he drove to Bakersfield.  And that's what he was driving

2    on November 6th.

3          You will hear that he wasn't there.  That whoever was

4    there, whoever was in that video at whatever time it was shot

5    was not him.  And you will hear that he didn't have any longer

6    the driver's license that was used for identification.  That

7    had either been lost or stolen previously.  You will hear that

8    he was using to drive then a suspended license and he ended up

9    getting cited for that because it was an old suspended license

10   because he never got a new one after that one was taken.

11         You are going to hear that whatever this picture may

12   appear to be at first blush is very different when you get to

13   the end of it.  And again, Shawn McCormack has things that he

14   must answer for.  And you will hear about things in his life

15   that may have brought that about and put him in a position to

16   be doing those things.

17         But what you will also hear is that there is more

18   than reasonable doubt that he produced these images and videos

19   and victimized these two children.

20         Because in order to get to that step, which is the

21   only question in this courtroom in Fresno, California, you

22   have to cut through a foggy and murky picture of supposed

23   facts.  And you can't do that.

24         And at the end of this case, after you have heard all

25   the evidence, after you have heard all the witnesses, you and

1  I will have another opportunity to speak together.  And you

2  will be reminded of some of the promises that you made in jury

3  selection.  And we will discuss together why, when you

4  dispassionately and objectively view the evidence of what

5  Shawn McCormack is accused of here, that you must find him not

6  guilty.  Thank you.

7          THE COURT:  All right.  We'll begin the presentation

8  of evidence.  And the plaintiff government may begin with the

9  government's case in chief.

10          MR. DELAHUNTY:  Your Honor, the government will call

11  its first witness, Detective Paul Krawczyk.  Before he enters

12  the courtroom, I'd like to address a preliminary matter

13  though.

14          THE COURT:  Sure.

15          MR. DELAHUNTY:  The parties have agreed, and it was

16  filed earlier at ECF number 76, that certain exhibits are

17  authentic business reports and otherwise admissible.  I'd like

18  to move those exhibits into evidence now.  Those exhibits are

19  84, 81, 82, 86 and 155, Government's Exhibits.

20          THE COURT:  And defense?

21          MR. FALLER:  That's a correct statement of the

22  stipulation, Your Honor.

23          THE COURT:  Each of those items then are admitted

24  into evidence and may be used during the course of the trial

25  in consideration by the jury.

1           (Government's Exhibits 81, 82, 84, 86 and 155

2           were received.)

3                          **PAUL KRAWCZYK**,

4    called as a witness on behalf of the Government, having been

5    first duly sworn, testified as follows:

6           THE CLERK:  Please have a seat.  State your full name

7    for the record and spell it.

8           THE WITNESS:  Thank you.  It's Paul Krawczyk,

9    K-R-A-W-C-Z-Y-K.

10                         DIRECT EXAMINATION

11   BY MR. DELAHUNTY:

12   Q.  Good afternoon, Detective Krawczyk.

13   A.  Good afternoon.

14   Q.  Can you tell the members of the jury where you work.

15   A.  I work with the Toronto Police Service in Toronto, Canada.

16   Q.  What is your current title?

17   A.  I am a detective.

18   Q.  Are you assigned to any particular division or section of

19   the Toronto Police Service?

20   A.  Yes, I work in the child exploitation section of the sex

21   crimes unit.

22   Q.  How long have you worked in that capacity?

23   A.  I worked in the child exploitation section from 2002 until

24   2007.  And then I returned there in 2008 and have worked there

25   since then.

1    Q.  Can you tell the members of the jury what kind of cases

2    you investigate in that capacity?

3    A.  Yes.  I investigate cases where -- that involve child

4    pornography or internet luring or traveler cases.  People that

5    are attempting to make engagements on line with children and

6    to travel and have sex with them.

7    Q.  Do any -- have any of your investigations included an

8    undercover element or capacity?

9    A.  Yes, they do.

10   Q.  Can you estimate the number of undercover investigations

11   you've done in --

12   A.  I'm sorry.  I missed the last part of that question.

13   Q.  Can you estimate the number of investigations you've done

14   in an undercover capacity that relate to child pornography?

15   A.  It would be well over 1,000.

16   Q.  I'm going to ask you some questions about your work

17   experience, okay?

18   A.  Yes.

19   Q.  Have you received any training relating to using the

20   internet in an undercover capacity?

21   A.  Yes, I have.

22   Q.  Have you received any training or offered any training

23   relating to using peer-to-peer file sharing networks?

24   A.  Yes.  I've both taken training and I train officers as

25   well.

1    Q.   Can you tell the -- do you know -- can you tell the

2    members of the jury what a peer-to-peer file sharing network

3    is?

4    A.   Yes.   A peer-to-peer file sharing network is different

5    than what we call a traditional network, which might be

6    considered client and server based.   A typical client and

7    server based network is one where, like at Toronto Police

8    Service, I log into the police computer and there's a server

9    out on the fifth floor of our building that has all the

10   information.   And I log in and I'm able to access that

11   information.   But all the information is stored in one

12   location.

13          With peer-to-peer networks, what happens is people

14   download typically free software over the internet and then

15   there is no central server where files are stored.   The people

16   using the software themselves become what they call peers and

17   those people are the one that host the files.   And then files

18   get sent -- if I request a file, I'll get it from someone in

19   that peer network and we'll trade files amongst each other.

20   That's basically, in layman's terms, how it works.

21   Q.   Are there any other uses or can you list the uses of such

22   networks for a user?

23   A.   Yeah.   Typically we often hear in the news about it being

24   used for people to download music.   You can also share videos

25   and images and typically, in my line of work, we see people

Krawczyk - Direct

203

1    sharing child pornography, images and videos.

2    Q.  Have you used any of these peer-to-peer file sharing

3    networks in an undercover capacity acting in your law

4    enforcement capacity?

5    A.  Yes, I have.

6    Q.  Can you approximate the number of times that you've used

7    one such network?

8    A.  I've used the network known as GigaTribe hundreds and

9    hundreds of times.

10   Q.  Why have you used that particular network?

11   A.  Because I am very familiar with the network.  I also train

12   officers from across Canada and I have trained some from the

13   United States in that software.  I'm very comfortable with it.

14   I also find that there are numerous people on that network who

15   are interested in trading child pornography.

16   Q.  You mentioned teaching courses using that network.  Can

17   you approximate the number of courses that you taught

18   regarding that network?

19   A.  I have taught -- as courses, I've caught three separate

20   courses across Canada on that network.  But also individual

21   officers at different times.

22   Q.  Have you heard the term "IP address" before?

23   A.  Yes, I have.

24   Q.  Can you describe to the jury what that means?

25   A.  Yes.  IP address or internet protocol address is -- is

1   basically like a license plate on your car.  As

2   you're -- you're driving in your car and you're driving around

3   and you have your license plate.  As people -- you drive

4   people and places, people can look and see your license plate.

5   The same thing sort of applies using that analogy to describe

6   what an IP address is.

7           When you subscribe to the internet through, say, like

8   Qwest or Verizon or something like that, they give you a

9   modem.  That modem assigns you an IP address.  Often this is

10  done in the background without most people's knowledge or, you

11  know, they don't care to know about it.  And that's all for

12  obvious reasons, the company wants to, you know, track how

13  often you're on the internet, that might be for billing

14  purposes.

15          But any time you visit a website or you use software,

16  often your IP address is being viewed.  Every time you visit a

17  website, maybe your local news station has a website, they're

18  capturing your IP address because it's visible to them.  And

19  those IP addresses give out information, for instance, of the

20  approximate location where you are, certainly the city that

21  you reside in and where you're using the internet from.

22  Q.  Are you familiar with any software or tools that would

23  allow a law enforcement officer to identify the IP address of

24  someone online?

25  A.  Yes.  I've used several.  The one that I used in this case

Krawczyk

205

1    is publicly available.  It is called CommView.  And it is

2    publicly available for anyone to use.  It just -- there's a

3    fee to buy it.

4    Q.  Have you taught any courses regarding the use of CommView

5    and the tracking of IP addresses?

6    A.  Yes, I have.

7    Q.  Can you approximate the number of courses you've taught on

8    that subject?

9    A.  Well, I teach it every time I've taught GigaTribe, so at

10   least on three occasions.  But also if officers come to me for

11   advice on tracing IP addresses, I will recommend CommView.

12   Q.  Are there any other tools that you have used or taught

13   people to use that are helpful in tracking IP addresses?

14   A.  Yes.  You can visit websites.  And again, these are

15   publicly available.  Anybody can do this.  I visit a site

16   called MaxMind.com, M-A-X-M-I-N-D dot com and it is accessible

17   by anyone.  And when you input an IP address in there, MaxMind

18   will tell you who the registrant of that IP address is.  Say

19   it's -- it belongs to Comcast or whoever.  And then it will

20   geolocate that IP address for you.

21        And what that means is it will give you the

22   approximate location of where that IP address is from.  So

23   often it will tell you the city or the general area.  But it

24   obviously doesn't get specifically down to a customer or

25   anything like that.

206

1  Q.  In your experience as a law enforcement officer using
2  these tools, have you had an opportunity to test the accuracy
3  of CommView?
4  A.  Yes, I have.
5  Q.  And have you -- what did you learn about its accuracy?
6  A.  I have -- it has been 100 percent accurate for me in terms
7  of tracing the proper IP address of the user that I was on
8  line with at the time.
9  Q.  Previously, has a court ever qualified you as an expert to
10  offer an opinion regarding tracking an IP address?
11  A.  Yes.  Not specifically just on IP addresses, but in
12  general in child pornography investigations and peer-to-peer
13  investigations, et cetera.
14  Q.  That answered my next question.  But I'm going to ask it.
15  Has a court ever qualified you as an expert to offer an
16  opinion regarding peer-to-peer file sharing networks?
17  A.  Yes.
18       MR. DELAHUNTY:  Your Honor, the United States would
19  offer Detective Paul Krawczyk as an expert regarding
20  peer-to-peer file sharing networks, including GigaTribe and
21  the identification of IP addresses by internet users.
22       THE COURT:  Defense.
23       MR. FALLER:  Your Honor, it's hard to say that before
24  we actually hear what opinions he's going to have to give.  I
25  would reserve any objections I have until then.

1          THE COURT:  Okay.  Proceed then.  I'll indicate he's

2    qualified; however, if there's a specific objection then

3    defense counsel will raise it and I'll address it.

4    BY MR. DELAHUNTY:

5    Q.   Detective Krawczyk, when did you first access the

6    GigaTribe software?

7    A.   I believe my first investigation was sometime in 2008.

8    Q.   In 2010, were you using -- or did you have access to

9    GigaTribe?

10   A.   Yes, I did.

11   Q.   Did you use it in any of your law enforcement

12   investigations that year?

13   A.   I did.

14   Q.   I'd like to ask you about how the network worked in 2010,

15   okay?

16   A.   Yes.

17   Q.   What steps did a user have to take in 2010 to get on to

18   the GigaTribe network?

19   A.   Typically a user would visit the website

20   www.GigaTribe -- that's G-I-G-A-T-R-I-B-E  dot com.  In there

21   there would be a link to download the software.  You would

22   then click on that link and it would download the software to

23   your computer.  You would then open that file, which would be

24   a setup file.  And it would then launch the installer program

25   on your computer.

1        And once you installed that software, you would then

2   open that software up for the first time and it would ask you

3   to create an account.  You'd have to actually create an

4   account on there in order to use it.

5   Q.  Who assigned the user name of someone that opened an

6   account?

7   A.  You choose a user name.  And GigaTribe would tell you

8   whether that user name was taken or not.  And if it was, you

9   wouldn't be able to create another account using that user

10  name until you found a unique one that hadn't been used yet.

11  Q.  Just to confirm.  User names were unique on the GigaTribe

12  network in 2010?

13  A.  Correct.

14  Q.  Does GigaTribe assign any other information, such as

15  numbers to particular accounts?

16  A.  Yes.  They -- each GigaTribe user name is assigned a

17  unique number that GigaTribe uses to track the clients using

18  their software.

19  Q.  Okay.  I'm going to ask you about a specific time period.

20  April and June 2010.  Okay?

21  A.  Yes.

22  Q.  During April of 2010, did you come into contact with a

23  GigaTribe user named "Toddlers"?

24  A.  Yes.  On April 27th of 2010, I signed on to one of my

25  undercover -- am I good?  Okay.  Sorry.  One of my undercover

Krawczyk - Direct

209

1   GigaTribe accounts and I observed that someone with the user

2   name Toddlers had sent me an invitation to be a contact, a

3   user with them.

4   Q.   Did you take a screenshot of that interaction?

5   A.   I did.

6   Q.   Can you describe to the Court what a screenshot is?

7   A.   I run software, again that's publicly available, that

8   essentially takes a picture of my screen.  Instead of me

9   having to hold up a camera and take a picture, the software

10  runs in the background and I choose some key strokes and it

11  will take an exact picture of my screen and save it as any

12  type of file that I need to.

13  Q.   I think your addressed this, but I want to make sure I

14  understand.  Is it fair to compare that to a photograph?

15  A.   Yes.  It's, I would argue, even better.  It's exactly how

16  my screen appeared.

17  Q.   I'd like to direct your attention to Exhibit -- what's

18  been previously marked as Exhibit Number 1.  It's in the

19  binder in front of you.  Can you turn to that, please?

20  A.   Yes.  Yes.

21  Q.   Have you seen that document before?

22  A.   Yes, I have.

23  Q.   And what is it?

24  A.   It is the screen capture I made on April 27th, 2010 of

25  exactly what my screen was looking like.  And this, you can

1    see, there is numerous people that were inviting me to be

2    their friend, using quotes, and then Toddlers is about

3    two-thirds of the way down.  It says "Toddlers has invited

4    you.  Click here to answer."

5    Q.  Okay.  Let me ask you this first, though, before we get to

6    that.  Is it a fair and accurate depiction of your computer

7    screen as it appeared that day?

8    A.  Yes, it is.

9          MR. DELAHUNTY:  The government would move into

10   evidence Exhibit Number 1, Your Honor.

11         THE COURT:  Defense?

12         MR. FALLER:  No objection at this time, Your Honor.

13         THE COURT:  All right.  It is admitted.

14         (Government's Exhibits 1 was received.)

15   BY MR. DELAHUNTY:

16   Q.  Do you see Exhibit Number 1 on the screen in front of you?

17   A.  Yes, I do.

18   Q.  Going to direct your attention to a particular part of the

19   screen by highlighting it; okay?

20   A.  Yes.

21   Q.  Well, do you see my highlights?

22   A.  I did.  They're gone now.

23   Q.  Okay.  I'll try again.

24   A.  There we go.

25   Q.  Do you see the area that I highlighted?

1    A.  Yes, I do.

2    Q.  Can you read to the jury what I highlighted?

3    A.  Yes.  So it says "Toddlers" in red there, colon, "has

4    invited you.  Click here to answer."

5    Q.  What did you do in response to that invitation?

6    A.  I clicked on the underlined "here" which then allows me to

7    either accept or deny the request.  And in this case, I

8    accepted it.

9    Q.  What did that enable you to do with Toddlers once you

10   accepted the friend request?

11   A.  Once I accepted the friend request, Toddlers then appeared

12   in my contact list and that gives me the ability to see when

13   Toddlers is online.

14   Q.  Did you have any future interactions with Toddlers?

15   A.  I did.

16   Q.  When was your next interaction with that user name?

17   A.  My next interaction was on June 5th, 2010.

18   Q.  I'd like to direct your attention to Exhibits Number 2 and

19   14 in your binder.  Take a look at those, please.

20   A.  2 and 14?

21   Q.  Yes.

22   A.  Yes.

23   Q.  Look at 14, please.

24   A.  Yes.

25   Q.  Are both of these items screenshots?

212

1    A.  They are screenshots that I took, yes.

2    Q.  Do they fairly and accurately depict the way your screen

3    looked on that day?

4    A.  They do.

5            MR. DELAHUNTY:  Government would move into evidence

6    Exhibits 2 and 14, Your Honor.

7            THE COURT:  Defense?

8            MR. FALLER:  No objection, Your Honor.

9            THE COURT:  They are admitted.

10           (Government's Exhibits 2 and 14 were received.)

11   BY MR. DELAHUNTY:

12   Q.  Can you turn to Exhibit 2, is that on your screen,

13   Detective Krawczyk?

14   A.  It is now, yep.

15   Q.  What does that reflect?

16   A.  That is showing the contact list of who was on -- well, my

17   contact list, both of who's online and who is offline on June

18   5th, 2010.

19   Q.  What is the name that's highlighted?

20   A.  That name is highlighted and it's a little small to read,

21   but it says "Toddlers."

22   Q.  I'd like you to look at the top half of the screen.  Do

23   you see where it says 6-5-2010.

24   A.  Yes.

25   Q.  And it says 11:14:30 a.m.?

213

1   A.  Yes.

2   Q.  What does that mean?

3   A.  That, when I take a screen capture, the software

4   automatically puts information at the start of the file name

5   for me.  So in this case, it automatically put the date and

6   the time that I did the screen capture.  So the first part

7   stands for June 5th, 2010.  And then 11:14:30 was 11:14 and 30

8   seconds a.m.  And that's exactly when I captured the screen.

9   Q.  Could we briefly to Exhibit 14.  Could you tell the

10  members of the jury what that depicts?

11  A.  Yes.  That is the profile for the user Toddlers.

12  Q.  So I'd like you to look now at -- let me ask you:  Were

13  you able to see what images or folders Toddlers was sharing

14  online?

15  A.  Yes, I was.

16  Q.  I ask you to look at Exhibit Number 3 in your binder.

17  A.  Yes.

18  Q.  Is that a screenshot of your activity that day?

19  A.  Yes, it's a screenshot showing what Toddlers was sharing.

20  Q.  Is it a fair and accurate depiction?

21  A.  Yes, it is.

22          MR. DELAHUNTY:  I move into evidence Exhibit 3.

23          THE COURT:  Defense?

24          MR. FALLER:  No objection.

25          THE COURT:  It is admitted.

(Government's Exhibits 3 was received.)

BY MR. DELAHUNTY:

Q. Can we see that on the screen, please? What does this exhibit depict?

A. This exhibit depicts what Toddlers was sharing. And in this case, you can see, although it's a little small, that they were sharing three folders or directories. One entitled "pics," P-I-C-S. One entitled "toddlers" and one entitled "vids."

Q. Were you able to view the contents of these folders while you were online that day?

A. I was.

Q. And what were you able to view by clicking on them?

A. I was able to view both images and video -- well, by clicking on them, I'm actually able to view the thumbnail version of the images. So I'm actually able to see the image without even downloading anything. In terms of videos, I can see that it's a video, I can't see the content of the video unless I download it.

Q. In your experience, how does a thumbnail compare to what's actually -- what the actual file is?

A. In the majority of cases, and I'm talking 99.9 percent of the cases that I've ever seen, the thumbnail is an exact replica of the actual picture itself.

Q. After you saw these folders, did you make any effort to

1    download the contents?

2    A.   Yes, I did.

3    Q.   I'd ask you to look at Exhibits 4 and 5.

4         THE COURT:  Counsel, before we do that, I need to

5    take a quick break.  Have the jury go out.  Remember the

6    admonition, folks, we'll see you in a couple of minutes.  I

7    need to check with counsel on something.

8         (The jury left the courtroom.)

9         THE COURT:  The jury has left.

10        (Off the record.)

11        MR. FALLER:  Before the jury comes in, could I

12   inquire of something on the record?

13        THE COURT:  Sure.

14        MR. FALLER:  My understanding of the Court's ruling

15   on Monday was that the thumbnails and the images, whatever

16   images or videos this witness may testify to, those are all

17   coming in to evidence over the previously made defendant's

18   objections.  Is that correct?

19        THE COURT:  Correct.

20        MR. FALLER:  So what I wanted the record to be clear

21   that when I said there's no objection to their admission, I'm

22   not waiving any of those previously made objections that the

23   Court has overruled.  And also that just to be clear, that the

24   Court's order was what I believe it to be and we can go on

25   from there.  I think that makes it clear.

216

1          THE COURT:  All right.  Let me do the following.  I'm

2     going to make a ruling or just acknowledge that defense has

3     made objections with respect to various exhibits.  I've

4     overruled the objections.  I'm not going to require the

5     defense to renew the objections.  I will consider them to be

6     standing objections.  However, if -- so you can just indicate

7     "submit" or whatever.  Just indicating that --

8          MR. FALLER:  That's a good suggestion.  That's what

9     I'll do.  That will make the record clear.

10          THE COURT:  All right.  Now, however, if there is

11     something specific -- because remember, I'm basing the ruling

12     on the representations made and it does appear to be

13     consistent with the representation that this is really in

14     order to assist the jury in understanding from this witness

15     how he went about getting the basic information and getting

16     contact with the person that's been identified as Toddlers.

17          I believe it is relevant and otherwise admissible,

18     even taking into consideration the defendant's objections.  So

19     that's still my ruling.  And as far as I'm concerned, it's a

20     standing objection.

21          However, you need to clue me if there's a specific

22     exhibit that you really want to say, okay, this is one that I

23     want to not only keep a continuing objection, but I also now

24     have a specific additional supplemental objection that you'd

25     like to place on the record.  That's fine.  And we can do

1    that, you can state your objection on the record.

2          MR. DELAHUNTY:  Your Honor --

3          MR. FALLER:  Go ahead.

4          MR. DELAHUNTY:  I'd like to just get some

5    clarification here.  I don't think counsel is lodging a

6    running objection to all future exhibits.  I think he -- I

7    want to make sure I'm clear on this.  He's continuing to

8    submit his objection with regard to explicit images, but not

9    towards otherwise benign Word documents.  Is that correct?

10         THE COURT:  Well, in his objections, he had raised a

11   number of objections and, of course, those are on the record.

12   Those that I overruled -- he obviously didn't object to all of

13   them.  So there are some that he did not object to in his

14   formal written objections.  Obviously we can refer to his

15   further written objections just to see.

16         But those that he specifically raised -- now those

17   again, Mr. Faller, those that you have raised and I've ruled

18   on overruling your objection, I'm not going to require to

19   renew the objection.  They're considered to be standing

20   objections.

21         But those that were not specifically objected to,

22   either in your written objections or otherwise, you're going

23   to have to raise those specifically.  And there are some that

24   you did not object to, at least in writing or otherwise, and

25   those I have not considered to be standing objections.  In

1   other words --

2          MR. FALLER:  I understand what the Court is saying.

3   And if there are what would be more commonly referred to as

4   the usual trial objections as far as general admissibility

5   issues, I know that I have to make those to particular items

6   if I have them in order to preserve them.

7          THE COURT:  Okay.  Got it.  And then if there's any

8   concern, obviously, as I indicated, during the breaks of

9   course in the evening, we'll break by 4:30 at the very latest

10  today, just indicate to defense counsel and witnesses and the

11  exhibits, and then if there's a specific objection or

12  something -- if there's some dispute, okay, did the judge

13  really rule on that beforehand or not, I can take that up at

14  8:30 tomorrow morning so that we don't wind up where the

15  government is sort of blindsided, "oh, I didn't realize that

16  was a standing objection, I would have said something more on

17  the record to preserve my part of the record."  And I don't

18  want you to be in that position either.

19         MR. FALLER:  Sure.

20         THE COURT:  So meeting and conferring, I think, might

21  be helpful at least in terms of resolving those issues.

22         MR. FALLER:  Okay.

23         THE COURT:  Okay.  Anything else before we have the

24  jury come in?

25         MR. DELAHUNTY:  If I may have a moment?

219

1          THE COURT:  Sure.

2          MR. DELAHUNTY:  Okay.  The government is ready.

3    Thank you.

4          (Off the record.)

5          THE COURT:  The jury has returned.  Thank you for

6    helping us resolve that matter so now we can proceed.  Go

7    ahead, counsel.

8          MR. DELAHUNTY:  Thank you, Your Honor.

9    Q.   Detective Krawczyk, after you viewed the folders that

10   Toddlers made available on June 5th, what did you do next?

11   A.   I was able to download some files.

12   Q.   Can I direct your attention to Exhibits 4 and 5, that have

13   been marked as Government's Exhibits 4 and 5, please.

14   A.   Yes.

15   Q.   Do those depict screenshots you took on that date?

16   A.   Yes, they do.

17   Q.   Are they fair and accurate representations of your

18   computer screen as they appeared that day?

19   A.   Yes, they are.

20   Q.   What does Exhibit 4 depict?  Wait.  Pardon me.  Can we

21   show the other 4, please.

22          THE COURT:  Moving to admit 4 and 5?

23          THE CLERK:  No, it's not in.

24          MR. DELAHUNTY:  I apologize, Your Honor.  Can we take

25   that off the screen, please.  Government move into evidence

1    Exhibits 4 and 5, Your Honor.

2              MR. FALLER:  Submitted.

3              THE COURT:  They are admitted.

4              (Government's Exhibits 4 and 5 were received.)

5    BY MR. DELAHUNTY:

6    Q.   Can we see Exhibit 4, please.  What does that depict,

7    Detective Krawczyk?

8    A.   That is a screen capture of the downloads that I received

9    up until about 12:01 p.m.

10   Q.   Look at Exhibit 5, please.

11   A.   And those are the downloads -- sorry, the ones that are in

12   green are the downloads that I received from Toddlers as of

13   12:09 p.m. on June 5th.

14   Q.   As a result of this downloading that you were doing, were

15   you able to identify the IP address of Toddlers?

16   A.   Yes, I was.

17   Q.   And how did you go about doing that?

18   A.   As I described before, I had -- I was using software on

19   the computer called CommView.  CommView shows all the IP

20   addresses that I am connected to at the time.  And I was able

21   to -- I view, as I'm downloading information, in this case

22   images and videos from Toddlers, I'm obviously receiving a lot

23   more information from that particular IP address and that's

24   how I'm able to determine which IP address Toddlers had.

25   Q.   Did you take any screenshots of your efforts?

1   A.  I did.

2   Q.  And I direct your attention to what's been previously

3   marked Government's Exhibit 13 and 18.

4   A.  Yes.

5          MR. FALLER:  Did you say 13 and 18 or 13 through 18?

6          MR. DELAHUNTY:  13 and 18.  Only those two exhibits.

7          MR. FALLER:  Thank you.

8   BY MR. DELAHUNTY:

9   Q.  Do those two exhibits reflect screenshots you took that

10  day?

11  A.  They do.

12  Q.  Do they fairly and accurately reflect your computer screen

13  as it appeared that day?

14  A.  They do.

15         MR. DELAHUNTY:  Government would move into evidence

16  those two exhibits, Government's Exhibit 13 and 18, Your

17  Honor.

18         MR. FALLER:  Submitted.

19         THE COURT:  They are admitted.

20         (Government's Exhibits 13 and 18 were received.)

21  BY MR. DELAHUNTY:

22  Q.  Can I direct your attention to Exhibit 13, please.

23  A.  Yes.

24  Q.  What does this exhibit indicate?

25  A.  This is the screen capture that shows the CommView window

1    that was open on my computer screen, which is the CommView

2    software.  And I actually took my mouse and highlighted where

3    Toddlers' IP address is, and that's why it's in blue.

4           And so the important information on this screen, it's

5    divided into columns and you can see under the third column in

6    says "Remote IP."  Those are the IP addresses that I'm

7    connected to.  And the highlighted one says "71.221.105.230."

8    And beside it, it shows "United States."  Meaning it's -- it

9    belongs in the United States.

10           And then further over, at the very right of the

11    screen, we can see under "Bytes," we see the highlighted

12    number of "7,273,363."  And that shows how many -- how many

13    bytes -- how much information was coming from Toddlers.  And

14    as you can see, if you look at all the other numbers, it

15    was -- it's very different.  This is a much higher number.

16    And that's how I'm also able to determine that this is

17    Toddlers' IP address because I was receiving files from

18    Toddlers and that's why the number is bigger.

19    Q.  Can you compare it, that number to all the other ones on

20    this screen?

21    A.  Yes.  So this one is like I said, 7.2 million bytes and

22    the next closest, a quick look, is 197,000.  So -- and that

23    one doesn't even -- isn't even related to GigaTribe.  So, yes,

24    it's much, much bigger than all the other IP addresses.

25    Q.  And on the top left, can you tell the jury what that

223

1   indicates of this exhibit?

2   A.   The very top of the screen?  It shows the time that I took

3   this, which was at 12:36 p.m. on June 5th, 2010.

4   Q.   Can we look at Exhibit 18, please.  How does this exhibit

5   compare to Exhibit 13?

6   A.   It was just taken a little bit later at 12:55 p.m. on June

7   5th.  And again, it's showing the same IP address and with an

8   even higher number now of 9.8 million bytes when every other

9   number on the screen is less than 100,000.  So much greater

10  value.

11  Q.   Can you identify the IP address that was associated with

12  that approximately 9 million bytes of information, please?

13  A.   Yes, it's 71.221.105.230.

14  Q.   Were you able to identify any other information about who

15  the provider or internet provider of that IP address is from

16  this exhibit?

17  A.   Yes.  It's a little hard to see at this size, but under

18  the second to last column, it says "hostname" at the top.  If

19  you scroll down to where the blue highlighted area is, which

20  is the IP of Toddlers, it shows in that what we call

21  "hostname," it shows "qwest.net" and that indicated to me that

22  this IP belonged to Qwest.

23  Q.   Did you take any further steps to learn whether or not

24  this IP address was associated with Qwest?

25  A.   I did.

1   Q.  Did you take any screenshots of those efforts?

2   A.  I did.

3   Q.  May I direct your attention to Government's Exhibit 18 and

4   19 in your binder, please.

5   A.  Yes.

6   Q.  Pardon me.  19 and 20.  If I can direct you to Exhibits 19

7   and 20.

8   A.  Yes.

9   Q.  Are those screenshots of your activity on June 5th, 2010?

10  A.  Yes, they are.

11  Q.  Are they fair and accurate representations of your

12  computer screen on that day?

13  A.  They are.

14  Q.  Generally speaking, what do they depict?

15  A.  Exhibit -- sorry.  Am I supposed to open the screen or --

16  Q.  I'm just going to ask you --

17  A.  Okay.  Sorry.

18  Q.  -- one more background question and then we'll talk about

19  it in detail.  But can you generally describe what that

20  indicates in Exhibits 19 and 20?

21  A.  Yes, they are -- I used two different websites to trace

22  the IP address.  And these websites like I said before are

23  publicly available, anybody can access them.  And they tell me

24  who the registered company is of that IP and the approximate

25  location of the customer.

225

1    MR. DELAHUNTY:  Your Honor, the government would move

2    into evidence Government Exhibits 19 and 20.

3            MR. FALLER:  Submitted.

4            THE COURT:  They are admitted.

5            (Government's Exhibits 19 and 20 were received.)

6    BY MR. DELAHUNTY:

7    Q.  I'm going to ask you to look on your monitor Exhibit 19.

8    A.  Yes.

9    Q.  And what does this indicate with regard to any IP

10   addresses that are reflected on it?

11   A.  Again, I visited the site MaxMind and I inputted the IP

12   address, which I'm finding a little difficult to see right

13   now.  But I believe it's 71.221 -- thank you -- .105.230.  And

14   this website provides back information.  In this case, it says

15   that the country is the United States.  That the city is

16   Colorado Springs.  And that the internet service provider

17   or -- which is often used "ISP" is Qwest Communications.

18   Q.  Thank you.  Can I ask you to look at Exhibit Number 20,

19   please.

20   A.  Yes.

21   Q.  Can we enlarge that, please.  How does this information

22   compare to what we discussed in Exhibit 19?

23   A.  It's very similar.  It's just a different website to trace

24   IP addresses.  In this case, it's Domain Tools.  And I again

25   inputted the same IP address and near the top, it shows IP

226

1    location.  And in this case, it says that it was United

2    States, Colorado Springs and Qwest Communications Company.

3    Q.   Okay.  Can I ask you to look at what's been previously

4    admitted as Government's Exhibit 155.  It's in the back of

5    your binder.  Or can we show that exhibit, please?  Do you see

6    that on your monitor?

7    A.   Yes, I do.

8    Q.   Does that exhibit refer to any particular IP addresses?

9    A.   Yes.  If you look towards the top left under the tracking

10   number, it says "71.221.105.230" with a date of June 5th,

11   2010.  And the time.

12   Q.   Okay.  What is this document -- what do you understand

13   this document to show about that particular IP address?

14   A.   I believe it shows who the subscribe -- the subscriber

15   information for the customer who had that IP address at that

16   date and time.

17   Q.   Does this exhibit show who that subscriber was?

18   A.   It does.

19   Q.   Who does it show as being the subscriber of that IP

20   address on June 5th, 2010?

21   A.   Last name of McCorack, first name of Shawn, S-H-A-W-N.

22   Q.   Does it identify an address?

23   A.   It does.  It says 14275 Vessey, V-E-S-S-E-Y, and then

24   C-I-R, which I believe stands for Circle, Black Forest and C-O

25   for Colorado.

227

1   Q.  Does this exhibit say anything about when this account was

2   established?

3   A.  Yes, it does.  Well, it says -- I don't believe that to be

4   when the account was established.  I believe that, from my

5   experience, to be when the IP was assigned to that customer.

6   And it shows June 4th, 2010.

7   Q.  Okay.  Let's go back to talking about your interaction

8   with Toddlers.  Okay?

9   A.  Yes.

10  Q.  On June 5th, did you engage in a chat with Toddlers?

11  A.  I did.

12  Q.  Is that a function of GigaTribe?

13  A.  Yes, it is.

14  Q.  Does it allow users to talk to each other, write messages

15  in realtime?

16  A.  Yes, it does.

17  Q.  Did you take any screenshots of your chats with Toddlers

18  on that day?

19  A.  I did.

20  Q.  I'd like you to look at Government's Exhibit 7, 8 and 9

21  and 17 in your binder, please.

22  A.  And 17, did you say?

23  Q.  Yes.  7, 8, 9 and 17.  All Government's Exhibits.

24  A.  Yes.

25  Q.  Are each one of those exhibits reflecting screenshots of

1   your activity on June 5th, 2010?

2   A.  Yes, they are.

3   Q.  And are they all fairly and accurately reflecting your

4   computer screen as it appeared that day?

5   A.  Yes, they do.

6   Q.  Do they all show the transcript of the chat that you had

7   with Toddlers on that day?

8   A.  They do.

9           MR. DELAHUNTY:  Move into evidence, Your Honor,

10  Government's Exhibit 7, 8, 9 and 17.

11          MR. FALLER:  Submitted.

12          THE COURT:  They are admitted.

13          (Government's Exhibits 7, 8, 9 and 17 were received.)

14  BY MR. DELAHUNTY:

15  Q.  Can we put on the screen, please, Exhibit Number 7.

16          And can we rotate it, please, to the right.  Can we

17  zoom out?  Can we highlight the top half of this, please?  Or

18  zoom in.

19          Detective Krawczyk, do you recognize this as a

20  transcript of your chat with Toddlers?

21  A.  I do.

22  Q.  Ask you about the columns in this chat and then we'll talk

23  about specific lines in it.  Okay?

24  A.  Yes.

25  Q.  The left hand column has a name -- has what appear to be

229

1  names.  Is that accurate?

2  A.  Yes.

3  Q.  Do you see the name "Toddlercumdaddy"?

4  A.  Yes, I do.

5  Q.  And whose user name is that?

6  A.  That's one of my undercover user names.

7  Q.  Why did you use that name?

8  A.  It's actually very similar to a name I used in a previous

9  investigation where we arrested somebody who had a name

10 similar to that.  The reason I chose that user name for my

11 undercover work is because to me it's quite clear if you're

12 chatting with someone named Toddlercumdaddy that there's no

13 question to what that person's sexual interests are.

14 Q.  There's a name on the right that says "Toddlers."  What

15 does that indicate or refer to?

16 A.  That's the -- the person on the left is the person who's

17 actually typing the chat, who typed that.  The person on the

18 right, in this case, "Toddlers" for the first set, is the

19 person who's receiving the chat.  And that's who you're having

20 the chat with.

21 Q.  To the right of that is, in parentheses, what appears to

22 be a date and time.  Is that accurate?

23 A.  Yes, it is.  It's to my time zone, which is three hours

24 ahead of here.

25 Q.  Okay.  Can I direct your attention to the line that

1    begins -- at 11:18, that says "my pass is canoe."

2    A.   Yes.

3    Q.   Who wrote that?

4    A.   I did.

5    Q.   What did you mean?

6    A.   I was sharing folders.  I had folders that I was sharing.

7    And mine were password protected.  So I was telling Toddlers

8    what the password was to my folders.

9    Q.   Before we get into the content of this chat, I'd like to

10   ask you:  Did you have any files that actually depicted any

11   child pornography on this date?

12   A.   I did not.

13   Q.   Were you making any actual files of child pornography

14   available?

15   A.   I was not.

16   Q.   But you were representing that to Toddlers, though?

17   A.   Correct.

18   Q.   The first line, you say "My pass is canoe."  Can you tell

19   the jury what you wrote next?

20   A.   What I wrote next?

21   Q.   I'm sorry.  What Toddlers wrote in response.

22   A.   Toddlers wrote "Sure."  But that was in response to

23   something I had asked just before I stated my password.

24        And then Toddlers said, "So what are you into?"

25   Question mark.

1   Q.   What did you write?

2   A.   I wrote, "Very young."

3   Q.   What did Toddlers respond?

4   A.   "Same her," which I took to mean "here."  "I like kids

5   under age 4."

6   Q.   What did you respond?

7   A.   I said "nice."  And then "going to be away from keyboard."

8   Meaning -- or "form keyboard."  I meant "from."  And that

9   meant I was going to be stepping away from my computer.

10  Q.   What did Toddlers write next?

11  A.   "You ever play with any?"  Question mark.

12  Q.   What did you understand that mean?

13  A.   In my experience, I know that to mean Toddlers was asking

14  me if I've ever been sexually active with children.

15  Q.   What was the next communication with Toddlers?

16  A.   At 11:27 Toddlers sent me the message "you have any kids?"

17  Question mark.

18  Q.   What did you respond?

19  A.   I responded, "Sorry.  Back."  Meaning I'm now back at the

20  keyboard.  And then I said that "I do have kids.  3 and 7.

21  You?"  Question mark.

22  Q.   Were you referring to your actual kids?

23  A.   Not my actual kids.  This is my persona online.

24  Q.   What did Toddlers write back to you?

25  A.   "Nice.  Boys or girls?"  Question mark.

232

1    Q.   What did you respond?

2    A.   I responded "3 yo" meaning year old.  So "3 year old is

3    girl.  7 yo is boy."

4    Q.   What did Toddlers respond to that?

5    A.   M-M-M, which I take to be "mmm, nice.  Do you have any

6    pics of her?"  Question mark, question mark.

7    Q.   What did you respond?

8    A.   I responded "I do ... but I only share private for

9    private ... sorry.... I hope you understand."

10   Q.   What did you mean when you wrote the term "private"?

11   A.   In this line of work, "private" means -- and in my

12   experience, I know "private" to mean images or videos that

13   someone has taken of a child that's known to them.  So in this

14   case, I was putting forth that I had, you know, pictures of

15   child pornography of a child that was known to me.

16   Q.   Had you used that term previously in other undercover

17   investigations in GigaTribe?

18   A.   Yes, I have.

19   Q.   Did you use it to mean the same thing?

20   A.   Yes.

21   Q.   Was it your understanding that other people used it to

22   mean the same thing?

23   A.   Yes.

24   Q.   What was the next communication that you got from Toddlers

25   after writing that?

233

1   A.   At 12:11, Toddlers sent me the message "I have private."

2   Q.   What did you understand that to mean?

3   A.   That Toddlers had child pornography pictures of a child

4   that is known to Toddlers.

5   Q.   What did he write after that?

6   A.   "My friends son I take at nights."

7   Q.   What did you understand that to be referring to?

8   A.   I -- at the time I just -- it made it sound like somehow

9   Toddlers got ahold of his friend's child that he somehow took.

10  Q.   What did you write next?

11  A.   I said "nice.. how old."

12  Q.   Who were you referring to when you asked "how old"?

13  A.   About the friend's son that he mentioned.

14  Q.   Okay.  What did Toddlers write in response?

15  A.   "He's two.  Your daughter wear diapers?"  Question mark

16  question mark.

17  Q.   What was your next statement to Toddlers?

18  A.   At 12:13, I stated, "He sleeps over a lot?"  Question

19  mark.  And I was referring back to the fact that he said he

20  took his friend's son at night.

21        And then I said "yes, she does."  But I was referring

22  back to him asking me if my daughter wore diapers.

23  Q.   What was Toddlers next response?

24  A.   At 12:13, Toddlers responded, "oh, nice," which I took to

25  be the response to me saying that my daughter wears diapers.

234

1          And then Toddlers stated:  "No when I visit I take

2     him out late in the night to a hotel."

3     Q.  What did you understand him to be responding to when he

4     wrote that?

5     A.  Again, to my question about the friend's son who I asked

6     "does he sleep over a lot?"

7     Q.  Did you ask any followup questions to Toddlers in this

8     chat about that statement?

9     A.  Yes, I actually said, "Where are your privates?"  Meaning

10    where are those pictures?  At 12:14.

11          And at 12:14, I also asked "How the heck do the

12    parents let you take him to a hotel?"  Question mark.

13    Q.  What was his response?

14    A.  At 12:15, Toddlers stated:  "They don't, their asleep when

15    I do it."

16    Q.  What did you understand Toddlers to mean when he said

17    "they don't"?

18    A.  Meaning that I -- at 12:14, when I asked "how do the

19    parents let you take him to a hotel," I believe he was

20    referring to "they're asleep and they don't know that I do

21    it."

22    Q.  What did you say in response to that?

23    A.  I said "That's pretty risky."

24    Q.  What was Toddlers' response?

25    A.  He said "it is."

1        And then "Let's trade some pics and you will see

2   him."

3   Q.  What did you say to that?

4   A.  At 12:17, I said "K."  Meaning okay.  Dot dot dot.  "I

5   will put mine up with a new password.  They are archived and

6   encrypted so give me a sec."

7   Q.  Did you ask -- what was your next question to Toddlers?

8   A.  I then asked "What folder are yours in?"

9   Q.  What did you mean, "folder"?

10  A.  Meaning as we saw previously in that other exhibit, there

11  are folders that Toddlers was sharing and I was asking of

12  those folders, where are these private pictures.

13  Q.  Can I ask you to look forward a little bit at line -- the

14  date of 12:21.

15  A.  Yes.

16  Q.  Okay.  Can you tell the jury what you wrote at 12:21?

17  A.  Yes.  I wrote:  "Put it up and I will put mine up .... the

18  folder will be called Emma."

19  Q.  What were you referring to in that statement?

20  A.  I was referring to I will -- you know, put up your private

21  collection and I will put up my private collection.  And that

22  my folder of my private collection will be called Emma.

23  Q.  What did Toddlers respond to that?

24  A.  Toddlers responded, "my is called new folder lol."

25  Q.  What did you understand that to be referring to?

1   A.  Me asking him to put up the private collection.  So I

2   believe that to mean that there would be a folder there with

3   the name "new folder."

4   Q.  Okay.  Look now at 12:23, do you see that?

5   A.  Yes.

6   Q.  What question did Toddlers ask you?

7   A.  Toddlers asked at 12:23:  "Ok.  Are yours up now?"

8   Question mark.

9   Q.  What did -- what did you understand him to be asking you

10  about?

11  A.  He was asking if my private collection was being shared.

12  Q.  What was Toddlers next statement to you?

13  A.  12:24 Toddlers stated:  "Ok.  Vids are in."

14  Q.  What did you understand that to mean?

15  A.  I understood that to mean that Toddlers had also put in

16  videos from his private collection.

17  Q.  We'll take a look at some other screenshots that may

18  depict that in a second.  But I'd like to keep going through

19  this chat.

20          Can we look at Exhibit Number 8, please.  Like you to

21  look where I'm highlighting.  Do you see that?

22  A.  Yes.

23  Q.  Okay.  At 12:31, what did you ask Toddlers in this chat?

24  A.  I asked:  "When did you take" -- sorry.  "When did you

25  take those pics?"  Question mark.

1   Q.  Which pictures were you referring to?

2   A.  I was referring to what I was observing in the new folder

3   directory that Toddlers had shared with me.

4   Q.  And when you say "when did you" who were you referring to?

5   A.  Toddlers.

6   Q.  Did Toddlers answer did your question?

7   A.  He did at 12:32.  He stated:  "Um" -- U-M -- "about a year

8   ago.  Why?"

9   Q.  And this chat took place in June of 2010?

10  A.  Correct.

11  Q.  What was your understanding then of when these pictures

12  were made?

13  A.  Well, his -- he's telling me that they were made about a

14  year ago from 2010, so that would have been 2009.

15  Q.  Can we look at Exhibit 17, please.  Can we zoom on the

16  bottom half of that, please.

17       I'm going to ask you to look at the lines I'm

18  highlighting.  Do you see those on your screen?

19  A.  Yes, I do.

20  Q.  I can direct your attention to on Exhibit 17 at the

21  portion of the chat that's at 12:52.  Do you see that?

22  A.  Yes, I do.

23  Q.  And what question did you ask Toddlers at that point in

24  time?  Or -- what did Toddlers ask you at that point in time?

25  A.  At 12:52, Toddlers asked:  "What is her name?"  Question

238

1    mark.

2    Q.  Who did you understand that to be referring to?

3    A.  To what he believed was my daughter.

4    Q.  What did you write in response?

5    A.  I stated:  "Wouldn't that be great... you could teach my

6    little girl.  Emma."

7    Q.  And what -- did you ask Toddlers a question as well?

8    A.  I did.  I asked "What about the boy?"  Question mark.

9    Q.  What did you mean, what were you asking about there?

10   A.  About what the boy's name was.

11   Q.  Did Toddlers tell you what the boy's name was?

12   A.  Yes, at 12:52 he stated "Ben."

13   Q.  And did you understand that -- or who did you -- who is

14   the boy in question, who were you asking about?

15   A.  I was asking about the boy I could see in the pictures

16   that -- from the "new folder" directory that Toddlers shared

17   with me.  And that I was able to partially download.

18   Q.  Can we take this off the screen, please?

19        Can we -- can I direct your attention to Exhibit 6,

20   please.

21   A.  Yes.

22   Q.  Is this a screenshot of your computer on that day?

23   A.  Yes, it is.

24   Q.  Does it fairly and accurately depict what your computer

25   screen looked like on that day?

239

1    A.  Yes, it does.

2            MR. DELAHUNTY:  The government would move into

3    evidence Government's Exhibit 6.

4            MR. FALLER:  Submitted.

5            THE COURT:  It is admitted.

6            (Government's Exhibits 6 was received.)

7    BY MR. DELAHUNTY:

8    Q.  Can we see that exhibit, please, on the screen.  On the

9    top left of this document, can you tell the jury what time it

10   was made?

11   A.  Yes, it was made at 12:21 and 41 seconds p.m. on June 5th,

12   2010.

13   Q.  What does this exhibit depict?

14   A.  It depicts the contents of the "new folder" at that

15   time -- that particular time, which shows the thumbnail

16   versions of the 13 images that were inside the folder at that

17   time.

18   Q.  Could we put back up on the screen, please, Exhibit Number

19   8.  Pardon me.  Exhibit Number 7.  Can we zoom right in the

20   middle, please.

21           Do you see where I'm highlighting at 12:21?

22   A.  Yes.

23   Q.  And do you see where it says "new folder"?

24   A.  Yes.

25   Q.  Is that the same folder that we just looked at in Exhibit

240

1   Number 6?

2   A.  Yes.

3   Q.  Can I ask you to look at Exhibit Number 11.

4        Is Exhibit Number 11 a screenshot of your computer

5   screen as it appeared that day?

6   A.  Yes, it is.

7   Q.  Does it fairly and accurately depict what your computer

8   screen looked like on that day?

9   A.  It does.

10        MR. DELAHUNTY:  The government would move into

11   evidence Government's Exhibit Number 11.

12        MR. FALLER:  Submitted.

13        THE COURT:  It is admitted.

14        (Government's Exhibits 11 was received.)

15   BY MR. DELAHUNTY:

16   Q.  On the top left, can you identify when this screenshot was

17   taken?

18   A.  Yes.  It was taken at 12:35 and 48 seconds p.m. on June

19   5th, 2010.

20   Q.  Was it taken later in time than Government's

21   Exhibit -- the screenshot depicted in Government's Exhibit 6?

22   A.  Yes, it was.

23   Q.  Is there a difference between the contents as reflected in

24   this screenshot?

25   A.  Yes.  I believe the images are the same.  But there are

241

1    three additional files which are video files.  And they're the

2    ones that you can just sort of see an icon in the middle but

3    have white all around them.

4    Q.  Can we zoom in to there that I highlighted.

5         Do you see these four thumbnails?

6    A.  Yes, I do.

7    Q.  Do you see the series of numbers below them?

8    A.  Yes, I do.

9    Q.  What do you understand those to be referring to?

10   A.  Well, in my experience, there's different camera makers or

11   different camera things have a default way of naming, a sort

12   of default naming mechanism.  So often times you'll see files

13   directly from a camera entitled "IMG" and then a set of

14   numbers.  Some camera makers have "PICT" and then followed by

15   four numbers and then dot jpg.

16        When I see those in investigations, it's just a

17   heightened awareness when I see those because in my

18   experience, people often, in the child pornography world,

19   change the name of the files.  When I see what appears to be a

20   native naming system to a camera, I'm concerned because it's

21   more likely than those could be pictures taken by whoever I'm

22   in contact with at the time.

23   Q.  Those file names that were underneath those images -- did

24   you understand those numbers to be the file names of those

25   images?

Krawczyk - P.

242

1   A.   The letters "PICT" and then -- P-I-C-T and then the

2   numbers, yes, those are the file names.

3   Q.   In your experience, how does the file name that can be

4   viewed on a GigaTribe user's images compare to the file name

5   that would be on the GigaTribe user's personal computer?

6   A.   I would expect them to be exactly the same.

7   Q.   I just have a couple more questions for you, Detective

8   Krawczyk.   In your -- we looked at a chat transcript of

9   GigaTribe; correct?

10  A.   Yes.

11  Q.   In your experience, is the chat transcript of a GigaTribe

12  user stored on the GigaTribe user's computer?

13  A.   Yes, by default with the software, it stores the chat

14  locally on the person's computer unless they choose to clear

15  out the history of the chat.

16  Q.   And when you say store "locally," can you put that in more

17  layman's terms, please?

18  A.   So the chat is actually sits on -- the transcript of the

19  chat sits on that person's computer.   That particular computer

20  they were using when they had that chat.

21  Q.   So would the particular chat that we just discussed in

22  Government's Exhibit 7, 8, 9 and 17, would you expect to find

23  that on Toddlers' personal computer?

24  A.   Yes, I do.

25  Q.   I think you've answered this, but I want to make this

1    clear.  Did you share any actual images of child pornography

2    that day?

3    A.  I did not.

4    Q.  After this internet session with Toddlers on June 5th,

5    2010, the information that you learned, what did you do next?

6    A.  I forwarded the information to American law enforcement,

7    specifically Officer Romine of Colorado Springs Police

8    Department.

9         MR. DELAHUNTY:  I think that's all I have.  May I

10   have a moment to confer, Your Honor?

11        THE COURT:  Yes.

12   BY MR. DELAHUNTY:

13   Q.  I apologize, Detective Krawczyk.  I am going to ask you

14   one more line of questions.

15        You mentioned earlier that you started downloading

16   files from Toddlers.

17   A.  Correct.

18   Q.  Were you able to download any particular images or files?

19   A.  I was.

20   Q.  I'm asking you to look at Government's Exhibit 21 and 22.

21   A.  Yes.

22   Q.  Are those two documents screenshots taken on your computer

23   that day?

24   A.  No, I don't believe they were screenshots.  I believe

25   those are just printouts of two of the files I was able to

1  download from Toddlers.

2  Q.  And you've seen these documents before?

3  A.  I have.

4  Q.  Did they fairly and accurately depict the files that you

5  downloaded that day?

6  A.  They do.

7        MR. DELAHUNTY:  The government would move into

8  evidence Exhibits Number 21 and 22, Your Honor.

9        MR. FALLER:  Submitted.

10        THE COURT:  All right.  They are admitted.

11        (Government's Exhibits 21 and 22 were received.)

12  BY MR. DELAHUNTY:

13  Q.  Okay.  Can we show those briefly?  That's Exhibit Number

14  21.  We see Exhibit Number 22.  Can we take those off the

15  screen, please.

16        Can I ask you to look at Government's Exhibit 10,

17  Detective Krawczyk.

18  A.  Yes.

19  Q.  What does this document reflect?  I'm sorry, let me ask

20  you.  Is this a screenshot taken from your online session that

21  day?

22  A.  It is.

23  Q.  Is it a fair and accurate depiction of your computer

24  screen as it appeared that day?

25  A.  It is.

1        MR. DELAHUNTY:  Government would move into evidence

2   Government Exhibit 10, Your Honor.

3        MR. FALLER:  Submitted.

4        THE COURT:  It is admitted.

5        (Government's Exhibit 10 was received.)

6   BY MR. DELAHUNTY:

7   Q.  Does this reflect the particular files that you were

8   downloading and attempting to download?

9   A.  Yes.  The first half of the screen, the top half, the

10  screen and then the blue above that, those are the files that

11  I did and attempted to receive from Toddlers.

12  Q.  Okay.  Can we enlarge the top half of that?  Do you see

13  where I'm circling?

14  A.  Yes.

15  Q.  Is that file named PICT0286.jpg.

16  A.  It appears to be, yes.

17  Q.  And what does this screen indicate with regard to that

18  particular exhibit, or that particular file?

19  A.  So that in itself, that file name shows that it was

20  downloaded because there's a little green checkmark which is a

21  little hard to see just to the left of that name.

22        And then to the right of that, the next column, it

23  shows "download completed."  Which means I got the entire

24  file.

25        And then the next column shows the user that I got

1   the file from, which shows Toddlers.

2          And then to the right of that, it shows how big the

3   file was.  Again it's a little hard to see in here, but I

4   believe it says 1.28 megabytes and to the right of that it

5   shows a green bar.  And that means that I got the entire file.

6   Q.  Can we zoom out, please.  This shows your downloading as

7   it appears at that point in time; correct?

8   A.  Correct.

9   Q.  So your downloading continued past this point?

10  A.  Correct.

11  Q.  So just because all the file wasn't downloaded at this

12  point doesn't exclude the possibility that it was downloaded

13  later on in the session?

14  A.  Correct.

15         MR. DELAHUNTY:  I have no further questions at this

16  time, Your Honor.

17         THE COURT:  Okay.  It's almost 4:30.  Mr. Faller, I'm

18  tempted to just break.  I don't know how long your cross will

19  be.

20         MR. FALLER:  It's certainly going to be, I would

21  think, more than five minutes.

22         THE COURT:  All right.  Fine.  Members of the jury,

23  we are go to take our first break.

24         Remember until the trial is over, do not discuss this

25  case with anyone including your fellow jurors, members of your

1  family, people involved in the trial or anyone else.  And do

2  not allow others to discuss the case with you.  This includes

3  discussing the case in internet chatrooms or through internet

4  blogs, internet bulletin boards, emails or text messaging.  If

5  anyone tries to communicate with you about the case, please

6  let me know about it immediately.

7         Do not read, watch or listen to any news reports or

8  other accounts about the trial or anyone associated with it,

9  including any online information.

10        Do not do any research, such as consulting

11 dictionaries, searching the internet or other reference

12 materials and do not make any investigation about the case on

13 your own.

14        Finally, keep an open mind until all the evidence has

15 been presented and you've heard the arrangements of counsel,

16 my instructions on the law and the views of your fellow

17 jurors.  If you need to speak with me about anything, simply

18 give me a signed note.

19        Members of the jury, we're going to take our evening

20 recess.  You'll reconvene with us at nine o'clock tomorrow

21 morning.  If you can be in the jury room a little bit before

22 nine o'clock, that would be great so that right at nine

23 hopefully we can just get you out and we can continue on with

24 the presentation of the evidence.

25        It should be a little easier tomorrow than today.

248

1    There were like 45 of you folks, the whole panel, obviously

2    they're gone, so it will just be the 14 of you.  I don't think

3    there's another trial starting tomorrow.  So hopefully it will

4    be a little easier getting into the courtroom, et cetera.

5            Again, if you've been taking notes, just leave them

6    in the jury room, we do lock the jury room at night.  We will

7    give you a contact telephone number in case, heaven forbid,

8    anything should occur that you need to contact us over the

9    evening or first thing in the morning.

10           Otherwise, we'll see you tomorrow morning at nine

11   o'clock to continue with your role.  We're going to remain in

12   session.  Thank you.  Have a good evening.  We'll see you

13   tomorrow morning at nine o'clock.

14           (The jury left the courtroom.)

15           THE COURT:  You can go ahead and step down.  They

16   might want to see you before then, but we'll resume at nine

17   o'clock.

18           THE WITNESS:  Thank you.

19           THE COURT:  Go ahead and have a seat just for a

20   moment.

21           All right.  First of all, is there anything that we

22   need to take up either this evening or first thing tomorrow

23   morning that the government is aware of?

24           MR. DELAHUNTY:  Nothing at this point, Your Honor.

25           THE COURT:  Defense, anything?

1          MR. FALLER:  No, Your Honor.

2          THE COURT:  All right.  Normally we convene at 8:30.

3    But if you seriously don't think there are any issues, we can

4    reconvene at 8:45.  And basically I'm just going to come and

5    see if there are any issues that we can take up or need to

6    take up and then we can go ahead and do that.

7          What I would appreciate, of course, if you can just

8    this evening or first thing tomorrow.  Government, as far as

9    witnesses, obviously we'll have the detective back up on the

10   witness stand.  But in terms of the order of your witnesses

11   tomorrow, what are you looking at?

12         MR. DELAHUNTY:  Government anticipate calling

13   Detective Hall next and then -- or Agent Hall and then

14   Detective Rogers.  I would suspect that would take us into mid

15   morning.  And then we would have a witness from Viacom, that

16   would be a short examination.  And another law enforcement

17   officer, Agent Squire.  Although there's a lot of variables, I

18   think that would take us through to lunch tomorrow.

19         MR. FALLER:  Actually, Agent Rogers is going to do

20   the -- testify about the forensic examination of the laptop.

21         MR. DELAHUNTY:  That's correct.

22         MR. FALLER:  That tends to bog down a little bit.

23         THE COURT:  Yeah.  And again, not time frame wise,

24   but as long as we know essentially the order and if there are

25   any exhibits that the government intends to admit through any

250

1    of those folks, you might want to meet and confer and see if

2    there are any issues.

3         I did want to -- and I'm just going to say this in

4    general.  When I indicated to counsel that defense has a

5    standing objection for those exhibits for which an objection

6    was originally made, I'm not going to require defense counsel

7    to repeat them.  I'll consider them to be standing objections

8    for the reasons stated.

9         I do want to make sure that all the parties are aware

10   and if this goes up on appeal or whatever, that I'm only not

11   requiring defense to renew objections that were previously

12   made.  If there's a new or different objection, of course,

13   then -- I think, Mr. Faller, you alluded to this -- defense

14   would have to make it specifically.  So that I don't want

15   anyone to later state that by the Court allowing it to be a

16   continuing objection, it was for all grounds stated or

17   unstated.  That's not the case.

18        I'm only allowing continuing objections on the

19   grounds previously stated.  If they're new or different

20   grounds, they need to be stated on the record so that the

21   government can respond to them and so that I can rule on them

22   specifically.  But I'm not -- it's not carte blanche that all,

23   you know, all exhibits are being objected to on all possible

24   grounds, even those that were not previously stated on the

25   record by counsel.

251

1          MR. FALLER:  I did not understand it to mean that,

2    Your Honor.

3          THE COURT:  Great.  Okay.  And then the other thing,

4    and again, this is just generalities.  Sometimes the

5    government might be lulled that simply Mr. Faller said

6    "submitted," that you might shortcut laying foundations, et

7    cetera.  Just make sure you do that.  Which you are doing,

8    which is fine, but I just want to make sure that by allowing a

9    continuing objection, that somehow I'm inadvertently

10   misleading either or both sides on what your obligations are

11   and what my intent was as far as continuing objections.

12         So with that then, if there's nothing else, then

13   we'll go ahead and reconvene at 8:45.  Again, I'm just going

14   to check.  If you have no issues to address, then I'm just

15   going to leave and return at nine o'clock and you can continue

16   with trial preparation for the morning.

17         But other than that, we'll recess for the evening.

18   We'll see you tomorrow morning at 8:45.  Or at least I'll

19   check in with you at 8:45 tomorrow morning.

20         MR. DELAHUNTY:  Thank you, Your Honor.

21         MR. FALLER:  Thank you, Your Honor.

22         (The proceedings were concluded at 4:31 p.m.)

23                          -oOo-

24

25

          I, KAREN HOOVEN, Official Reporter, do hereby certify

that the foregoing transcript as true and correct.



          DATED:  11th of May, 2015     /s/  Karen Hooven

                                        KAREN HOOVEN, RMR-CRR