UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII, JUDGE

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )  No. 11-CR-324-AWI
                               )
vs.                            )  JURY TRIAL
                               )    DAY 2
SHAWN JOSEPH McCORMACK,        )
                               )
        Defendant.             )
_____)

Fresno, California                 Wednesday, April 8, 2015


REPORTER'S TRANSCRIPT OF PROCEEDINGS


Volume 2, Pages 252 through 474, inclusive


KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:       United States Attorney's Office
                         BY: **PATRICK R. DELAHUNTY**
                         and **MEGAN A.S. RICHARDS**
                         2500 Tulare Street
                         Suite 4401
                         Fresno, California 93721

                         U.S. Department of Justice
                         BY:  **MAUREEN C. CAIN**
                         1400 New York Avenue
                         Suite 600
                         Washington, D.C. 20540


For the Defendant:       **CARL M. FALLER**
                         Attorney at Law
                         Post Office Box 912
                         Fresno, California 93714

254

1                              **INDEX**

2    **GOVERNMENT'S WITNESSES**:

3    **PAUL KRAWCZYK**                                    258
     CROSS-EXAMINATION BY MR. FALLER                      258
4    **SCOTT D. HALL**                                    261
     DIRECT EXAMINATION BY MS. CAIN                       261
5    CROSS-EXAMINATION BY MR. FALLER                      274
     **BRYAN ROGERS**                                     277
6    DIRECT EXAMINATION BY MS. RICHARDS                   277
     CROSS-EXAMINATION BY MR. FALLER                      334
7    **JOSEPH CAPORALE**                                  337
     DIRECT EXAMINATION BY MS. RICHARDS                   337
8    **GREGORY DAVID SQUIRE**                             357
     DIRECT EXAMINATION BY MS. RICHARDS                   357
9    CROSS-EXAMINATION BY MR. FALLER                      378
     **KAMLESH SHIHORA**                                  379
10   DIRECT EXAMINATION BY MR. DELAHUNTY                  379
     CROSS-EXAMINATION BY MR. FALLER                      414
11   REDIRECT EXAMINATION BY MR. DELAHUNTY                422
     **VERONICA PIKE**                                    427
12   DIRECT EXAMINATION BY MS. RICHARDS                   427
     **ROBERT ROBLES**                                    443
13   DIRECT EXAMINATION BY MR. DELAHUNTY                  443
     CROSS-EXAMINATION BY MR. FALLER                      450
14   **ADAM ROMINE**                                      453
     DIRECT EXAMINATION BY MS. CAIN                       453

15

16                              * * * * *

17

18

19

20

21

22

23

24

25

255

1                          INDEX OF EXHIBITS

2    GOVERNMENT'S                                          Received
        23                                                    269
3       24 through 27                                         271
        28 through 32                                         287
4       33 through 40                                         293
        42, 46, 48, 49 and 50                                 294
5       52, 54, 55 and 57                                     294
        59 through 73                                         294
6       77 through 80                                         308
        89                                                    371
7       90                                                    374
        91, 92 and 93                                         378
8       104                                                   385
        101                                                   396
9       102                                                   402
        103                                                   406
10      94, 95 and 96                                         432
        97                                                    435
11      98 and 99                                             442
        106 through 114                                       463

12

13                            * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

1   Wednesday, April 8, 2015                    Fresno, California

2   8:45 a.m.

3        THE COURT:  All right.  Good morning.  On the record

4   outside the presence of the jury.  See if there's anything we

5   need to take up by counsel.

6        MR. DELAHUNTY:  Your Honor, I'm not sure, I haven't

7   spoke to the individuals.  But I believe the two members in

8   the gallery right now are from the press and I would just like

9   to ask the Court if we could provide some guidance on the

10  appropriateness of depicting the victims' parents.  The

11  government believes to protect their privacy, and under 18 USC

12  3509, pictures or depictions of the parents should not be made

13  or publicized to protect their privacy.

14       THE COURT:  All right.  We do have -- I assume we

15  have some people from the media.

16       NEWS REPORTER: Yeah.

17       THE COURT:  And you're perfectly welcome, obviously

18  anything is fair game.  But we do have some issues regarding

19  parents of minors, I don't know what -- will be testifying and

20  there are some issues that we have to address as far as their

21  privacy interests.  Anything else I think would be okay.

22       Are there any issues you have regarding that?

23       NEWS REPORTER:  Not at all, no.

24       THE COURT:  I appreciate your cooperation.  Anything

25  else then?

1    MR. DELAHUNTY:  Nothing further, Your Honor.  Thank
2  you.

3    THE COURT:  Mr. Faller?

4    MR. FALLER:  No, Your Honor.

5    THE COURT:  I'll come in at nine o'clock.  We'll have
6  the jury come in.  We'll continue on with the testimony of the
7  officer.

8    MR. FALLER:  Great.

9    (Recess.)

10    THE COURT:  Are we ready to have the jury come in?

11    MR. DELAHUNTY:  Yes, Your Honor.

12    MR. FALLER:  I was going to refer to an exhibit by
13  using the projector and I wondered if the jury's screens need
14  to be popped up.

15    THE COURT:  Sure.  Yes.

16    THE CLERK:  Done.

17    THE COURT:  They'll pull them up.  Anything else?

18    We'll have the jury come in.

19    (The jury entered the courtroom.)

20    THE COURT:  The record will reflect the jury is
21  present.  Please be seated.

22    Good morning, members of the jury.  We'll continue on
23  with the plaintiff government's case in chief.  And you may
24  recall your first witness.

25

1                        **PAUL KRAWCZYK**,

2    called as a witness on behalf of the Government, having been

3    previously sworn, testified as follows:

4              THE COURT:  Go ahead and have a seat.  As you have a

5    seat, I'll remind you you're still under oath.  Just state

6    your name again for the record.

7              THE WITNESS:  Yes.  Good morning.  It's Paul

8    Krawczyk, K-R-A-W-C-Z-Y-K.

9              THE COURT:  Thank you.

10                       CROSS-EXAMINATION

11   BY MR. FALLER:

12   Q.  Good morning, detective.

13   A.  Good morning.

14   Q.  As I understood your testimony yesterday, your first

15   contact with the person that's been referred to as "Toddlers"

16   took place on April 27th of 2010?

17   A.  I received an invitation -- or I accepted an invitation on

18   that day, yes.

19   Q.  Was that the date on which you were able to determine

20   the -- what IP address this person was utilizing?

21   A.  No, that was June 5th.

22   Q.  That was June 5th.

23   A.  Yes.

24   Q.  Was there any -- could we look at Exhibit 155, please.

25   I'm putting up a copy of it on the monitor.

1    A.   Okay.  Great.  Thank you.

2    Q.   And I notice that this was -- this was a document from

3    Qwest in response to your inquiry and it's dated June 5th,

4    2010?

5    A.   June -- well, the IP, I believe, is for June 10th.  I

6    don't know when this is dated.  Because there's a date on here

7    as of June 7th.  So --

8    Q.   Well, I see down below it says -- if I'm looking at the

9    statement document, it says "Established 6-4-2010."

10   A.   Correct.

11   Q.   Now, is that when the account was established with Qwest?

12   A.   I can't answer that.

13   Q.   So you don't -- from this document, you don't have any

14   knowledge of from what IP address the friend request came on

15   April 27th, 2010?

16   A.   No.  The way GigaTribe works is you send a friend request

17   and an invitation and it will sit there until that person logs

18   in.  So I'm not sure when the invitation was sent, but the

19   27th is when I went online, noticed it and accepted it.

20   Q.   Okay.  So at that point, you don't have any knowledge of

21   what IP address that was coming from at that point?

22   A.   Correct.  In fact, I don't even know if Toddlers was

23   online at the time.  It's just the invitation request is

24   sitting there.

25   Q.   And so at that time, you don't know from what account,

1    from what computer or anything of that nature; correct?

2    A.   All I knew was that Toddlers sent me a request.

3    Q.   Yes.

4    A.   Yeah.

5    Q.   And when you are online chatting, as you were with the

6    person we referred to as Toddlers, at that point you don't

7    have any personal knowledge of who is actually sitting at the

8    other computer; do you?

9    A.   Correct.

10   Q.   All you know is it's what you're receiving and receiving

11   from someone of a particular screen name?

12   A.   With a particular IP address, correct.

13   Q.   Yes.  With a particular IP address.

14   A.   Yes.

15   Q.   And you didn't determine that IP address until June?

16   A.   Correct.

17            MR. FALLER:  That's all I have, Your Honor.  Thank

18   you.

19            THE WITNESS:  Thank you.

20            THE COURT:  And redirect.

21            MR. DELAHUNTY:  No redirect, Your Honor.

22            THE COURT:  Either party wish this witness to remain

23   subject to recall?

24            MR. DELAHUNTY:  This witness can be excused from the

25   government's perspective.

1        MR. FALLER:  As far as I'm concerned, he can leave.

2        THE COURT:  All right.  You are excused.  Thank you

3   very much.

4        THE WITNESS:  Thank you very much, Your Honor.

5        MS. CAIN:  Your Honor, the United States calls

6   Special Agent Scott Hall as its next witness.

7        THE CLERK:  Good morning.  Please approach the

8   witness stand.

9                        **SCOTT D. HALL**,

10   called as a witness on behalf of the Government, having been

11   first duly sworn, testified as follows:

12        THE CLERK:  Please have a seat.  State your full name

13   for the record and spell it.

14        THE WITNESS:  My name is Scott D. Hall, S-K-O-T-T D.

15   H-A-L-L.

16                      DIRECT EXAMINATION

17   BY MS. CAIN:

18   Q.  Good morning.  Could you please tell the jury where you

19   work?

20   A.  I work for Home Security Investigations in Colorado

21   Springs, Colorado.  I am a special agent and have been so

22   employed by the US government as a special agent since 2002.

23   Q.  Okay.  And prior to working with Homeland Security

24   Investigations, what did you do?

25   A.  I was an ICE Special Agent.  Previous to that I was an INS

262

1   Special Agent.  Previous to that I was a United States Border

2   Patrol Agent.  And have been employed by the US government as

3   a law enforcement officer since 1985.

4   Q.   And what is your current title with Homeland Security

5   Investigations?

6   A.   Special agent.

7   Q.   And during the course of your time with Homeland Security

8   Investigations, have you worked child pornography

9   investigations?

10  A.   Yes, ma'am.

11  Q.   And approximately how many years have you worked child

12  pornography investigations?

13  A.   I have worked child pornography investigations since

14  approximately 2005.

15  Q.   And are you involved in the investigation against the

16  defendant Shawn McCormack?

17  A.   Yes.

18  Q.   And do you see him sitting in court today?

19  A.   Yes.  I see Shawn Joseph McCormack, date of birth

20  9-23-1983, sitting there at the defense table in a blue shirt

21  with his head shaved.

22       MS. CAIN:  May the record reflect, Your Honor, that

23  the witness has identified the defendant?

24       THE COURT:  That's an issue for the jury.

25       MS. CAIN:  Thank you, Your Honor.

1  Q.  Taking you back to June of 2010, did you receive any

2  information from the Toronto Police and the Legal Attache?

3  A.  Yes.  I received information from the Toronto Police and

4  John Ward, the HSI Assistant Attache in Toronto about an

5  individual by -- that went by the screen name of Toddlers, who

6  had distributed child pornography.  He had an IP address which

7  located him in the Colorado Springs area.

8          I also learned that he had related in the chats that

9  he had had access to a two-year old boy that he took to hotel

10  at night.  He had access to him.

11  Q.  And through the lead information, was this received

12  ultimately from the Toronto Police Services?

13  A.  Yes.

14  Q.  Detective Krawczyk?

15  A.  Yes.

16  Q.  And through this lead information, did you get the

17  specific IP address that was associated with Toddlers?

18  A.  Yes, I did.

19  Q.  And generally speaking, what is an IP address?

20  A.  Any time -- when you have a computer and you go on the

21  internet, you have an internet service provider.  Let's say

22  it's Ma Bell.  Any time you go online, Ma Bell connects you to

23  the internet with an internet protocol address.  This is

24  unique to your computer at that moment that you're on.  So

25  let's say that you're on for ten minutes time.  That IP

264

1    address will not change for that ten minutes time that you're

2    on.

3    Q.   And how does an IP address assist law enforcement in child

4    pornography investigations?

5    A.   Let's say that a detective receives child pornography from

6    a suspect and he has the date and the time and the IP address.

7    We then know that at that time that child pornography went to

8    that IP address.

9    Q.   Does it assist you at all in determining the location as

10   to where the criminal activity was occurring?

11   A.   Yes.  It does.

12   Q.   And after learning Toddlers' IP address, what did you do

13   next?

14   A.   I took the IP address and then I looked through a registry

15   that shows what companies have what batch of IP addresses.

16   And I found out that that IP address was associated with

17   Qwest.  It's an internet service provider.  And then I served

18   legal subpoena on Qwest for the date and time that the IP

19   address was used.

20   Q.   And after you served a subpoena on Qwest for Toddlers' IP

21   address, did you receive information back from Qwest?

22   A.   Yes.  I will have to say that they are bombarded with

23   these requests.  And what I had done is because I --

24        MR. FALLER:  I apologize, Your Honor.  That's

25   nonresponsive.

265

1          THE COURT:  Sustained.  Go ahead and ask another
2   question.
3   BY MS. CAIN:
4   Q.  Showing -- so just to answer my question --
5   A.  Yes.
6   Q.  -- directly and not get into a narrative.  Did you receive
7   information from Qwest connected to --
8   A.  Yes.
9   Q.  -- Toddlers' IP address?
10  A.  Yes, I did.
11  Q.  Okay.  And showing you what's been marked as Government's
12  Exhibit 155, which has already been moved in.  Do you
13  recognize that document?
14  A.  Yes, ma'am.  The IP address 71.221.105.230 on 6-5-10 at
15  11:14 GMT-400.
16  Q.  And according to this document, who was this IP address
17  assigned to as of June 5th, 2010?
18  A.  This was assigned to Shawn McCorack, M-C-C-O-R-A-C-K at
19  14275 Vessey Circle, Black Forest, Colorado.
20  Q.  And after receiving this document from Qwest, did you look
21  into more information about who was living at this Vessey
22  Circle address?
23  A.  Yes.  I contacted the Colorado Springs Police Department
24  and I made an inquiry through Colorado Springs utilities.  And
25  I found out that at 14275 Vessey Circle in Black Forest,

1    Colorado, the person that resided there was Shawn McCormack.

2    Q.  And so did you see -- then did you learn that the McCorack

3    was just merely a typo missing the "M"?

4    A.  Yes.

5    Q.  After determining the location of the IP address

6    associated with Toddlers, was there a point in time when you

7    worked to get a residential search warrant on Shawn

8    McCormack's residence?

9    A.  Yes.  I had contacted the Colorado Springs Police

10   Department, a detective I know Adam Romine.  We worked to get

11   a state search warrant.  We had other agents go there and

12   visually look at the residence and describe it for the search

13   warrant purposes.  And we were able to get a search warrant

14   for the next day.

15   Q.  Okay.  So then taking you to June 8th of 2010, is that the

16   day that you and Detective Romine executed a search warrant on

17   Shawn McCormack's residence?

18   A.  Yes.

19   Q.  And when you first arrived at the residence, did you see

20   anyone there?

21   A.  Yes.  We met with Marsha McCormack.  And we learned from

22   her that she was Shawn's mother.  She told us --

23          MR. FALLER:  Your Honor, I'm going to object as

24   calling for hearsay.

25          THE COURT:  Sustained.

1    BY MS. CAIN:

2    Q.   And so after seeing Marsha McCormack, was she outside of

3    the house?

4    A.   Yes.  Outside.

5    Q.   Okay.  And then were you able to enter the residence?

6    A.   Yes.  We were able to enter the residence.

7    Q.   Okay.  And how did you guys get into the residence?

8    A.   She had a key.

9    Q.   Okay.

10   A.   We showed her the search warrant.  We entered.

11   Q.   All right.  And when you entered the residence, did you

12   find Shawn McCormack present at that point in time?

13   A.   No.  No one was present inside the house.

14   Q.   And did law enforcement ever attempt to call Shawn

15   McCormack at his cell phone at that point in time?

16   A.   Yes.

17   Q.   Was there an answer?

18   A.   No.  No answer.

19   Q.   So looking at the residence, how many bedrooms were in

20   this residence at Vessey Circle?

21   A.   It's a mobile home.  There was two bedrooms.

22   Q.   And when you were going through the residence, did you see

23   bedding in any -- bedding on the mattresses of any of the

24   bedrooms?

25   A.   Yes.  In the south bedroom, which we identified as F,

1    there was a bed that was made.  It had sheets, pillow, pillow

2    cases.  It had a comforter and it appeared that somebody had

3    slept in that bed and the covers were merely thrown back and

4    they had left.

5    Q.   Did you see men's clothing in that bedroom as well?

6    A.   Yes.

7    Q.   And with respect to the other bedroom in the residence,

8    was bedding set up on the mattress at that point in time?

9    A.   It appeared to have more storage area.  It had some boxes,

10   papers, things like that, clothing set up.  Not a bed.

11   Q.   Or sheets on a bed?

12   A.   No.

13   Q.   Did you and Detective Romine find any computers at the

14   residence that day?

15   A.   Yes.  We found --

16   Q.   I'm sorry.

17   A.   -- a laptop.

18   Q.   I'm sorry.  You found a laptop that day?

19   A.   Yes.  We found a laptop in the south bedroom, bedroom F,

20   in a chest of drawers.

21   Q.   And when you say "bedroom F, the south bedroom," what does

22   F mean?

23   A.   We always will do a diagram of a residence when we go

24   there and we will assign rooms letters or numbers.

25           MS. CAIN:  Your Honor, may I have permission to

 1  approach the witness with a physical item?

 2          THE COURT:  Yes.

 3          MS. CAIN:  Thank you.

 4  Q.  Special Agent Hall, I have just handed you an item that's

 5  been marked as Government Exhibit 23.  Do you recognize that

 6  item?

 7  A.  Yes.  This is the laptop that we recovered.

 8  Q.  And does this laptop appear to be in substantially the

 9  same condition as it was on the day in which it was seized?

10  A.  Yes.

11  Q.  And I see some red tape on that laptop.  What is that?

12  A.  That's tape that we put on there to secure evidence.

13  Q.  And did this laptop assist you and law enforcement in the

14  investigation against Shawn McCormack?

15  A.  Yes.

16          MS. CAIN:  Your Honor, the United States moves

17  Exhibit 23 into evidence.

18          MR. FALLER:  Submitted.

19          THE COURT:  It is admitted.

20          (Government's Exhibit 23 was received.)

21  BY MS. CAIN:

22  Q.  And if you can open up the laptop, which you've done.  Are

23  you able to see what the model is for that particular laptop?

24  A.  Yes.  This is a Toshiba Laptop Satellite Number

25  A305-S6905.

1    Q.   And to go back.  Did you say this was found in the south

2    bedroom?

3    A.   Yes.

4    Q.   After seizing the Toshiba laptop from the residence, was

5    this ultimately given to anyone in Colorado Springs for

6    further forensic review?

7    A.   Yes.  It was given chain of custody to the Colorado

8    Springs forensic detectives for examination.

9    Q.   Okay.  And in your experience, does examinations of

10   laptops take some time?

11   A.   Yes.

12   Q.   And does it take time to also go through the results of

13   those examinations?

14   A.   Yes.  And to forward any findings to NCMEC.

15   Q.   And what is NCMEC?

16   A.   National Center for Missing & Exploited Children.

17   Q.   What do they do, how do they --

18   A.   They will take -- let's say there's a substantial library

19   of known images of child pornography and they will take any of

20   the images that are found and they will go against that and

21   they will then come back with known images where they have

22   known victims on file that they can contact.

23   Q.   While executing the search warrant on Shawn McCormack's

24   residence that day, did you seize any documents that showed

25   who resided there?

271

1   A.  Yes.

2          MS. CAIN:  Your Honor, may I approach one more time

3   with some documents?

4          THE COURT:  Yes.

5   BY MS. CAIN:

6   Q.  I have just handed you, Special Agent Hall, Government

7   Exhibits 24 through 27.  Could you please examine those items

8   and tell us what those documents are generally.

9   A.  Government Exhibit 24 is a receipt.

10  Q.  Okay.

11  A.  Government Exhibit 25, 26 and 27 are envelopes.

12  Q.  Does the receipt and three envelopes appear to be in

13  substantially the same condition as they were in the day they

14  were seized?

15  A.  Yes.

16  Q.  Did they assist law enforcement in their investigation?

17  A.  Yes.

18         MS. CAIN:  United States moves Exhibits 24 through 27

19  into evidence.

20         MR. FALLER:  No objection.

21         THE COURT:  All right.  They are admitted.

22         (Government's Exhibits 24 through 27 were received.)

23         MS. CAIN:  Your Honor, may I take those documents

24  back to place on the Elmo?

25         THE COURT:  Yes.

272

1          MS. CAIN:  Thank you.

2   Q.  Showing you what's been marked as Government Exhibit 24,

3   can you please tell the jury what this shows?

4   A.  This is a receipt from Best Buy from Glendora, California

5   purchased on 4-1-09.

6   Q.  And do you see the line that starts with A305?

7   A.  Yes.

8   Q.  Towards the top?

9   A.  Yes.

10  Q.  Could you please read that first part of the line to the

11  jury?

12  A.  That line is A305-S6905.

13  Q.  And what do you interpret that to be, based on your

14  investigation?

15  A.  That is the model number of the Toshiba laptop.

16  Q.  And if you can turn your attention towards the bottom, do

17  you see a name on this receipt?

18  A.  Yes, I do.

19  Q.  Whose name is on it?

20  A.  Shawn J. McCormack.

21  Q.  Thank you.  Showing you what's been marked and moved in as

22  Government Exhibit 27, could you please explain to the jury

23  what this is?

24  A.  This is an envelope from Front Range Wireless,

25  Incorporated at 7476 South Eagle Street, Unit A in Centennial,

1    Colorado 80112.  It is addressed to Shawn McCormack at 8780

2    Shoup Road, Colorado Springs, Colorado 80908.

3    Q.  And did your investigation reveal whether Shawn McCormack

4    lived at this address previously?

5    A.  Yes.  Record checks indicate that there was a tie to that

6    address with Shawn McCormack.

7    Q.  Prior to moving into the Vessey Circle residence?

8    A.  Yes.

9    Q.  Showing you Government Exhibit 25.  Could you please tell

10   the jury what this is?

11   A.  This is a Qwest order confirmation envelope and the name

12   that it's addressed to is Shawn McCorack at 14275 Vessey

13   Circle, Colorado Springs, Colorado, 80908.

14   Q.  And was this the internet service provider that you

15   testified to previously?

16   A.  Yes.

17   Q.  Is Exhibit 26 the same thing?

18   A.  Yes.  Only difference is the first envelope says "one of

19   two."  And the second envelope says "two of two."

20   Q.  During your search of the residence, did you come across

21   any other documents tying in to Shawn McCormack?

22   A.  Yes.  There was a utility bill that we also seized at the

23   address in the name of Shawn McCormack.

24   Q.  And was it registered to the Vessey Circle address?

25   A.  Yes.  14275 Vessey Circle.

1          MS. CAIN:  Court's indulgence, Your Honor.

2          THE COURT:  Yes.

3          MS. CAIN:  I have no further questions.  Thank you.

4          THE WITNESS:  You're welcome.

5          THE COURT:  Cross-examination.

6          MR. FALLER:  Thank you, Your Honor.

7                         CROSS-EXAMINATION

8   BY MR. FALLER:

9   Q.  Good morning, Agent Hall.

10  A.  Good morning, sir.

11  Q.  How many -- how many law enforcement officers were

12  involved in the search of the residence we've been referring

13  to?

14  A.  I believe six to eight.

15  Q.  Were you actually the seizing officer on the items that

16  you just testified to?

17  A.  Yes.

18  Q.  And were they taken pursuant to a federal or a state

19  search warrant?

20  A.  A state search warrant.

21  Q.  And that was obtained by members of the Colorado Springs

22  Police Department?

23  A.  Yes.

24  Q.  In your search of the residence, did you find any other

25  documents or -- you know what I mean when I'm referring to

1    indicia of identity, did you find anything else having to do

2    with other people who may have resided at the residence?

3    A.   No.

4    Q.   So everything that you found was in Shawn McCormack's

5    name?

6    A.   Yes.

7    Q.   Now, is that everything you found or everything you

8    seized?

9    A.   We did not take everything that was in the house, every

10   piece of paper.  That would be too much to take.

11   Q.   Were there -- were there items in the house addressed or

12   bearing the name of a Scott McCormack?

13   A.   I'm not sure, sir.  I didn't seize anything that said

14   Scott McCormack's name.

15   Q.   And part of that was the reason you were there was to

16   investigate Shawn McCormack; correct?

17   A.   We were investigating Toddlers at that point.  And we were

18   looking for a computer that was linked to that address.

19   Q.   And didn't you have the information about the Qwest

20   account at that point?

21   A.   Yes.  We knew it was registered to Shawn McCorack.

22   Q.   McCorack.

23   A.   Yes.

24   Q.   At that point.  So you had a name that you were pursuing

25   at that point.

276

1    A.   Yes.  We had initiated an investigation.

2    Q.   And that name was referred to in the affidavit for the

3    search warrant and in the search warrant; correct?

4    A.   Yes.

5    Q.   And you didn't actually do any examination of the content

6    of the laptop, that was -- that was handled by someone else?

7    A.   Yes.  I'm not a forensic examiner, sir.  I did not do the

8    examination.

9           MR. FALLER:  That's all I have, Your Honor.  Thank

10   you.

11          THE WITNESS:  Thank you, sir.

12          THE COURT:  And redirect.

13          MS. CAIN:  No redirect, Your Honor.

14          THE COURT:  Either party wish this witness to remain

15   subject to recall?

16          MS. CAIN:  We do not foresee needing him for recall.

17   He's dismissed from our view, Your Honor.

18          MR. FALLER:  Not by the defense, Your Honor.

19          THE COURT:  You are excused.  Thank you very much.

20          THE WITNESS:  Thank you, Your Honor.

21          MS. RICHARDS:  The United States calls Detective

22   Bryan Rogers.

23          MR. FALLER:  Your Honor, could we approach for just a

24   brief sidebar?

25          THE COURT:  Sure.

1          (The following proceedings were held at sidebar

2          between the Court and counsel:)

3          MR. FALLER:  I'm not sure whether this is going to be

4     gone into with this witness or not.  There were quite a

5     quantity of images, possibly child pornography, that were on

6     the computer.  I believe it's 6500.

7          MS. RICHARDS:  I'm not going into that.

8          MR. FALLER:  You're not going --

9          MS. RICHARDS:  Just what's in the binder.

10          MR. FALLER:  Just talk about the charged stuff?

11          MS. RICHARDS:  Yes.

12          MR. FALLER:  Fine.  Then I have no problems.

13          (The following proceedings were held in open court:)

14          THE CLERK:  Good morning, please approach the witness

15     stand.

16                         **BRYAN ROGERS**,

17     called as a witness on behalf of the Government, having been

18     first duly sworn, testified as follows:

19          THE CLERK:  Please have a seat.  State your full name

20     for the record and spell it.

21          THE WITNESS:  Bryan Rogers, R-O-G-E-R-S.

22                         DIRECT EXAMINATION

23     BY MS. RICHARDS:

24     Q.  Good morning, Detective Rogers.  What do you do for a

25     living?

278

1  A.   I work for the Colorado Springs Police Department as a

2  computer forensic detective.

3  Q.   What does a computer forensic detective do?

4  A.   I examine data from digital devices.

5  Q.   And what is a digital device?

6  A.   Could be anything from a computer to a cell phone or like

7  a USB thumb drive or a camera.

8  Q.   And how long have you been a computer forensic detective

9  for Colorado Springs?

10  A.   Since 2009.

11  Q.   And do you have specialized training in investigating

12  cases generally?

13  A.   Yes.

14  Q.   And what kind of training do you have?

15  A.   I attended the Colorado Springs Police Department training

16  academy.  And there they teach you interviewing, crime scene

17  and investigations and report writing, things of that nature.

18  Q.   Are these skills you use as a computer forensics

19  detective?

20  A.   Yes.

21  Q.   Do you also have formal education related to the use of

22  computers?

23  A.   Yes.

24  Q.   What formal education do you have?

25  A.   I've attended several training classes, some from Guidance

1    Software, which produce the software EnCase, which is a

2    computer forensic suite.  Through them, I've attended basic,

3    intermediate and advanced computer forensic analysis.

4    Advanced internet analysis, McIntosh and Linux computer

5    forensics.

6           I've also had training in forensics related to cell

7    phones and training from the National White Collar Crime

8    Center in identifying and seizing electronic devices,

9    previewing electronic devices on scene.  And I've also had

10   additional training in ethical hacking and computer forensic

11   hacking investigator.

12   Q.  Let's go back to EnCase.  You mentioned, I think, the

13   EnCase forensics suite.  Is that what you called it?

14   A.  It's a computer forensic suite, yes.

15   Q.  Okay.  And how do you use EnCase?

16   A.  It's a primary tool that I use for computer forensic

17   analysis.  It allows me to see all the data on like a hard

18   drive or a thumb drive or any data that I've extracted from a

19   device.

20   Q.  When you say "data," what do you mean?

21   A.  It's the content that's stored on the device.  So it could

22   be user created data such as pictures, videos, documents.  It

23   could be a program such as an operating system like Windows or

24   Microsoft Office or like a photo editing tool or something

25   like that.

280

1   Q.   Did you use EnCase in the investigation of Shawn
2   McCormack?
3   A.   Yes, I did.
4   Q.   Do you have any degrees that are related to the use of
5   computers?
6   A.   Yes.
7   Q.   What degree do you possess?
8   A.   I have a bachelors degree in software engineering and a
9   masters degree in information systems security.
10  Q.   And what is information systems security?
11  A.   It relates to protecting information, mainly on networks
12  or other computer systems.  Also detecting whether those
13  networks or that data has been compromised.
14  Q.   And you said previously that you are a forensic
15  investigator.  As a forensic investigator, what tasks do you
16  perform?
17  A.   Pretty much perform the analysis of data from digital
18  devices.
19  Q.   And what percentage of your time has been spent analyzing
20  computers since you started as a forensic investigator in
21  December 2009?
22  A.   About 75 percent.
23  Q.   And of that 75 percent, roughly how many of those cases
24  are related to child exploitation?
25  A.   About 50 percent of those.

281

1  Q.  And when I say "child exploitation," what do you
2  understand that to mean?
3  A.  Generally child pornography.
4  Q.  To the best of your ability, can you estimate how many
5  computers you've examined in the last six years?
6  A.  Well over 500.
7  Q.  Is there any other training that you have not described
8  that you think is relevant to this case?
9  A.  No.
10  Q.  Have you previously testified in court regarding your work
11  forensically examining electronic devices?
12  A.  I have.
13  Q.  And have you been qualified as an expert previously to
14  give opinion on computer forensic examinations?
15  A.  Yes, I have.
16  Q.  How many times have you been qualified as an expert in
17  computer forensics?
18  A.  About ten times.
19        MS. RICHARDS:  Your Honor, the United States tenders
20  Detective Bryan Rogers as an expert regarding the forensic
21  analysis of electronic devices.
22        THE COURT:  Defense?
23        MR. FALLER:  I don't have any questions at this
24  point.  Obviously it will depend on what opinions are asked of
25  the detective.

282

1          THE COURT:  All right.  At this time, I will indicate

2     he has qualified as an expert in computer forensics analysis.

3          MS. RICHARDS:  Thank you, Your Honor.

4     Q.  Detective Rogers, I'd like to ask you some questions about

5     the scope of your investigation.

6          When did you first become involved in the case

7     against Shawn McCormack?

8     A.  In June of 2010.

9     Q.  And how did you become involved?

10    A.  I was asked to analyze the data from a Toshiba laptop

11    computer.

12         MS. RICHARDS:  Your Honor, may I have permission to

13    approach the witness with a physical item?

14         THE COURT:  Yes.

15    BY MS. RICHARDS:

16    Q.  Detective Rogers, do you recognize the item in that bag?

17    A.  Can I remove it?

18    Q.  Yes, you can.

19    A.  I do.

20    Q.  And is that the item that you were asked to examine?

21    A.  Yes, it is.

22    Q.  Did you perform that examination?

23    A.  Yes.

24    Q.  From whom did you receive that computer to examine?

25    A.  Detective Romine.

1    Q.   And what organization is he with?

2    A.   He's also with Colorado Springs Police Department.

3    Q.   Okay.  And what type of computer is that?

4    A.   It is a Toshiba laptop computer.

5    Q.   And are there any identifying numbers on the computer?

6    A.   There are.

7    Q.   Can you read them?

8    A.   It is a model A305-S6905.

9    Q.   Are there any other unique codes on the laptop?

10   A.   Yes.

11   Q.   Is there a serial number?

12   A.   There is.

13   Q.   Can you read the last four digits of the serial number?

14          MR. FALLER:  Your Honor, we'll stipulate that that

15   was the laptop computer seized in the search warrant.

16          THE COURT:  All right.

17   BY MS. RICHARDS:

18   Q.   And what was the legal authorization for you to conduct

19   the forensic examination?

20   A.   Detective Romine obtained a search warrant.

21   Q.   And approximately when did you examine the computer?

22   A.   In June of 2010 and in August of 2011.

23   Q.   And what types of evidence were you looking for when you

24   examined the computer?

25   A.   I was asked to look for images, videos and documents

284

1   related to sexual exploitation of children as well as

2   peer-to-peer file sharing software and indications of who may

3   have owned or used the device.

4   Q.  And what is peer-to-peer file sharing software?

5   A.  It's programs that allow users on a network to share

6   files.  It can be files shared between two single users or it

7   could be files shared between one user and then gathering data

8   from multiple users across the network.

9   Q.  Is GigaTribe an example of a peer-to-peer file sharing

10  network?

11  A.  Yes, it is.

12  Q.  Upon receiving the computer, did you take preliminary

13  steps to protect the evidence during your examination?

14  A.  Yes, I did.

15  Q.  What steps did you take?

16  A.  Well, I removed the hard drive from the computer and the

17  hard drive is where all the data is stored.  I took that out

18  and connected that to what's called a hardware write blocker.

19  And that prevents any changes to the data on the hard drive.

20          From there, I connected it to my computer and loaded

21  it into EnCase.  And at that point, I made a forensic image.

22  And what that is is a -- basically a duplicate of the hard

23  drive so that I don't have to do an exam on the hard drive

24  itself.  I can do an examination on the copy.

25  Q.  And why are these steps necessary?

1  A.  To make sure that all the data on the hard drive remains
2  the exact same as it was from when it was taken from whatever
3  location it was taken from.
4  Q.  If you accessed the data on the hard drive without taking
5  these steps, would it have changed the data on the hard drive?
6  A.  Yes, it would.
7  Q.  What kind of write block device did you use?
8  A.  It was a Tableau forensic bridge.
9  Q.  And after connecting the computer to a write block device
10 and making a forensic image of the computer, what did you do?
11 A.  I had it in EnCase and I had it process the evidence.  And
12 what that means is it looks for certain known data, such as
13 internet histories.  It also identifies the true nature of a
14 file to determine if a file is actually a picture or a video.
15 Q.  And did you find -- did you find any files that were
16 relevant to your investigation?
17 A.  I did.
18 Q.  Before we go there, let me ask you:  Were there any
19 external memory devices connected to the computer at the time
20 of your examination?
21 A.  There was an optical drive in the computer.  And it did
22 contain a disk.
23 Q.  And what kind of disk was that?
24 A.  It was a Qwest installation disk.
25 Q.  And what do you understand Qwest installation disk to be

286

1   used for?

2   A.   Software for the internet service provider or telephone

3   company Qwest to install their programs on your computer.

4   Q.   Did you conduct a virus scan for the computer?

5   A.   I did.

6   Q.   What were your findings regarding the virus scan?

7   A.   There were no detections for viruses or other malware.

8   Q.   Detective Rogers, did you prepare exhibits for this case

9   to illustrate some of the forensic findings that you found in

10  Shawn McCormack's Toshiba laptop?

11  A.   I did.

12  Q.   Can you look through the binder in front of you at

13  Exhibits 28 through 32.

14          Your Honor, may I approach to take the physical item?

15          THE COURT:   Yes.

16  BY MS. RICHARDS:

17  Q.   Detective Rogers, do you recognize the exhibits?

18  A.   Yes, I do.

19  Q.   What are they?

20  A.   Several of them are screenshots of the EnCase program,

21  showing various information.  And one of them is a printout

22  of, I believe, some internet history.

23  Q.   And did you create these exhibits?

24  A.   Yes, I did.

25  Q.   And did you create them from your examination of the

1  Toshiba laptop?

2  A.   Yes.

3  Q.   And did you create them to illustrate your findings?

4  A.   Yes.

5  Q.   And are they fair and accurate depictions of what you saw

6  while conducting your examination with EnCase?

7  A.   Yes.

8        MS. RICHARDS:  Your Honor, the government moves to

9  admit Government's Exhibits 28 through 32.

10        MR. FALLER:  No objection.

11        THE COURT:  They are admitted.

12        (Government's Exhibits 28 through 32 were received.)

13        MS. RICHARDS:  Thank you.  Can we please put Exhibit

14  28 on the screen.

15  Q.   Detective Rogers, I'm showing you Government's Exhibit 28.

16  What does this show?

17  A.   This is a screenshot of what EnCase looks like showing the

18  registered owner of the Toshiba laptop.

19  Q.   Okay.  And what does this mean right here, this "Current

20  Version"?

21  A.   That is where a lot of settings are stored for the

22  installation of Windows on a computer.

23  Q.   And is Windows the operating device?

24  A.   The operating system, yes, it is.

25  Q.   Okay.  And does this show that you're searching for

1    registered owner?

2    A.   Yes.

3    Q.   And who's the registered owner?

4    A.   It is listed as Shawn.

5    Q.   Can you circle where that's shown on this document?

6         Who had input that information?

7    A.   The user would have to do that.

8    Q.   Are you familiar with what BIOS information is?

9    A.   I am.

10   Q.   What is BIOS information?

11   A.   Well, among other things it can contain the date and time

12   of the system.  And it is stored in there when the computer is

13   powered off.

14   Q.   And did you obtain BIOS information for the Toshiba

15   laptop?

16   A.   I did.

17   Q.   And what was the -- what did you learn from the BIOS

18   information?

19   A.   That the time listed in the BIOS was approximately one

20   hour off from my local time.  However, I was later able to

21   determine that the operating system was set to Pacific time.

22   And I was doing my examination in Mountain time.  And if I

23   made those adjustments, then the time appeared to be roughly

24   accurate.

25   Q.   And what's the significance of that for your

1    investigation?

2    A.   The time on the computer was showing an accurate time as

3    of when it was seized and when I performed my examination.

4    Q.   Were you able to obtain any user information for the

5    Toshiba laptop?

6    A.   Yes.

7    Q.   Let's go to the next exhibit, 29.

8              Detective Rogers, what are we looking at here?

9    A.   Another screenshot of EnCase.  And this one is showing the

10   users on the system.

11   Q.   Can you use your finger to show where -- to show how you

12   know we're looking at the users?

13   A.   Right over here, it lists all the users under the name

14   "Users."  And this is actually a screenshot of what's called

15   the registry in Windows.  Sorry, this isn't the registry.

16   This is the file system.  And they're all listed under the

17   user directory.

18   Q.   What is the file system?

19   A.   That is where all the files and data are stored by

20   Windows.

21   Q.   And when you talk about "a user," what do you mean by

22   that?

23   A.   Well, there's several different users listed here.  But

24   there are only two that were created by a user of the system.

25   And those are the last two on this screenshot here.  One

Page 39

290

1    listed as "Shawn" and "Yup" right there.  All the others

2    listed on this system are created by the system and cannot be

3    removed by the user.

4    Q.  So if a person has a Windows computer, any Windows

5    computer, would you expect to find these other users here,

6    such as "AppData," "Default" and "Default User"?

7    A.  It depends on the version.  The "All Users" and "Default

8    User" are in there because it makes the system backwards

9    compatible with previous versions of Windows.  But with this

10   one, you have the additional "Public," "Default" and

11   "AppData."  So the combination of the two are all default

12   users there.

13   Q.  Did you find any -- did you find any files relevant to

14   your examination in any of the default user areas?

15   A.  No.

16   Q.  In which of the user areas did you find evidence relevant

17   to your search for child pornography evidence?

18   A.  Primarily in the "Yup" account.

19   Q.  Were you able to ascertain whether the user areas were

20   password protected?

21   A.  Yes.

22   Q.  All right.  Let's start with Shawn user area.  Was the

23   Shawn user area password protected?

24   A.  It was.

25   Q.  And were you able to determine the password?

1    A.   Yes.

2    Q.   And how were you able to determine the password?

3    A.   I used a password cracking utility that allows me to use a

4    dictionary, which is basically just a list of words to attack

5    the password.   It tries all the combinations of passwords in

6    that dictionary until it finds one that matches.

7    Q.   Okay.   And what was the password for Shawn?

8    A.   "Home."

9    Q.   Okay.   And were you able to determine if the Yup user area

10   had a password?

11   A.   Yes.

12   Q.   And were you able to determine the password?

13   A.   I was not.

14   Q.   Why were you not able to determine the password?

15   A.   Because I only attempt to crack the password usually for

16   several hours or maybe a couple of days at most.   Because I

17   don't need the password to do my examination, it is just

18   something that I like to do to show that there was a password.

19        So if I can determine what it was, that's great and I

20   include it like I did with the Shawn account.   But if I'm not

21   able to, I can at least determine that the password was

22   complex enough that I couldn't crack it within several hours.

23   Q.   So the password for the Yup account was more complex than

24   the password for the Shawn account?

25   A.   Possibly.   Or it wasn't located in the dictionary that I

1   used.

2   Q.   Okay.  And you said that you do not need to know the

3   password to conduct your forensic exam.  Why is that?

4   A.   Because the data on the hard drive isn't obscured in any

5   way.  It's not encrypted.  So it's plainly visible.  And the

6   password only protects the information when you actually boot

7   the computer into Windows.  But using the tool that I use, the

8   password is irrelevant.

9   Q.   Okay.  At this time I'd like to turn your attention to a

10  series of Government's Exhibits.  I'm going to give

11  you -- I'll give you the numbers a few at a time.  And if you

12  can look up after you've looked at them, I'll give you the

13  next in the series.  I'd like to see if you are familiar with

14  all of these exhibits.

15  A.   Okay.

16  Q.   So the first group of exhibits is 33 through 40.  And 42.

17  46.  48 through 50.  52.  54 through 55.  57.  59 through 73.

18         Detective Rogers, do you recognize these exhibits?

19  A.   Yes, I do.

20  Q.   And are three of the exhibits disks?

21  A.   Yes.

22  Q.   Okay.  What are these exhibits?

23  A.   Most of the exhibits here are the ones that I created for

24  trial here.  They were all from the examination that I did on

25  the Toshiba laptop.

293

1    Q.  And were all -- and do you recognize all of the exhibits

2    as containing images or videos of files that you found on the

3    Toshiba laptop?

4    A.  Yes.

5    Q.  And are there -- are there approximately two exhibits that

6    you didn't actually create, but you were able to verify that

7    they came from the Toshiba laptop computer?

8    A.  Yes.

9    Q.  And are they fair and accurate depictions of files that

10   you found on the laptop computer?

11   A.  Yes, they are.

12   Q.  And have some of the pictures been altered by you to cover

13   genitalia or other graphic depictions?

14   A.  Yes.

15   Q.  But they're still fair and accurate depictions of images

16   you found on the computer?

17   A.  Correct.

18           MS. RICHARDS:  At this time the government moves to

19   admit Exhibits 33 through 40, 42, 46, 48 through 50, 52, 54,

20   55, 57 and 59 through 73.

21           THE COURT:  Defense?

22           MR. FALLER:  Submitted.

23           THE COURT:  All right.  Each of those are admitted.

24           (Government's Exhibits 33 through 40 were received.)

25   ///

294

1          (Government's Exhibits 42, 46, 48, 49 and 50 were

2          received.)

3          (Government's Exhibits 52, 54, 55 and 57 were

4          received.)

5          (Government's Exhibits 59 through 73 were received.)

6          MS. RICHARDS:  And at this time, the government will

7    be showing the images.  So can we please put up Exhibit 33.

8    Q.  Detective Rogers, is this a picture that you found on the

9    computer?

10   A.  Yes.

11   Q.  Can you describe what's in the picture?

12   A.  A young boy appears to be sleeping with a penis above him.

13   Q.  Okay.  Can we now turn to Exhibit 34.

14          Detective Rogers, what are we looking at here?

15   A.  It is the same image as the previous one with the penis

16   covered or redacted.

17   Q.  Okay.  And why did you redact the image?

18   A.  To cover the genitalia.

19   Q.  And can you look up at the words that are at the top here.

20   What does that show?

21   A.  That shows the location on the hard drive where the image

22   was found.

23   Q.  And where was this image found?

24   A.  It was found in four different locations under the Yup

25   account on the desktop.

295

1   Q.  Okay.  And in the Yup account, what folder was this in?

2   A.  Well, it's two different -- or three different ones.  One

3   is under "my kids," then "new folder" and "new folder(8)."

4   Q.  Okay.  And what was the file name of this picture?

5   A.  PICT -- that's P-I-C-T -- 0276.jpg or jpg.

6   Q.  Okay.  And what types of files are jpg?

7   A.  They are image files.

8   Q.  Let's turn now to Exhibit 35.  Did you find this image on

9   the computer?

10  A.  Yes.

11  Q.  And what does this depict?

12  A.  The same child appears to be sleeping with a penis above

13  him.

14  Q.  All right.  Let's turn to Exhibit 37.  Sorry.  36.

15         All right.  Is this the same picture as the last one

16  that was shown?

17  A.  Yes, it is.

18  Q.  But it's been redacted?

19  A.  Yes.

20  Q.  All right.  And what do we see here at the top?

21  A.  The location of the image.

22  Q.  And where was this image located?

23  A.  Under the Yup account on the desktop.

24  Q.  And was it also in four different places?

25  A.  Yes.

296

1   Q.  And was it in folders named "my kids" and "new folder"?

2   A.  Yes.

3   Q.  And what was the -- this image's name?

4   A.  PICT0277.jpg.

5   Q.  All right.  Can we turn to Exhibit 37, please.  What are

6   we looking at in Exhibit 37?

7   A.  The same child who appears to be sleeping, also with a

8   penis next to him.

9   Q.  All right.  And let's turn to Exhibit 38.  Is this the

10  same image?

11  A.  Yes.

12  Q.  Okay.  And where was this image found?

13  A.  Yup account on the desktop, under the same folders.

14  Q.  And what's the name of this image?

15  A.  PICT0278.jpg.

16  Q.  All right.  Let's turn to Exhibit 39.  What does this

17  image depict?

18  A.  The same child sleeping with a penis above him.

19  Q.  And let's turn to Exhibit 40.  Is this the redacted image

20  from before?

21  A.  Yes.

22  Q.  All right.  And where was this image found?

23  A.  The same location, the Yup account on the desktop under

24  the same folders.

25  Q.  Do you have any idea what this is down here?

1   A.  I'm not sure.

2   Q.  Okay.  Let's turn to Government's Exhibit 42.  Is

3   Government's Exhibit 42 a clip?

4   A.  Yes.

5   Q.  And do you recognize the file name of that clip?

6   A.  It is PICT0301_(2).avi.

7   Q.  Where did you find that clip?

8   A.  It's on the Toshiba laptop.

9   Q.  I'm going to play the clip briefly.  It's about 30

10  seconds.  After it's over, can you describe what happened in

11  it, just for the record, in just one or two sentences.

12  A.  Yes.

13          MS. RICHARDS:  Okay.  Can you please play the clip.

14          (Playing video.)

15  BY MS. RICHARDS:

16  Q.  Detective Rogers, what did we just watch?

17  A.  It was an adult male who appeared to be masturbating over

18  a young child.  The child appeared to be crying.  And the

19  adult male appeared to place something over his mouth.

20  Q.  And was that the full video of that clip?

21  A.  No, it was not.

22  Q.  How long was the full video?

23  A.  I believe that one was several minutes in length.

24  Q.  Can we please bring up Government's Exhibit 46.  Is this a

25  redacted screenshot of that video?

1  A.  Yes, it is.

2  Q.  And while this video was playing, could you hear any audio

3  in the background?

4  A.  Yes.

5  Q.  And what did that sound like to you?

6  A.  There were several different sounds in the background.

7  One was of the child crying.

8  Q.  Okay.  And could you also hear a television in the

9  background?

10  A.  Yes, I could.

11  Q.  And do you see the face of the person in this video?

12  A.  No.

13  Q.  And in all of the clips that you've seen on the computer

14  related to this case and in all of the images, do you ever see

15  the full face of the person in these depictions?

16  A.  No.

17  Q.  Why is that?

18  A.  He appears to be wearing a black mask.

19  Q.  Okay.  You can take that down.

20       All right.  Let's turn now to Exhibit 48.  What image

21  is this?

22  A.  This is -- appears to be the same child as we've

23  previously seen laying on a floor with a diaper and his hands

24  bound to his legs with what appears to be electrical tape.

25  Q.  And does this setting appear to be the same setting as in

1  that video we watched?

2  A.  Yes.

3  Q.  And how do you know that?

4  A.  The bedspread appears to be very similar.

5  Q.  Let's turn to Government's Exhibit 49.  And what is

6  depicted in Government's Exhibit 49?

7  A.  The same child appears to be laying on the bed with his

8  diaper removed and genitalia exposed.

9  Q.  Let's turn to Government's Exhibit 50.  What is depicted

10  here?

11  A.  The same image as the previous one with his genitalia

12  covered or redacted.

13  Q.  Where did you find this image?

14  A.  On the Toshiba laptop under the Yup account with four of

15  them under the -- on the desktop.

16  Q.  And what is the file name?

17  A.  PICT0281.jpg.

18  Q.  Okay.  And what is the setting for this image do you

19  believe?

20  A.  I believe it is the same as the previous ones that we've

21  seen.

22  Q.  Okay.  Let's go down to Government's Exhibit 52.  Is this

23  another clip?

24  A.  Yes.

25  Q.  Is this the full image -- the full video?

300

1   A.   No, it's not.

2   Q.   And did you find this on the defendant's computer?

3   A.   Yes.

4   Q.   Okay.  Can we please play this clip.  It's about 20

5   seconds long.

6              (Playing video.)

7   BY MS. RICHARDS:

8   Q.   Detective Rogers, what did we just see?

9   A.   A male urinating on the same child that we've seen before

10  in a bathtub.

11  Q.   And you've watched this with the sound on; is that

12  correct?

13  A.   Yes.

14  Q.   Do you recall what's in the background of this image?

15  A.   No, I do not.

16  Q.   Was there a TV playing in the background?

17  A.   There may have been.

18  Q.   Can you tell the general appearance -- can you tell

19  anything about the general appearance of the perpetrator in

20  this video?

21  A.   That he does not appear to be wearing any pants.

22  Q.   Can you tell anything about his skin color or his body

23  build?

24  A.   That he appears to be a white male.  And from this

25  particular video, can't really tell what his build might be.

301

1   Q.   Okay.  From any of the videos, could you tell what his
2   build might be?
3   A.   He was slender and a bit muscular.
4   Q.   Let's turn to Government's Exhibit 54.  Is this a redacted
5   image from that video?
6   A.   Yes.
7   Q.   And we can go beyond that.  Let's go now to Government's
8   Exhibit 57.  Is this another clip?
9   A.   Yes.
10  Q.   And is this the full video?
11  A.   No, it's not.
12  Q.   I'm going -- we're going to play this again -- or play
13  this last clip.  And can you describe what happened in the
14  clip after we play it.
15  A.   Yes.
16  Q.   All right.  Can you please play it.
17          (Playing video.)
18          THE WITNESS:  This is a video, appears to be of the
19  same child in the same setting as we've previously seen, where
20  the male is digitally penetrating the child's anus with his
21  finger.
22  BY MS. RICHARDS:
23  Q.   And what is the perpetrator wearing in this video?
24  A.   Appears to be a T-shirt and a mask.
25  Q.   Let's turn now to Government's Exhibit 59.  Is this a

1    screenshot from that video?

2    A.   Yes, it is.

3    Q.   And what was the original of the video?

4    A.   Over three minutes.

5    Q.   What is the file name?

6    A.   This is PICT0283.avi.

7    Q.   And where did you find this video?

8    A.   On the Toshiba laptop under the Yup account on the

9    desktop.

10   Q.   Let's turn now to Government's Exhibit 60.  What is

11   depicted here?

12   A.   The same room on the previous videos.  Mainly showing the

13   bedspread or comforter.

14   Q.   And there's no perpetrator in this -- in this video and

15   neither is there a victim in this video.  What is shown here?

16   A.   Just the comforter folded back on the bed.

17   Q.   And when was this image taken?

18   A.   How do you mean?

19   Q.   If this was taken from the video that we just watched, why

20   is there nobody in this screenshot?

21   A.   The camera was moved suddenly from side to side.  So it

22   moved to the left and stopped and this is the screenshot that

23   we have from that.  Shortly after this, it would have moved

24   back.

25   Q.   Does this location appear familiar at all to you?

1   A.   Yes.

2   Q.   And what does it look like?

3   A.   It looks like the previous videos that we've seen.

4   Q.   Okay.  And when you watch the full video, could you see

5   the carpet at all?

6   A.   In this one, I don't believe so.

7   Q.   Was it too dark?

8   A.   Yes.

9   Q.   Let's turn now to Government's Exhibit 61.  What is

10  depicted here?

11  A.   This is the same child laying on grass with an adult penis

12  above him.

13  Q.   Let's turn now to Government's Exhibit 62.  What is this

14  exhibit?

15  A.   The same image as the last one with the genitalia

16  redacted.

17  Q.   And what is the file name for this exhibit?

18  A.   PICT0303.jpg.

19  Q.   And where did you find this picture?

20  A.   On the Toshiba laptop under the Yup account on the

21  desktop.

22  Q.   Let's turn now to Exhibit 63.  What is depicted here?

23  A.   The same setting as the last image with the same child and

24  an adult penis next to him.

25  Q.   Let's go to Exhibit 64.  What is depicted here?

304

1   A.  The same image as the last one with the genitalia

2   redacted.

3   Q.  And where did you find this image?

4   A.  On the Toshiba laptop under the Yup account on the

5   desktop.

6   Q.  And what is the file name?

7   A.  PICT0304.jpg.

8   Q.  Does this appear to be the same perpetrator as in the last

9   image?

10  A.  Yes.

11  Q.  How do you -- how can you tell that?

12  A.  The clothing appears to be very similar.

13  Q.  Okay.  What clothing in particular are you paying

14  attention to?

15  A.  The jeans, the shirt and the belt.

16  Q.  Thank you.  Let's move to Government's Exhibit 65.  What

17  is depicted here?

18  A.  The same child that we've previously seen laying on the

19  grass with his diaper pulled down and genitalia exposed and we

20  can also see another penis over him.

21  Q.  Can you turn to the next page, please.  What is depicted

22  here?

23  A.  The same image as the last one with the genitalia

24  redacted.

25  Q.  And what is the file name for this image?

1    A.  PICT0307.jpg.

2    Q.  And where did you find this image?

3    A.  On the Toshiba laptop under the Yup account on the

4    desktop.

5    Q.  Does this appear to be the same child to you?

6    A.  Yes.

7    Q.  So you've now testified about finding several photographs

8    and videos.  And you testified about the file names.  Did you

9    see any patterns in the file names?

10   A.  They had very similar naming convention.

11   Q.  And what is that naming convention?

12   A.  They all started with PICT, the letters P-I-C-T, and a

13   four digit number and either a jpg or avi extension, which

14   would be after the period.

15   Q.  And I don't think you explained what an AVI extension is

16   yet, what is an AVI extension?

17   A.  It stands for audio video interleave format.  It's a video

18   file.

19   Q.  Are you able to draw any conclusions about the fact that

20   these images and the videos had the same file naming

21   convention?

22   A.  I believe they would have been taken with the same device.

23   Q.  Okay.  And Detective Rogers, you have a binder in front of

24   you with the printed versions of these photos and you've also

25   seen the digital version on the screens in front of you.  Did

306

1  you see any differences between the printed version and the

2  digital version?

3  A.  Yes.  The digital version is much higher quality.  The

4  printed version, many of them came out either a lesser quality

5  or darker.

6  Q.  And why is that?

7  A.  Because when you print something, it's -- the quality is

8  highly dependent on the print settings and the printer used.

9  Q.  Okay.  Let's go now to Government's Exhibit 30.

10        Detective Rogers, what are we looking at here?

11  A.  This is another screenshot of the EnCase program.

12  Q.  And just to reorientate everybody, is this from your

13  examination of the defendant's computer?

14  A.  Yes, it is.

15  Q.  And this is from EnCase?

16  A.  Yes.

17  Q.  Okay.  And what's this particular EnCase screenshot show?

18  A.  This one is showing some registry settings.  And just

19  briefly, the registry is where Windows stores many of the

20  settings used for its programs and for the operating system.

21        But here, showing the Yahoo Messenger account and

22  what profiles are listed under that account.  And in this

23  case, the only profile listed is "toddlers24."

24  Q.  Let's turn now to Exhibit 31.  What are we looking at

25  here?

1  A.  This is another screenshot from the registry file.  And

2  this one is showing the GigaTribe user information.

3  Q.  And what is GigaTribe?

4  A.  GigaTribe is a peer-to-peer file sharing program.

5  Q.  And what is this number right here, this 937137?

6  A.  That is the user ID given to the user on this computer,

7  which was the Toshiba laptop.

8  Q.  And is that user ID unique?

9  A.  Yes.

10  Q.  And when I say "unique," what do you mean -- what do you

11  understand that to mean?

12  A.  That no other user on this particular network using this

13  program would have that ID.

14  Q.  Okay.  And is GigaTribe used for file sharing?

15  A.  Yes.

16  Q.  Is it used for anything else?

17  A.  You can communicate with other people.

18  Q.  Okay.  And if you communicate with other people, would

19  that be like chatting, like sending a text message?

20  A.  Yes.

21  Q.  And if a user on this computer was using GigaTribe to chat

22  with other people, would GigaTribe store any data from those

23  chats?

24  A.  It keeps logs of the chats that occurred on the computer.

25  Q.  And so those would be the chats from a person that was

1  physically on that computer using GigaTribe?

2  A.  Yes.

3  Q.  I'm showing you -- actually, I need you to turn to

4  Exhibits 77 through 80 in the binder in front of you.

5        Do you recognize those exhibits?

6  A.  I do.

7  Q.  What are they?

8  A.  These are portions of chat logs taken from the Toshiba

9  laptop for GigaTribe.

10 Q.  And are they true and accurate, fair and accurate -- fair

11 and accurate depictions of the chats as you saw them on the

12 GigaTribe -- on the GigaTribe chat logs?

13 A.  Yes.

14        MS. RICHARDS:  The government moves into evidence

15 Exhibit 77 through 80.

16        MR. FALLER:  Submitted, Your Honor.

17        THE COURT:  They are admitted.

18        (Government's Exhibits 77 through 80 were received.)

19        MS. RICHARDS:  Can we please put up 77.

20 Q.  All right.  I'm now showing you Government's Exhibit 77.

21 What does this depict?

22 A.  This is a spreadsheet of that chat log between users

23 Toddlers and Filetradermom on GigaTribe.

24 Q.  Can you go over the meaning of the different columns up

25 here?

1    A.  Yeah.  The first column is the date and time that the

2    message occurred in Greenwich Mean Time.  And what that is is

3    it's a standard time used.  Like out here we are in Pacific

4    time, so we're minus 7 or 8 hours from Greenwich Mean Time

5    depending on the daylight savings time for the year.

6          The next column is the "Sender ID," which for that

7    937137, that's what we saw in the registry on the Toshiba

8    laptop, the "sender username" is the name associated with that

9    GigaTribe user ID.  And then the "Plain ASCII message" is the

10   text that was sent in the message.

11   Q.  All right.  From your examination, do you know who

12   Filetradermom is?

13   A.  I do not.

14   Q.  I'm going to have you read some lines from this.  Can you

15   start at 4:27 right here where I placed a yellow dot on the

16   screen.  And read the full page.

17   A.  First message is from Toddlers:  "Do you play with your

18   kids?"

19          "Filetradermom:  No, too scared to try."

20          "Toddlers:  I play with my friends kids sometimes."

21   Q.  Let me stop you right there.  From your investigations

22   into child pornography, have you seen other people use the

23   term "play with your kids"?

24   A.  Yes.

25   Q.  And does it -- does this term sometimes mean something

310

1   different than how people would usually use it?

2   A.   Yes.

3   Q.   What do you understand it to mean?

4   A.   That that would be to have physical contact like with

5   genitalia or take photographs of partially clothed or nude

6   children.

7   Q.   Can you start back again with Toddlers saying "I play with

8   my friends kids sometimes" and keep reading.

9   A.   "Toddlers:  I play with my friends kids sometimes.

10              "Filetradermom:  Wowww your friend know?

11              "Toddlers:  No, I stay the night there then sneak

12              them out at night time.

13              "Filetradermom:  Wowww, aren't you afraid they will

14              tell?

15              "Filetradermom.  How old are they?

16              "Toddlers:  One and three.

17              "Toddlers:  They never tell on me.

18              "Filetradermom:  Ooooo real little.

19              "Filetradermom:  Mmmmm cool.

20              "Toddlers:  I do anal with him.

21              "Filetradermom:  I didn't think it would fit without

22              tearing him.

23              "Toddlers:  It does.

24              "Filetradermom:  That's hard to believe.

25              "Filetradermom:  I would never think my girls could

311

1    take it there.

2    "Toddlers:  I'll show pics of him later.

3    "Toddlers:  But yes they can take it.

4    "Filetradermom:  That's incredible.

5    "Toddlers:  I can put about 2 or 3 inches in him.

6    "Filetradermom:  WOW.

7    "Filetradermom:  Are they both boys?

8    "Toddlers:  3 year old is a girl."

9  Q.  Can you start at the top of this -- of page 2.  We could

10  page down to the next page.

11    All right.  If you could read the first five chats at

12  the top.

13  A.  Which exhibit is that?  Is this showing a different one

14  than what I have here on the next page from 77?

15  Q.  Yes.  That is different.  Let me put it on the Elmo in

16  front of you.  Just one moment.

17    Can we please switch back over to Sanction.  I'm

18  sorry about that.

19    All right.  Detective Rogers, if you could please

20  start from the top of this page.

21  A.  "Filetradermom:  Oh, okay.  You do it in her butt too?

22    "Toddlers:  I did but not anymore.

23    "Filetradermom:  How come?

24    "Toddlers:  Lol she got potty trained and I lost

25    interest when she was out of diapers."

312

1    Q.  You can stop right there.  Can you please start again

2    right here where the yellow is?  With "Toddlers."

3    A.  Toddlers at 4:49?

4    Q.  At 4:48.

5    A.  Okay.

6         "Toddlers:  I do it with the boy and nobody ever

7         knows.

8         "Filetradermom:  You think maybe his dad does it too?

9         "Toddlers:  No.

10        "Filetradermom:  How come you lose interest when

11        there out of diapers?

12        "Toddlers:  Getting too old for me.

13        "Toddlers:  I like them young only.

14        "Filetradermom:  Wow.

15        "Filetradermom:  Can I see your locked folder?"

16   Q.  You can stop there.  Thank you.

17        Let's turn now to Exhibit 78.  Detective Rogers, do

18   you recognize this exhibit?

19   A.  Yes.

20   Q.  What is it?

21   A.  A GigaTribe chat log between the users Toddlers and

22   Jessietac.

23   Q.  And what date was this chat?

24   A.  On May 9th, 2010.

25   Q.  And did you find this on the computer?

1    A.   Yes.

2    Q.   All right.  If you could start reading at Jess -- with

3    Jessietac's question at 10:27.

4    A.   "Jessietac:  You trade privates too?

5            "Toddlers:  Sure.

6            "Toddlers:  I'll show you my friends kid.

7            "Jessietac:  Okay.

8            "Jessietac:  You are rejecting my downloads.

9            "Toddlers:  No my shit only allows one at a time I

10           don't have giga ultamate."

11   Q.   You can stop there.  What do you understand this

12   discussion to be about at this point?

13   A.   That they're trying to share private photographs on

14   GigaTribe.

15   Q.   Do you have an understanding of what "privates" mean in

16   this context?

17   A.   Yes.

18   Q.   What does that mean?

19   A.   A folder that would be protected with a password.

20   Q.   Okay.  Are private folders often -- are private pictures

21   often ones that the person has taken themselves?

22           MR. FALLER:  Object to that as no foundation.

23           THE COURT:  Sustained.  Foundation.

24           MS. RICHARDS:  I'll move on from that.

25   Q.   Could you please read from right here, "Show me your

314

1   friends kid" -- "your friends boy please."

2   A.  "Jessietac:  Show me your friends boy please.

3           "Toddlers:  Okay.

4           "Toddlers:  Okay.  Look in new folder.

5           "Toddlers:  Can you start the vids too.

6           "Jessietac:  This is a serie.

7           "Jessietac:  I got the vids.

8           "Jessietac:  Come on.

9           "Toddlers:  Me too.  Their my friends son.  I take

10          him to a hotel every once and a while.

11          "Jessietac:  Wow nice.

12          "Jessietac:  Serie.

13          "Toddlers:  I just give them to all couse if no body

14          ever shared theirs we would not have much to see."

15  Q.  You can stop there.  I'm going to show you the next page

16  of this exhibit.

17          If you could read from this line right here through

18  the end of the page.

19  A.  "Toddlers:  Please I will keep them private.  I just share

20          myne couse I feel that's what we should all do.

21          "Jessietac:  You got privates stuff too?

22          "Toddlers:  Yes I showed you the other day.

23          "Toddlers:  But I share them with every one.

24          "Jessietac:  Sorry.

25          "Jessietac:  Don't remember that.

1          "Jessietac:  Where are those vids?

2          "Jessietac:  Which is your boy?"

3   Q.  All right.  So this chat that you just read, these last

4   eight or so lines, what day -- what day did that chat happen

5   on?

6   A.  On May 17th, 2010.

7   Q.  And was that the same day as the lines you read earlier

8   between Jessietac and Toddlers?

9   A.  No.

10  Q.  Okay.  Can you explain why both chats are showing up in

11  the same chat log?

12  A.  With GigaTribe, you have a single log for each user that

13  is communicated with.  So you don't have multiple users in a

14  log, you only have the communication between two different

15  users.

16  Q.  Okay.  So let's go to the next page and continue where we

17  left off.  So the last question from Jessietac was "Which is

18  your boy?"  Can you start reading from the top.  And I'll let

19  you know when you can stop.

20  A.  "Jessietac:  What age?

21          "Toddlers:  14 months.

22          "Jessietac:  What???

23          "Jessietac:  A baby?

24          "Toddlers:  Yes.

25          "Toddlers:  In new folder.

316

1            "Jessietac:  Let me see.

2            "Toddlers:  K.

3            "Jessietac:  Cute.

4            "Jessietac:  But I got the serie.

5            "Toddlers:  Thanks.

6            "Jessietac:  And the pics.

7            "Jessietac:  And the vids.

8            "Jessietac:  You are the mask guy?

9            "Toddlers:  I got lots more of him.

10           "Toddlers:  Yes.

11           "Jessietac:  No way.

12           "Toddlers:  Hes my friends son.

13           "Jessietac:  Really.

14           "Jessietac:  The one fingering him?

15           "Toddlers:  Yes and the two fingers.

16           "Toddlers:  Also shoved my dick in him.

17           "Toddlers:  I took him to a hotel.

18           "Toddlers:  Well?

19           "Toddlers:  Can I see yours?"

20  Q.  You can stop there.  Let's go to the next page.  Start at

21  "wich is the finger one" and read from there, please.

22  A.  "Jessietac:  Wich is the finger one?

23           "Toddlers:  283."

24  Q.  Let me stop you there.  Does the number "283" resemble any

25  file name that you found on the computer?

317

1    A.  Yes.

2    Q.  Do you recall which image or video had 283 in the title?

3    A.  I don't recall the exact one, no.

4    Q.  Okay.  You can keep reading from there.

5    A.  "Jessietac:  Okay.

6            "Jessietac:  Do you dildo him?

7            "Toddlers:  No.

8            "Toddlers:  First one finger then two.

9            "Jessietac:  Yes.

10           "Jessietac:  I saw that vids.

11           "Jessietac:  Is there anyone new?

12           "Toddlers:  Did you see the one where I used my dick

13           and put in 2 inches?

14           "Jessietac:  Yes.

15           "Toddlers:  Really?

16           "Jessietac:  Sorry.

17           "Toddlers:  There's one where I pee on him.

18           "Jessietac:  Don't remember.

19           "Jessietac:  Yes the pee one in the tub.

20           "Jessietac:  Don't remember the fuck one.

21           "Toddlers:  Dame nobody keeps shit private."

22   Q.  Can we go to the next page, please.  Can you please read

23   from the top here.

24   A.  "Toddlers:  Okay.  I'll tell you what one it is.

25           "Jessietac:  Lol.

318

1          "Jessietac:  Okay.

2          "Toddlers:  301.

3          "Toddlers:  Its so awesome taking him out at night.

4          "Jessietac:  And where do you get him?

5          "Toddlers:  He's my friends son.

6          "Jessietac:  Wow."

7   Q.  You can stop there.  Thank you.

8          And again, where was this chat from?

9   A.  It's from the Toshiba laptop.

10  Q.  And let's go now to Exhibit 79.

11         THE COURT:  It's a little after 10:30.  We'll take

12  our morning recess.  Members of the jury, I'm going to read a

13  couple of jury instructions or portions of jury instructions

14  to you.  The one first I'm going to read, we're basically

15  advised to give it more than once.  After I give these

16  instructions, I'll just remind you at each break "remember the

17  admonition" and these are the instructions we're referring to.

18         We're about to take our first break of the day.

19  Remember until the trial is over, do not discuss this case

20  with anyone, including your fellow jurors, members of your

21  family, people involved in the trial or anyone else.  And do

22  not allow others to discuss the case with you.  This includes

23  discussing the case in internet chat rooms or internet blogs,

24  bulletin boards, emails or text messaging.  If anyone tries to

25  communicate with you about the case, please let me know about

1    it immediately.

2         Do not watch, read or listen to any news reports or

3    other accounts about the trial or anything associated with it,

4    including any online information.  Do not do any research,

5    such as consulting dictionaries, searching the internet or

6    using other reference materials.  And do not make any

7    investigation about the case on your own.

8         Finally, keep an open mind until all the evidence has

9    been presented and you've heard the arguments of counsel, my

10   instructions of the law and the views of your fellow jurors.

11   If you need to speak with me about anything, simply give me a

12   signed note.

13        It will be your duty to weigh and to evaluate all the

14   evidence received in the case and in that process to decide

15   the facts.  To the facts as you find them, you will apply the

16   law as I give it to you whether you agree with the law or not.

17   You must decide the case solely on the evidence and the law

18   before you.  You must not be influenced by any personal likes

19   or dislikes, opinions, prejudices or sympathy.

20        We'll take our morning recess.  15 minutes.  And

21   remember these admonitions.

22        (The jury left the courtroom.)

23        THE COURT:  All right.  The jury has left.  You may

24   step down.  15 minutes.

25        Before we take our morning recess, anything that we

1   need to cover on behalf of plaintiff's side?  Anything?

2          MR. DELAHUNTY:  Nothing for the government.

3          THE COURT:  Defense side, anything?

4          MR. FALLER:  Yes, Your Honor.  I have to take a

5   moment to place on the record the fact that during the playing

6   of the videos, I observed juror number 12 -- and I'm sorry, I

7   don't know her name.

8          THE COURT:  Yes.  Juror 012.

9          MR. FALLER:  She was visibly gaping and sobbing

10  during the playing of the videos.  I need to make sure that

11  that reaction is on the record as it may relate to issues

12  which have been previously raised in regard to Rule 403 and

13  any evidence that was presented.

14         THE COURT:  Okay.  We'll note that for the record.

15  And I do want to also, as a followup, note that this is not a

16  simple rote exercise where, as the government moves to admit

17  certain exhibits for which the defense has objected

18  previously, that it is not simply a perfunctory matter of

19  defense counsel submitting and the Court perfunctorily simply

20  admitting the exhibits.

21         As each of the exhibits are requested to be moved

22  into evidence, I am tracking because I have in front of me at

23  all times the defense objections to proposed government

24  exhibits, document 71, which includes the specific exhibits

25  for which there were objections or comments and the specific

1   grounds that were stated for the objections.  They are

2   primarily matters of relevancy, inadmissibility under Rule

3   404(b) or 403.

4           And so when the matter is submitted to me by defense,

5   I am -- it's not taking too long, but I am considering each of

6   the objections previously made before admitting the exhibits.

7           So I just want the parties to know that I am tracking

8   the prior objections that were made and considering those

9   objections when I allow the exhibits to be admitted after

10  defense submits the matter for the Court's determination.

11          Okay.  Anything else then before we take our break?

12          MR. FALLER:  No, Your Honor.

13          MR. DELAHUNTY:  No, Your Honor.

14          THE COURT:  We'll take 15 minutes from now.

15          (Recess.)

16          THE COURT:  All right.  Back on the record outside

17  the presence of the jury.  Anything before we have the jury

18  come back?  Plaintiff's side, anything that we need to

19  address?

20          MR. DELAHUNTY:  Not at this time, Your Honor.

21          THE COURT:  Defense, anything?

22          MR. FALLER:  No, Your Honor.

23          THE COURT:  I'm just going to mention to the folks --

24  when the jury comes in, I am going to read to them three jury

25  instructions.  One is bench conferences and recesses since we

1    do have occasional sidebars, I just want to mention that to
2    them.
3           The other is stipulation of facts, so that they'll
4    know whenever the parties say "we stipulate" to something,
5    they understand what that means in terms of that means that
6    the facts stipulated to are proven.
7           And then the third one is the jury instruction
8    regarding expert witness, expert testimony, how they're
9    to -- basically it's the model instruction 417, opinion
10   evidence, expert witness.
11          MR. DELAHUNTY:  Thank you, Your Honor.  Because the
12   government does anticipate seeking the reading of a
13   stipulation during the next witness' testimony.
14          THE COURT:  Sure.
15          MR. DELAHUNTY:  Is it the Court's preference that the
16   Court read the stipulation to the jury or that the --
17          THE COURT:  No.  The parties can go ahead and do
18   that.  That's fine.
19          MR. DELAHUNTY:  Thank you, Your Honor.
20          THE COURT:  The reason I was already going to read it
21   anyway is there was a stipulation that was briefly mentioned
22   this morning.  And so I just wanted to let the jury know what
23   that means.
24          Anything else before we bring the jury in?
25          MR. DELAHUNTY:  Not at this time, Your Honor.  Thank

1  you.

2         THE COURT:  All right.  We'll have the jury come in.

3         (The jury entered the courtroom.)

4         THE COURT:  The jury is present.  Please be seated.

5  Members of the jury, before we continue on with the testimony,

6  I want to read you a couple of other jury instructions that

7  would be helpful regarding some of the things we do.

8         On occasion you'll see counsel approach sidebar,

9  usually a procedural matter that they just need to get

10 resolved.  I'm going to read you an instruction that applies

11 to that.

12        From time to time during the trial, it may become

13 necessary for me to take up legal matters with the attorneys

14 privately either by having a conference at the bench or, when

15 necessary, by calling a recess.  We will do what we can to

16 keep the number and length of these conferences to a minimum.

17 I may not always grant an attorney's request for a conference.

18        All right.  The next one involves stipulations.

19 During the course of the trial, you may hear the parties

20 indicate they stipulated to something.  And they will usually

21 tell you what it is that they stipulated to and so I want to

22 give you an explanation as to what that means.

23        The parties have agreed or will agree to certain

24 facts that have been or will be stated to you.  You should

25 therefore treat these facts as having been proved.

324

1          And then finally, you've seen me indicate some

2    witnesses may testify as experts.  We went over this

3    informally during jury selection, so I'll give you the formal

4    jury instruction on that now.

5          You have heard and may hear testimony from persons

6    who, because of education or experience, are permitted to

7    state opinions and the reasons for their opinions.  Opinion

8    testimony should be judged just like any other testimony.  You

9    may accept it or reject it and give it as much weight as you

10   think it deserves considering the witness' education and

11   experience, the reasons given for the opinion and all the

12   other evidence in the case.

13         Okay.  We'll go ahead and continue with the testimony

14   then.

15         MS. RICHARDS:  Thank you, Your Honor.

16   Q.  Hi Detective Rogers.

17   A.  Hi.

18   Q.  There are a few housekeeping things I want to go to before

19   we go back to the chats that you were going over before we

20   broke for our morning break.

21         We played three video clips.  If you could turn to

22   Government's Exhibit 42.  Was that the first of the video

23   clips?

24   A.  I think it was.

25   Q.  And what was the file name of that clip?

1    A.   PICT0301_(2).avi.

2    Q.   Thank you.  And let's turn now to 57.  Can you please read

3    the -- well, can you please confirm, first, that this was a

4    clip that we played?

5    A.   It was.

6    Q.   And can you please state what the file name was.

7    A.   PICT0283.avi.

8    Q.   And can you now turn to Exhibit 52.  What is this exhibit?

9    A.   It's also for another video clip.

10   Q.   And what is the file name for that clip?

11   A.   PICT0301.avi.

12        MS. RICHARDS:  And at this time I'd like to read a

13   stipulation into the record.

14        THE COURT:  Again, remember the instruction regarding

15   stipulations.  They are agreements of fact that are considered

16   to be conclusive for your purposes.

17        MS. RICHARDS:  This is factual stipulation one,

18   Family Matters episode and Pepperidge Farms commercial.

19        The parties stipulate that the television show heard

20   in the background of PICT0301_(2).avi is episode number 131 of

21   the television series Family Matters, which is entitled,

22   quote, "Cheers Looking At You Kid," end quote.

23        The parties stipulate that one commercial heard in

24   the background of PICT0301_(2).avi is a commercial from

25   Pepperidge Farms and Campbell Soup Company, which is referred

326

1  to by the unique name and ID number chocolate Rev CC at ID

2  code CPPC001100.

3  Q.  All right.  Detective Rogers, let's now go to Exhibit 79.

4  Do you recognize this exhibit?

5  A.  I do.

6  Q.  What is it?

7  A.  This is a GigaTribe chat log from the Toshiba laptop

8  between users Toddlers and Youngdaddy.

9  Q.  Okay.  And what date was this chat log?

10  A.  On June 6, 2010.

11  Q.  Can you please read from "you have any kids"?

12  A.  "Toddlers:  You have any kids?

13        "Youngdaddy:  I have a daughter, yes.  You?

14        "Youngdaddy: ?

15        "Toddlers:  Sorry was kinda busy.

16        "Toddlers:  So how old is she?

17        "Toddlers:  How old is your daughter?

18        "Toddlers:  You their?

19        "Youngdaddy:  Hi sorry.

20        "Youngdaddy:  She is 8.  Do you?

21        "Toddlers:  No I have a kiddy do play with though.

22        "Toddlers:  She your only kid?

23        "Youngdaddy:  Oh whose kid is it?  And yes.

24        "Toddlers:  My friends kid.

25        "Youngdaddy:  Do they know?

327

1        "Toddlers:  No.

2        "Toddlers:  I stay the night their and take him out

3        at night.

4        "Youngdaddy:  Out where?

5        "Toddlers:  I take him to a hotel at night and then I

6        have my fun with him.

7        "Toddlers:  Do you play with your girl?"

8   Q.  You can stop there.  Thank you.

9        Let's go now to Exhibit 80.  And what does this

10  exhibit show?

11  A.  A GigaTribe chat log from the Toshiba laptop between

12  Toddlers and Toddlercumdaddy.

13  Q.  And what date was this chat?

14  A.  This was June 5th, 2010.

15  Q.  Can you come down to right here where my finger is

16  highlighting at 4:11 p.m. with -- actually, let's start right

17  above that.  With Toddlers asking a question at 4:11 p.m.

18  A.  "Toddlers:  Mmm nice.  You have any pics of her?

19       "Toddlercumdaddy:  I do... but I only share private

20       for private.  Sorry.  I hope you understand.

21       "Toddlercumdaddy:  Have to be careful.

22       "Toddlercumdaddy:  She is cute as a button.

23       "Toddlers:  I have private.

24       "Toddlers:  My friends son I take at nights.

25       "Toddlercumdaddy.  Nice.  How old?

1          "Toddlers:  He's 2.

2          "Toddlers:  Your daughter wear diapers?

3          "Toddlercumdaddy:  He sleeps over a lot?

4          "Toddlercumdaddy:  Yes, she did.

5          "Toddlers:  Oh nice.

6          "Toddlers:  No when I visit I take him out late in

7          the night to a hotel.

8          "Toddlercumdaddy:  Where are your privates?

9          "Toddlercumdaddy:  How the heck do the parents let

10         you take him to a hotel?

11         "Toddlers:  They don't their asleep when I do it.

12         "Toddlercumdaddy:  That's pretty risky.

13         "Toddlers:  It is.

14         "Toddlers:  Let's trade some pics and you will see

15         him."

16    Q.   Okay.  You can stop there.

17         You testified before that this chat is using

18    GigaTribe?

19    A.   Yes.

20    Q.   Do users -- when users are using GigaTribe, can they also

21    share images at the same time?

22    A.   Yes.

23    Q.   Okay.  Let's skip forward two pages.  Can we go forward

24    one more page, please.

25         Can you please read from right here where it says

1   "what is her name?"

2   A.   "Toddlers:  What is her name?

3        "Toddlercumdaddy:  Wouldn't that be great... you

4        could teach my little girl.

5        "Toddlercumdaddy:  Emma.

6        "Toddlercumdaddy:  What about the boy?

7        "Toddlers:  Ben."

8   Q.   All right.  You can stop there.

9        Did you do any searches in other chats that were on

10  the computer to see if Toddlers mentioned any children

11  relevant to this case by name?

12  A.   Yes.

13  Q.   And what did you search for?

14  A.   The name "Ben."

15  Q.   And you just read a place where the name Ben was

16  mentioned.  Is that correct?

17  A.   Yes.

18  Q.   Did you see it mentioned anywhere else?

19  A.   I don't recall.

20  Q.   Did Toddlers ever give any contact information to people

21  he spoke with?

22  A.   Yes.

23  Q.   What contact information did he give?

24  A.   The email address toddlers24@yahoo.com and what appeared

25  to be a phone number, which was 210-0708.  And then a couple

1  of lines later in the chat, the area code was given as 719.

2  Q.  And are you familiar with where in -- where the 719 area

3  code generally goes to?

4  A.  It applies to Colorado Springs.  I believe there's other

5  locations near the area.

6  Q.  Okay.  Did you find any evidence that the Yup user area of

7  the computer -- and, well, let me rewind a little bit.

8       Which user area did you find all of these chats?

9  A.  Under the Yup account.

10 Q.  Did you find any evidence that the Yup user area and the

11 Shawn user area were controlled by the same person?

12 A.  Yes.

13 Q.  Can you please -- can we please show Government's Exhibit

14 32.  What are we looking at here?

15      Oh, you can look on the screen.  This is already in

16 evidence.

17 A.  It's easier to read on the piece of paper --

18 Q.  Oh, I understand.

19 A.  -- than on the screen.

20 Q.  That's fine then.

21 A.  This is a printout of a partial internet history from the

22 Toshiba laptop.

23 Q.  Okay.  And did you create this exhibit?

24 A.  Yes.

25 Q.  All right.  Can you go over the columns that we see in

1  this exhibit?

2  A.  The first one under "Name" is the file that the records

3  came from.  In this case, the index.dat is where Internet

4  Explorer stores the records.

5  Q.  Is this something that the computer does automatically?

6  A.  Yes, it is.

7  Q.  Okay.

8  A.  The "profile name" is the -- well, what user the record

9  was created under.

10         The "Url Name" is actually the website page visited.

11         The "Last Accessed" date and time is when that visit

12  took place.

13         "Internet Artifact Type" is the type of artifact that

14  was recorded.

15         The "Browser Type" lists what type of browser was

16  used.

17         And then the "Title" lists the title of the web page

18  if there was one.

19  Q.  Does the title of the web page populate automatically in

20  the index.dat file or is that something you put in there?

21  A.  All of this information would be automated.

22  Q.  Okay.  And if we look at the first -- the first entry in

23  this chart, what do we have here?  What search is this?

24  A.  This is a search for "house for rent" at the Colorado

25  Springs Craigslist website.

332

1    Q.   How did you tell that it's a search?

2    A.   It says "query equals."  And I know from looking at this

3    website that it uses the query equals in the Url, the address,

4    to list what the user has entered in for a search.

5    Q.   And what did this user enter in?

6    A.   "House for rent."

7    Q.   Okay.  And which user name -- which user was this?

8    A.   This was the Shawn account.

9    Q.   Okay.  Did you see any other similar searches?

10   A.   There is another search on the last line of this page.

11   And the third line up at the same website, the Colorado

12   Springs Craigslist website for "house for rent."

13   Q.   Okay.  And can you show us where that is with your finger?

14        Okay.

15   A.   It's not really showing up.

16   Q.   So are you talking about three from the bottom or the very

17   bottom?

18   A.   The very bottom one.

19   Q.   Okay.

20   A.   And then the third one up from the bottom.

21   Q.   Okay.  And which user -- which user went to Craigslist to

22   search those terms?

23   A.   The Yup account.

24   Q.   Okay.  And when was that?

25   A.   For the Yup, that was on May 11th, 2010.  The first one

333

1   was at approximately 3:08 p.m. and the last one was at 3:09

2   p.m.

3   Q.  Okay.  And you said that this Internet Artifact Type

4   column, does this have a meaning that's relevant to our

5   investigation?

6   A.  The ones listed here are what's called "visited links" for

7   Internet Explorer.  And these are websites that were actually

8   visited by the user.

9   Q.  Okay.  Can we go to the next page of this exhibit, please.

10          What are we looking at here?

11  A.  This is a similar record of internet history and it's a

12  partial record again.

13  Q.  Okay.  And do we have the same columns on this page as in

14  the last page?

15  A.  Yes, we do.

16  Q.  And do they have the same meanings?

17  A.  Yes.

18  Q.  All right.  Let's see.  Do you see any similar searches on

19  this page between the Shawn user area and the Yup user area?

20  A.  I don't see any searches.  But I do see similar web pages

21  visited.

22  Q.  Okay.  And what are those web pages?

23  A.  The Colorado Springs Craigslist website.

24  Q.  And when were they visited?

25  A.  On May 25th, 2010.

Rogers - X

1    Q.  At what time?

2    A.  The last one for the Craigslist website under the Shawn

3    account was at 6:27 and 20 seconds p.m. and the first one

4    under the Yup account for the Colorado Springs Craigslist

5    website was on the same date at 6:57 and 31 seconds p.m.

6    Q.  All right.  Thank you.

7            One moment, please.

8            Detective Rogers, you testified that in the GigaTribe

9    chats, the Toddlers user gave out some contact information.

10   And I believe you said there was an email address.  Can you

11   tell me what that email address was?

12   A.  Toddlers24@yahoo.com.

13           MS. RICHARDS:

14   A.  All right.  Thank you.  I have no further questions.

15           THE COURT:  Cross-examination.

16           MR. FALLER:  Thank you, Your Honor.

17                            CROSS-EXAMINATION

18   BY MR. FALLER:

19   Q.  Were you present at the search when the Toshiba laptop was

20   actually seized?

21   A.  I was not.

22   Q.  And so your first contact with the case was when it was

23   given to you by Detective Romine to conduct a forensic

24   examination?

25   A.  Yes, it was.

335

1  Q.  So as far as personal knowledge of the investigation is

2  concerned, everything that you know is what you observed in

3  your examination of the computer?

4  A.  Yes.

5  Q.  And in terms of who any of the users on the machine might

6  be, you might conclude who they are by other facts you know;

7  but from the actual forensic examination of the computer, you

8  can't determine who the users were.  Correct?

9  A.  How do you mean?  By full name?

10 Q.  Yes.

11 A.  I cannot.

12 Q.  You're dealing with user names or screen names?

13 A.  That's correct.

14 Q.  And while you testified a minute ago about some searches

15 or sites that were contacted by both the Shawn and the Yup

16 account, you do not know whether those accounts were created

17 by the same person; do you?

18 A.  Correct.

19 Q.  You don't know if they were used by the same person; do

20 you?

21 A.  Correct.

22 Q.  And in terms of the chats that you were reading, you've

23 become aware during the investigation at least one of those

24 was with an undercover officer in Toronto; is that right?

25 A.  Correct.

336

1   Q.  And as you were examining the computer, there was -- there

2   were indications from the -- from the internet logs, for lack

3   of a better term, that showed that whoever the user or users

4   were of the computer, were also using the computer for what we

5   could call legitimate means; is that correct?

6   A.  That's correct.

7   Q.  There were other things being done with the computer other

8   than having it contain child pornography?

9   A.  Yes.

10  Q.  You indicated, I believe, that based upon your examination

11  of the, for lack of a better term, captions on some of the

12  images or actually on all the images, indicating what kind of

13  device they might have been made from.  Do you recall that?

14  A.  I don't recall the captions.  I did say that they may have

15  come from the same device.

16  Q.  Okay.  And what would be the correct technical term for

17  the designations PICT and then the --

18  A.  A naming convention.

19  Q.  Say again, please?

20  A.  A naming convention.

21  Q.  Naming convention.  Okay.  And were you able to determine,

22  from your training and experience, what the likely device was

23  that had created those items?

24  A.  No.

25  Q.  The extent of what you could determine was that they had

337

1  been perhaps made from the same device?

2  A.  Perhaps.

3          MR. FALLER:  Okay.  That's all I have.  Thank you.

4          THE COURT:  Redirect.

5          MS. RICHARDS:  No redirect.

6          THE COURT:  Either party wish this witness to remain

7  subject to recall?

8          MR. FALLER:  No, Your Honor.

9          MS. RICHARDS:  No, Your Honor.

10          THE COURT:  All right.  You are excused.  Thank you

11  very much.

12          THE WITNESS:  Thank you.

13          MS. RICHARDS:  United States calls Joe Caporale.

14                       **JOSEPH CAPORALE**,

15  called as a witness on behalf of the Government, having been

16  first duly sworn, testified as follows:

17          THE CLERK:  Please have a seat.  State your full name

18  for the record and spell it.

19          THE WITNESS:  Joseph Caporale.

20          THE CLERK:  Spell it, please.

21          THE WITNESS:  C-A-P-O-R-A-L-E.

22          THE CLERK:  Thank you.

23                       DIRECT EXAMINATION

24  BY MS. RICHARDS:

25  Q.  Good morning, Mr. Caporale.

338

1    A.   Good morning.

2    Q.   What is your occupation?

3    A.   Manager of on-air operations for Viacom.

4    Q.   And what is Viacom?

5    A.   Viacom is a broadcast company.

6    Q.   And does Viacom -- can you describe that a little further?

7    What is a broadcast company?

8    A.   So my responsibility is I receive the play back and uplink

9    for Viacom media networks, which is probably over 70 different

10   channels.

11   Q.   Can you give a few examples -- a few examples of those

12   channels?

13   A.   Sure.  Spike, CMT, MTV, VH1, Nickelodeon, MTV Brazil, one

14   of our international channels, MTV2.  I can keep going if you

15   like.

16   Q.   That's probably enough.  Thank you.  How long have you

17   been employed by Viacom?

18   A.   29 years.

19   Q.   What was your first position at Viacom?

20   A.   I was a master control operator.

21   Q.   What does a master control operator do?

22   A.   So responsibilities are to sit in a control room and to

23   verify the play back of whatever is scheduled for that given

24   day in that given network.  And to restore the channel if

25   there's any possible problems.

339

1  Q.  Okay.  And do you use -- do you use records to do that?

2  A.  Yes, we do.

3  Q.  And is it -- and how do you use those records?

4  A.  Those records are -- the times are put in by an operator

5  and we are verifying that what is on that record is actually

6  what aired.

7  Q.  Okay.  Is it important to -- is it important that what is

8  on the record is actually what is aired?

9  A.  Yes.

10 Q.  And why is that?

11 A.  That record is a legal document.

12 Q.  Okay.

13 A.  And it's also -- commercials are also billed off of that

14 as well.  So we need to verify that what was supposed to air

15 is what aired.

16 Q.  Okay.  And as a master control operator -- well, first,

17 where did you work when you were a master control operator?

18 Was that in the same location where you are now?

19 A.  Same location.  Same facility, yes.

20 Q.  And what location is that?

21 A.  That's at the Network Operation Center in Hauppauge, New

22 York.

23 Q.  And how long were you a master control operator?

24 A.  It was about nine or ten years.

25 Q.  Okay.  And what was your next position at Viacom?

1   A.   I was an on-air supervisor for five years.

2   Q.   And what were your duties as -- did you say an on-air

3   supervisor?

4   A.   I was an on-air supervisor before I got into my current

5   position, yes.

6   Q.   Okay.  And what does an on-air supervisor do?

7   A.   So my responsibilities are to directly oversee the shift

8   that I'm on to make sure that all of the operators, which I

9   was, are correctly doing their jobs and to help with any

10  issues that may arise during the shift.

11  Q.   Do you remember approximately how many people you

12  supervised?

13  A.   There was probably 15 to 20 people on a shift at any given

14  time.

15  Q.   And was that also at Clawhog (phonetic) -- in Hauppauge,

16  New York?

17  A.   That was also in Hauppauge, New York.

18  Q.   Hauppauge, okay.  I think Clawhog is something else?

19  A.   Just don't ask me how to spell it.

20  Q.   Okay.  Great.  What is the next position that you held at

21  Viacom Media Networks?

22  A.   That's my current position of manager of on-air

23  operations.

24  Q.   Okay.  And you supervise about 15 people in this position?

25  A.   So, no, that's a much broader range of people.  So we have

341

1   four shifts which are comprised of the operators and also
2   supervisors.  So all of those teams report back to me.  So I
3   would probably say it's about 60, 65 people total.
4   Q.  Okay.  And what sorts of functions do you control as the
5   manager of operations?
6   A.  So it's a lot of liaison with the network, but the most
7   important thing is to make sure play out is correct as the
8   channels are expecting it.
9   Q.  Okay.  And we're going to put up government's -- actually,
10  I need you to flip to Government's Exhibit 84 in that binder
11  in front of you.
12  A.  Sorry.  You said 84?
13  Q.  Yes.  Do you recognize the first page of that exhibit?
14  A.  Oh, sorry.  I'm on 83.  Yes.
15  Q.  Okay.  What is that?
16  A.  So this is from the scheduling system.  It tells when a
17  certain show in this case, Family Matters, was scheduled and
18  was aired.
19  Q.  Have you had occasion to rely on a record such as that one
20  in your position as manager of op erations?
21  A.  Occasionally, yes.
22  Q.  Did you ever rely on a record such as that one in
23  previous -- in your previous positions at Viacom?
24  A.  We have just to, again, see when something was supposed to
25  be scheduled, yes.

342

1   Q.   And you called that a scheduling systems log?

2   A.   This is just an excerpt from a scheduling -- from one of

3   our scheduling systems telling when a specific show, in this

4   case Family Matters, and this episode is scheduled to air for

5   the next few months or whatever it might be.

6   Q.   Okay.  And who would create that record?

7   A.   That would be the programming teams.  In this case, the

8   programming team from Nickelodeon.

9   Q.   Okay.  And would that programming team have knowledge of

10  the facts going into the record?

11  A.   Yes.

12  Q.   And would they make that record at or near the time of the

13  events in the record?

14  A.   Yes, they would.

15  Q.   Okay.  And was the record made as part of a regular -- the

16  regular practice of Viacom?

17  A.   Yes, absolutely.

18  Q.   If you could turn to the next page.  What is -- what does

19  the next page show?

20  A.   So this is a traffic recon record showing when, in this

21  case, commercials have -- scheduled commercials have actually

22  aired.

23  Q.   Okay.

24  A.   It will also show you shows and also where the breaks are

25  as well.

343

1  Q.  Okay.  Thank you.  Can we put up Government's Exhibit 84,

2  which is already in evidence.

3       Let's go back to that first record you were talking

4  about.  Can you go through the columns in this record and

5  explain what they mean.  Starting with "Series Name."

6  A.  So "Series Name" is the name of the particular show.  The

7  "Episode Name" is also the name of the episode for that

8  particular show.  The "Episode Number," the specific episode

9  number for that series name with that episode name.  The name

10  of the channel that it's airing on.  The air date and the

11  scheduled time.

12  Q.  And can you state again what this particular record is

13  used for?

14  A.  So this is showing when a particular show and episode was

15  scheduled.

16  Q.  Okay.  And let's start with the first entry up here.

17  A.  Okay.

18  Q.  What date was this show scheduled to air?

19  A.  So it was scheduled to air on 8-7 of 2008 at 11:30 p.m.

20  eastern time.

21  Q.  Okay.  And would this show have aired at -- okay.  Let me

22  backtrack.

23       All right.  So would this show have aired at 11:30

24  p.m. on the calendar day of August 7th, 2008?

25  A.  Yes.

344

1    Q.  Let's go to this entry now.  What does the second entry

2    that I highlighted show?

3    A.  So it talked about the same episode airing at three a.m.

4    on -- now this is different here.  Because our broadcast day

5    starts at six a.m. and ends at 5:59:59.  And so broadcast

6    day -- and these air dates are actually all broadcast days.

7    So Saturday 3-28-2009 is our broadcast log.  The actual

8    calendar date that this would have aired would have been

9    Sunday, the 29th at 3 a.m.

10   Q.  Okay.  So let me make sure I get this straight.  So if

11   something is before midnight on this chart, would you expect

12   it to air on the calendar -- would you expect the calendar day

13   that it aired to be the same as the air date that it aired?

14   A.  That's correct, yes.

15   Q.  Okay.  If it's after midnight, would you expect the

16   calendar date that it aired to be the same as the air date

17   that it aired?

18   A.  No.

19   Q.  Okay.

20   A.  No.  It would be the following date because it's after

21   midnight.  Again, our log broadcast day is 6 a.m. to 6 a.m.

22   Q.  Okay.  So at 6 a.m., that's when you switch days to the

23   next day?

24   A.  Exactly.

25   Q.  Okay.

345

1  A.  And it's been that way for 29 and a half years.  It's hard

2  to get out of it sometimes.

3  Q.  So this is the usual way -- is this the usual way for

4  television networks to display air dates?

5  A.  For our company it is.  I can't speak to others, but for

6  our company, yes.

7  Q.  Okay.  And it is like this for all of the different

8  channels that Viacom Media Networks broadcast?

9  A.  For all of the Viacom channels, we all run on the same

10  broadcast day.

11  Q.  Okay.

12  A.  Six a.m. to six a.m.

13  Q.  All right.  Let's go to the next page of this exhibit.

14         What record are we looking at here?

15  A.  So this is a recon log from the commercial operations.

16  Q.  Okay.  And what is a recon log?

17  A.  So it is saying that a -- in this case, specific

18  commercials, what time they actually aired.

19  Q.  Okay.  And what is the purpose of this log?

20  A.  It's to verify, A, the commercial has aired and, B,

21  they'll also use it for billing.

22  Q.  Okay.  And is this from a -- and where did this record

23  come from?

24  A.  So it comes from the operators inputting the time that

25  they've seen the commercial air and then it's fed into this

1    log.

2    Q.  Okay.  And what day does this log go to?  Or sorry.  What

3    time period does this particular sheet of the recon log apply

4    to?

5    A.  So this particular sheet, it runs from 11:30 p.m. to 12:23

6    a.m. on August 7, 2008.  Log date.  Broadcast date August 7,

7    2008.

8    Q.  Okay.  Have you been able to look at the whole exhibit

9    that we have here?  All -- I think there's 16 pages.

10   A.  I have.  They're all very similar, just different dates.

11   Q.  Okay.  And how are they similar?

12   A.  Again, they're all from the -- from traffic recon logs or

13   commercial operation recon logs.  Again, they're just

14   different dates and different times.

15   Q.  Do they show records for a similar show?

16   A.  They do, yes.

17   Q.  And do you know which show that is?

18   A.  Yes.  The show is shown in purple.  It's Family Matters.

19   Q.  Okay.  And does it refer to a particular episode?

20   A.  Yes, it does.  It's also in purple.  It shows episode 131.

21   And then it breaks it down based on which segment of that show

22   it might be.

23   Q.  Okay.  And you said it also shows commercials?

24   A.  Yes, it does.

25   Q.  Can we please go to the sixth page.  Yes.  This is good.

1          All right.  So on this page, I'd like you to go over

2    the columns and we'll just start with "Actual Time."  What

3    does the "actual time" mean?

4    A.  So the actual time is the time that that particular

5    commercial aired.

6    Q.  Okay.  And is this log in east coast time?

7    A.  This log is in east coast time.

8    Q.  Okay.  And if we wanted to know when a show aired in the

9    west coast, how would we figure that out?

10   A.  So there's a time zone delay, we have a west coast feed

11   that plays back three hours later.  So the time would be the

12   same thing as entered here.

13   Q.  So if -- let's say we had this Glade Fragrance commercial

14   right here.

15   A.  Uh-huh.

16   Q.  So if this Glade Fragrance commercial aired at 3:10 on the

17   east coast local time, you'd also expect it to air at 3:10

18   west coast local time?

19   A.  Exact same time, yes.

20   Q.  Okay.  And would you expect the actual -- the air dates

21   to -- would you expect, you know, the Glade commercial to come

22   on at the approximate time that is displayed in this record?

23   A.  It would be the exact time that it comes on.

24   Q.  And is it important for Viacom Media Networks that it

25   shows at that exact time?

1    A.   Absolutely, yes.

2    Q.   And why is that?

3    A.   We want to make sure that whatever airs on the east is the

4    exact same thing that airs on the west coast.

5    Q.   Okay.  Can you go now to the second column.  What does

6    that say?

7    A.   That says "Traffic Memo."  And that's really just for the

8    schedulers.  If you look on the green line or what appears to

9    be a green line, about halfway down, there's a note I think it

10   says "Doritos."  I don't know.  It's just a note for the

11   schedulers knowing there's some sponsorship coming up in that

12   next break.

13   Q.   What is the next column?

14   A.   The next column is "Rate," which is what we charge that

15   particular advertiser.

16   Q.   Okay.  And what is the next column?

17   A.   So it's "Rate Class."  It's really just based on when the

18   particular commercial was scheduled.  And based on the time is

19   what the different rate will be that they charge.  So it just

20   breaks it down into what category it will be in.

21   Q.   And the next column?

22   A.   Is the length of that particular commercial spot.

23   Q.   Okay.  And would you also have the length of the episode

24   in there too?

25   A.   Yes.

1  Q.  So to go back to this Glade Fragrance commercial, how long

2  was that?

3  A.  That was 30 seconds.

4  Q.  Okay.  And the next column says "Advertiser/Program."

5  What does that mean?

6  A.  So in this case, it is the -- who the advertiser is for

7  the commercial spot.  If you look up in the purple, where it

8  says "Program," that shows you the program that it's actually

9  airing in.

10  Q.  Okay.  And what program -- what program was airing at this

11  time?

12  A.  This was Family Matters.

13  Q.  And which episode?

14  A.  Episode 131.

15  Q.  Okay.  And the next column, "Brand/Episode/Break Format."

16  What does that mean?

17  A.  So the "brand" is what the particular advertiser is trying

18  to sell, in this particular instance Glade Fragrance.  The

19  "episode" will show you the episode number for the show that

20  is airing.

21  Q.  Okay.  And the next column, "Product Categories"?

22  A.  It's just really a breakdown of automotive, home, if it's

23  a movie.  They would just do that.  Again, it's more just for

24  billing that they would use that for.

25  Q.  Okay.  And the next column, "Days Times."

1  A.  Is a day part that they would want to schedule that

2  particular commercial in.

3  Q.  Okay.  And the next column, "ISCI/Promo Sub Title."

4  A.  So I don't know what that stands for.

5  Q.  Okay.

6  A.  But the next column -- the "ISCI" is what identifies that

7  specific commercial.  ISCI stands for International

8  Standardized Commercial Identifier.

9  Q.  Okay.  And is that a unique code?

10  A.  It is.

11  Q.  And by "unique," I mean would you expect that code to only

12  go to one program?

13  A.  Not one program, one particular commercial spot.

14  Q.  Okay.  And the next column, "USN"?

15  A.  That's a number, I believe it's a unique serial number.

16  That is when a commercial deal is made, a USN number will be

17  assigned to that particular advertiser even before an ISCI

18  code is assigned.  So any time SC Johnson comes up for Glade,

19  that USN number is assigned.  And then the ISCI, which comes

20  in after -- because the ISCI is actually the piece of content

21  that's playing, the ID that plays.

22  Q.  Okay.  Thank you.  If you could go down to this yellow

23  line.  Says "Break #2."

24  A.  Uh-huh.

25  Q.  What does that refer to?

1    A.   That just says the -- so every show has a certain format.

2    There's a certain number of commercial breaks in any given

3    show.   In this case, that is just denoting that break or

4    commercial break number 2 is coming up and what's coming up

5    after that is what is scheduled.

6    Q.   Okay.   And what do you see scheduled for break number 2?

7    A.   So there's a five-second billboard, followed by a

8    five-second Campbells spot, followed by a 30-second Campbells

9    spot, followed by a 30-second Visa spot, followed by a

10   15-second IHOP spot, then a 15-second Buena Vista spot.   Looks

11   like the movie spot.   After -- followed by 30-second Procter &

12   Gamble spot, followed by a 15-second Pinnacle Foods spot,

13   followed by a 30-second SC Johnson spot, followed by a

14   30-second Whirlpool spot, followed by 15-second Johnson &

15   Johnson spot.   Then we have a one-minute affiliate cover spot.

16   And then we go back into the next segment of the show that's

17   scheduled, in this case Family Matters.

18   Q.   And that's still episode 131.

19   A.   That's correct, yes.

20   Q.   All right.   Can I please turn your attention to

21   this -- the black line across here.

22   A.   Uh-huh.

23   Q.   What spot is that?

24   A.   That is a Campbells spot selling Pepperidge Farm cookies.

25   Q.   And how long was that spot?

352

1   A.   30 seconds.

2   Q.   And when did that spot air?

3   A.   3:19:36 a.m.

4   Q.   In California, what local time would it have aired?

5   A.   3:19:36.

6   Q.   And what is the name of that commercial?

7   A.   It's -- the sponsor is Campbells, Pepperidge Farms --

8   Q.   Is there a code that goes to this commercial?

9   A.   Yes, the ISCI code is in the far column.  CPPC0011000.

10  Q.   Okay.  And is there any other name that refers to this

11  commercial?

12  A.   None that I can see, no.

13  Q.   Do you know what "chocolate rev cc" means?

14  A.   I don't in this case.

15  Q.   Okay.  One moment.

16         Can I turn your attention to the very top of this

17  page.

18  A.   Yes.

19  Q.   It's not quite up yet, but -- all right.  This is the page

20  we were just looking at.  What do we have here in the very top

21  of the log?

22  A.   Where it says "Log"?

23  Q.   Yes.

24  A.   So that's depicting the log, broadcast date, which is

25  Saturday March 28th, 2009, 11:30 p.m. to 6:05 -- 6:00:05 a.m.

1    Q.  Okay.  And if we wanted to convert this to, I'd say,

2    non-broadcast time, just time that we would all understand,

3    what day does this log go to?

4    A.  So it ends on Sunday, March 29th at 6:00:05 a.m.

5    Q.  Okay.  So we're going through the night of March 28th and

6    into the morning of March 29th --

7    A.  That is correct.

8    Q.  -- with this log?

9    A.  Yes.

10        MS. RICHARDS:  Okay.  Thank you.  I have no further

11   questions.

12        THE COURT:  Cross-examination?

13        MR. FALLER:  No questions, Your Honor.

14        THE COURT:  Either party wish this witness to remain

15   subject to recall?

16        MR. FALLER:  No, Your Honor.

17        MS. RICHARDS:  Your Honor, may I ask a clarifying

18   question of the witness.

19        THE COURT:  Sure.

20   BY MS. RICHARDS:

21   Q.  Mr. Caporale, just to clarify.  The commercial that I

22   asked you about, the Campbells commercial.

23   A.  Uh-huh.

24   Q.  What date did it air?

25   A.  Sunday, the 29th of March, 2009.

1          MS. RICHARDS:  All right.  Thank you.

2          THE COURT:  Subject to recall?

3          MS. RICHARDS:  No, Your Honor.

4          THE COURT:  All right.  You are excused.  Thank you.

5          THE WITNESS:  Thank you.

6          MR. DELAHUNTY:  Your Honor, may we address something

7    before the witness comes in?

8          THE COURT:  Sure.

9          MR. DELAHUNTY:  I'd just like to advise that this

10   next witness will probably provide about an hour of direct

11   testimony and we're close to lunch.  Would the Court prefer we

12   start now or wait until after lunch?

13         THE COURT:  Why don't we go ahead and get started.

14   We'll break at noon.  You can go ahead and do the preliminary

15   matters first and when you reach a natural breaking point, let

16   me know and we'll take a break.

17         MS. RICHARDS:  Your Honor, our witness has left from

18   right outside the door, so we're trying to track him down.

19         THE COURT:  Why don't we do the following then.

20   Members of the jury, we're going to take our noon recess.

21   There's some things probably that counsel and I can chat about

22   now anyway.

23         We'll still resume at 1:30 this afternoon.  Remember

24   those admonition instructions that I gave you.  We'll see you

25   at 1:30 this afternoon.

1          (The jury left the courtroom.)

2          THE COURT:  All right.  The jury has left for its

3    noon recess.  You can have a seat if you wish.  Not going to

4    take too much time.

5          Just need to know, first of all, yesterday at the

6    close of the day, government counsel indicated the witnesses,

7    not necessarily in this order, would be Hall, Rogers, a

8    representative from Viacom and then Special Agent Squire.  Is

9    that pretty much how you're going to be -- so Mr. Squire would

10   be next, is that correct?

11         MR. DELAHUNTY:  Government is calling him next.  And

12   I can also update the Court with the next series of witnesses.

13         THE COURT:  Yes.

14         MR. DELAHUNTY:  The next witness after Agent Squire

15   will be Mr. Shihora, Kamlesh Shihora.  Followed by Special

16   Agent Pike, who is at counsel table.  And if we get to him,

17   Detective Robles.

18         THE COURT:  All right.  I understand that to be the

19   order of the witnesses.  Is there anything we need to be aware

20   of in advance as far as the witness' testimony or exhibits,

21   Mr. Faller?

22         MR. FALLER:  I don't believe so, Your Honor.  Not

23   that I'm aware of.

24         THE COURT:  Okay.  Anything else that we need to take

25   up or address before we break for lunch?

1          MR. DELAHUNTY:  Not at this time, Your Honor.

2          THE COURT:  Defense?

3          MR. FALLER:  No, Your Honor.

4          THE COURT:  All right.  We'll resume at 1:30 this

5    afternoon.

6          (Noon recess.)

7          THE COURT:  Anything before we have the jury come

8    back in?

9          MS. RICHARDS:  Your Honor, we'd like to put something

10   on the record.

11         THE COURT:  Yes.

12         MS. RICHARDS:  The government would like to put on

13   the record that Exhibits 42, 52 and 57, which are video clips,

14   were played to the jury without the audio.

15         MR. FALLER:  That's an accurate statement, Your

16   Honor.

17         THE COURT:  All right.  Anything else?

18         MS. RICHARDS:  No, Your Honor.

19         THE COURT:  Anything from defense?

20         MR. FALLER:  No, Your Honor.

21         THE COURT:  We'll have the jury come in.

22         (The jury entered the courtroom.)

23         THE COURT:  The jury is present.  Please be seated.

24   Government plaintiff may call its next witness.

25         MS. RICHARDS:  United States calls Special Agent

1  Gregory Squire.

2                    **GREGORY DAVID SQUIRE**,

3  called as a witness on behalf of the Government, having been

4  first duly sworn, testified as follows:

5           THE CLERK:  Please have a seat.  State your full name

6  for the record and spell it.

7           THE WITNESS:  It's Gregory David Squire, S-Q-U-I-R-E.

8                    DIRECT EXAMINATION

9  BY MS. RICHARDS:

10 Q.  Good afternoon, Agent Squire.  What do you do for a

11 living?

12 A.  I am a special agent with the Department of Homeland

13 Security, Homeland Security Investigations in Boston.

14 Q.  What are your primary duties as an special agent with

15 Homeland Security Investigations?

16 A.  I'm assigned to the child exploitation group.

17 Q.  And what do you do as part of the child exploitation

18 group?

19 A.  Our primary objective is to identify suspects and victims

20 in crimes of all, you know, sorts of child exploitation cases.

21 Q.  In a typical case, how do you go about determining who a

22 victim is?

23 A.  We have a sort of a methodology that we use in determining

24 locations.  And it's kind of a combination of analyzation of

25 these videos and images that we come across during cases.

1   Q.   And where do you typically come across child exploitation

2   videos?

3   A.   Usually in the possession of individuals that are

4   arrested, whether that's an individual that Homeland Security

5   Boston arrests or a fellow agent in another part of the

6   country or even state and local cases that we work with.

7   Q.   And when you come across a video, before you conduct your

8   victim identification analysis, what do you do first?

9   A.   We have a kind of a multi-step process.  The first thing

10  we do is we submit the images and videos to the National

11  Center For Missing and Exploited Children.  Also known as

12  NCMEC.  NCMEC is a non-governmental agency in Virginia.  Their

13  primary mission is to catalog and do intake for law

14  enforcement.  And in that intake, an agency will execute an

15  arrest, find whatever evidence there is, will submit it to the

16  national center.  They will vet it, catalog it and then

17  provide a report back to law enforcement whether that is an

18  identified child, whether that child is unidentified, the

19  number of times they've seen that image before, that video

20  before.  And that's all information that will be used in

21  determining whether or not we're going to conduct our victim

22  identification.

23  Q.   If you find that the child is unidentified, what do you do

24  next?

25  A.   The second part that we do is we contact the liaison at

1    INTERPOL, which is the international law enforcement agency

2    in Lyon, France.  They maintain a very similar database that

3    NCMEC does.  And they're able to tell us whether or not they

4    have identified that series on an international level or

5    whether they might have files that we don't have that could

6    assist us in identifying the victim and the abuser.

7    Q.   Agent Squire, you've referred to the word "series" a few

8    times.  Can you describe what you mean by a "series" when

9    you're discussing child pornography?

10   A.   Sure.  A series is basically a term used by NCMEC, by law

11   enforcement world-wide to describe the collection of the abuse

12   material of a particular victim.  So whether it's ten videos

13   and a few images of that same victim that is being abused,

14   that is considered a series.

15   Q.   All right.  So in a case where you have received a video,

16   you've determined from NCMEC that it's -- that the victim is

17   unknown and you've determined from INTERPOL that the victim

18   and series are unknown to them also.  What do you do next?

19   A.   Our team will start analyzing the photos and the videos.

20   And by "analyzing," we look to identify all the items that you

21   see in a particular video or in a particular image.  And that

22   comes down to every piece of carpet, piece of furniture,

23   blinds, you know, soda cans.  Anything we can positively

24   identify, we use that in helping to locate the -- where the

25   abuse took place.

1  Q.  Are you able to conduct this type of thorough victim
2  identification on every image that you come across where the
3  victim is unknown?
4  A.  No, not every image holds items that can be identified.
5  But a lot -- there is a lot to be learned though.
6  Q.  Okay.  And how long, typically, does it take you to
7  identify a victim in a series?  Is this a long process or can
8  you usually do this quickly?
9  A.  No, it's a very tedious process.
10 Q.  And how do you choose which images you focus on?
11 A.  For specific images -- as a whole, again, when we're
12 picking these series, a lot of times we'll focus on series
13 that have victims that are too young to talk.  They don't have
14 a voice for themselves.  They can't self report.  And those
15 kind of rise to the top for us because those kids aren't able
16 to tell anyone, their mom or dad or anyone what's happening.
17       And then we take those series and image by image we
18 break down the images that have the most items in them.  And
19 again, items being anything from furniture to water bottles.
20 Q.  All right.  I'm going to show you a series -- not a
21 series, but a group of four images.  They're all exhibits in
22 our case.  After I show them to you, can you tell me know if
23 you recognize some, none or all of the exhibits.
24       So the first one is Exhibit 40.  And then 54.  59.
25 And Exhibit 68.

361

1   A.   Yes.  I recognize all of those.

2   Q.   And where do you recognize the images from?

3   A.   Those are all images from the Swirl Carpet series we

4   investigated.

5   Q.   Okay.  And when did you first come across those images?

6   A.   Approximately 2010.

7   Q.   And how did you come across them?

8   A.   We discovered the series in analyzing a suspect, Robert

9   DiDuca, an individual we arrested in Massachusetts as part of

10  a large scale operation.

11  Q.   And as part of that investigation, did you seize his

12  computer?

13  A.   Yes, we did.

14  Q.   And what did you find on the computer?

15  A.   We found thousands and thousands of images of child

16  pornography, to include the series named Swirl Carpet.

17  Q.   And did you take some of the same steps that you mentioned

18  earlier after you found these images?  Did you send them to

19  NCMEC, for example?

20  A.   Yes, we did.

21  Q.   And did you send them to INTERPOL?

22  A.   Yes, we did.

23  Q.   And did you decide to conduct victim identification

24  analysis on these images?

25  A.   Yes.  Swirl Carpet qualified, I guess, for lack of a

better term, as a series that was unidentified and, again, a
victim that was too young.

Q.  And approximately how many pictures and videos did you see
that you came to -- came to understand to be a part of the
Swirl Carpet series?

A.  I would say approximately 15 images.

Q.  Were there also videos?

A.  Yes, there were.

Q.  And after coming across the pictures and videos, what did
you do next?

A.  Our team began our analyzing sort of process.  We started
taking a look at the photos and, again, prioritizing those by
photos of highest resolutions, the photos with the most items
in there that we could identify.  And we somewhat literally do
a white board and we start listing those items.

        And each member of the team takes a few items, tries
to contact the manufacturer, you know, in identifying it,
whether it's using Google or using partners that we've
developed over the years that would be in a certain industry
that could better identify those items.

Q.  So does this involve a lot of emails and phone calls?

A.  It sure does.

Q.  I'm showing you Government's Exhibit 40, which is already
in evidence.  Is this one of the pictures that you analyzed?

A.  Yes.

363

1    Q.   Okay.  Can you point to -- can you go through some of the

2    images in this picture that you used to determine either where

3    it was produced or when it was produced or who the victim was?

4    A.   Sure.  So in this photo in particular -- so we identified

5    the crib.  Which you can see at the top of the photo.  The bed

6    sheets in the crib were identified.  The Milk Bone toy was

7    identified.  And I believe the pillow was also identified.

8    Q.   Which of these items, if any, were relevant to determining

9    when this video -- or when this image may have been produced?

10   A.   The Milk Bone was mostly helpful in this particular

11   series.  That Milk Bone, we ended up speaking to the folks who

12   manufacture it and distribute it, they indicated that it had

13   been manufactured and distributed only for a short amount of

14   time as part of a promotional item from Milk Bone and it was

15   the second quarter of 2008.

16   Q.   And did you -- did learning that information lead you to

17   any conclusions about when this image was produced?

18   A.   It was our determination that the series would have been

19   produced, you know, from 2008 up to that date.

20   Q.   Were there any other items in this scene -- and by

21   "scene," I mean in this room or where this crib is that are

22   not visible in this picture that you used to identify the time

23   when this may have been produced?

24   A.   Yes.  In another photo taken at a similar angle, there's a

25   book, a Disney book that we can see that was also in that 2008

1   time frame.

2   Q.   Okay.  And I'm showing you now Government's Exhibit 60,

3   which is also already in evidence.  Agent Squire, do you

4   recognize this exhibit?

5   A.   Yes, I do.

6   Q.   What do you recognize it to be?

7   A.   That is a screenshot from one of the videos in the Swirl

8   Carpet series.

9   Q.   And have you viewed the video that the screenshot is from?

10  A.   Yes, I have.

11  Q.   And do you recall what was in that video?

12  A.   Yes.  The video was a very graphic video of an adult male

13  abuser anally raping a child who was bound with electrical

14  tape.  I forget, it was a couple of minutes long.

15  Q.   How many times did you watch this video?

16  A.   Dozens.

17  Q.   And when you watched this video, was there sound in the

18  video?

19  A.   Yes, there was.

20  Q.   Okay.  And do you recall what was playing in the back of

21  the video?

22  A.   Yes.

23  Q.   Okay.  Can you describe that?

24  A.   Throughout the video, the child is heard crying very

25  loudly.  That is somewhat of the predominant sound that's

365

1    heard.  Also in the background, we were able to pick up a

2    television show that was being played on the TV at the same

3    time.  The television show was heard, public service

4    announcement was heard and a small snippet of a commercial was

5    heard.

6    Q.   Okay.  Let's talk first about the television show that was

7    heard.

8    A.   Sure.

9    Q.   Were you able to determine what show was being played?

10   A.   Yes.  We were.

11   Q.   And how did you determine that?

12   A.   We had determined that by taking the words that we heard

13   the actor saying and started to kind of plug those into Google

14   and we ended up learning the exact episode of that show.

15   Q.   And what episode was that?

16   A.   That's the -- the show was called Family Matters and it

17   was episode 131, it's called Cheers Looking At You Kid.

18   Q.   Okay.  And after you determined the episode name and the

19   episode number, were you able to determine any of the

20   commercials that played with it?

21   A.   Yes, we were.

22   Q.   And how did you determine what commercials were playing in

23   the background?

24   A.   Similar method.  We took the words that we heard the

25   announcer saying during that commercial and plugged them in

366

1   and got our results that way.

2   Q.  Okay.  And what were your results?

3   A.  It was a Pepperidge Farm commercial and it was called

4   Chocolate Rev CC, I believe.

5   Q.  And do you know what the commercial was advertising?

6   A.  It was a chocolate cookie of sorts.

7   Q.  Okay.  At some point did you send a grand jury subpoena to

8   any entity to get records for the Family Matters episode?

9   A.  Yes, we did.

10  Q.  Who did you send a grand jury subpoena to?

11  A.  To Viacom.

12  Q.  And why did you send it to Viacom?

13  A.  Through our research about the Family Matters show, we

14  determined that Nickelodeon was the -- I guess the official

15  station that could air it.  Nickelodeon is owned by

16  Viacom/MTV.

17  Q.  And when you sent those records, what did you request?

18  A.  We requested any time that that episode was aired from

19  approximately January 28th through the end of 2010.

20  Q.  When you say "January 28th" --

21  A.  I'm sorry, January 2008.

22  Q.  Okay.  And why January 2008?

23  A.  That was as far back as we felt we needed to go based on

24  the identification of the manufacturer of the Milk Bone and

25  also of the Disney book.

1  Q.  And why did you only ask for records up to November 2010?

2  A.  2010 was the time frame where we arrested Robert DiDuca,

3  so we knew this video, having been in his possession, would

4  have had to been produced in that time frame.

5  Q.  Okay.  We're going to put up on the monitor Government's

6  Exhibit 84.  Do you recognize this exhibit?

7  A.  Yes, I do.

8  Q.  What do you recognize this to be?

9  A.  This was the first return we received from Viacom

10 regarding the airing dates and times of the episode of Family

11 Matters.

12 Q.  And how did you use this document?

13 A.  We used this document to compare against the results that

14 we had requested from Pepperidge Farm for the airing of their

15 Chocolate Rev CC commercial.

16 Q.  And according to your reading of this document, how many

17 times did Family Matters air during the period that -- during

18 2008 through 2010?

19 A.  I believe it was 13.  Although if you bear with me, I can

20 count.

21 Q.  Go ahead.

22 A.  15.  Sorry.

23 Q.  Okay.  And I think you said that you cross-referenced this

24 with another document.

25 A.  Yes, that's correct.

1    Q.   And what document was that?

2    A.   We requested very similar information from Pepperidge

3    Farms.  Because we heard that commercial was aired, we went to

4    them and asked them almost the same question we did in the

5    form of a grand jury subpoena, when did you air that

6    commercial?  Please provide the dates and times.

7    Q.   And based on -- based on this document and also

8    cross-referencing it with that, what was your understanding of

9    when the commercial may have aired?

10   A.   Our understanding was that the only date that the two were

11   aired together was March 28th, 2009.

12   Q.   Okay.  And can we go to the next page of Exhibit 84,

13   please.  Agent Squire, do you recognize this document?

14   A.   Yes.  This is the second document that Viacom provided to

15   us upon request.

16   Q.   Okay.  And how many pages did you receive from Viacom that

17   looked similar to this?

18   A.   I believe it was 15.

19   Q.   And what did you understand these documents to represent?

20   A.   Our understanding was that each page represented the half

21   an hour, the approximate half an hour time block that the

22   Family Matters episode would have aired on that date.  And it

23   also included the commercial breaks and whatnot through that

24   half an hour time frame.

25   Q.   And did you review all of these 15 pages?

1  A.  We did.

2  Q.  And what were you looking for when you reviewed the 15

3  pages?

4  A.  We were looking for that intersection of the Pepperidge

5  Farms commercial and the television -- and the Family Matters

6  episode.

7  Q.  And how many times did you find that intersection?

8  A.  One time.

9  Q.  And do you recall which page you saw that intersection?

10  A.  I believe it's on page six.

11  Q.  All right.  Is this the page that you're referring to,

12  page 6?

13  A.  Yes, it is.

14  Q.  Can you show me on this record where you see the

15  Pepperidge Farms commercial airing?

16  A.  Sure.  It's actually right in the middle.

17  Q.  Okay.  Did this lead you to draw any conclusion about when

18  the video that occurred in the hotel room was created?

19  A.  Yes.

20  Q.  Okay.  And what did you conclude?

21  A.  We concluded that the video would have been produced on or

22  about March 28th, 2009.

23  Q.  Let's put up Government's Exhibit 58.  Agent Squire, do

24  you recognize this video?

25  A.  Yes, I do.

1  Q.  At some point in time, did you learn where this video was

2  produced?

3  A.  Yes, we did.

4  Q.  What steps did you take to determine where it was

5  produced?

6  A.  We continued on with our methodology of identifying the

7  items that you see here.  For example, the items you see here

8  in this picture, the screenshot of this one particular video

9  includes a lamp that we identified, the headboard we

10  identified.  And you can somewhat see in the top corner a

11  piece of art that we identified.

12  Q.  Okay.  Did you make any -- did you make any diagrams to

13  show the items that were in this hotel room?

14  A.  Yes, we did.

15  Q.  Can I have you turn to Exhibit 89 in the binder in front

16  of you.  Do you recognize that exhibit?

17  A.  I do.

18  Q.  What does it depict?

19  A.  This is a diagram that our team produced.

20  Q.  And did you create this as part of your investigation?

21  A.  Yes, we did.

22  Q.  And is this an accurate diagram of the hotel room as you

23  understood it to be?

24  A.  Yes.

25  Q.  And what did you use to create this diagram?

1   A.   We used an Adobe product.

2   Q.   And what was the source of the photos in the diagram?

3   A.   All the photos that you see laying around are screenshots

4   from the series known as Swirl Carpet.

5   Q.   And will this diagram be helpful in explaining the layout

6   of the hotel room as you understood it to be?

7   A.   Yes, we believe it was.

8        MS. RICHARDS:   The United States moves to admit

9   Government Exhibit 89.

10       MR. FALLER:   No objection.

11       THE COURT:   It is admitted.

12       (Government's Exhibit 89 was received.)

13       MS. RICHARDS:   Put Government's Exhibit 89 on the

14   screen.

15  Q.   Agent Squire, can you please go through the diagram and

16  point out any relevant items that you used in order to find

17  the hotel room where the video was produced?

18  A.   Yes.   In looking at the document as seen on the screen,

19  starting with the screenshot which you see under March of

20  2009, the words "March of 2009," that is a screenshot from one

21  of the videos.   And as I mentioned before, the lamp and the

22  headboard, sort of items that we were going to attempt to

23  identify.

24       You can also see a thermostat more to the left of the

25  photo in the mirror in the bathroom area.

1          Working clockwise, you see a picture of the headboard
2    that was in the series, fairly distinct.
3          Moving down from there, the nightstand, the older
4    version of a telephone.
5          And at that point, you can conclude that the
6    nightstand and the headboard are possibly from the same
7    manufacturer given the design.
8          The bottom photo, again a picture of the nightstand.
9          Moving to the lower portion of the diagram, that is
10   the bedspread that we saw on the bed in multiple photos and in
11   the video.
12         Moving to the left, you see a screenshot of the
13   carpeting in the hotel room.  And based on the design there,
14   swirl carpet was pretty much how they named that series in
15   NCMEC.
16         Moving up from there, another screenshot of the swirl
17   carpet and also of the bedspread.
18         The photo above, that is a screenshot from the video.
19   And that gave us a look at the television that was in the
20   hotel room as well as another piece of furniture, which is
21   another sort of design match for the headboard and the
22   nightstand.
23         And above that is the piece of art that I referenced.
24   There was one on the wall above the TV stand and there was
25   also one above the bed, same photo.

373

1          Lastly, the vanity countertop, that's a sort of a

2    close-up version of what's called the curtain.  And the

3    curtain is the piece of material that hangs underneath a

4    countertop in a bathroom setting like this.

5    Q.  Okay.  Let's talk some more about that vanity curtain or

6    granite curtain.  Where did this image come from?

7    A.  So that screenshot there is from one of the images in the

8    Swirl Carpet series.  And it's a zoomed in version.  And it

9    was lightened to better see the pattern on the curtain.

10   Q.  Can we please put up Government's Exhibit 69.  Is this the

11   image that you used to get an image of the granite curtain?

12   A.  Yes.

13   Q.  Okay.  Can you show, by marking with your finger, where

14   the granite curtain is in this image?

15   A.  Yes, it's up in the top left corner.

16   Q.  Okay.  And why is it not visible in this image?

17   A.  This is the original image from the series, so the

18   background is very dark.

19   Q.  Okay.  And can we now put up Government's Exhibit 90.

20   Actually, this is not -- 90 is not in evidence yet.

21          Can you please look at Government's Exhibit 90 in the

22   binder.  Do you recognize that exhibit?

23   A.  Yes, I do.

24   Q.  What is that?

25   A.  This is the screenshot that we created that is a -- again,

1    a zoomed in version of that photo that you were just looking

2    at with the curtain actually lightened.

3    Q.  All right.  And is that a true and accurate depiction of

4    the granite curtain as you saw it in the photo?

5    A.  Yes, it is.

6            MS. RICHARDS:  The government moves to admit

7    Government's Exhibit 90.

8            MR. FALLER:  No objection.

9            THE COURT:  All right.  It is admitted.

10           (Government's Exhibit 90 was received.)

11   BY MS. RICHARDS:

12   Q.  Can we please put up Government's Exhibit 90 next to

13   Government's Exhibit 69.

14           Thank you.

15           Can you show with your finger on Government's Exhibit

16   69 where Exhibit 90 came from?

17   A.  Yes.  It's the top left corner here.

18   Q.  Okay.  Thank you.  Let's go back to Government's Exhibit

19   89.  How did you use the furniture -- or was the furniture in

20   this diagram relevant to your investigation?

21   A.  Yes, it was.

22   Q.  How did you use the furniture?

23   A.  Once we determined the furniture manufacturer, we were

24   able to communicate with them, take a look at their website to

25   sort of get a visual confirmation that this was the same

1    furniture and also get their opinion on that conclusion.  From

2    there, we provided them with the grand jury subpoena

3    requesting every hotel that they had distributed their

4    furniture to.

5    Q.  When you received the document from them showing every

6    hotel they had distributed their furniture to, how many hotels

7    did you see on that document?

8    A.  I believe there's a little over 300.

9    Q.  Okay.  And what did you do next?

10   A.  As a team, we divided the list and began searching online

11   for photos of the hotels they had distributed their furniture

12   to, looking on Trip Advisor or other sorts of hotel websites,

13   or even if the hotel had their own website.  And obviously the

14   mission there was to identify the hotel room that the abuse

15   had taken place in.

16   Q.  And what sorts of things did you look at when you were

17   pulling up hotels online?

18   A.  We looked for all the items that you see here in the

19   diagram that was produced.  A lot of them are very unique.

20   You know, there's certain things that can be changed in hotels

21   naturally.  One of the other reasons we created the document

22   was because although you can change, you know, a curtain or a

23   bedspread, structurally the rooms don't normally change.  So

24   we used the combination, again, our working knowledge of the

25   series as a whole and also this document.

1    Q.   And at some point, did you think that you had found the
2    hotel where the video was made?
3    A.   Yes.
4    Q.   And what did you do next?
5    A.   After identifying the hotel and what we believed was the
6    California Best Inn in Bakersfield, California, we called out
7    to our office in Bakersfield and began communication directly
8    with Special Agent Veronica Pike.
9    Q.   And do you recall the address of the hotel in Bakersfield
10   that you thought was a match?
11   A.   I believe it was Wible Road, but I don't know the number.
12   Q.   Okay.  And did you give Agent Pike any information
13   regarding what to look for in her search?  Well, actually,
14   sorry, I jumped ahead.
15           What did you ask Agent Pike to do in the lead that
16   you sent her?
17   A.   We were hoping that they could actually go to the hotel to
18   get us visual confirmation that, in fact, the pictures we saw
19   on the website for California Best Inn was indeed still true
20   and accurate.
21   Q.   And was she able to do that?
22   A.   She was.
23   Q.   And did you send her anything to help her with her search
24   for the right hotel room?
25   A.   Yes.  We sent her the document, Exhibit 89, as well as

1  other screenshots of the hotel room.

2  Q.  Did you also send her a screenshot of the enhanced

3  granite?

4  A.  We did.

5  Q.  And can we put up Exhibit 89 and 90 side by side, please.

6       Agent Squire, what was the reason for your focus on

7  the granite?

8  A.  It was our belief that, again, as different things can

9  change in the hotel room, such as the bedspread or even the

10  carpet could be changed, the pattern on granite is very unique

11  and, as you know from maybe your own homes, no two pieces of

12  granite are ever the same.  So we viewed this granite curtain

13  almost as our fingerprint of that room.

14  Q.  At some point did you come to believe that Agent Pike had

15  found the hotel room where this video was created?

16  A.  Yes, we did.

17  Q.  And at that point, did you send her any other images?

18  A.  We sent her sanitized photos of the victim.

19  Q.  Can you please turn in your binder to Exhibits 91, 92 and

20  93.

21  A.  Okay.

22  Q.  Do you recognize those exhibits?

23  A.  Yes, those are the screenshots that we created.

24  Q.  And are they true and accurate depictions of the victim as

25  you found him in the images of the Swirl Carpet series?

378

1    A.  Yes, they are.

2            MS. RICHARDS:  The government moves to admit Exhibits

3    91 through 93.

4            MR. FALLER:  Submitted, Your Honor.

5            THE COURT:  They are admitted.

6            (Government's Exhibits 91, 92 and 93 were received.)

7    BY MS. RICHARDS:

8    Q.  Agent Squire, at this point did you do any more

9    substantive investigating on this case?

10   A.  No.  At this point we turned over the primary lead to the

11   Bakersfield office.

12           MS. RICHARDS:  Thank you, Agent Squire.  I have no

13   further questions.

14           THE COURT:  Cross-examination.

15                   CROSS-EXAMINATION

16   BY MR. FALLER:

17   Q.  Agent Squire, is the granite that's been referred to in

18   the photograph, is that actual granite or is it some kind of

19   synthetic laminate?

20   A.  I don't know, sir.

21   Q.  Okay.  So it actually could be a manufactured product; is

22   that correct?

23   A.  Sure.

24   Q.  And if a product is manufactured, it can be manufactured

25   the same way more than once; correct?

1  A.  I think that's a possibility.

2            MR. FALLER:  No more questions.

3            THE COURT:  And redirect?

4            MS. RICHARDS:  No redirect, Your Honor.

5            THE COURT:  Either party wish this witness to remain

6  subject to recall?

7            MS. RICHARDS:  No, Your Honor.

8            MR. FALLER:  No, Your Honor.

9            THE COURT:  All right.  You are excused.  Thank you.

10           THE WITNESS:  Thank you, Your Honor.

11           MR. DELAHUNTY:  United States calls its next witness,

12  Your Honor, Mr. Kamlesh Shihora.

13           THE COURT:  Do you want to close the binder up there?

14                          **KAMLESH SHIHORA**,

15  called as a witness on behalf of the Government, having been

16  first duly sworn, testified as follows:

17           THE CLERK:  Please have a seat.  State your full name

18  for the record and spell it.

19           THE WITNESS:  I'm sorry?

20           THE CLERK:  Please state your full name for the

21  record and then spell it.

22           THE WITNESS:  Kamlesh Shihora.  K-A-M-L-E-S-H.  Last

23  name S-H-I-H-O-R-A.

24                        DIRECT EXAMINATION

25  BY MR. DELAHUNTY:

Shihora - D.

380

1   Q.   Thank you, Mr. Shihora.

2   A.   Thank you.

3   Q.   Where do you live now?

4   A.   San Diego.

5   Q.   How long have you lived in San Diego?

6   A.   About four years.

7   Q.   Prior to living in San Diego, where did you live?

8   A.   Bakersfield.

9   Q.   When did you move from Bakersfield to San Diego?

10  A.   In 2010, July.

11  Q.   When did you first move to Bakersfield, California?

12  A.   July, 1999.

13  Q.   During the time period that you lived in Bakersfield, from

14  July 1999 to July 2010, did you have a job?

15  A.   Yes.

16  Q.   Where did you work?

17  A.   California Best Inn as a co-owner.  California Best Inn

18  hotel.

19  Q.   Was the name of the hotel the California --

20  A.   Best Inn.

21  Q.   So, Mr. Shihora, today when you and I talk, when you

22  answer questions, the court reporter has to write down only

23  one voice.  So can you wait until I finish my question and

24  then answer?

25  A.   Sure.

381

1   Q.  And I'll wait until you answer and then I'll ask the next

2   question.  Okay?

3           Do you remember the address of the hotel, the

4   California Best Inn?

5   A.  Yes.

6   Q.  What was the address?

7   A.  1030 Wible Road.

8   Q.  And what was your job at the California Best Inn?

9   A.  As a manager and supervising the place.

10  Q.  Did you have any ownership interest in the hotel?

11  A.  Co-owner, yes.

12  Q.  As co-owner and manager, did you work to oversee the

13  operations of the motel?

14  A.  Yes.

15  Q.  Did you train employees of the motel?

16  A.  Yes.

17  Q.  Were the employees that worked at the motel in 2009, did

18  you train them?

19  A.  Yes.

20  Q.  While you were co-owner, did you ever work day to day at

21  the hotel?

22  A.  Yes, I did.  Before November 2009 I worked on all the

23  shifts.

24  Q.  While you were a co-owner, did you ever have an occasion

25  or a chance to check in a guest?

Shibgra Pd

382

1   A.   Yes.

2   Q.   Did you train your employees on how the motel should have

3   its guests check in?

4   A.   Yes.

5   Q.   Did the motel have any record keeping procedures --

6   A.   Yes.

7   Q.   -- for its guests?

8   A.   Yes.

9   Q.   Did you provide training on those procedures?

10  A.   Yes.

11  Q.   And are you familiar with those procedures?

12  A.   Uh-huh.  Yes.

13  Q.   And I'm talking about the time period when you were

14  co-owner.  You're familiar with the procedures in that time

15  period?

16  A.   Yes, sir.

17  Q.   Now I'm going to ask you some questions about 2009 in

18  particular.  Okay?

19  A.   Okay.

20  Q.   During 2009, what time of day could a motel guest check in

21  at the hotel?

22  A.   Mostly any time.

23  Q.   A guest could check in 24 hours a day?

24  A.   Uh-huh.

25  Q.   Is that a yes?

383

1   A.   Yes.

2   Q.   Okay.  Let's talk about the check in procedure.  Okay?

3   When a guest arrived at the hotel, what was the first step in

4   checking in?

5   A.   Once they walk into the hotel, in lobby, we give them

6   registration card to fill out.  Called the guest registration.

7   Q.   Did you train employees to give the guest a guest

8   registration card?

9   A.   Yes.

10  Q.   And I'm going to ask you to look at a document.  It's

11  Exhibit Number 101 or tab 101 in the binder in front of you.

12  Can you look at that, please?  Excuse me.  104.

13          Do you have what's been marked at the bottom right as

14  Government's Exhibit 104 in front of you?

15  A.   Yes.  Yes, sir.

16  Q.   Have you seen this document before?

17  A.   Yes.

18  Q.   What do you recognize it to be?

19  A.   It says "Guest Registration."

20  Q.   Does it show what motel it's associated with?

21  A.   Yes, it says name and address also.

22  Q.   Does it show which motel?

23  A.   Yes.

24  Q.   What motel does it show?

25  A.   California Best Inn.

384

1  Q.  Who would have filled out this form?

2  A.  The information for the guest, the guest fill out.

3  Q.  Did an employee help fill it out?

4  A.  No.  That information for guest side is guest fill out.

5  And rest the employee fill out.

6  Q.  When the employee filled it out, did they fill it out

7  while the guest was checking in?

8  A.  Yes.  Same time.

9  Q.  Did the motel store this document in its records?

10  A.  Yes.

11  Q.  Why did it -- did it store that as the normal course of

12  its operations?

13  A.  Yes.

14        MR. DELAHUNTY:  The government would move into

15  evidence Government's Exhibit 104, Your Honor.

16        MR. FALLER:  Perhaps I could ask a few questions

17  about this record storage or perhaps he could elaborate on it.

18        THE COURT:  All right.  Why don't we followup on the

19  storage process.

20        MR. DELAHUNTY:  Want me to ask?

21        MR. FALLER:  Why don't you.

22        MR. DELAHUNTY:  Okay.

23  Q.  You said that the motel kept a record of this in storage.

24  Was that true in 2009?

25  A.  Yes, sir.

385

1    Q.   Was that to help run the operations of the motel?

2    A.   Yes.

3    Q.   Where did it store these records at the motel?

4    A.   In the motel storage room.

5    Q.   And was that employee trained to store the record there?

6    A.   Right.

7              MR. FALLER:  No objection.

8              THE COURT:  It is admitted.

9              (Government's Exhibit 104 was received.)

10   BY MR. DELAHUNTY:

11   Q.   Can we put on the screen, please, Government's Exhibit

12   104.

13             Mr. Shihora, I'm going to ask you some questions

14   about this.  Do you see it on the monitor in front of you?

15   A.   Yes, I do.

16   Q.   Okay.  Let's look at the right-hand side.  On the top

17   right of Government's Exhibit 104.  Do you see the top right?

18   A.   Uh-huh.

19   Q.   Do you see a box that says "room number"?

20   A.   Correct.

21   Q.   You do see that?

22   A.   Yes.

23   Q.   What does that refer to?

24   A.   Room number.

25   Q.   What is in that box?

386

1    A.   221.

2    Q.   Who would have filled that out, the employee or the guest?

3    A.   The employee.

4    Q.   What is the box below that show?

5    A.   The check-out date.

6    Q.   Is there a date in there?

7    A.   It's March 29, '09.

8    Q.   Who would have filled that out?

9    A.   My employee.

10   Q.   Do you see a box below that?

11   A.   Yes.

12   Q.   What does that box show?

13   A.   Arrival date or check-in date.

14   Q.   Who would have filled that out?

15   A.   My employee.

16   Q.   What date is in that box?

17   A.   March 28, '09.

18   Q.   Do you see a box below that?

19   A.   Yes.

20   Q.   What is in that box?

21   A.   It looks like it's Triple A.  Looks like they put Triple

22   A.   Look like they may be member of Triple A.

23   Q.   Do you know what that's referring to?  Do you know what

24   that means?

25   A.   Triple A -- yeah, people check in has a Triple A

387

1    membership.

2    Q.  Below that do you see the box that says "room total"?

3    A.  Yes.

4    Q.  Do you see a number to the right?

5    A.  Yeah.

6    Q.  What is that number?

7    A.  45.

8    Q.  Who would have filled that out?

9    A.  The employee.

10   Q.  Do you see below that the tax?

11   A.  Yes.

12   Q.  And a number beside it?

13   A.  $2.70.

14   Q.  Who would have filled that out?

15   A.  The employee.

16   Q.  Below that the total?

17   A.  47.70 with tax and everything.

18   Q.  What would have filled that out?

19   A.  My employee.

20   Q.  And below that, do you see any notations or any notes?

21   A.  It says "cash."

22   Q.  What does that mean?

23   A.  Paid cash, the guest.

24   Q.  Let's look at the left-hand side of this document.  Do you

25   see up at the top where it says "Name"?

388

1   A.   Uh-huh.

2   Q.   Is that a yes?

3   A.   Yes.

4   Q.   Okay.  Do you see a name in that box?

5   A.   Yes, I do.

6   Q.   What do you understand that name to read?

7   A.   Check in name of the guest, Shawn McCormack.

8   Q.   Who would have filled that out?

9   A.   By the guest.

10  Q.   Was it the hotel or motel's policy that the guest was to

11  fill out their name on the guest registration card?

12  A.   Guest has to do it, yes.

13  Q.   Do you see that below the "name" box, the "street" box?

14  A.   Yes.

15  Q.   You do see it?

16  A.   Yes.  "Street."

17  Q.   Is there anything in that?

18  A.   No.  No street address there.

19  Q.   Who was supposed to fill out that box?

20  A.   That's the guest.

21  Q.   Do you see that, the box that says "city"?

22  A.   Yes.

23  Q.   Is there anything in that box?

24  A.   No, nothing there.

25  Q.   Who is supposed to fill that out?

1    A.  The guest.

2    Q.  Do you see to the right of that the box that says "state

3    and zip"?

4    A.  Yes.

5    Q.  Is there anything in that box?

6    A.  Yes, it's "California" and the zip code is "91740."

7    Q.  Who would have filled that out?

8    A.  The guest.

9    Q.  Do you see the next box to the bottom left that says "area

10   code and phone number"?

11   A.  Yes.

12   Q.  Is there anything in that?

13   A.  No.

14   Q.  Who was supposed to fill that out?

15   A.  The guest.

16   Q.  Do you see to the right of that, "company representing"?

17   A.  Yes.

18   Q.  Is there anything in that box?

19   A.  No.

20   Q.  Who was supposed to fill that out?

21   A.  The guest.

22   Q.  Do you see the box that says "car license"?

23   A.  Yes.

24   Q.  Is there anything in that box?

25   A.  No.

Shibata - D.

390

1  Q.  Who was supposed to fill that out?

2  A.  Also guest.

3  Q.  Do you see the box to the right of that that says "state"?

4  A.  Yes.

5  Q.  Let me back up.  Is "car license" -- who's car license is

6  that referring to?

7  A.  The guest who check in.

8  Q.  Do you see that to the right of that, it says "state"?

9  A.  Yes.

10  Q.  Is that -- what is that referring to?

11  A.  State of the license plate.

12  Q.  Is there anything in that box?

13  A.  No.

14  Q.  Who was supposed to fill that out?

15  A.  The guest.

16  Q.  To the right of that, you see the box "make and color"?

17  A.  Yes.

18  Q.  Is there anything in that box?

19  A.  No.

20  Q.  Who was supposed to fill it out?

21  A.  By guest.

22  Q.  And what is it referring to?

23  A.  Make of car and color.

24  Q.  Do you see to the right of that, "year"?  That box?

25  A.  Yes.

391

1  Q.  What's in that box?

2  A.  Year of the car.

3  Q.  Is there anything written in it?

4  A.  No.

5  Q.  Let's go to the next line on the left.  You see where it

6  says "number in party"?

7  A.  Yeah.

8  Q.  What's written in that box?

9  A.  "2."

10  Q.  Who would have filled that out?

11  A.  The guest.

12  Q.  The next box over is signature.  Do you see that?

13  A.  Yeah.

14  Q.  And whose signature should be in that box?

15  A.  Guest who check in.

16  Q.  Okay.  Let's look at the bottom here, or a little bit

17  below that.  You see where it says "check-out time"?

18  A.  Yes.

19  Q.  What is the check-out time that's shown?

20  A.  11 o'clock in the morning.  11 a.m.

21  Q.  Okay.  Let's look over on the very left-hand side of the

22  guest registration card.  There's some numbers on the very

23  left that are kind of turned sideways.  Do you see those?

24  A.  Yeah.

25  Q.  What are the last three numbers there?

1   A.   "179."

2   Q.   Did the motel refer to those or call those anything?

3   A.   Folio number.

4           MR. FALLER:  I'm sorry, I didn't catch that.

5           THE WITNESS:  Folio number.  Registration number.

6   BY MR. DELAHUNTY:

7   Q.   When the guest checked in, did the motel have a policy

8   about looking at the driver's license of the guest?

9   A.   Yes.

10   Q.   Did the motel make copies of guest driver's license?

11   A.   Yes.

12   Q.   And did it attach the copy to the guest registration card?

13   A.   Yes.

14   Q.   On the bottom of Government's Exhibit 104, do you see

15   anything that looks like a driver's license copy?

16   A.   Yeah.

17   Q.   And whose drivers license do you understand that to be?

18   A.   Check-in guest.

19   Q.   The guest that checked in?

20   A.   Uh-huh.  Yes.

21   Q.   And do you see at the top the state that's referred to?

22   A.   "Arizona."

23   Q.   And what's it say below that?

24   A.   "Driver's license."

25   Q.   What's it say below that?

Shibozra - D

393

1    A.   "Number."

2    Q.   Is there a number besides where it says number?

3    A.   "D00129651."

4    Q.   Do you see a name on this driver's license copy?

5    A.   Yes, I do.

6    Q.   What name do you see?

7    A.   "Shawn Joseph McCormack."

8    Q.   Do you see a signature below that?

9    A.   Yes.

10   Q.   Do you see a picture of anyone?

11   A.   Yeah.

12   Q.   Whose picture did you understand that to be?

13   A.   The same person who checked in with the ID.

14   Q.   Did you give guests any training about looking at the

15   driver's license and comparing it to the person that was

16   standing and checking in?

17   A.   Yes, I did.

18   Q.   What was your training?

19   A.   Training the one guest check in, check the driver's

20   license not expired.  And make sure he's -- looking at the

21   picture and you check guest, make sure he's the right person.

22   Q.   What do you mean by check to make sure it's the right

23   person?

24   A.   To sometimes they look in IDs different than their face.

25   Q.   What was an employee supposed to do if the person checking

1    in looked different than the person on the driver's license?

2    A.  They usually check a couple of things.  We train them to

3    check a signature match and then ask for second ID, does it

4    match.

5    Q.  Okay.  If an employee checked for a second ID, were they

6    supposed to make a copy of it?

7    A.  Yes.

8    Q.  Okay.  Let's turn to, in your binder, what's marked

9    as -- well, let me ask first:  Did the motel make any records

10   that would show the information on the guest registration

11   card?

12   A.  Yes.

13   Q.  Did it have a name for those records?

14   A.  Yes.

15   Q.  What was the name?

16   A.  Daily report.

17   Q.  I'd like you to look at Exhibit Number 101, it's tab 101

18   in the binder in front of you, please.

19           Do you have that in front of you, Mr. Shihora?

20   A.  Yes, sir.

21   Q.  Do you recognize that document?

22   A.  Yes.

23   Q.  And what do you understand it to be or called?

24   A.  Daily Report.

25   Q.  Is that the same daily report you mentioned when I asked

Shibata - D

395

1    you about guest registration cards?

2    A.   Uh-huh.

3    Q.   Is that a yes?

4    A.   Yes.

5    Q.   Who was in charge of filling this out?

6    A.   The employee who worked that day.

7    Q.   When was this supposed to be filled out?

8    A.   Any time between they finish the shift.

9    Q.   Can you say that again?

10   A.   Any time -- the employee who worked there, the time they

11   finished their job to finish this report before they go.

12   Q.   Was it supposed to be filled out on a daily basis?

13   A.   Yes, daily basis.

14   Q.   On the same day as -- same day as the information that was

15   shown on it?

16   A.   Yes.

17   Q.   Did the motel keep a record of this in its records?

18   A.   Yes.

19   Q.   Was the record keeping of it part of the normal operations

20   of the motel?

21   A.   Yes.

22   Q.   And was it stored in the normal operations of the hotel?

23   A.   Yes.

24            MR. DELAHUNTY:   The government moves into evidence

25   Exhibit Number 101, Your Honor.

Shihora - D

396

1          MR. FALLER:  No objection.

2          THE COURT:  It is admitted.

3          (Government's Exhibit 101 was received.)

4          MR. DELAHUNTY:  Can we see on the screens, please,

5    Government Exhibit 101.

6    Q.  Mr. Shihora, I'm going to ask you some questions about

7    this document.  Okay?

8    A.  Okay.

9    Q.  You referred to this as a daily report; correct?

10   A.  Yeah.

11   Q.  Do you see on the top right of this document a date.

12   A.  Yeah.

13   Q.  What date is shown?

14   A.  March 28, '09.

15   Q.  And can we zoom out a little bit and capture the bottom

16   right.  Do you see a date at the bottom right of this

17   document?

18   A.  Yes.

19   Q.  What date is shown?

20   A.  March 28, '09.

21   Q.  Can we zoom out, please.  Is this document referring to

22   the guests at the hotel on March 28, '09?

23   A.  Yes.

24   Q.  So I'm going to ask you about the columns on top.  On the

25   top left.  Okay?  You see the top left, it says "Guest's

1    Name"?

2    A.  Yes.

3    Q.  Is that referring to the guest that stayed at the hotel on

4    that day?

5    A.  Yes.

6    Q.  What does the next column show?

7    A.  Room number.

8    Q.  And that shows the room that the guest stayed in?

9    A.  Yes.

10   Q.  To the right of that, what does that column show?

11   A.  Folio number.  We put the folio number and the

12   registration number the same.

13          THE COURT:  You need to move the microphone a little.

14   Back away.

15          THE WITNESS:  Thank you.

16   BY MR. DELAHUNTY:

17   Q.  I think -- did you say that the third column refers to the

18   folio number?

19   A.  Yes.

20   Q.  And that's the same number that's on the guest

21   registration card?

22   A.  Yes.

23   Q.  The next column, does it show number of guests?

24   A.  Yes.

25   Q.  The next column, does it show balance due?

1   A.   Yes.

2   Q.   The next column, does it show room rental?

3   A.   Yes.

4   Q.   What is captured there, is that the room rate?

5   A.   Yes.

6   Q.   Does the next column show room tax?

7   A.   Yeah.

8   Q.   The next column show local phone?

9   A.   Yes.

10  Q.   And then what does the next column show?  Can you read

11  that?

12  A.   Is it long distance phone number.  Long distance phone

13  that they use.

14  Q.   Next column?

15       THE COURT:  Maybe if you can enlarge it.

16       MR. DELAHUNTY:  Yeah, sorry.  Thank you, Your Honor.

17  Can we zoom in on those, please.

18       THE WITNESS:  Thank you.

19  BY MR. DELAHUNTY:

20  Q.   Okay.  All right.  We were looking at --

21  A.   Yeah.

22  Q.   -- long distance phone.  The next one, what does that show

23  under "J"?

24  A.   Bar restaurant.  We don't have a bar restaurant.

25  Q.   And the next one, under "K"?

399

1   A.   Phone deposit.

2   Q.   The next one under "L"?

3   A.   Total charges.

4   Q.   The next one refers to cash; correct?

5   A.   Yes.

6   Q.   The next one credit card?

7   A.   Yes.

8   Q.   The next one accounts receivable.

9   A.   Yes.

10  Q.   The next one total credits.

11  A.   Yes.

12  Q.   And the next one balance due; correct?

13  A.   Yes.

14  Q.   Okay.  Can we zoom out a little bit, please.  And can we

15  zoom back in on line 15, please.

16            Okay.  Do you see at line 14, Mr. Shihora?

17  A.   Yes, sir.

18  Q.   Do you see a name there?

19  A.   Yeah.

20  Q.   What name do you see?

21  A.   McCormack.  McCormack.

22  Q.   And do you see to the right of that a room number?

23  A.   Yeah.

24  Q.   What room number do you see?

25  A.   221.

Shibata, D.

400

1   Q.  And the next number that you see, what is that?

2   A.  Folio number.

3   Q.  What number is in there?

4   A.  0179.

5   Q.  Okay.  And the room rate, what was paid?

6   A.  $45.

7   Q.  Look at the rest of the numbers across there.  Do you see

8   those?

9   A.  Yeah.  2.70.  And 47.70 is total charge.  Paid cash 47.70

10  total.  Balance is zero.

11  Q.  Does that -- and you can look back if you need to.  Are

12  those the same numbers that we saw on Government Exhibit 104?

13  A.  Yes.

14  Q.  Is that the same room number that we saw on Government

15  Exhibit 104?

16  A.  Yes.

17  Q.  And the same person or guest?

18  A.  Uh-huh.  Same.

19  Q.  Okay.  I'm going to ask you to look at, in your binder,

20  please, Government's Exhibit 102.  Let me back up.

21          Let's go back to Exhibit 101.  This list of names

22  that are on here -- and they are on the 3-28-09 daily report;

23  correct?

24  A.  Yes.

25  Q.  What day would these guests have checked in?

1  A.  March 28, '09.

2  Q.  What day would they next check out?

3  A.  March 29, '09.

4  Q.  Can we look at Government's Exhibit 102.  Do you have

5  that?  Can we take 101 down.

6       Do you have Exhibit 102 in front of you, Mr. Shihora?

7  A.  Yes.

8  Q.  Have you seen this kind of document before?

9  A.  Yes.

10  Q.  What would you call that?

11  A.  Daily report.

12  Q.  And who would have made this document?

13  A.  Employee who worked there.

14  Q.  When would they have made it?

15  A.  Same day.

16  Q.  Same day as what?

17  A.  Same day they work, finish the job before they go home.

18  Q.  Does it reflect information that was gathered on a daily

19  basis?

20  A.  Yes.

21  Q.  Did the motel store this kind of document?

22  A.  Yes, sir.

23  Q.  Did it make a regular practice to store it?

24  A.  Yes.

25  Q.  Was it stored in the normal course of operations at the

Shihora - D

402

1    hotel?

2    A.  Yes.

3         MR. DELAHUNTY:  Government moves into evidence

4    Exhibit Number 102, please.

5         MR. FALLER:  No objection.

6         THE COURT:  It is admitted.

7         (Government's Exhibit 102 was received.)

8         MR. DELAHUNTY:  Can we show, please, on the screen,

9    Government's Exhibit 102.

10   Q.  Mr. Shihora, this appears to be a computer generated

11   document.  Is that accurate?

12   A.  Yes.

13   Q.  How does the information on this document compare to what

14   we looked at in Government's Exhibit 101?  Is it similar or

15   different?

16   A.  Similar.

17   Q.  Okay.  Let's look at the date on this.  The top left.  Do

18   you see that date?

19   A.  Yeah.

20   Q.  What date is shown?

21   A.  March 28, '09.

22   Q.  What does that -- does that mean that this document refers

23   to the guests on March 28th?

24   A.  Yes.

25   Q.  Do you see where it says "printed" above that?

403

1   A.   Yes.

2   Q.   What date is shown where it says "printed"?

3   A.   Printed after, next following day.

4   Q.   Which day was it printed, can you read that?

5   A.   March 31st, 2009.

6   Q.   Okay.  Can we zoom out, please.  Can we look at line 17,

7   please.  What is shown at line 17, Mr. Shihora?  What is the

8   name there?

9   A.   McCormack, Shawn.

10  Q.   What room is shown as being the room for Shawn McCormack?

11  A.   221.

12  Q.   And how much does it show that he paid in total?

13  A.   Total 47.70.

14  Q.   And is that the same number that we saw as what he paid in

15  Government's Exhibit 101 and 104?

16  A.   Yes.

17  Q.   Is it the same room number that we saw in those two

18  exhibits?

19  A.   Yes.

20  Q.   The same guest?

21  A.   Yes.

22  Q.   Okay.  Can we take that off the screen, please.

23       I'd like to ask you to take a look at tab number 103

24  in your binder, please, Mr. Shihora.  Do you have that in

25  front of you?

404

1    A.   Yes.

2    Q.   Have you seen this document before?

3    A.   Yes.

4    Q.   In fact, there's a number of different pages to this.  Can

5    you flip through that, please, and look up when you've looked

6    at those.

7    A.   Okay.

8    Q.   What kind of document do you understand this to be?

9    A.   Availability sheet.

10   Q.   Did you say "availability sheet"?

11   A.   Uh-huh.

12            MR. FALLER:  I apologize.  What number are we on?

13            MR. DELAHUNTY:  Exhibit 103.

14   Q.   And generally speaking, what information is shown in

15   what's been marked as Exhibit 103?  Not the detail, just

16   generally what was shown.

17   A.   Room occupied and room available.

18   Q.   Did you say the room occupied and who occupied it?

19   A.   Room occupied and available rooms this shows.

20   Q.   Can you say that again a little more slowly, please?

21   A.   This is a form, availability sheet that shows occupied

22   guest and available rooms to rent.

23   Q.   And on the top of the first page on Government's Exhibit

24   103, there's a date.  Do you see that?

25   A.   Yes.

405

1   Q.  And does the information that's shown on the top page of

2   this document refer to that date?

3   A.  March 1st, '09.

4   Q.  Is the other information on this sheet about March

5   1st, '09?

6   A.  This is guest information, guest name there.

7   Q.  For that date?

8   A.  Yes.

9   Q.  Who would have filled this sheet out?

10  A.  Employee.

11  Q.  Would they have filled it out on March 1st?

12  A.  Yes.

13  Q.  They would have filled it out on the same day as the date

14  on the top right?

15  A.  Yes.

16  Q.  Did the motel keep a record of these documents or copies

17  of them?

18  A.  Records.  We keep records.

19  Q.  They kept the original?

20  A.  Yes.

21  Q.  Do they keep that in -- as part of running a motel?

22  A.  Yes.

23  Q.  Was it part of the normal operations of the motel to keep

24  a copy?

25  A.  Yes.

406

1        MR. DELAHUNTY:  Government would move into evidence

2   Government's Exhibit 103, Your Honor.

3        MR. FALLER:  No objection.

4        THE COURT:  It is admitted.

5        (Government's Exhibit 103 was received.)

6   BY MR. DELAHUNTY:

7   Q.   So on the top right, what day is shown?

8   A.   March 1st, '09.

9   Q.   Okay.  Let's look at the next page on the top right.  What

10  date is shown?

11  A.   March 2nd, '09.

12  Q.   And the third page?

13  A.   March 3rd, '09.

14  Q.   Let's look at the last page.  Do you see the date on the

15  top right of the last page of the document?

16  A.   Yes.

17  Q.   Can we take -- can I have a moment, Your Honor.

18       THE COURT:  Sure.

19       MR. DELAHUNTY:  Oh, there it is.  Okay.  Got that.

20  Q.   What is the date on the top right of the last page on the

21  document?

22  A.   March 31st, '09.

23  Q.   Can you take a moment to look through Government's Exhibit

24  103 and tell me if there is a sheet for every day of the month

25  in March of '09?  Just take a moment to flip through and see

407

1    if there's a sheet for every day of that month.  Okay?

2            Is there a sheet for every day of the month in

3    March '09?

4    A.  Yes.

5    Q.  Can you look at the first page of Government's Exhibit

6    103.  Do you have that in front of you?

7    A.  Yeah.

8    Q.  I'd like to make sure that -- I'd like to learn a little

9    bit more about what this sheet shows.  Okay?  So let's look at

10   on the top left, under the room number.  Do you see that?

11   A.  Yeah.

12   Q.  Does that refer to the hotel room number?

13   A.  Yes.

14   Q.  And then there's a number under that, do you see "102"?

15   A.  Yeah.

16   Q.  Does that refer to the room 102?

17   A.  Yes.

18   Q.  Do you see "K"?

19   A.  Yes.

20   Q.  What does that mean?

21   A.  King size.

22   Q.  The size of the bed?

23   A.  Size of the bed.

24   Q.  Do you see to the right of that, it says "N/S."

25   A.  Uh-huh.

408

1  Q.  What does that mean?

2  A.  Nonsmoking.

3  Q.  Do you see the next column says "C/O"?

4  A.  Yeah.

5  Q.  It's C slash O.

6  A.  Yeah.

7  Q.  What does that mean?

8  A.  Check out.

9  Q.  Okay.  Let's go down to room 102.  Do you see what's

10 written there?

11 A.  Yeah.

12 Q.  What does it say?

13 A.  "S/O."

14 Q.  What does that mean?

15 A.  Stay over.  Staying over, guest staying over.

16 Q.  So -- okay.  And the name right beside that is whose name?

17 A.  Guest name.

18 Q.  Let's go down to Room 112.  It's a little further down on

19 the left-side.  Do you see that?

20 A.  Yes.

21 Q.  And what is to the right of the 112?

22 A.  "QS."

23 Q.  What does that mean?

24 A.  Queen sofa.  Queen bed, one bed with sofa.  Couch.

25 Q.  Does -- how many beds would be in the room that said --

409

1    A.   One.   One queen size bed.

2    Q.   Right to the right of that, it says "C/O."  Do you see

3    that?

4    A.   Yes, sir.

5    Q.   And what does that mean?

6    A.   Check out.

7    Q.   And to the right of that it says a name; correct?

8    "Brown"?

9    A.   Yes, that's guest name.

10   Q.   We're looking at March 1st, '09's availability sheet.  And

11   it shows -- says "Brown" in Room 112; right?

12   A.   Yes.

13   Q.   When would Mr. Brown or Ms. Brown, whoever it was, when

14   would they have checked out according to this sheet?  What

15   day?

16   A.   2nd, March 2nd, '09.

17   Q.   Okay.  I'd like you to flip now forward to the

18   availability sheet contained in Government's Exhibit 103,

19   which says at the top right "3/28/09."  Do you see that?

20   A.   103?

21   Q.   We're in Exhibit 103.  And on the top right, the sheet

22   that is dated 3-28-09.

23   A.   Okay.

24   Q.   I'd like -- does this also show the room availability on

25   March 28th, '09?

410

1    A.   Yeah.

2    Q.   I'd like you to look at the room number 221.  Do you see

3    that?

4    A.   Yes.

5    Q.   Did I circle on your screen towards the middle right, Room

6    221?

7    A.   Yes, sir.

8    Q.   I'd like to ask you about that.  Do you understand 221 is

9    referring to the room number?

10   A.   Yeah.

11   Q.   What does it say to the right of that?

12   A.   Queen size, one bed.

13   Q.   It says "QS"?

14   A.   Yeah.

15   Q.   What does that mean?

16   A.   Queen sofa bed, one bed.

17   Q.   I just want to make sure I heard you right.  You mean one

18   bed in the room?

19   A.   Yes.

20   Q.   And then do you see that, it says "N/S"?

21   A.   Right.

22   Q.   What does that mean?

23   A.   Nonsmoking.

24   Q.   What does it say to the right of that in the next column?

25   A.   Checkout, "C/O."

Shihora - D.

411

1   Q.  And whose name is to the right of that?

2   A.  McCormack.  Guest name.

3   Q.  On the basis of what you see on this document, what date

4   would the guest, Mr. McCormack, have checked out?

5   A.  March 29, '09.

6   Q.  Can you take that off the screen, please.  Actually, I'm

7   sorry, can we see that again, please?  3-28.

8          Mr. Shihora, I think you said -- testified to this,

9   but who would have filled this out?

10  A.  The employee.

11  Q.  Do you see where it says the guest name for Room 221?

12  A.  Uh-huh.

13  Q.  Do you see how it's spelled?

14  A.  Right.

15  Q.  Am I right that it's spelled M-C-C-O-R-W-A-C-K?

16  A.  Yeah, look like.

17  Q.  I want to go back and look at Government's Exhibit 104.

18  Do you have that?  And you see that this shows the name at the

19  top right?

20  A.  Right.

21  Q.  And you see how it spells the guest name?

22  A.  Yeah.

23  Q.  And how is the guest name spelled on this page?

24  A.  Shawn, S-H-A-W-N, M-C-C-O-R- --

25  Q.  What's the next letter?

1   A.   Look like "M" or "N."

2   Q.   Can you tell what the next letter is?

3   A.   C-K.

4   Q.   And --

5   A.   M-A-C-K.

6   Q.   Did you have some trouble reading that?

7   A.   Yeah.  I could not read the "M" or "N."

8   Q.   Would an employee have used that handwriting to fill out

9   the other sheets that we looked at in Government's Exhibit

10  101, 102 and 103?

11  A.   I'm sorry.  Can you repeat again?

12  Q.   Would an employee have read that and used what they read

13  to fill out Government Exhibits 101, 102 and 103?

14  A.   They go from there.

15  Q.   So do you know why the spelling is a little different on

16  104 versus what's shown in 103?

17  A.   I believe it's human error, something.  Spelling mistake.

18  Q.   Did you say spelling mistake?

19  A.   Uh-huh.

20  Q.   Okay.  Can we take that down, please.

21       You mentioned this earlier, but you were the co-owner

22  from 1999 to 2010; correct?

23  A.   Yeah.

24  Q.   During your time as a co-owner, did the hotel undergo any

25  renovations?

1   A.   No.

2   Q.   There were no remodelings of the room?

3   A.   2006 and '7.  Not after that.

4   Q.   So there was a remodeling in 2006, 2007?

5   A.   Yes.

6   Q.   What was remodeled?

7   A.   We changed carpet, furniture, tiles, countertop, bedding,

8   bedspread.  Most of the rooms we changed.

9   Q.   Do you know if the rooms were remodeled again after that?

10  A.   No.

11  Q.   They were not?

12  A.   Not when I was owner.

13  Q.   I want to make sure I understand your answer.  When you

14  were owner, the only time that they were remodeled was in

15  2006/2007?

16  A.   Yes.

17  Q.   My last set of questions to you is just about how your

18  hotel or motel advertised; okay?

19  A.   Okay.

20  Q.   And I want to ask you about the time period of 2008 and

21  2009 specifically.  Okay?

22  A.   Okay.

23  Q.   During that time period, how did the motel advertise to

24  potential guests?

25  A.   We have a lot of sources we was going through advertising.

1  CheapOair.

2  Q.  Any others?

3  A.  And Expedia.com is part of Hotel.Com.  Then we go Yellow

4  Pages and one more was that called the Hotel Guide.

5  Q.  And do you know if the Hotel Guide, with your hotel

6  listing, was available to people in Arizona and Nevada?

7  A.  Yes.

8  Q.  And when you said Expedia and Hotel.com, were you

9  referring to websites?

10 A.  Yes.

11 Q.  And those websites, to your knowledge, were available

12 online?

13 A.  Yes.

14 Q.  In your experience, did you get guests who stayed at your

15 inn that were from other states?

16 A.  All the time, yes.

17        MR. DELAHUNTY:  May I have a moment to confer, Your

18 Honor?

19        THE COURT:  Yes.

20        MR. DELAHUNTY:  Nothing further from the government

21 on this witness, Your Honor, at this point.

22        THE COURT:  Cross-examination.

23                    CROSS-EXAMINATION

24 BY MR. FALLER:

25 Q.  I'd like to refer you back to Exhibit 104, the check-in

1   card.  So I believe you just said that an employee would give

2   this card to the guest when they came in; is that right?

3   A.  Yes, sir.

4   Q.  And the employee was instructed by you as part of their

5   duties to make sure that the guest filled in all the

6   information on the left-hand side of the card, such as their

7   address, their phone number, any vehicle they had, things of

8   that nature; correct?

9   A.  Yes, sir.

10  Q.  So as far as this particular guest registration 104 is

11  concerned, the employee did not follow those instructions;

12  correct?  Because this is an incomplete document; isn't it?

13  A.  That's -- most we train them is to get the name and an ID.

14  If they put their own information, sometimes they don't fill

15  out.  That's why ID is second thing they have to ask for, and

16  the ID copy they make.

17  Q.  Okay.  But I mean in the information area of the

18  registration that you have testified is supposed to be filled

19  out by the guest, other than "California" and a zip code and a

20  signature and number in party, none of that information is

21  filled in by the guest, correct?

22  A.  No.

23  Q.  And the employees were supposed to make sure they did

24  that; didn't they?  Weren't they?

25  A.  If they have ID and put their information, they have to

416

1   look for it first thing.  If the customer is missing, they go

2   with the ID and then they got signature and name.  Then they

3   go from the ID information.

4   Q.  Well, as a matter of fact, here the city and -- it says

5   State, California and a zip code.  That's different than what

6   appears on the ID; isn't it?  This is an Arizona driver's

7   license with a Tucson, Arizona address; correct?

8   A.   ID is Arizona.

9   Q.  Yeah.  So that's different with the little bit that's

10  filled in on the guest registration; isn't it?

11  A.  Easily -- can I explain more about this?

12  Q.  Sure.

13  A.  Because this happen --

14          THE COURT:  Back away from the microphone.

15          THE WITNESS:  People moving.  They say "I'm moving

16  from Arizona to California."  They fill out what they like to

17  fill out on the card and then they give us -- ask for an ID,

18  then say ID is different because they moved out from there and

19  we live in California.  That happened in the past.

20  BY MR. FALLER:

21  Q.  So what you're saying now is that the personal information

22  that's supposed to be on the registration card, that the guest

23  does not have to fill that out if they don't want to?

24  A.  They have to fill out the guest registration card

25  completely.

1  Q.  But this isn't filled out completely, is it?

2  A.  No.  But it's part of the process they have to fill out

3  completely by the guest.

4  Q.  Okay.  And that wasn't done here; correct?

5  A.  I don't see it done here.

6  Q.  So the employee didn't follow their instructions and their

7  training in filling -- in having this guest card filled out;

8  correct?

9  A.  Right.

10  Q.  Now, these two, how were -- once these records were

11  created, you said they were stored.  How were they stored?

12  A.  We stored all the business daily activity reports, put

13  them in a file and keep the record.

14  Q.  I'm talking about the guest cards.

15  A.  Yes.

16  Q.  How were they stored?

17  A.  We stored in the monthly basis.

18  Q.  Did you put them in a box?

19  A.  Yes.

20  Q.  And how is the copy of whatever ID was associated with the

21  guest card, how was that attached to the guest card?

22  A.  They attach to the guest card.

23  Q.  How?

24  A.  Stapler.

25  Q.  Stapler.  So these two items here that we see on Exhibit

1    104, those were actually two different pages when they were

2    created; correct?

3    A.   This -- I'm talking about 104.  I'm looking here.

4    Q.   Yes.

5    A.   This is two pages because the ID copy would made separate.

6    We don't make ID copy with the registration card.

7    Q.   Exactly.

8    A.   But we attach.  After the copy we made, then we attach it

9    with the registration.

10   Q.   And our --

11   A.   It is the second page.

12   Q.   They're supposed to be stapled together.

13   A.   Stapled or rubber band.  It don't have to --

14   Q.   Rubber band.  Okay.

15   A.   Yeah.  Paperclip.

16   Q.   Is there anything about this document 104 that indicates

17   what time the guest checked in?

18   A.   No.

19   Q.   Now, I'd like to refer to, now, Exhibit 101, which is the

20   daily report.  And then I'd also like to refer to the page in

21   Exhibit 103 that bears the date March 28th, '09.

22            THE CLERK:  Which exhibit is that?

23            MR. FALLER:  That is a page of 103.

24            THE CLERK:  Thank you.

25   ///

Shibata X

419

1    BY MR. FALLER:

2    Q.   Okay.  Do you have those two?

3    A.   103, yes.

4    Q.   Okay.  Do you have the page that says 3-28-09 at the time

5    of page 103?

6    A.   Exhibit 103?

7    Q.   Yes.

8    A.   You want to look on the screen or here?

9    Q.   Either way.

10   A.   March 28.

11   Q.   Yes.  Okay.  Now, I see, according to how I understand

12   that the records of the motel are to be kept, that the

13   information on the availability sheet should be the same as

14   the information on the handwritten daily report; is that

15   right?  Which is 101.

16   A.   Right.

17   Q.   Now, I've circled, down on the availability sheet, a name

18   of "Ruiz" down there in Room 230.

19   A.   Yes.

20   Q.   Does the name "Ruiz" appear on the daily report of

21   3-28-09, Exhibit 101?

22   A.   Yes.

23   Q.   Where is it?

24   A.   3-28.

25   Q.   No.  But on Exhibit 101.  What number is Mr. or Ms. Ruiz?

1   A.   103.   103.   I can see right here.

2   Q.   Right.   It's on 103.

3   A.   Exhibit 103.

4   Q.   I want you to tell me where it is on 101.

5   A.   Oh, 101.   Okay.   It's daily report.

6   Q.   Correct.   Where do you see the name "Ruiz" on there?

7   A.   Can you do the screen?

8   Q.   I don't know.

9        MR. DELAHUNTY:   Is he asking for it to be on the

10  screen?

11       MR. FALLER:   I can do that.   This is Exhibit 101 out

12  of my binder.   But it is quite small.

13  Q.   So I'm looking at the left-hand column where it says

14  "guest name."   And I don't see a "Ruiz" listed from.

15  A.   It's item number 6.

16       MR. DELAHUNTY:   Your Honor --

17       THE WITNESS:   It is there.

18  BY MR. FALLER:

19  Q.   That's there?

20       MR. DELAHUNTY:   Could we see the actual exhibit

21  that's been introduced and shown on the screen, please?   103

22  or 101.

23       THE WITNESS:   It's right there.

24  BY MR. FALLER:

25  Q.   It's in red?

1   A.   Yes.

2   Q.   Why is it in red?

3   A.   Nothing, just used a different pen.

4   Q.   Oh, okay.  Now, the folio number listed for Mr. McCormack

5   there is 079 on Exhibit 101.  Is that correct?

6   A.   Exhibit 101?

7   Q.   Yes.

8   A.   0179.

9   Q.   Now, on the computerized daily report that is Exhibit 102.

10   A.   Yes, sir.

11   Q.   There appear to be 18 -- excuse me, appear to be 19 guests

12   listed there for 3-28-09.  Is that correct?

13   A.   The list in order is 19 is not correct because guest is

14   not 19 there.

15   Q.   Say again, please.

16   A.   There's no guest 19 stayed that day.  Because if you see

17   line third from the top, Room 112, the check out is

18   showing --

19            THE COURT:  You need to move back.

20            THE WITNESS:  -- no daily activity there.  He's gone.

21   BY MR. FALLER:

22   Q.   So how many rooms were occupied that day?

23   A.   15.

24            MR. FALLER:  That's all I have, Your Honor.

25            THE COURT:  Redirect.

1          MR. DELAHUNTY:  Briefly, Your Honor.  Thank you.

2                    REDIRECT EXAMINATION

3   BY MR. DELAHUNTY:

4   Q.  First of all, Mr. Shihora, in your experience as the

5   co-owner of your hotel, did police from Bakersfield Police

6   Department or other law enforcement agencies ever come to your

7   hotel and ask you about your records?

8   A.  Yes.  A lot of times.

9   Q.  Why did they do that?

10          MR. FALLER:  I'm going to object.  Relevance.

11          THE COURT:  Sustained.

12  BY MR. DELAHUNTY:

13  Q.  Did you keep your motel guest records to help assist law

14  enforcement officers?

15  A.  Yes.

16          MR. FALLER:  Objection.

17          THE WITNESS:  Well, when they asked.

18  BY MR. DELAHUNTY:

19  Q.  In your experience managing the hotel, in responding to

20  such questions from police, did they complain to you that your

21  hotel records were inaccurate?

22          MR. FALLER:  Objection.

23          THE WITNESS:  No.

24          MR. FALLER:  That calls for hearsay.

25          THE COURT:  Sustained.

Shibata - RD

423

1   BY MR. DELAHUNTY:

2   Q.  I'd like you to look at 104 again, please.  Do you see

3   that?

4   A.  Right.

5   Q.  What's the name on the top of that guest registration

6   card?

7   A.  Shawn Mc -- Mc -- sorry for my language.  But

8   it's -- pronunciation is not good, I'm sorry about that.

9   McCormack.

10  Q.  What room number does it show for that guest?

11  A.  221.

12  Q.  Is there a driver's license at the bottom?

13  A.  Yes.

14  Q.  What is the name on that driver's license?

15  A.  Shawn Joseph McCormack.

16  Q.  Is there a picture on that driver's license?

17  A.  Yeah.

18  Q.  Did you train employees to look at the picture on the

19  driver's license?

20  A.  Yes.

21  Q.  Did you train your employees to see if that matched the

22  person that was handing them the driver's license?

23  A.  Yes.

24  Q.  If you look at the Exhibit Number 101.

25  A.  Okay.

424

1    Q.   Actually can we go back to 104.   What is the check-in date

2    shown for Shawn McCormack on that date?

3    A.   March 28, '09.

4    Q.   What is the check out date?

5    A.   March 29, '09.

6    Q.   You go to Exhibit 101.

7    A.   Okay.

8    Q.   And you go to line 14.

9    A.   Yes.

10   Q.   What is the name shown there?

11   A.   McCormack.

12   Q.   What is the room number?

13   A.   221.

14   Q.   What day is this on?

15   A.   March 28, '09.

16   Q.   What day would this guest have checked out, according to

17   this document?

18   A.   March 29, '09.

19   Q.   You go to Exhibit Number 102, please.   Do you see line 17?

20   Does that have the same information regarding the guest Shawn

21   McCormack in Room 221 as the last two documents we looked at?

22   A.   Yes, sir.

23   Q.   Can you go to Exhibit Number 103 and to the page that has

24   3-28-09 on it?   Do you see Room 221 and a guest name?

25   A.   Yes.

425

1    Q.  That guest name, is it the same information that was shown

2    in the last three exhibits we just looked at?

3    A.  Yes, sir.

4    Q.  I'd also like you to look at the next date, 3-29.  Does

5    this day show anyone checking in in Room 221 on 3-29?

6    A.  No.

7    Q.  Can you go to the next day, 3-30.  Does this show any

8    guest checking in Room 221 on 3-30?

9    A.  No.

10   Q.  Can you go to the next page, 3-31.  Does this show any

11   guest checking in on Room 221 on 3-31?

12   A.  No.

13   Q.  Let's go backwards.  Can you go back to 3-28 again.  Can

14   you go back one more to 3-27.  Does this show any guest

15   checking in Room 221 on 3-27-09?

16   A.  No.

17   Q.  Can you go back one more day, please.  Does this show any

18   guest checking in Room 221 on 3-26-09?

19   A.  No.

20   Q.  Can you go back one more day, please.  Does this show a

21   guest checking in Room 221 on 3-25-09?

22   A.  Yes.

23   Q.  Does it show when that guest would have checked out?

24   A.  Yes.

25   Q.  What day would that guest have checked out?

426

1   A.   March 26th, '09.

2   Q.   What is that guest's name?

3   A.   Hernandez.

4            MR. DELAHUNTY:  No further questions.

5            MR. FALLER:  No more questions, Your Honor.

6            THE COURT:  Either party wish this witness remain

7   subject to recall?

8            MR. DELAHUNTY:  The government does not, Your Honor.

9            MR. FALLER:  No, Your Honor.

10           THE COURT:  All right.  You are excused.  Thank you

11  very much.

12           All right.  It's a little after three o'clock.

13  Members of the jury, we'll go ahead and take our afternoon

14  recess.  Remember those admonishing instructions and we'll be

15  in recess.

16           (The jury left the courtroom.)

17           THE COURT:  All right.  The jury has left for its

18  recess.  Anything we need to take up before we take our break?

19  Plaintiff's side, anything?

20           MR. DELAHUNTY:  Not at this time, Your Honor.

21           THE COURT:  Defense?

22           MR. FALLER:  No, Your Honor.

23           THE COURT:  All right.  15 minutes.

24           (Recess.)

25           THE COURT:  We're back on the record.  Anything

1   before we have the jury come back in?

2           MR. DELAHUNTY:  Nothing from the government, Your

3   Honor.

4           MR. FALLER:  No, Your Honor.

5           THE COURT:  All right.  We'll have the jury come in.

6           (The jury entered the courtroom.)

7           THE COURT:  The jury is present.  Please be seated.

8   We'll continue the next witness.

9           MS. RICHARDS:  The United States calls Special Agent

10  Veronica Pike.

11                      **VERONICA PIKE**,

12  called as a witness on behalf of the Government, having been

13  first duly sworn, testified as follows:

14          THE CLERK:  Please have a seat.  State your full name

15  for the record and spell it.

16          THE WITNESS:  My name is Veronica Pike,

17  V-E-R-O-N-I-C-A P-I-K-E.

18                     DIRECT EXAMINATION

19  BY MS. RICHARDS:

20  Q.  Good afternoon, Agent Pike.  What do you do for a living?

21  A.  I am a criminal investigator, special agent with Homeland

22  Security Investigations, Department of Homeland Security.

23  Q.  And what are your duties as a special agent?

24  A.  I investigate any crimes regarding international traffic

25  as well as child exploitation crimes within Kern and Inyo

1    County.

2    Q.   And are you the case agent for this case?

3    A.   I am, yes.

4    Q.   How did you first come to investigate Shawn McCormack?

5    A.   On September 9th, 2011, I was contacted by Agent Squire of

6    our Boston office.

7    Q.   And what did Agent Squire ask you to do?

8    A.   Agent Squire requested my assistance with serving the

9    California Best Inn at 1030 Wible Road in Bakersfield,

10   California with a grand jury subpoena.

11   Q.   Is Bakersfield, California in the Eastern District of

12   California?

13   A.   Yes, it is.

14   Q.   And did you serve that subpoena at California Best Inn?

15   A.   I did, yes.

16   Q.   And in response to the subpoena, what did you receive?

17   A.   The subpoena was for guest records associated around March

18   28th, 2009 for the California Best Inn.

19   Q.   And as part of those records, what did you receive?

20   A.   I received a box of guest records spanning from January to

21   March of 2009.

22   Q.   And other than serve that subpoena for records, did Agent

23   Squire ask you to do anything else in relation to the

24   California Best Inn?

25   A.   Yes.  Agent Squire informed me that a child pornography

429

1  video had been found and he believed that the setting, the

2  scene of that video was a room at the California Best Inn.  He

3  requested my assistance with trying to pinpoint the specific

4  room the video was made in.

5  Q.  And what, in particular, did he want you to do?

6  A.  He wanted me to take a look at the furnishings, the

7  carpet, the layout of the rooms, the countertops, everything

8  within the rooms.

9  Q.  Did he give you anything to help you look for those

10  things?

11  A.  Yes.  He provided me with several images, sanitized images

12  of a victim, screen captures that were taken from the video

13  itself and a diagram depicting the layout of the room.

14  Q.  Can we please put up Government's Exhibit 89 and 90.

15          Agent Pike, are these two of the images that Agent

16  Squire sent to you?

17  A.  Yes, they are.

18  Q.  And what did you understand the purpose of these images to

19  be?

20  A.  My understanding was that they were to help me identify

21  the specific room within the California Best Inn that the

22  video was made.

23  Q.  And did you use these images?

24  A.  Yes, I did.

25  Q.  And after receiving these images, what did you do next?

430

1   A.   I looked at all of the rooms, the guest rooms at

2   California Best Inn, comparing them to this diagram, this

3   picture of the granite.

4   Q.   In general, did the rooms at the California Best Inn

5   appear to match the room in the diagram?

6   A.   Yes.  All the rooms at the California Best Inn have the

7   same carpet and bedspread and furniture style.  The layouts

8   were different, could be different from room to room.

9   Q.   And did the carpet match the carpet in this diagram in

10  Exhibit 89?

11  A.   Yes.  Yes, this carpet right here.

12  Q.   And is that the carpet with the swirl pattern?

13  A.   Yes, it is.

14  Q.   And did the bedspreads match the bedspreads on this

15  diagram?

16  A.   Yes.

17  Q.   And did the furniture look similar to the furniture in

18  this diagram?

19  A.   Yes.  The headboard, the TV stand over here and the

20  nightstand were of the same style.

21  Q.   Okay.  And once you determined that you thought that the

22  hotel was a match, did you try to narrow down the search any

23  further?

24  A.   Yes.  First, I looked at rooms who had a similar layout as

25  the one in the diagram here, namely where this back wall is

1    here that separates the bathroom from the bedroom.  I'll try

2    and highlight it if I can.  Rooms that had that wall on the

3    right-hand side as you entered the room and had the sink and

4    vanity over here.  And the rooms that were set up to have a

5    bedroom on the right-hand side like you see here.

6    Q.   At some point did you find a room that you thought might

7    be a match?

8    A.   Yes.

9    Q.   What room was that?

10   A.   Room 221.

11   Q.   Did you take any pictures of Room 221?

12   A.   I did, yes.

13   Q.   Can you look in the binder in front of you at Exhibits 94,

14   95 and 96?

15   A.   Yes.

16   Q.   Do you recognize those exhibits?

17   A.   I do, yes.

18   Q.   What are they?

19   A.   They're photographs that I took of Room 221.

20   Q.   And are they true and accurate depictions of Room 221 at

21   the California Best Inn?

22   A.   Yes, they are.

23            MS. RICHARDS:  The government moves to admit

24   Government Exhibits 94, 95 and 96.

25            MR. FALLER:  No objection, Your Honor.

432

1           THE COURT:  They are admitted.

2           (Government's Exhibits 94, 95 and 96 were received.)

3    BY MS. RICHARDS:

4    Q.  Let's put up Government Exhibit 94.  Agent Pike, what is

5    depicted here?

6    A.  It's the door to Room 221.

7    Q.  Okay.  And why did you take this picture?

8    A.  Oh, when I was taking pictures of the rooms, I separated

9    them by taking a picture of the door first and then taking

10   pictures of the room so I didn't confuse the room pictures.

11   Q.  Let's go to the next exhibit, Exhibit 95.  What is

12   depicted here?

13   A.  That is the interior of Room 221 if you're

14   standing -- just as you come in to the door and then to the

15   right.

16   Q.  Okay.  And do you see anything in this picture that

17   appeared to be similar to the diagram?

18   A.  Yes.  I saw that the bedspread was very similar to the

19   diagram.

20   Q.  And can we put the diagram up next to this, Government

21   Exhibit 89.

22           Okay.  Agent Pike, can you show the similarities on

23   the exhibits on the screen by using your finger to circle

24   them?

25   A.  Sure.  For instance, the bedspread here matched -- or

1   appeared to match the bedspread here.  Although it's a little

2   dark, this carpet here looked like this carpet here, had the

3   same swirl pattern.  This nightstand -- or excuse me, chest of

4   drawers with a TV on it was right here.  This picture, you

5   can't see it in this picture, but it's actually above the

6   headboard, above the bed over here.  The countertop here was

7   here.  The dividing wall along with the thermostat is here.

8   This headboard -- again, you can't see it, but it's abutting

9   this wall over here.  And next to it is a similar nightstand

10  with a phone on top of it.

11  Q.  Is there anything in the picture on the left, which is

12  Exhibit 94 -- 95, sorry.  Exhibit 95.  Is there anything in

13  Exhibit 95 that you paid particular attention to?

14  A.  Yes.

15  Q.  What was that?

16  A.  It was the granite pattern on the countertop by the sink.

17  Q.  And did you compare this granite countertop to anything

18  else that you had from any source?

19  A.  Yes.  Agent Squire had provided me with a slightly

20  lightened screen capture from the video which depicted the

21  granite countertop and showed the particular stain on it.

22  Q.  Can we please put up Government's Exhibit 90 on the

23  right-hand side.  And 95 on the left.  Can you

24  show -- actually, let's go on to 96 on the left.

25          Okay.  Agent Pike, can you circle with your finger

434

1    the patterns that you saw in the granite in the hotel room?

2    A.   Yes.  The most distinctive pattern that we saw, that we

3    all noticed was this particular sort of peach colored stripe

4    going from high left down to low right.  It starts out kind of

5    narrow and then widens as it goes.  We noticed a similar

6    pattern was right here.

7    Q.   Did you check the granite slabs in the other rooms of the

8    hotel?

9    A.   Yes, I did.

10   Q.   Did you find this pattern on any of the other slabs?

11   A.   No, I did not.

12   Q.   At a later date, did you return to Room 221 to take any

13   other pictures?

14   A.   Yes, I did.

15   Q.   Can you please look at Government's Exhibit 97 in front of

16   you.

17   A.   Okay.

18   Q.   And what does that picture depict?

19   A.   That is a picture of the bathroom in Room 221 at the

20   California Best Inn.

21   Q.   And did you take that picture?

22   A.   I did, yes.

23   Q.   And is it a true and accurate depiction of the bathroom as

24   you found it?

25   A.   Yes.

435

1          MS. RICHARDS:  The government moves into evidence

2    Government Exhibit 97.

3          MR. FALLER:  No objection.

4          THE COURT:  It is admitted.

5          (Government's Exhibit 97 was received.)

6    BY MS. RICHARDS:

7    Q.  Can we please put up 97 on the screen.  Agent Pike, what

8    are we looking at on the screen now?

9    A.  That is the picture I took of the bathroom in Room 221.

10   Q.  And why did you take a picture of this bathroom?

11   A.  We -- one of the videos that was found associated with the

12   Swirl Carpet series was a video of a young boy being urinated

13   on in a bathtub.

14   Q.  And did you have an occasion to compare the picture that

15   you took of Room 221 to any image of the boy being urinated on

16   in a bathtub?

17   A.  Yes, I compared it with the video and screenshots from the

18   video.

19   Q.  Can we please put up Government's Exhibit 55 next to

20   Exhibit 97.

21          Does this appear to be a screenshot from that video?

22   A.  Yes, it is.

23   Q.  And is it redacted?

24   A.  Yes, it is.

25   Q.  Okay.  Can you compare the screenshot to the picture you

436

1  took and point out any similarities that you see?

2  A.  Yes.  The curtain here is a sort of peachy blushy color,

3  very similar to this color here.  The tile here --

4  sorry -- it's a sort of lighter color tile with dark grout,

5  similar to here.  You can't -- you can kind of see it in my

6  picture, there's actually grooves on the bottom of the bathtub

7  here, which you can see in the video as well.  Also the soap

8  rack here is in a similar location in the video.

9  Q.  After locating Room 221, which you believe to be the room

10  from the video, what did you do next?

11  A.  I then went back to the records that I received from the

12  California Best Inn looking for guests that had stayed there

13  the morning of the 28th.

14  Q.  Okay.  What did you learn when you looked at those

15  records?

16  A.  I learned that nobody had stayed there the night of March

17  27th, morning of 28th.  But somebody had stayed in that room

18  on the night of the 28th, morning of the 29th.

19  Q.  And who had stayed there?

20  A.  Shawn McCormack.

21  Q.  Let's put up Government's Exhibit 101.

22        Agent Pike, can you indicate on this record where you

23  saw a guest in Room 221?

24  A.  Right here.

25  Q.  Okay.  And when you first read this, did you believe it

1    said "McCormack" there?

2    A.   Yes.  I had other documents that I had a better spelling

3    on.

4    Q.   Can we turn to Government's Exhibit 102.  Did you look at

5    this record?

6    A.   Yes, I did.

7    Q.   And can you show where it says "Shawn McCormack" on this

8    record?

9    A.   That's fine.  I can see it.  Right here.

10   Q.   And let's move on to Government's Exhibit 103.  During

11   your search, what did you understand this record to be?

12   A.   My understanding was that it was availability sheets that

13   were made for each day.  Any time a guest would check in,

14   their name would be placed next to their room and it would let

15   the hotel owners know which rooms had occupants and which ones

16   did not.

17   Q.   Did you use this record during your search?

18   A.   Yes, I did.

19   Q.   And do you recall on which date, if any, you saw Shawn

20   McCormack on the room availability sheet?

21   A.   It would have been the night of March 28th.

22   Q.   Can we please go to March 28th in this document.  Agent

23   Pike, is this the correct date?

24   A.   Yes, it is.

25   Q.   Do you see Shawn McCormack on this sheet?

438

1    A.   Yes, I do.

2    Q.   Can you circle where that is?  And what room does it say

3    that he was staying in?

4    A.   Room 221.

5    Q.   From your review of the records, had any other person

6    rented the room -- rented Room 221 in close proximity to March

7    28th, 2009?

8    A.   Reviewing the availability sheets for the whole month,

9    nobody had stayed in Room 221 in the days after McCormack

10   throughout the month of March.  And I think the earliest one

11   prior was March 25th.

12   Q.   Let's turn now to Government's Exhibit 104.  Did you

13   utilize this document during your investigation?

14   A.   Yes, I did.

15   Q.   And where did you get this document?

16   A.   I received it from the California Best Inn.

17   Q.   And how did you use this document?

18   A.   I -- once we realized that Room 221 was the likely scene

19   of the video, I looked at this, noticed that an individual

20   named Shawn McCormack, who had provided a zip code of 91740

21   was -- had been the resident of the room that night.

22        Using public records, databases, I looked for an

23   individual named Shawn McCormack who had lived in that zip

24   code.  I got records -- or I found records showing a Shawn

25   McCormack with the same date of birth as on the driver's

1    license, which is 9-23-83, who had lived in various places,

2    including Bakersfield and Glendora, California, which is near

3    Pasadena, that has the same zip code.

4    Q.  Do you remember any of the other places that you saw in

5    the record search where this individual had lived?

6    A.  He had lived in various places, Glendora, Bakersfield,

7    some in Tucson and then in Colorado Springs.

8    Q.  And after finding this individual, what did you do next?

9    A.  I ran the name and the date of birth through various law

10   enforcement databases.

11   Q.  And did you have any hits?

12   A.  Yes, I did.

13   Q.  And did you learn that he was the subject of an

14   investigation at one point?

15   A.  Yes.  I learned that he was the subject of an

16   investigation in Colorado Springs, Colorado.  And also there

17   had been an incident involving him in Bakersfield in November

18   of 2009.

19   Q.  And without going into the subject matter of that

20   Bakersfield investigation, did what you see in the database

21   lead you to draw any conclusions about Shawn McCormack's

22   access to children?

23        MR. FALLER:  Your Honor, I'm going to object to that.

24   It's an improper opinion.

25        THE COURT:  Foundation.

1          MR. FALLER:  No foundation.

2          THE COURT:  Sustained.

3    BY MS. RICHARDS:

4    Q.  After you found -- after you found a record for Shawn

5    McCormack in Bakersfield, what did you do next?

6    A.  I looked up the incident report related to the incident.

7    Q.  Okay.  And did you -- were you able to contact anybody

8    that had been involved in that incident?

9    A.  Yes.  I contacted Ashley Karen.

10   Q.  Okay.  And who is Ashley Karen?

11   A.  She was the girlfriend/wife, eventual wife of Andrew, who

12   was a friend of Shawn McCormack.

13   Q.  Were you able to ascertain whether they knew Shawn

14   McCormack?

15   A.  Yes, I was.

16   Q.  And did you meet with them?

17   A.  I did, yes.

18   Q.  And when you met with them, what did you do with them?

19   A.  I met with them.  And then I showed Ashley Karen several

20   photographs that I had been provided by Boston that showed

21   sanitized images, which I showed to her in increments.  I

22   showed her first a photograph of some objects in a room.

23   Q.  Can we put up Government's Exhibit 92.

24         MR. FALLER:  Your Honor, I'm going to object if

25   there's going to be testimony as to what this person said

1    about the photographs.  I assume she's going to testify.

2    Otherwise it's just hearsay.

3         THE COURT:  Sustained.

4    BY MS. RICHARDS:

5    Q.  Okay.  And so you showed -- you showed Ashley Karen

6    pictures that you received from Squire.  Did she recognize the

7    individual in the pictures?

8    A.  Yes.

9         MR. FALLER:  Your Honor, that's my same objection.

10        THE COURT:  Sustained.

11   BY MS. RICHARDS:

12   Q.  At some point did you learn the names of Ashley Karen's

13   children?

14   A.  Yes, I did.

15   Q.  And what were their names?

16   A.  She had a son named Ben and a daughter named Elizabeth.

17   Q.  Okay.  And did you ask Ashley Karen to provide you

18   anything as part of your investigation?

19   A.  Yes.  I asked her to provide me some family photographs of

20   both Ben and Elizabeth from around early 2009.

21   Q.  Okay.  And can you look at Exhibits 98 and 99 in the

22   binder in front of you.

23   A.  Okay.

24   Q.  And are those the photographs that she provided to you?

25   A.  Yes.

442

1          MS. RICHARDS:  The government moves to admit

2    Government's Exhibits 98 and 99.

3          MR. FALLER:  No objection.

4          THE COURT:  All right.  They are admitted.

5          (Government's Exhibits 98 and 99 were received.)

6    BY MS. RICHARDS:

7    Q.  Did you use either of these exhibits at any point in your

8    investigation?

9    A.  Yes, I did.

10   Q.  Can we please put up Government's Exhibit 99.

11         Who did you understand this picture to be of?

12   A.  Of Elizabeth.

13   Q.  Okay.  And did you use this exhibit in your investigation?

14   A.  I did, yes.

15   Q.  And how did you use it?

16   A.  I was informed that --

17         MR. FALLER:  Your Honor, again, I'm going to object.

18   This is all hearsay.  What she's informed of, I mean --

19         THE COURT:  Sustained.

20         MS. RICHARDS:  One moment, please.

21         THE COURT:  Sure.

22         MS. RICHARDS:  I have no further questions.  Thank

23   you.

24         THE COURT:  And cross-examination.

25         MR. FALLER:  No questions at this time, Your Honor.

443

1    I understand that the agent will be subject to recall.

2          THE COURT:  Yes.  You can go ahead and step down.

3    You're still under oath.  Both sides may call you back later

4    during the course of the trial.

5          THE WITNESS:  Thank you.

6          MR. DELAHUNTY:  Your Honor, the government calls its

7    next witness, Detective Robles.

8                          **ROBERT ROBLES**,

9    called as a witness on behalf of the Government, having been

10   first duly sworn, testified as follows:

11         THE CLERK:  Please have a seat.  State your full name

12   for the record and spell it.

13         THE WITNESS:  My name is Robert Robles, R-O-B-L-E-S.

14                     DIRECT EXAMINATION

15   BY MR. DELAHUNTY:

16   Q.  Detective Robles, are you currently employed?

17   A.  Yes.

18   Q.  Where do you work?

19   A.  For the Bakersfield Police Department.

20   Q.  How long have you worked at the Bakersfield Police

21   Department?

22   A.  For over ten years.

23   Q.  What is your current title?

24   A.  I'm a narcotics investigator in the detectives division.

25   Q.  Prior to that, what was your title?

444

1    A.   I was a patrol officer.

2    Q.   When you refer to "patrol officer," does that mean that

3    you would drive around in a police cruiser when on duty?

4    A.   Yes.

5    Q.   Were you on duty on the night of November 6, 2009?

6    A.   Yes.

7    Q.   Do you recall responding to an incident at 3913 Wilson

8    Road in Bakersfield, California?

9    A.   We weren't actually responding to an incident.  We were

10   just driving through the general area.

11   Q.   And did you become involved in an incident at that

12   address?

13   A.   Yes.

14   Q.   How did you become involved?

15   A.   We were flagged down by a female subject identified as

16   Ashley.

17   Q.   Approximately what time of day or night was this?

18   A.   It was about 0140 hours.

19   Q.   You mean 1:40 a.m.?

20   A.   Yes.

21   Q.   What kind of neighborhood was this?

22   A.   It's a residential neighborhood.  I believe it's mostly

23   single family residences.

24   Q.   When you were flagged down, were you near a particular

25   residence?

445

1  A.  We were near the north alley of Wilson at about Akers

2  Road.

3  Q.  You mentioned the first person you interacted with was a

4  woman named Ashley Karen?

5  A.  Correction.  Actually -- correction on my last answer, it

6  was the south alley.

7  Q.  But otherwise your first interaction was with a woman

8  named Ashley Karen?

9  A.  Yes.

10  Q.  When you first encountered her, how did she appear?

11  A.  She was hysterical.  She was in a very excited and panicky

12  state.

13  Q.  And how could you tell that?

14  A.  We were having trouble understanding what it was she was

15  trying to tell us.

16  Q.  Did you -- were you able to communicate with her?

17  A.  We were able to get that her two-year-old son was missing

18  from her residence.

19  Q.  Did she tell you when her son had gone missing?

20  A.  We weren't able to get that information from her.

21  Q.  Did you know if he was missing for a short time or a long

22  time?

23  A.  At that point we hadn't confirmed that he was missing yet.

24  Q.  Did you ask -- did you learn anything else from Ashley

25  Karen when you first spoke with her?

1   A.   No, not from our initial contact.

2   Q.   Did you speak with anyone else at the scene?

3   A.   Yes.

4   Q.   Who was that?

5   A.   Andrew.

6   Q.   Did you learn what his relationship was with Ashley Karen?

7   A.   It was either her husband or her live-in boyfriend, I

8   believe.

9   Q.   When you first interacted with Andrew, how did he appear?

10  A.   He appeared upset.

11  Q.   How could you tell that?

12  A.   Just his general mannerisms, I don't recall his specific

13  body language.  But he appeared upset.

14  Q.   Did you learn why he was upset?

15  A.   Yes.

16          MR. FALLER:  I'm going to object to that as hearsay.

17          THE COURT:  Overruled.  Go ahead.

18  BY MR. DELAHUNTY:

19  Q.   Did you learn why he was upset?

20  A.   Yes, I did.

21  Q.   Why was he upset?

22  A.   He stated his two-year-old son Benjamin was missing from

23  the residence.

24  Q.   Did you learn if anyone else was not present at the

25  residence that should have been present?

1   A.   Yes.

2   Q.   Who was that?

3   A.   That was Shawn.

4   Q.   Do you recall Shawn's last name?

5   A.   McCormack.

6   Q.   Did you attempt to make contact with Shawn McCormack?

7   A.   I asked Andrew to make contact with Shawn.

8   Q.   Do you know if contact was made with Shawn McCormack?

9   A.   Yes.

10  Q.   And how was that made?  Was it over the phone or another

11  means?

12  A.   Shawn was contacted on his cellular telephone.

13  Q.   Do you know what the -- what Shawn McCormack said at that

14  point in time?

15  A.   He stated he had left from the residence with Benjamin,

16  the missing two-year-old son, and they had gone to a nearby

17  convenience store to get something to drink and they would be

18  back in a few minutes.

19  Q.   Did Mr. McCormack arrive?

20  A.   Yes.

21  Q.   Did you make contact with Mr. McCormack?

22  A.   Yes, I did.

23  Q.   Do you see that individual in this courtroom today?

24  A.   Yes, I do.

25  Q.   Can you identify him please?

448

1  A.  The gentleman seated to my right, looks like a long sleeve

2  kind of a turquoise button-up shirt.  Shaved head.

3  Q.  Are you pointing toward defense counsel's table?

4  A.  Yes, I am.

5  Q.  Was anyone in the car with Mr. McCormack when you first

6  made contact with him?

7  A.  Yes.

8  Q.  Who else was in the car?

9  A.  Benjamin was.

10  Q.  How old was Benjamin, or how old did he appear to be to

11  you?

12  A.  About two years old.

13  Q.  Do you recall what he was wearing?

14  A.  He was only wearing a diaper.

15  Q.  Was he in a car seat?

16  A.  No.

17  Q.  Do you recall the vehicle that Mr. McCormack was driving

18  when he -- when you first encountered him?

19  A.  It was a white 1999 Chevrolet Silverado, a work truck.  I

20  believe it had a black ladder rack.

21  Q.  After Mr. McCormack arrived, did you speak with him?

22  A.  Yes, I did.

23  Q.  What did you ask him?

24  A.  I asked him to relay what had happened.

25  Q.  Did he tell you?

449

1   A.  Yes.

2   Q.  What did he tell you?

3   A.  He stated he had woken up about five minutes prior to

4   receiving a frantic telephone call from Andrew and that he had

5   decided he wanted to get something to drink from a nearby

6   store.  He stated as he was leaving, he observed Benjamin up

7   and walking towards him so he made what he called a stupid

8   decision to take Benjamin with him to the store.

9   Q.  In the course of your interaction with Mr. McCormack or

10  the agitated and excited parents of Ben and Elizabeth, did you

11  learn whether or not Mr. McCormack had permission to take Ben

12  with him?

13  A.  He did not have permission.

14          MR. DELAHUNTY:  May I have a moment to confer, Your

15  Honor?

16          THE COURT:  Yes.

17  BY MR. DELAHUNTY:

18  Q.  In your interactions with Mr. McCormack, did you ask him

19  where he resided?

20  A.  I believe at some point I did.

21  Q.  Did you learn where he resided?

22  A.  Yes.  I believe it was in Colorado.  I don't recall the

23  specific address.

24  Q.  Is there any documents that would help you, would refresh

25  your memory or jog your memory?

1   A.   I believe as part of my report, there may be his official

2   address under his identity.  If I may refer to it to refresh

3   my recollection.

4           MR. DELAHUNTY:  Your Honor, may I approach the

5   witness?  I'll first show defense counsel what I intend to

6   approach him with.

7           THE COURT:  Yes.

8   BY MR. DELAHUNTY:

9   Q.   Detective Robles, take a moment to look at that and let me

10  ask you a question after you've had a moment to look at it.

11  Okay?

12  A.   Okay.

13  Q.   Does that refresh your memory as to what address Mr.

14  McCormack told you that night?

15  A.   Yes.

16  Q.   Okay.  What address did Mr. McCormack give you that night?

17  A.   He gave a residence on Shoup Street in Colorado Springs,

18  Colorado.

19          MR. DELAHUNTY:  Okay.  Nothing further for Detective

20  Robles at this point, Your Honor, from the government.

21          THE COURT:  Cross-examination.

22          MR. FALLER:  Thank you, Your Honor.

23                        CROSS-EXAMINATION

24  BY MR. FALLER:

25  Q.   Detective Robles, after Mr. McCormack was contacted, about

451

1   how long was it before he returned to the residence?

2   A.  You mean from the telephone contact?

3   Q.  Yes.

4   A.  About one to two minutes.

5   Q.  So for lack of a better term, he came right back; is that

6   right?

7   A.  I would agree with that.

8   Q.  Okay.  When you encountered Andrew, the father, did you

9   notice whether he exhibited any symptoms of being under the

10  influence of alcohol or drugs?

11  A.  Not that I can recall.

12  Q.  Did you -- you obviously didn't perform any tests or do

13  anything like that with him, your whole focus was trying to

14  figure out where Ben was; correct?

15  A.  Yes.  Our only concern was the child.

16  Q.  Okay.  And now, when Ben and Mr. McCormack returned

17  together, did you notice any evidence of any trauma with Ben?

18  A.  No.

19  Q.  Did he appear to be afraid of Mr. McCormack?

20  A.  No.

21  Q.  Did he appear to be calm and comfortable in his presence?

22  A.  He appeared --

23  Q.  Is that correct?

24  A.  -- to be a good natured child, I don't recall his exact

25  demeanor.  But he seemed to be healthy and in good spirits.

452

1   Q.   Okay.  Healthy and in good spirits after being in the car

2   with Mr. McCormack; correct?

3   A.   Correct.

4   Q.   Did you -- did you examine the interior of Mr. McCormack's

5   vehicle at all?

6   A.   I viewed into it.  I don't know if -- how close of an

7   examination I did.  I had other officers there assisting me.

8   Q.   Do you know if anyone actually searched it?

9   A.   I don't recall.

10  Q.   To your knowledge, did anybody seize any camera equipment

11  or anything of that nature from the vehicle?

12  A.   Not that I'm aware of.

13  Q.   And when you -- when you talked to Mr. McCormack, he told

14  you that he had done something stupid in taking Ben with him

15  to the store?

16  A.   Correct.

17          MR. FALLER:  That's all I have at this point.

18          THE COURT:  And redirect.

19          MR. DELAHUNTY:  No redirect, Your Honor.

20          THE COURT:  All right.  Either party wish this

21  witness to remain subject to recall?

22          MR. FALLER:  I do, Your Honor.

23          THE COURT:  All right.  Either side may still call

24  you back to testify.  You're under oath.  But you may go ahead

25  and leave the courtroom.  I'll leave it to the attorneys to

453

1   let you know the date and time if necessary to return.

2            THE WITNESS:  Thank you, Your Honor.

3            THE COURT:  Thank you.

4            MS. CAIN:  Your Honor, the government calls its next

5   witness, Detective Adam Romine.

6                          **ADAM ROMINE**,

7   called as a witness on behalf of the Government, having been

8   first duly sworn, testified as follows:

9            THE CLERK:  Please have a seat.  State your full name

10  for the record and spell it.

11           THE WITNESS:  My name is Adam Romine, R-O-M-I-N-E.

12                    DIRECT EXAMINATION

13  BY MS. CAIN:

14  Q.  Good afternoon.

15  A.  Good afternoon.

16  Q.  Where do you work?

17  A.  I work for the Colorado Springs Police Department.

18  Q.  And how many years have you worked for the Colorado

19  Springs Police Department?

20  A.  Almost 15.

21  Q.  And what is your title with Colorado Springs Police

22  Department?

23  A.  Police officer.

24  Q.  During your time with Colorado Springs Police Department,

25  have you investigated child pornography crimes?

1    A.   I have.

2    Q.   And have you ever been assigned to a particular unit that

3    specializes in child pornography offenses?

4    A.   Yes.  From the end of 2004 until the end of 2013 I was

5    assigned to the Internet Crimes Against Children Unit.

6    Q.   And what were your primary duties and responsibilities

7    with Internet Crimes Against Children Task Force Unit?

8    A.   I was in charge of investigating technology facilitated

9    crimes against children.  So child prostitution, human

10   trafficking, child pornography, things of that nature.

11   Q.   And did that involve any peer-to-peer investigations?

12   A.   Large majority of it was, yes.

13   Q.   Would that include GigaTribe investigations?

14   A.   Yes, it did.

15   Q.   And through your time working child pornography

16   investigations, approximately how many child exploitation

17   investigations have you worked or assisted in working?

18   A.   Well over 500.  It's probably closer to 1,000, but a lot.

19   Q.   So taking you back to June of 2010.  Did you become

20   involved in an investigation involving Shawn McCormack?

21   A.   I did.

22   Q.   And do you see Shawn McCormack sitting in court today?

23   A.   I do.

24   Q.   And where do you see him?

25   A.   He's seated to my right.  He's wearing like a blue colored

455

1  shirt.  Has a shaved head.

2  Q.  How did you first become involved in an investigation

3  against the defendant Shawn McCormack?

4  A.  I was advised of an investigative lead that the Colorado

5  Springs office of Homeland Security Investigations had

6  received from Toronto Police Department that involved

7  McCormack.

8  Q.  And had you been in touch with ICE Special Agent Scott

9  Hall with respect to this lead?

10  A.  Yes.  Scott Hall is the one who contacted me regarding the

11  lead.

12  Q.  And what did the lead involve, generally?  The nature of

13  the investigation that you learned about.

14  A.  It involved distribution of child pornography from

15  McCormack's residence in Colorado Springs to Officer --

16  Detective Krawczyk in Canada.

17  Q.  And after obtaining this lead information, did you work to

18  get a residential search warrant on the defendant's residence?

19  A.  I did.  I applied and received one on June 8th of 2010.

20  Q.  And did you, in fact, execute the search warrant on his

21  residence back in June of 2010?

22  A.  Yes, I did.

23  Q.  And was ICE Special Agent Hall also with you during the

24  execution of that search warrant?

25  A.  He was.

456

1  Q.  Do you recall the address of that residence?

2  A.  14275 Vessey Circle, it's in Colorado Springs area.

3  Q.  And when you first entered the residence, was the

4  defendant home?

5  A.  No, he was not present at the time we executed the search

6  warrant.

7  Q.  Did you make any attempts to contact the defendant while

8  executing that search warrant?

9  A.  Yeah.  I attempted to call him twice, because he wasn't

10  present, so that we could speak with him.  The phone number I

11  received for him I got from his utilities company.  They

12  provided me information.  The phone number that I had was

13  719-210-0708.

14  Q.  And during the execution of that search warrant in June

15  2010, were you present when a Toshiba laptop was recovered and

16  seized from the house?

17  A.  Yes.  I had located that laptop.

18  Q.  And do you recall what part of the house or what room that

19  was recovered from?

20  A.  Yeah, that was recovered from the south bedroom in the

21  residence.

22  Q.  So during your investigation into Shawn McCormack, did you

23  ever learn of a parallel investigation being conducted by law

24  enforcement agents out in Boston?

25  A.  The following year, in 2011, I learned of another

1  investigation being conducted by the SAC office in Boston of

2  Homeland Security.

3  Q.  And was there a particular agent out in Boston that you

4  came in contact with?

5  A.  Yeah, I was contacted by Special Agent Squire with HSI for

6  the Boston office.

7  Q.  And what information did Special Agent Squire provide you?

8        MR. FALLER:  Objection.  Hearsay.

9        THE COURT:  What I'll do is I'll overrule the

10  objection.  But again, it's only -- for the jury's purpose,

11  only to understand what this witness did subsequent to

12  receiving that information.  This is not being offered for the

13  truth of the matter, only to let you know what his thought

14  process was and what he did thereafter.  Go ahead.

15        MS. CAIN:  Thank you, Your Honor.

16  Q.  What information did Special Agent Squire provide you?

17  A.  Agent Squire provided me -- essentially informed me that

18  they had been conducting an investigation at the same time we

19  were into an unidentified series of child pornography that

20  involved a prepubescent male or a toddler age male and an

21  adult male.

22        That series had subsequently been identified -- or

23  they titled it Swirl Carpet series.  They had identified the

24  victim in that particular series and that they believed that

25  Shawn McCormack was involved in the making of that.

458

1    Q.  And had you obtained any information as to whether the

2    toddler victim in that series had ever been identified?  At

3    some point from the parallel investigation.

4    A.  Yes.  I learned that they had identified that child as

5    Ben.  They had a date of birth --

6              MR. FALLER:  Your Honor, again, I have to object.

7    This is just all hearsay and --

8              THE COURT:  Sustained.

9              MR. FALLER:  -- does not explain anything that he

10   did.

11             THE COURT:  Sustained.

12   BY MS. CAIN:

13   Q.  So as a result of getting in touch, obtaining information

14   from Agent Squire and hearing about the Swirl Carpet series,

15   did you do anything with the Toshiba laptop that had been

16   seized from the residence?

17   A.  Yes.  So I went back -- not the laptop itself, but the

18   forensic examination had already been completed on that

19   laptop.  I went back and reviewed the forensic results again

20   from that laptop the following day and confirmed that videos

21   and images from the Swirl Carpet series involving Ben were

22   located from the Toshiba laptop.

23   Q.  And did you come across other images of Ben on that

24   Toshiba laptop outside of that hotel room?

25   A.  Yes.

1  Q.  From what you recall.

2  A.  Yes.  There were images of Ben from the hotel room as well

3  as a secondary location.

4  Q.  And when you went back to look at the images of Ben found

5  on the Toshiba laptop, did your review of the images seem to

6  match what it was that Special Agent Squire was investigating?

7  A.  Yeah, they matched exactly the information he had

8  obtained.  And then my review of it.

9  Q.  And at some point did a federal arrest warrant come out

10  from the Eastern District of California?

11  A.  Yeah, September 16th of 2011, the federal arrest warrant

12  was issued for the production of child pornography from the

13  Eastern District of California.

14  Q.  And did you arrest Shawn McCormack for production of child

15  pornography based on that warrant that came out of the Eastern

16  District of California?

17  A.  I did.  That same day, September 16th.

18  Q.  Can you please explain to the jury how you went about

19  finding the defendant, Shawn McCormack, to arrest him on that

20  warrant?

21  A.  So that day, obviously, the starting point we had would be

22  his house.  So we responded to his residence to arrest him.

23  He wasn't present at that time.  Or at least not that we could

24  see.  There was another male party on scene that was

25  identified as his brother.  His brother had since moved into

1  the residence.  And so I asked him just to confirm that Shawn

2  wasn't there.  I asked him just if we could take a walk

3  through the house, which we did.  Didn't locate McCormack at

4  that point.

5          We left the residence for a short period of time.

6  Special Agent Hall I was still with at the time, Scott Hall,

7  and he received information via telephone that Mr. McCormack

8  had since returned to the residence.  So then we returned and

9  took him into custody.

10 Q.  And while you were going through the residence before the

11 defendant came home, did you observe anything in the residence

12 that was relevant to your investigation?

13 A.  So obviously we had done the search warrant previously to

14 this.  So going through the house to look for him, I saw

15 another -- a new desktop computer that was in one of the

16 rooms.  And I also learned that McCormack since had purchased

17 another laptop computer.

18 Q.  And while you were at the residence looking to find the

19 defendant and to arrest him, did you come across his mother,

20 Marsha McCormack?

21 A.  The second time, on September 16th?

22 Q.  Yes.  When -- at some point when you were in the

23 residence, was it for the arrest?  At some point did you have

24 an interaction with his mother?

25 A.  Yeah, I spoke with his mother actually in 2010 when we

461

1  executed the first search warrant.  She was present when we
2  were there.
3  Q.  Okay.  And then did you have any interactions with her
4  during the 2011 searches or going to arrest him at the house?
5  A.  During a second search warrant that we executed in 2011,
6  yes, I did come across Mrs. McCormack again.
7  Q.  Okay.  And was she helpful in your investigation of this
8  child exploitation crime?
9          MR. FALLER:  Objection.  Relevance.
10         THE COURT:  Sustained.
11 BY MS. CAIN:
12 Q.  After you arrested Shawn McCormack on the 16th, did you
13 obtain any additional search warrants on his residence at
14 Vessey Circle?
15 A.  I did.  Several days later.  On September 19th, I actually
16 applied for and received a search warrant for the residence.
17 And then it was executed on the 20th.
18 Q.  And what types of items were you looking for for this
19 residential search warrant that you obtained a couple of days
20 after the arrest?
21 A.  That was to go in and seize additional digital media,
22 computers, things like that.  Again, based on my original
23 investigation and then the subsequent information that I had
24 received from Agent Squire.  So the newest search warrant was
25 for additional computers and digital media.

462

1   Q.   And while you were executing the search warrant for

2   digital devices, were there any other items in the house that

3   you came across that became relevant to your investigation?

4   A.   Yeah.  We located quite a few clothing items that were of

5   particular importance in Agent Squire's investigation that

6   kind of matched together.

7   Q.   And did law enforcement obtain any other legal process to

8   seize the clothing items that became relevant to the

9   investigation?

10  A.   Yes.  So on the 20th, when we executed the search warrant

11  that I had obtained for the computers, we started finding

12  clothing items that were of significance to the exploitation

13  case involving Ben.  So I left the house and left other

14  investigators there and went and obtained an additional search

15  warrant to go back so that would allow us to seize the

16  clothing items that were relevant.

17  Q.   And while executing the search warrants in the residence

18  in 2011, were search warrant photos taken?

19  A.   They were.  Quite a few.

20  Q.   And if you can look at that white binder right in front of

21  you and leaf through Government Exhibits, the tabs 106 to 114.

22           And what is contained at Government Exhibits 106 to

23  114, generally?

24  A.   Pictures of items that were seized during the search

25  warrants in 2011.

463

1   Q.  And do those pictures or photos depict -- are they an

2   accurate depiction of the items that you saw at the residence

3   and seized during the search warrant in 2011?

4   A.  They are.

5   Q.  And did they assist you in your investigation?

6   A.  Yes, ma'am.

7          MS. CAIN:  United States moves Exhibits 106 to 114

8   into evidence.

9          MR. FALLER:  No objection.

10          THE COURT:  They are admitted.

11          (Government's Exhibits 106 through 114

12          were received.)

13  BY MS. CAIN:

14  Q.  If we could please pull up Government Exhibit 106, which

15  has just been admitted.

16          Could you please explain to the jury what this shows?

17  A.  This shows -- it's essentially a picture of an ID card

18  that was hanging from a hat in the south bedroom of that

19  residence.  The ID card is for Shawn McCormack.

20  Q.  And the south bedroom was the same room where the Toshiba

21  laptop was found in 2010; is that correct?

22  A.  That's correct.

23  Q.  And if you could please pull up Exhibit 107 on the screen.

24  Could you please explain to the jury what this photo shows?

25  A.  This is several black or dark colored ski masks.  We call

464

1   them balaclavas.  In cold weather -- I don't know what you

2   call them here, but ski masks.  As well as a dark colored like

3   cloth belt with a silver buckle.  These were all found in that

4   south bedroom so we took one picture of all of them.

5   Q.  And if we can keep Exhibit 107 up.  And then also do a

6   side by side with Exhibit 46.  Could you please explain to the

7   jury why the black masks were relevant to your investigation?

8   A.  In several of the pictures and, obviously, the video

9   involving Ben, the suspect was seen wearing a black ski mask

10  with like a nose piece on it.  So just the eyes and the mouth

11  were cut out.

12  Q.  And looking at Exhibit 46 on the right, what color T-shirt

13  is the perpetrator wearing there?

14  A.  It's a gray T-shirt.

15  Q.  And during the course of your search warrant, did you

16  recover gray T-shirts?

17  A.  We recovered two of them.

18  Q.  If we could please pull up and show it to the left,

19  Exhibit 108.  And then keep Exhibit 46 up.  Is Exhibit -- what

20  is Exhibit 108?

21  A.  That's a picture of one of the gray T-shirts that we

22  recovered.

23  Q.  Okay.  If we could please -- and where was that recovered?

24  A.  From the south bedroom.

25  Q.  And if we could please, to the left, pull up Exhibit 109

465

1   while keeping Government Exhibit 46 up.  What is this?

2   A.  This is a picture of the second gray T-shirt that we

3   recovered from the south bedroom in that residence.

4   Q.  Through the course of your investigation, did you see any

5   child pornography images involving Ben where the perpetrator

6   was wearing a belt?

7   A.  I did.

8   Q.  And if we could go back to Exhibit 110 again, which was

9   previously moved in.  Could you please explain to the jury

10  what this is?

11  A.  This is a picture of a second dark colored like cloth belt

12  with a silver buckle that we recovered in addition to the one

13  with the ski masks.

14  Q.  And which room was this second belt recovered from?

15  A.  Also from the south bedroom.

16  Q.  And if we could pull up Exhibit 107 again.  This belt that

17  I see above the black face mask, is that a different belt from

18  what we just saw?

19  A.  Yes.  So there were two dark colored like cloth belts,

20  both with silver buckles, that were located in that bedroom.

21  Q.  And if we can do a side by side with Exhibit 107 already

22  up, and then Exhibit 62.

23        Looking at this image on the right, Exhibit 62, could

24  you please describe that belt that you see there?

25  A.  Again, this would be why this particular belt was of

1    significance because you can see the suspect in this picture

2    is wearing a dark colored or black cloth belt with a silver

3    buckle on it.

4    Q.   During the course of the search warrant, did you recover

5    any boxer shorts?

6    A.   We recovered several pairs of boxer shorts, all from the

7    south bedroom.

8    Q.   And showing you Government Exhibit 111 previously

9    admitted.  And we can take down the one on the left.  Could

10   you please explain what this is?

11   A.   This is a picture of one of the pairs of boxer shorts that

12   it's kind of got a plaid stripe pattern.  This was of

13   significance because in some of the videos and pictures

14   involving Ben, there are some boxer shorts that look similar

15   to this that are visible on the suspect.

16   Q.   And if we can do a side by side between Exhibit 111

17   already up and then if we can pull up Exhibit 64 previously

18   admitted.  Are you able to see anything of relevance to your

19   investigation in Exhibit 64?

20   A.   Yeah.  So 64 shows the suspect, obviously with Ben.  You

21   can see both the black colored cloth belt again as well as

22   those kind of light greenish colored striped boxers.

23   Q.   During the search warrant, did you recover or find any red

24   T-shirts?

25   A.   Yeah, we recovered three red shirts from the south

1   bedroom.

2   Q.  And if we could please publish Exhibit 112, already

3   admitted.  What is this?

4   A.  That's a red colored like Henley long sleeved T-shirt that

5   we found.

6   Q.  And if we could please pull up Exhibit 114.  What is this?

7   A.  That's a red like cotton, normal cotton short sleeve

8   t-shirt that we found again from that south bedroom.

9   Q.  And then if we could please go to Exhibit 113, already

10  admitted.  What is this?

11  A.  I'm sorry, the last one was long sleeve.  This is a short

12  sleeve T-shirt, again, plain cotton like T-shirt that we found

13  from that south bedroom.

14  Q.  And if we could keep Exhibit 113 up and then do a side by

15  side with Exhibit 36, previously admitted.

16         Why was the red T-shirt of significance to you during

17  your search warrant?

18  A.  Obviously, looking at this particular picture with Ben,

19  you can see red -- what appears to be a short sleeve T-shirt

20  being worn by the suspect.  There's also a scar on that left

21  hand that was obviously significant for us investigatively as

22  well.

23  Q.  And so looking at the scar that's on Exhibit 36?

24  A.  That's correct.

25  Q.  When you arrested the defendant in 2011, did you take note

1  of the inside of the defendant's wrists?

2  A.  I did.  And I noted that there was a scar in that same

3  place.

4  Q.  At that point in time he had a mark?

5  A.  Yes.

6  Q.  You can take these down.

7         For the clothing items that were just shown to the

8  jury that were photographed, did law enforcement also seize

9  the physical items themselves?

10 A.  We did, yes.

11        MS. CAIN:  Your Honor, may I have permission to

12 approach the witness?

13        THE COURT:  Yes.

14 BY MS. CAIN:

15 Q.  Detective Romine, I just handed you a box that contains

16 items that have been marked as Government Exhibits 115 to 127.

17 Prior to testifying today, did you have an opportunity to go

18 back through what's in that box and what's in the bags?

19 A.  I did, yes.

20 Q.  And what are those items?

21 A.  These are the clothing items that we seized from the

22 residence.

23 Q.  And when you were looking at them, were you looking at

24 them during the lunch break today?

25 A.  I was.

469

1   Q.  And did the clothing items marked as Government Exhibits

2   115 to 127 appear to be in substantially the same condition as

3   the day in which they were seized back in 2011?

4   A.  They did.

5   Q.  And did these clothing items assist you in your

6   investigation?

7   A.  Yes, they did.

8   Q.  And were all these clothing items found in the south

9   bedroom of the residence?

10  A.  Yes.  Every single one of them.

11        MS. CAIN:  United States moves Exhibits 115 to 127

12  into evidence.

13        MR. FALLER:  Your Honor, I have not had an

14  opportunity to actually look at the physical items.

15        MS. CAIN:  And Your Honor, I apologize.  As soon as I

16  said that I realized I did not walk them over to defense

17  counsel.  May I do that?

18        THE COURT:  Yes.

19        MS. CAIN:  Thank you.  I'm sorry.

20        MR. FALLER:  Or do we want to just break and I can go

21  through them and --

22        THE COURT:  Well, it is 4:26, so we're almost at the

23  break time.  This might be a good time to break and then that

24  way, over the evening, you folks can go ahead and take a look

25  at those exhibits.

1           So, all right.  Members of the jury, we'll go ahead

2    and take our evening recess.  We'll resume tomorrow morning at

3    nine o'clock.  So be here at nine o'clock.  And so I'll go

4    ahead and excuse you folks.

5           And then, Juror 012, if you could just remain for a

6    moment, please.

7           All right.  You're excused.

8           (The jury, except Juror 012, left the courtroom.)

9           THE COURT:  You can step down and return tomorrow

10   morning at nine o'clock.

11          Go ahead and have a seat, Juror 012.

12          JUROR SEAT NUMBER TWELVE:  Sure.

13          THE COURT:  Couple of things.  First of all, one

14   thing that was mentioned is during the observation of some of

15   the displays of videos, et cetera, et cetera, you did have a

16   reaction.  During the jury selection process, you know, all

17   counsel tried to -- and the Court tried to make it clear to

18   prospective jurors what they might see, et cetera.  But that's

19   not the same thing as actually seeing it.

20          So the bottom line question for you.  And I am not

21   allowed to get into thought processes of jurors.  But I do

22   need to inquire whether or not your viewing any of that

23   information has affected your ability to be fair and impartial

24   in this case?

25          That doesn't mean -- I think defense counsel

1    mentioned, you know, jurors are not robots, we don't expect

2    you not to be able to react to anything, including my examples

3    of traffic collisions where people see anything from severe

4    injuries to autopsy photos.

5         But so, anyway, the bottom line is has that affected

6    in any way your ability to be fair and impartial in this case?

7         JUROR SEAT NUMBER TWELVE:  No, it has not.

8         THE COURT:  The other thing I noticed what I would

9    just call a chronic cough.  I would be remiss if I wasn't

10   concerned about the health of jurors.  Whatever the condition

11   is, it might be allergies, you should have seen me a couple of

12   weeks ago, I probably wouldn't have been able to sit here.  Is

13   that affecting your health by serving as a juror?

14        JUROR SEAT NUMBER TWELVE:  Unless it's distracting,

15   it's not affecting my health.

16        THE COURT:  Okay.  All right.  And that's the other

17   thing.  Because I did have another case where other jurors

18   were concerned.  Without delving too much into your personal

19   health, which is totally your privacy, hopefully it's nothing

20   that is problematic for you or the other jurors.  I don't know

21   if that's been a situation with you.

22        JUROR SEAT NUMBER TWELVE:  To the best of my

23   knowledge, it's just allergies.

24        THE COURT:  Okay.  Well, that's pretty common and

25   pretty rampant.  Okay.  That's all I needed to know.  So any

472

1    inquiry of counsel?

2         MR. FALLER:  No, Your Honor.

3         THE COURT:  All right.  Thank you very much.  And I

4    hate to pry into your privacy, but I'm obligated to do some

5    things like that.  But I appreciate your patience.  And you

6    are free to go.  See you at nine o'clock tomorrow morning.

7         JUROR SEAT NUMBER TWELVE:  Thank you.

8         (Juror 012 left the courtroom.)

9         THE COURT:  All right.  Before we -- well, let me

10   just do the logistics first.  Obviously, over the evening,

11   counsel can take a look at these exhibits.  If there are any

12   issues, we'll take them -- we'll reconvene at 8:30 tomorrow

13   morning.  If there are any issues relating to any of the

14   exhibits, 115 to 127, we can bring it up at that time.  Plus

15   any other issues that you might have.

16        The other question is the logistics.  We have Officer

17   Romine coming back tomorrow.  And then after him, who do we

18   have lined up?

19        MR. DELAHUNTY:  The government anticipates calling

20   two more witnesses, the parents of both victims, Your Honor.

21        THE COURT:  And then you would rest your case in

22   chief?

23        MR. DELAHUNTY:  We would rest.

24        THE COURT:  Obviously, Mr. Faller, what that does is

25   alerts you that, obviously, once they rest their case in

1    chief, I send the jury out.  We look over the exhibits, see if

2    there are any issues regarding exhibits, those you think have

3    been admitted but we don't show admitted.  Those that we show

4    admitted that you don't think have been admitted, et cetera.

5    We take those up.  If there are any legal issues or other

6    matters that we need to take up, we can do it at that time.

7             And then obviously at that point in time defense can

8    make the -- obviously will have to make the decision as to

9    whether or not you're going to present an affirmative defense.

10   And if so, obviously you'll need to have your witnesses ready

11   sometime in the morning.  You can probably get a fair sense

12   chatting this evening as to how much time you might need to

13   have your witnesses ready to go.

14            Other than that, there is one thing that Ms. Gaumnitz

15   had pointed out to me.  And that is one exhibit was not

16   displayed to the jury that was displayed to the witness.  And

17   that was Exhibit 58.  Was not admitted into evidence.  Now,

18   that was not shown to the jury.  Ms. Gaumnitz did not display

19   it to the jury.  So I just wanted to let you folks know that

20   that has not been admitted into evidence and has not been

21   displayed to the jury.

22            MR. DELAHUNTY:  Okay.  Thank you for the notice, Your

23   Honor.

24            THE COURT:  Okay.  Now, with that, then -- oh, the

25   other thing is there was a -- I wasn't sure, I just wasn't

474

1   sure when, and I can obviously change the wording in terms of

2   future, past, present tense.  But proposed instruction 211,

3   evidence for a limited purpose, regarding the user of

4   shawns525@yahoo.com email account and the users Shawn and Yup,

5   searching Craigslist.  There is a proposed instruction.  I

6   wasn't sure whether I should give it or, if so, at what point.

7   Obviously we can work around the language to the past tense,

8   present tense or future tense.

9           But if you can let me know tomorrow morning if you

10  want me to read that to the jury.  And if you feel that it

11  should be modified in any way, let me know and then I'll go

12  ahead and address that at 8:30 tomorrow morning.  All right?

13          With that, anything further on behalf of the

14  government?

15          MR. DELAHUNTY:  Not at this time.  Thank you, Your

16  Honor.

17          THE COURT:  Defense, anything?

18          MR. FALLER:  No, Your Honor.

19          THE COURT:  All right.  We'll reconvene tomorrow

20  morning at 8:30 then.  We'll be in recess.

21          (The proceedings were concluded at 4:33 p.m.)

22          I, KAREN HOOVEN, Official Reporter, do hereby certify

23  that the foregoing transcript as true and correct.

24

25  DATED:  12th of May, 2015        /s/  Karen Hooven____
                                     KAREN HOOVEN, RMR-CRR