UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII, JUDGE

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )  No. 11-CR-324-AWI
                               )
vs.                            )  JURY TRIAL
                               )     DAY 3
SHAWN JOSEPH McCORMACK,        )
                               )
          Defendant.           )
_____)

Fresno, California                 Thursday, April 9, 2015

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume 3, Pages 475 through 650, inclusive

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:      United States Attorney's Office
                        BY: **PATRICK R. DELAHUNTY**
                        and **MEGAN A.S. RICHARDS**
                        2500 Tulare Street
                        Suite 4401
                        Fresno, California 93721

                        U.S. Department of Justice
                        BY:  **MAUREEN C. CAIN**
                        1400 New York Avenue
                        Suite 600
                        Washington, D.C. 20540


For the Defendant:      **CARL M. FALLER**
                        Attorney at Law
                        Post Office Box 912
                        Fresno, California 93714

477

1                              <u>INDEX</u>

2    <u>GOVERNMENT'S WITNESSES</u>:

3     **ADAM ROMINE**                                          482
      CONTINUED DIRECT EXAMINATION BY MS. CAIN                 482
4     CROSS-EXAMINATION BY MR. FALLER                          510
      **ANDREW**                                               519
5     DIRECT EXAMINATION BY MS. CAIN                           520
      CROSS-EXAMINATION BY MR. FALLER                          536
6     **ASHLEY KAREN**                                         544
      DIRECT EXAMINATION BY MS. CAIN                           545
7     CROSS-EXAMINATION BY MR. FALLER                          560
      REDIRECT EXAMINATION BY MS. CAIN                         564

8
     <u>DEFENDANT'S WITNESSES</u>:
9
      **SHAWN McCORMACK**                                      571
10    DIRECT EXAMINATION. BY MR. FALLER                        571
      CROSS-EXAMINATION BY MR. DELAHUNTY                       598
11    REDIRECT EXAMINATION BY MR. FALLER                       615
      **MARSHA McCORMACK**                                     621
12    DIRECT EXAMINATION BY MR. FALLER                         622
      CROSS-EXAMINATION BY MS. RICHARDS                        628
13    REDIRECT EXAMINATION BY MR. FALLER                       633
      **VERONICA PIKE**                                        634
14    DIRECT EXAMINATION BY MR. FALLER                         635

15                             * * * * *

16

17                            EXHIBITS

18   <u>GOVERNMENT'S</u>                              Received
      115 to 127                                               483
19    128 through 132                                          486
      133 through 140                                          496
20    141 through 152                                          503
      153                                                      507
21    154                                                      509
      160                                                      603
22    161                                                      610
      162                                                      611
23    163                                                      613

24   <u>DEFENDANT'S</u>
      A and B                                                  637
25                             * * * * *

478

1    Thursday, April 9, 2015                         Fresno, California

2    8:33 a.m.

3          THE COURT:  Good morning.  On the record outside the

4    presence of the jury.  Let me just cover a few things and then

5    if you have anything else specific, let me know.

6          But with respect to Exhibits 115 to 127, Mr. Faller,

7    have you had a chance to review those?

8          MR. FALLER:  I have, Your Honor, and I don't have any

9    issues with them.

10         THE COURT:  Okay.  The next thing is how you would

11   like me to address, if at all, proposed jury instruction 211,

12   evidence for a limited purpose.

13         MR. FALLER:  You know, I don't really feel like it

14   needs to be given at this point.  It can just be given as part

15   of the general instructions.  You know, it's always a -- just

16   tell the Court my thinking.  It's always a coin flip whether

17   you give it and highlight it in that way or just put it in the

18   general instructions.  And my preference is to just have it be

19   part of the general instructions at the conclusion of the

20   case.

21         THE COURT:  Okay.  That's fine.  Is that okay with

22   the government then?

23         MS. CAIN:  Yes, Your Honor.  That's okay with the

24   government.  And then I think the version of the instruction

25   that currently stands, we talk about the emails involving

1   sexually explicit conversations from the shawns525 account.

2   That still stands.  I think the original version, though, also

3   talked about Craigslist postings --

4           THE COURT:  Yes.

5           MS. CAIN:  -- about women plus kids.  So we altered

6   our exhibits, so that part can be crossed.  We didn't end up

7   going there with it.

8           THE COURT:  Just the first paragraph?

9           MS. CAIN:  Yes, Your Honor.

10          THE COURT:  All right.  We'll make the changes and

11  then, obviously, I'll show it to you before, well, the final

12  instruction conference.

13          All right.  And that's pretty much it.  We'll give

14  you a copy of the proposed instructions.  I think you pretty

15  much agreed on virtually all of them.  If there are some that

16  we have an issue on, we can take those up at the end of the

17  presentation of evidence.

18          Okay.  Let me ask then.  First, plaintiff's side, are

19  there any other issues that we need to take up this morning?

20          MR. DELAHUNTY:  Not at this time, Your Honor.

21          THE COURT:  All right.  Defense, anything?

22          MR. FALLER:  No, Your Honor.

23          THE COURT:  Okay.  So as I understand, let's see,

24  this morning we'll have Officer -- or Detective Romine finish

25  up his testimony.  We'll have the two parents testify.

1      MR. DELAHUNTY:  That's correct.  And then the

2  government anticipates resting at that point, Your Honor.

3      THE COURT:  All right.  And then that will probably

4  occur, Mr. Faller, as we mentioned last night, probably some

5  time this morning.  So you need to be prepared.

6      There were two witnesses that were subject to recall.

7  Obviously Agent Pike would be here so that is not an issue.

8  But if either side wants Detective Robles from the Bakersfield

9  PD to come back, you'll need to let him know right away

10  because it will take him at least a couple of hours to get

11  here.

12      MR. DELAHUNTY:  He is available this morning, Your

13  Honor.  If we can give him some notice that he's not going to

14  be needed, I think he --

15      MR. FALLER:  I doubt that he will.  The only thing

16  that would make him necessary would be if something comes out

17  through the parents that's contradictory to what he related

18  about the events, about what they told him about the events of

19  that night.  That would be the only thing that I would need to

20  call him for.

21      And actually, we might even be able to stipulate --

22  if there's something in his report that I'm interested in, we

23  might even be able to stipulate that if he was called back, he

24  would just say what's in his report.

25      MR. DELAHUNTY:  Well, we can revisit that.  He's

1    available this morning, but perhaps we can see later if he's

2    still necessary.

3            THE COURT:  Okay.

4            MR. FALLER:  Yeah, I think it's only -- I think it's

5    less than 50/50 that I would have to have him back.

6            THE COURT:  The only caution is, obviously, it will

7    take him a couple of hours to get here.  We'll figure

8    something out.

9            All right.  If there's nothing else now, then I'll

10   come back on the bench at nine o'clock.  We'll have the jury

11   come in and we'll continue on and wrap up the government's

12   case in chief probably this morning.

13           All right.  We'll be in recess.

14           MR. FALLER:  Thank you, Your Honor.

15           (Recess.)

16           THE COURT:  Back on the record outside the presence

17   of the jury.  Anything before we have the jury come in?

18           MR. DELAHUNTY:  Not at this time, Your Honor.

19           THE COURT:  Defense?

20           MR. FALLER:  No, Your Honor.

21           THE COURT:  All right.  We'll have the jury come in.

22           (The jury entered the courtroom.)

23           THE COURT:  The jury is present.  Please be seated.

24   Good morning, members of the jury.

25           We'll continue on with the plaintiff's case in chief.

1    Government may continue with their witness.

2            MS. CAIN:  The United States recalls Detective

3    Romine.

4                        **ADAM ROMINE**,

5    called as a witness on behalf of the Government, having been

6    previously sworn, testified as follows:

7            THE COURT:  Go ahead and re-take your seat there.

8    I'll remind you you're still under oath.  But if you could

9    restate your name for the record, please.

10           THE WITNESS:  Yes, sir.  Adam Romine, R-O-M-I-N-E.

11                  CONTINUED DIRECT EXAMINATION

12   BY MS. CAIN:

13   Q.  Good morning.

14   A.  Good morning.

15   Q.  Yesterday before we broke for the day, I had introduced to

16   you a box of exhibits -- I will hand back up to you -- that

17   were Government Exhibits 115 to 127.  And I believe yesterday

18   you testified that those were various clothing items that were

19   found at the defendant's residence?

20   A.  Yes, that's correct.

21   Q.  And which room did you locate those clothing items in?

22   A.  Those were all found in the south bedroom at the

23   residence.

24   Q.  Okay.  I'm going to hand up that box to you.  Permission

25   to approach, Your Honor.

483

1          THE COURT:  Yes.

2          MS. CAIN:  Based on the questions that were asked

3    yesterday, Your Honor, the United States moves Government

4    Exhibits 115 to 127 into evidence.

5          MR. FALLER:  No objection.

6          THE COURT:  All right.  They are admitted.

7          (Government's Exhibits 115 to 127 were received.)

8    BY MS. CAIN:

9    Q.  So Detective Romine, if you could take a look at those

10   items and pull out Exhibits 120 and 121.  Pull out those bags,

11   please.

12   A.  Sorry.  They're not in numerical order.

13   Q.  That's okay.  And if you could tell the jury what are in

14   those two evidence bags.

15   A.  Yes.  So 120 is one of the black cloth belts with the

16   silver buckle.

17   Q.  And could you please take that out and show the jury what

18   it looks like.

19   A.  It's just a black generic cloth belt with a silver metal

20   buckle on it.

21   Q.  And could you please do the same thing with Exhibit 121.

22   A.  Again, another black cloth belt.  This one has a small

23   design, but again, silver metal buckle on it.

24   Q.  Thank you.  And then going back into that box, could you

25   please pull out the exhibit bags that are marked Exhibits 115

484

1   and 116.  And what clothing items do you see in Exhibits 115

2   and 116?

3   A.   These are two of the black like knit ski masks that we

4   located in that south bedroom.

5   Q.   And if you could please pull them out and place your hand

6   inside of it to show the jury the various holes.

7   A.   You can see eye holes and then there's a mouth hole.

8   Q.   And with respect -- is that Exhibit 115 that you're

9   holding up?

10  A.   It is.

11  Q.   And with respect to Exhibit 115, does it appear that the

12  cloth would cover the nose when wearing that?

13  A.   Yes, it does.  So, again, looking at that you can kind of

14  see where the nose would be right in the middle.

15  Q.   Okay.  And if you could please do the same with Exhibit

16  116 by holding it up to the jury.

17  A.   So again, this is 116.  Similar to 115.  Two eye holes,

18  kind of a mouth hole and you can see right in the middle again

19  where the nose would be.

20  Q.   And does it appear that cloth would cover the bridge of

21  the nose on that one as well?

22  A.   It does.

23  Q.   Thank you.  Through the course of your investigation of

24  the defendant, did you obtain any search warrants on email

25  accounts that were tied to him?

485

1   A.   I did.  I obtained two separate search warrants for email
2   accounts.
3   Q.   Okay.  And could you tell the jury on which ones?
4   A.   The two email accounts I identified belonging to him were
5   toddlers24@yahoo.com.  And the second was shawns525@yahoo.com.
6   Q.   And with respect to the toddlers24@yahoo.com, what
7   initially prompted you to obtain a search warrant on that
8   account?
9   A.   In 2010, after we executed that first search warrant at
10  McCormack's residence, Detective Rogers began doing forensic
11  exams.  And he located different emails on the computer in
12  which that account had sent or received child pornography.
13  Q.   And did you obtain an additional search warrant on that
14  toddlers24@yahoo.com account again in 2011?
15  A.   I did.
16  Q.   And after executing search warrants on the toddlers24
17  account, did you obtain emails from Yahoo associated with that
18  account?
19  A.   Yes, quite a few.
20  Q.   And while reviewing the search warrant return with the
21  toddlers24@yahoo.com account, did you come across various
22  emails and documents that assisted in your investigation?
23  A.   I did.  Quite a few.
24  Q.   And if you can look at the binder right in front of you,
25  and leaf through Government Exhibits 128 to 132.

486

1          Generally speaking, what are those exhibits?
2   A.  These are copies of -- or printed copies of emails that
3   were located in the accounts.
4   Q.  And are those exhibits accurate depictions of the emails
5   and data that you obtained from the search warrant return on
6   the toddlers24 email account?
7   A.  Yes, they are.
8          MS. CAIN:  United States moves Exhibits 128 to 132
9   into evidence.
10         MR. FALLER:  Submitted.
11         THE COURT:  All right.  They are admitted.
12         (Government's Exhibits 128 through 132
13         were received.)
14  BY MS. CAIN:
15  Q.  Now, through your experience in working child pornography
16  investigations, have you, in your undercover capacity, ever
17  had to set up email accounts on your own?
18  A.  Yes.  Quite a few.
19  Q.  And do you do that in order to start communicating with
20  people you're investigating?
21  A.  Yes.
22  Q.  And based on your training and experience in having to set
23  up email accounts for your undercover investigations, when you
24  are setting up an account with, say, Yahoo, are you typically
25  directed to provide user information to Yahoo in order to set

487

1    up an account?

2         MR. FALLER:  Your Honor, I'm going to object as

3    irrelevant here.  He didn't set up any accounts in this

4    investigation.  I mean, whatever the information is in the

5    accounts is the information.

6         THE COURT:  Okay.  And relevance?

7         MS. CAIN:  May I have a sidebar, Your Honor?  I can

8    say it on the record if you prefer.

9         THE COURT:  All right.  We can go sidebar.

10        MS. CAIN:  Okay.  Thank you.

11        (The following proceedings were held at sidebar

12        between the Court and counsel:)

13        MS. CAIN:  So the relevance, Your Honor, is that for

14   this toddlers24 account, the user information that the person

15   inserted was in the name of David Brown.  And I just -- and

16   had some other information about biographical information and

17   dates.  And I just want him to say when you set up an email

18   account, you have to put in user information.  It's not

19   necessarily accurate, you can put in whatever you want.  Yahoo

20   doesn't necessarily verify it.  That's all I'm trying to get

21   at.

22        MR. FALLER:  Well, if he -- if he can testify to what

23   Yahoo does, then we're not -- he's not really qualified to do

24   that.  I mean, the accounts are the accounts.  And you know,

25   for him to be testifying -- basically what he's trying to

1  testify to is that whatever information here, it may say

2  something different than Shawn McCormack and -- but it's still

3  Shawn McCormack.  Well, I'm not sure that he's qualified to

4  testify to that.

5         MS. CAIN:  And so --

6         MR. FALLER:  It is what it is.

7         MS. CAIN:  I was attempting to lay out the foundation

8  that through his undercover foundations he has had to set up

9  these accounts before and he puts in the data that he wants.

10        THE COURT:  Okay.  Yeah.

11        MS. CAIN:  That's why I was asking those questions to

12  try to lay that foundation.

13        THE COURT:  Okay.  So I don't find this to be opinion

14  testimony, but rather it's direct testimony of what he has

15  done just to show what you can put in.  Not necessarily what

16  Yahoo does with it, but what a subscriber can do.  So, yeah,

17  that's fine.

18        MS. CAIN:  Okay.  Thank you, Your Honor.

19        (The following proceedings were held in open court:)

20  BY MS. CAIN:

21  Q.  So Detective Romine, so based on your experience in

22  working with email accounts such as Yahoo, have you been able

23  to set up various user accounts?

24  A.  Yes, quite a few.

25  Q.  And what types of user information are you typically

1   requested to provide in setting up an email account?

2   A.   It would be basic user information.  So a name, typically

3   a zip code and/or a city.  A date of birth.  That's not always

4   required.  It kind of depends on which user you're

5   actually -- or which server you're actually using.

6   Q.   And when you are setting up these user accounts, does that

7   information have to be accurate?

8   A.   No, it does not.

9   Q.   So while you were going through the toddlers24 search

10  warrant return, did you find user information that had been

11  provided by the user of that particular account, the

12  toddlers24@yahoo.com account?

13  A.   Yes, ma'am.

14  Q.   And what was the name that the user inserted for purposes

15  of setting up the toddlers24@yahoo.com account?

16  A.   The name provided was David Brown.

17  Q.   And while you were going through the toddlers24@yahoo.com

18  account, did you find any images of child pornography

19  involving a young girl relevant to this case?

20  A.   Yes, ma'am.

21  Q.   And were the images of Elizabeth?

22  A.   They were.

23  Q.   During the course of this investigation, had you received

24  photos of Elizabeth from any other agents in this case?

25  A.   Yeah.  Agent Pike sent me pictures of Elizabeth for

490

1   comparison to our forensic exam results so that we could

2   identify her if she was in any of the photos that we located.

3   Q.  If we could please pull up Government Exhibit 128,

4   previously admitted.  And if we can blowup the top just

5   slightly.  Thank you.

6           What is this exhibit?

7   A.  This is the header line from an email sent from the

8   toddlers24 account on December 2nd, 2008.

9   Q.  And who is it sent to?

10  A.  It was sent to kinder_lover@live.nl.

11  Q.  And was there a subject line to this email?

12  A.  No, ma'am.

13  Q.  And were there attachments to this email?

14  A.  Yes, there were.

15  Q.  Okay.  And I see a line underneath the to/from section.

16  What do you see there?

17  A.  That is the title of the attachment that was in this

18  email.

19  Q.  And what is that particular title of that attachment?

20  A.  The title is IMG_1198.jpg.

21  Q.  And if we can scroll down to page two.  What does this

22  depict?

23  A.  This is a picture of Elizabeth that was attached to that

24  email.  It's obviously her laying in a diaper on a blanket of

25  some sort.

1  Q.  And if you can look to the top right of the image, do you

2  see a gray background in the top right?

3  A.  The top -- top left.

4  Q.  I'm sorry.  Can you circle it on your screen.  When you

5  were doing your investigation, was there anything about this

6  particular image that provided you information on where this

7  image would have been taken?

8  A.  Yes.  So looking at the image, when I went back to kind of

9  compare the pictures of Elizabeth that I had received and then

10  I found them on -- in the forensic results.  I kind of wanted

11  to see if I could tell where this picture might have been

12  taken.

13        So looking at this image in the top left corner, if

14  you look, you can kind of see a pattern, a cloth pattern with

15  kind of a smooth surface at the top and then maybe a

16  checkered -- like small checked or some kind of textured

17  pattern right below it.  My experience, I believe that was

18  possibly a cloth interior for a vehicle.

19  Q.  And if we can scroll to the next page.  And if we can blow

20  up that line.  What does this next page indicate on this

21  exhibit?

22  A.  So that would be the title. IMG_1199.jpg.  That's the

23  title of another attachment that was attached to that email.

24  Q.  And if we can go to the next page.  What does this show?

25  A.  This is another picture of Elizabeth.  Again, you can see

492

1    that -- the blanket underneath.  Her diaper is undone.

2    Obviously the image, the focus of it is on her vagina.  But

3    again, noticeable on the left side of that image is that same

4    cloth pattern that I had seen in the first one.

5    Q.  Thank you.  We can take this down.

6         Now, you have a binder in front of you of paper

7    copies of our exhibits; is that correct?

8    A.  Yes, ma'am.

9    Q.  And when you are looking at the paper copy of Government

10   Exhibit 128 that we just went over, does that picture appear

11   as clear as what you just saw on the computer?

12   A.  No.  Unfortunately, just printing, unless you have a photo

13   printer, the printing of the image is going to degrade it

14   significantly.  So in this particular case, the cloth pattern

15   almost blacks out, you can't even really tell what it is.

16   That's the most significant piece of the image differences.

17   Q.  And it's blacked out on the paper copy?

18   A.  On the paper copies, yes.  The cloth pattern is kind of

19   blacked out.

20   Q.  But the digital copy that we were just seeing, that is a

21   copy of what you recovered from the Yahoo account; is that

22   correct?

23   A.  Yeah, that's what we recovered from the Yahoo account,

24   which was from both my search warrant and it was on the

25   computer forensic results from McCormack's computer.

493

1    Q.  Did you recover -- if we can just go back to the first

2    page of Government Exhibit 128 again.  And if we can highlight

3    who that was to.  Did you recover any other emails where

4    toddlers24 communicates with kinder_lover@live.nl?

5    A.  Yeah, there were definitely multiple emails that were sent

6    back and forth between the two.

7    Q.  Okay.  So if we can pull up Exhibit 129 that was

8    previously admitted.  What is this?

9    A.  This is another email.  This one sent in February of 2011.

10   Again from that toddlers24 account to the same

11   kinder_lover@live.nl, kind of reconnecting it appears based on

12   the text.

13   Q.  And is there a subject line to this particular email?

14   A.  No, there's not.

15   Q.  And if you can read the first line.  What does toddlers24

16   say to kinder_lover?

17   A.  It says, "Hey, how's it going?  It's been a while.  How

18   are you?  I'd love to chat again at shawns525@yahoo.com."

19   Q.  Did you recover any additional images of Elizabeth being

20   distributed in this toddlers24@yahoo.com account?

21   A.  I did.

22   Q.  If we can pull up Government Exhibit 130 previously

23   admitted.  What is this?

24   A.  This is another email from the toddlers24 account,

25   December 5th, 2008.  This one is sent to do9ly@aol.com.  And

 1  this one, there's no subject line.

 2  Q.  And looking at that line beneath the to and from, what is

 3  that?

 4  A.  That would be the attachment name of an image that was

 5  attached to this email.  In this case, it's IMG_1204.jpg.

 6  Q.  And if we can scroll to page two.  What does this show?

 7  A.  This is another picture of Elizabeth.  Confirm -- the way

 8  we can confirm that is, one, you can see that same, I guess

 9  it's like a Disney blanket that's visible underneath her and

10  then the diaper is pulled back.  And this one is obviously

11  focused on her vagina with a penis being inserted.

12  Q.  Thank you.  You can take that down.  Showing you what's

13  been marked as Government Exhibit 131.  Previously admitted.

14  What is this?

15  A.  This is another email from the toddlers24 account again

16  December 5th, sent to that same user, do9ly@aol.com.  This one

17  has another image attached to it.  It's IMG_1198.jpg.

18  Q.  Okay.  You can scroll down to page 2.  Same image that we

19  saw before?

20  A.  That's correct.

21  Q.  We can scroll down to page 3.  What's this file

22  attachment?

23  A.  That's the IMG_1199.jpg file that was distributed before

24  as well.

25  Q.  And you can just scroll down quickly to page four.  And we

1    can take that down.

2          While reviewing the emails in the

3    toddlers24@yahoo.com account, did you find other emails where

4    toddlers24 was directing people to email him at a different

5    account?

6    A.  I did.

7    Q.  We can pull up Government Exhibit 132, previously moved

8    in.  What does Exhibit 132 show?

9    A.  This is an email.  Subject line is "Regarding: Hello."

10   Again, from toddlers24.  This is sent February 6th, 2011.  And

11   this is to mikey_angarano@hotmail.com.

12   Q.  And looking at the first line, what does toddlers24 state?

13   A.  Says, "Hey, how are you?  Email me at

14   shawns525@yahoo.com."

15   Q.  During the course of your investigation -- I believe you

16   may have mentioned this -- did you obtain a search warrant in

17   the shawns525@yahoo.com account?

18   A.  I did.  In November of 2011.

19   Q.  And while reviewing the search warrant return for the

20   shawns525 Yahoo account, did you come across emails that

21   assisted you in your investigation?

22   A.  I did.

23   Q.  And if you can take a moment to look at Exhibits 133 to

24   140 in front of you in that binder.

25         Generally speaking, what are those exhibits?

496

1    A.   Those are emails that were recovered during my search

2    warrant for the Yahoo shawns525 account.

3    Q.   And did it contain some other data associated with that

4    account as well?

5    A.   Yeah, there's basically user registration information from

6    Yahoo.

7    Q.   Are those Exhibits at 133 to 140 an accurate depiction of

8    the data that you recovered from the shawns525@yahoo.com email

9    account?

10   A.   Yes, they are.

11          MS. CAIN:   United States moves Exhibits 133 to 140

12   into evidence.

13          MR. FALLER:   Submitted.

14          THE COURT:   They are admitted.

15          (Government's Exhibits 133 through 140

16          were received.)

17   BY MS. CAIN:

18   Q.   So we can pull up Exhibit 133, please.   Could you please

19   tell the jury what this is?

20   A.   This is the Yahoo's -- they call it an account management

21   tool.   It's basically the basic registration information for

22   an account that they provide.

23   Q.   And if you look about eight lines down on page 1, what is

24   the name of the user that was inserted for this particular

25   account?

497

1   A.   Mr. Shawn McCormack.

2   Q.   And if we could turn to page 2.  And if we can blow this

3   up a little bit.  What is this?

4   A.   Again, part of the account management tool.  They provide

5   a messenger list both for the user and then on a reverse.  So

6   essentially that means what other users have this particular

7   account in their messenger list.

8   Q.   And if we can look at the messenger friends list.  What is

9   the first name that you see?

10  A.   Diaperlovejeff.

11  Q.   And who are the last two friends in the Shawn's messenger?

12  A.   The last would be thewatcher1969 and then wetpjs.

13  Q.   Did you see emails going back and forth between

14  thewatcher1999 and the shawns525 user?

15  A.   Yes, just to confirm, it's thewatcher1969.

16  Q.   Okay.  And you did see emails going back and forth between

17  shawns525 and thewatcher?

18  A.   Yes, ma'am.

19  Q.   Did those emails involve sexually explicit conversations

20  regarding children?

21  A.   Yes, that's all they concern.

22  Q.   And did you see any emails between wetpjs and shawns525?

23  A.   Yes, ma'am.

24  Q.   And did those emails also involve sexually explicit

25  conversations involving children?

1   A.  Yes, ma'am.

2   Q.  While reviewing emails in the shawns525 account, did you

3   come across additional items that tied to the identity of the

4   user of this account?

5   A.  I did.

6   Q.  So if we could pull up Exhibit 134, previously admitted.

7   If we can just blow that up.  The whole thing.  Perfect.

8   Could you please tell the jury what this is?

9   A.  Yes.  This is an email exchange between McCormack and then

10   this is regarding a Craigslist ad placed for a house for rent

11   at 14275 Vessey Circle in Colorado Springs area.

12   Q.  And can you read the message down below from Shawn

13   McCormack, shawns525.

14   A.  Yeah.  And again, so this is from the shawns525 account to

15   the person who placed the Craigslist ad.  And it says, "Hello.

16   I am responding to your house on Craigslist.  I am very

17   interested in your place.  Please contact me back at

18   shawns525@yahoo.com or 719-210-0708.  My name is Shawn.  Thank

19   you for your time."

20   Q.  If we can pull up Exhibit 135 previously admitted.  We can

21   blow that up.  What does this exhibit show?

22   A.  This is an email, subject line "Hello."  This is from

23   McCormack at the shawns525 account.  This is responding to a

24   personal ad on Craigslist.  You can see from the "to" subject

25   line.  And it says, "Hello there.  My name is Shawn.  If you

1  would like to chat, text me any time you like at

2  719-210-0708."

3  Q.  Did you find any utility bills in the shawns525 account?

4  A.  Yeah, I found -- it wasn't a bill so much as it was -- or

5  there was a bill, I'm sorry.  But it's the email regarding the

6  bill from Mountain View Electric.

7  Q.  Okay.  And so if we can pull up Exhibit 136 previously

8  admitted.  What is this?

9  A.  So this is the email from Mountain View Electric to Shawn

10  dated November 18th, 2010.  The subject is "Mountain View

11  Electric electric service bill for customer" and then customer

12  number.  The text of it is addressed to Shawn McCormack,

13  saying that "Your new billing statement is available for view

14  and payment for the following account."  And the service

15  location was identified as 14275 Vessey Circle.

16  Q.  Through the course of your investigation and elsewhere,

17  did you learn what line of work the defendant was involved in?

18  A.  Yeah.  Through the investigation, I found that he

19  performed cell phone tower maintenance or repair, some form of

20  that.

21  Q.  On cell phone towers?

22  A.  That's correct.

23  Q.  If we can -- oh, through the course of your review of this

24  email account, did you find specific emails that show sexual

25  conversations about children?

1  A.  Yes.  Quite a few.

2  Q.  If we can pull up Exhibit 137 previously admitted.  Could

3  you please explain this exhibit to the jury?

4  A.  So this is an email from McCormack dated February 1st,

5  2011 and it's addressed to droseth1011@yahoo.com.  No subject

6  line in this one.  The text of it says" "Oh cool.  I love

7  diapers and kids under age 3.  Got any cp?"

8  Q.  Now, through your time working child pornography

9  investigations, have you come across the expression "CP"

10 before?

11 A.  Yes, quite a bit.

12 Q.  And what does that mean to you?

13 A.  Child pornography.

14 Q.  If we can pull up Exhibit 138, please.  Previously

15 admitted.  Could you please explain this exhibit to the jury?

16 A.  Yeah.  Again, another email from McCormack to the

17 droseth1011 account dated February 3rd, 2011.  No subject

18 line.  Text -- or the body of this says "CP (childporn)

19 sometimes the 18 month old comes in my room to wake me up and

20 I love to smell the crotch of his diaper lol."

21 Q.  If we can please pull up Exhibit 139.  Previously

22 admitted.  Could you please explain this email to the jury?

23 A.  Yes.  So this is an email with the previous string

24 attached to it below.  Subject line in this one is "Regarding:

25 your email" from McCormack at the shawns525 account dated May

501

1   22nd, 2011.  And this one is to slaveboy24@hotmail.co.uk.

2   Q.  And if we can look at the bottom of the email, since

3   that's dated earlier.  What does Shawn McCormack, shawns525

4   state?

5   A.  So the text of it starts with:  "Yes, what are you into?"

6           As you move up, the response from slaveboy was:

7   "Love young especially young pissing n being pissed on.  You?

8   Send pics n I'll reply."

9           And then McCormack's reply to that was:  "I love kids

10  this age and love seeing them peed on also."

11  Q.  And if we can scroll to page two of this exhibit.  What is

12  this?

13  A.  So you can see, this particular email had an attachment to

14  it.  The attachment was titled 20023134kSV.jpg.  This picture

15  is that attachment.  It's obviously the picture of an infant

16  in a diaper laying in a crib.

17  Q.  Okay.  If we can pull up Exhibit 140.  What does this

18  exhibit show?

19  A.  This is another email from McCormack, again dated May

20  22nd, 2011 back to slaveboy24.  No subject line.  Or it's

21  empty.  It says:  "Nice I've got two with a two year old and

22  an 8 month old being peed on.  Can I see one of yours?"

23  Q.  Now, while reviewing the sexually explicit emails about

24  children in this account, was there a pattern with the no

25  subject line?

1  A.  Yeah, typically what I saw in terms of subject line was if

2  it either pertained to, you know, sexual conversations

3  regarding children and/or had images, child pornography images

4  attached, typically the subject line would be empty.

5  Q.  We can take Exhibit 140 down.

6        During the course of your investigation into the

7  defendant, did you ever obtain a search warrant on his

8  vehicle?

9  A.  I did.  In October, 2011.

10 Q.  And where did law enforcement find the defendant's car?

11 A.  It was parked at his residence, 14275 Vessey Circle.

12 Q.  And after it was located at his residence, where did it

13 go?

14 A.  I had it towed to the Colorado Springs Police Department

15 impound lot.

16 Q.  And what kind of vehicle was the defendant driving at that

17 point in time?

18 A.  It was a 1999 Chevy Silverado truck, white in color.

19 Q.  And while executing the search warrant on the car, did you

20 take photos of the vehicle?

21 A.  Yes, ma'am.

22 Q.  And if you can look at the binder in front of you and leaf

23 through Exhibits 141 to 152.  What do those exhibits generally

24 show?

25 A.  Those are printed copies of the digital photographs that I

503

1    took of McCormack's truck.

2    Q.   And do those exhibits accurately depict what you saw on

3    the day in question when you searched the vehicle?

4    A.   Yes, ma'am.

5    Q.   Did they assist you in your investigation?

6    A.   Yes, they did.

7         MS. CAIN:   United States moves Exhibits 141 to 152

8    into evidence.

9         MR. FALLER:   No objection.

10        THE COURT:   They are admitted.

11        (Government's Exhibits 141 through 152

12        were received.)

13   BY MS. CAIN:

14   Q.   So if we could please publish Exhibit 141.

15        What does this show?

16   A.   This is a picture of the front of the truck, typically

17   taken just so I can show the license plate attached to the

18   vehicle.

19   Q.   And if we can pull up Exhibit 142.  What does this show?

20   A.   Again, zoomed in to that license plate, you know, for my

21   purposes because I can show it attached to the vehicle and its

22   registration information associated with the license plate.

23   Q.   And what's the license plate state?

24   A.   It's Colorado 603 UOX.

25   Q.   And if we can pull up Exhibit 143.  What is this?

504

1   A.   That's a picture of the passenger side of the vehicle.

2   Q.   Go to 144.  What is this?

3   A.   This is looking into the truck from the driver's door with

4   the driver's door open.

5   Q.   If we can go to 145.  What is this?

6   A.   It's rotated kind of funny, but if you turned it

7   counterclockwise, this is the driver's seat.  You can see the

8   kind of seat belt there.

9   Q.   And if we can go to 146.  What is this?

10  A.   This is essentially a zoomed in photo of the cloth

11  interior.  Again based on the photos of Elizabeth, I wanted

12  that for a comparison.

13  Q.   Go to 147.  What does this show?

14  A.   That's a bench seat in the vehicle showing -- again, focus

15  of it being the cloth interior, the seat.  So you can kind of

16  see the checked pattern with the smooth cloth above it.

17  Q.   And looking at this exhibit where it looks dark and it's a

18  solid pattern, is that where a person's bottom would go when

19  they're getting into the car.  Is that where they would sit?

20  A.   The dark portion.  That would be the bottom.  It looks

21  like maybe there's a blanket or something covering it.

22  Q.   And then when I see, looking at this lighter area in the

23  upholstery, is that where a person's back would lean up?

24  A.   That's correct.

25  Q.   If we can go to Exhibit 148.  What is this?

505

A.   Again, just zoomed in a little bit more to that cloth
pattern where the back -- where your back would lean up
against, again, for comparison reasons to the other images of
Elizabeth.

Q.   149.  What is this?

A.   This is -- I'm going through my attempt to be a CSI.  I'm
zooming in again slightly more to that cloth pattern.

Q.   Go to 150.  What is this?

A.   Zoomed in again.  But this one I think you get a pretty
good idea of that separation and then the different patterns
just right next to each other.

Q.   Go to 151.  What does this show?

A.   This is the console area, looking for the registration.
You can see the vehicle registration there in the middle.

Q.   And 152.  What does this show?

A.   This is the picture of the actual registration card for
the vehicle in the name of Shawn Joseph McCormack at 14275
Vessey Circle.

Q.   If we can pull up a side by side of Exhibit 128 previously
moved in.  And if we can get to page 2 of that exhibit.  And
then if we can pull up next to it Exhibit 149, which is
previously moved in.

        Could you please explain what you saw with the
defendant's car and how it related to your investigation with
these images of Elizabeth.

1   A.   Yeah.  So, again, looking at this picture of Elizabeth,

2   you can -- as I pointed out before, I try and identify that

3   location you can see on that top left corner.  That cloth

4   pattern behind with kind of a smooth texture with some kind of

5   pattern texture immediately below it with a distinct mark in

6   between.

7            And then the picture on the right is McCormack's

8   truck, again significant to me because the patterns appear to

9   match.

10  Q.   And then if we can look at Exhibit 128 and scroll to the

11  next image of Elizabeth.  And then again, if we can focus our

12  attention to the corner away from the blanket, what do you

13  see?

14  A.   Yeah, so, you know, looking at these images, the focus

15  again trying to identify that location.  That cloth pattern I

16  think is slightly more visible in this image.  For comparison

17  reasons, looking at the two -- the one of McCormack's truck on

18  the right that I took and then the image of Elizabeth on the

19  left.

20  Q.   We can take that down.  Thank you.

21           When you arrested the defendant back in September of

22  2011, did the defendant agree to speak with you and Special

23  Agent Hall?

24  A.   He did.

25  Q.   And was he provided his Miranda rights?

1    A.  He was.

2    Q.  Did the defendant agree to waive his Miranda rights?

3    A.  Yes, he did.

4    Q.  So if I can show you, in your binder, what's been marked

5    as Government Exhibit 153.  Do you recognize this?

6    A.  I do.

7    Q.  What is that?

8    A.  This is the Miranda waiver form that we typically use.

9    The rights are at the top, the waiver being at the bottom with

10   date and time inserted.  At the bottom it's signed by Shawn

11   McCormack as well as Special Agent Hall and myself.

12   Q.  And did the defendant Shawn McCormack sign this in your

13   presence?

14   A.  Yes, he did.

15   Q.  And is this waiver form in substantially the same

16   condition as when you obtained it?

17   A.  Yes, ma'am.

18          MS. CAIN:  United States moves Exhibit 153 into

19   evidence.

20          MR. FALLER:  No objection.

21          THE COURT:  It is admitted.

22          (Government's Exhibit 153 was received.)

23   BY MS. CAIN:

24   Q.  If we could briefly pull that up.

25          Now, prior to interviewing the defendant, did you

508

1   have an opportunity to observe him?

2   A.  Well, yes.  Yes.  I've seen him before, yes.  And I

3   observed him until we started speaking.

4   Q.  And did he appear to be under the influence of drugs or

5   alcohol when you were observing him?

6   A.  No, not that I'm aware of.

7   Q.  And prior to interviewing the defendant, did you or

8   Special Agent Hall make any threats against him?

9   A.  Absolutely not.

10  Q.  Did you or Special Agent Hall do anything to pressure him

11  into talking to you?

12  A.  No, ma'am.

13  Q.  When you and Special Agent Hall interviewed the defendant,

14  was it videotaped?

15  A.  It was.

16        MS. CAIN:  Your Honor, may I have permission to

17  approach the witness?

18        THE COURT:  Yes.

19  BY MS. CAIN:

20  Q.  I have just handed you an item that's been marked as

21  Government Exhibit 154.  Do you recognize that item?

22  A.  I do.

23  Q.  What is that?

24  A.  It's a disk containing the interview that Agent Hall and

25  myself conducted with McCormack.  And it's marked Government's

1  Exhibit 154.

2  Q.  And prior to testifying today, did you have an opportunity

3  to look at the contents of that disk?

4  A.  I did.

5  Q.  And are the contents of that disk an accurate depiction of

6  the interview as it transpired on the day on which you

7  interviewed him?

8  A.  Yes, it is.

9          MS. CAIN:  United States moves Exhibit 154 into

10  evidence.

11          MR. FALLER:  No objection.

12          THE COURT:  It is admitted.

13          (Government's Exhibit 154 was received.)

14          MS. CAIN:  At this point, Your Honor, the United

15  States would like to play his interview.  And just for court

16  reference, it's about 20 minutes long.

17          THE COURT:  All right.  The parties stipulate the

18  court reporter need not take this down?  That the video itself

19  is the evidence of what's spoken, so she doesn't have to take

20  down verbatim what is on the video.

21          MS. CAIN:  No objection from the government.

22          MR. FALLER:  That's fine, Your Honor.

23          THE COURT:  All right.

24          (Playing video.)

25          MS. CAIN:  I have no further questions for this

1   witness, Your Honor.

2          THE COURT:  Cross-examination.

3          MR. FALLER:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5   BY MR. FALLER:

6   Q.  Detective Romine, when you served the search warrant at

7   the Vessey Circle residence and seized the clothing you've

8   identified here, how many dressers were there in the house?

9   A.  In the entire house?

10  Q.  Yes.

11  A.  I believe there was one in the second bedroom and one in

12  the south bedroom.

13  Q.  So at least two?

14  A.  I think two.

15  Q.  Did you search both of them?

16  A.  I didn't personally, no.

17  Q.  Were they both searched?

18  A.  Yes, the entire house was searched.

19  Q.  And at that time you were aware that Scott McCormack was

20  living there also?

21  A.  During the second one, is that what you're referring to?

22  Q.  Yes.

23  A.  Yes.  Scott had moved in.

24  Q.  Did you take any steps to try and identify what clothing

25  or other items were Scott's and what belonged to Shawn?

511

1    A.  It appeared -- I mean, again, looking at the residence --

2    that the second person who I'm going to assume is Scott was

3    staying in that second bedroom and that the south bedroom

4    remained Shawn's as it did in the first one.

5    Q.  Did you take any steps to try and determine which clothing

6    was perhaps Shawn's and which was Scott's?

7    A.  No, I don't -- obviously his name is not on it.  Just the

8    clothing was found in the south bedroom where McCormack

9    stayed.

10   Q.  And did you -- was Scott there when you conducted the

11   search?

12   A.  During the second one, I'm not certain.  I don't remember.

13   I'd have to look back at my reports.

14   Q.  Did you ever talk to him about whether any of the clothing

15   that you seized belonged to him?

16   A.  No.  I did not.

17   Q.  Now, I notice that you seized three red shirts; is that

18   correct?

19   A.  Yes, sir.

20   Q.  Two of them short sleeve, one of them long sleeve?

21   A.  Yes, sir.

22   Q.  In any of the images or videos that are in evidence, is

23   there ever a red long sleeve shirt seen?

24   A.  You know, it's hard to tell.  Obviously, looking at the

25   picture, sleeves can be pulled up.  So I can't say for sure

1    whether a long sleeve shirt was worn or not.

2    Q.  Didn't you testify yesterday that one of them was a short

3    sleeve red shirt?

4    A.  And that's what I said, I believe it was a short sleeve

5    red shirt only because you can't see -- you're looking at the

6    lower portion of the arm and all you see is skin.  So, you

7    know, it's possible it's short sleeve, it's also possible that

8    it could just be a long sleeve with pulled up sleeves.

9    Q.  Okay.  It's also possible that it was some red shirt

10   that's none of the three that you seized; correct?

11   A.  That's possible.

12   Q.  Because there weren't any particularly distinctive visible

13   characters of the shirt that you saw in the image that would

14   identify one of the shirts you seized as definitely being that

15   shirt; correct?

16   A.  No.  I can't say for sure that any one of the three is for

17   sure the one in the pictures.

18   Q.  And could have been some other red shirt as far as you

19   know?

20   A.  It's possible.

21   Q.  Okay.  And you also seized, I believe, two gray t-shirts.

22   A.  Yes, sir.

23   Q.  And were you able to determine whether either of those

24   gray t-shirts was the t-shirt that appeared in a video or

25   image that is in evidence here?

513

1   A.  Again, not -- not definitively I could say that one

2   particular gray shirt was the one.

3   Q.  So it could have been one of the two gray shirts that you

4   seized or it could be another gray t-shirt all together;

5   correct?

6   A.  It's possible he had another gray t-shirt that we didn't

7   seize that he had thrown away at some point.

8   Q.  And it's possible that it could have been a gray t-shirt

9   that Shawn McCormack never owned; correct?

10  A.  I suppose it's possible he was just borrowing somebody's

11  shirt, yes.

12  Q.  Well, you don't -- you're concluding that the gray shirt

13  in the video belonged to Shawn McCormack; correct?

14  A.  No.  I'm concluding that he wore a gray shirt in the

15  video.

16  Q.  And you're -- and that's based upon your conclusion that

17  you believe the person in the video is Shawn McCormack?

18  A.  Yes, sir.

19  Q.  And based upon that conclusion, you -- that's why you

20  thought the gray t-shirts were relevant; correct?

21  A.  Yes, sir.

22  Q.  Now, the two belts that you referred to, are they both the

23  same size?

24  A.  I -- there's no size marking on them.  I don't know.

25  Q.  Did you ever --

Benitez - X

514

1    A.   I never --

2    Q.   Did you ever try and determine whether they're the same

3    size?

4    A.   No.  I didn't measure them, no.  I didn't see the

5    relevance in having -- you know, knowing if one was 36 inches

6    versus one was 34.  It wasn't of particular relevance.

7    Q.   And did you -- are you able to determine whether either

8    one of those belts is actually in any of the videos or the

9    still images?

10   A.   I believe the one, yes, is.

11   Q.   One of them is?

12   A.   I believe so.

13   Q.   Which one?

14   A.   I believe the one with the silver buckle without the

15   marking on it is the one in the video.

16   Q.   And then why did you seize the other one then?

17   A.   Because my search warrant asked for all black cloth belts

18   with silver buckles.  And that, in fact, matched that

19   description.

20   Q.   You seized four what were referred to as ski masks.

21   A.   Yes, sir.

22   Q.   And three of them were black?

23   A.   Yes.

24   Q.   And one of them was gray.

25   A.   Yes, sir.

515

1    Q.   There's no gray ski mask in any of the videos or the

2    images; is there?

3    A.   Not that I'm aware of, no.

4    Q.   But you seized it anyway.

5    A.   Yes, sir.

6    Q.   And those ski mask items are not -- is not unique or

7    unusual for an individual to possess something like that in

8    the state of Colorado; is it?

9    A.   Obviously they sell them in the state of Colorado.  I

10   personally don't own any.

11   Q.   No, but you're aware of and your experience in Colorado

12   that, because of the cold, outdoors people own ski masks like

13   that?

14   A.   Yes, sometimes.

15   Q.   And people wear them riding snowmobiles; correct?

16   A.   I've never been snowmobiling, I don't know.

17   Q.   You don't know.  People that work outside would wear them

18   sometimes; isn't that true?

19   A.   I suppose it's possible.  Again, I mean, I worked outside

20   for quite a few years and I never wore one.  So I don't know.

21   I couldn't say for sure.

22   Q.   You can't say for sure.  You've seen them in other places

23   other than criminal investigations, though, haven't you?

24   A.   Yeah, I've seen them in REI.

25   Q.   Offered for sale to the public?

1    A.   Yes, sir.

2    Q.   Okay.  Now, the photographs of Elizabeth that you

3    concluded were taken in a vehicle, were you able to reach an

4    opinion as to whether they were taken during the day or during

5    the night?

6    A.   Well, if you look at the two pictures side by side as we

7    did earlier, my pictures were taken during the day.  You can

8    see, you know, the color differentiation.  So based on that, I

9    would say the pictures of Elizabeth that were on McCormack's

10   computer were taken at night.

11   Q.   Do you believe they were taken at night?

12   A.   Yes, sir.

13   Q.   When you conducted the search, any of the searches of the

14   McCormack -- Shawn McCormack's residence, are you aware of any

15   video equipment being seized?

16   A.   Other than obviously cell phones can make videos.

17   Q.   I understand that.  I assume other than cell phones, your

18   answer is no?

19   A.   Yeah, I'm not aware of any other.

20   Q.   Did you take any steps to try and determine what devices

21   were used to produce the still images and the videos that were

22   found on the computer?

23   A.   That would -- Detective Rogers would have done the

24   analysis in terms of data extraction and whatnot, so I'm not

25   aware of whether he did that or not.

517

1    Q.  So the answer to that question if you're aware of it is

2    no?

3    A.  That's correct.

4    Q.  Now, you -- I believe you identified and testified about

5    an email, I believe it was Exhibit 138 where someone that you

6    believe to be Mr. McCormack talked about an 18 month old

7    coming in and waking him up.  Is that right?

8    A.  Yes, that's in one of the emails, yes.

9    Q.  Now, this -- that email was sent on what date?

10   A.  February 3rd, 2011.

11   Q.  And do you have any knowledge on February 3rd, 2011 how

12   old Ben would have been?

13   A.  No, I don't know.

14   Q.  The seats in the pickup that were -- that was seized from

15   Mr. McCormack were -- it seemed kind of difficult to tell in

16   some of the photographs, were they tan or gray?

17   A.  Kind of a grayish color.

18   Q.  Gray?

19   A.  Yes, sir.

20   Q.  And I believe there was a gray blanket on the bottom seat

21   when the search warrant videos were -- or excuse me, the

22   search warrant photographs were taken?

23   A.  Yes, sir.

24   Q.  Have you ever had any direct contact with either Ben or

25   Elizabeth?

518

1   A.  I have not personally, no.

2   Q.  In the seats in Mr. McCormack's truck and the portions of

3   the seats that you were able to observe in the Elizabeth

4   images, were you able to detect any damage to the seats that

5   would -- that would show that it was the same vehicle?

6   A.  Unfortunately, the portion of the seat that's visible in

7   the pictures of Elizabeth is obviously very small.  So that's

8   the only portion I have to compare to.  So in terms of -- like

9   if you're asking if there's a certain rip on a seat or

10  something like that, no, there wasn't that I could identify.

11  Q.  So the answer is no?

12  A.  Yes, sir.

13  Q.  Is that right?

14  A.  Yes, sir.

15  Q.  Okay.  Now, the answer would be the same for any kind of

16  distinctive wear patterns or anything of that nature?

17  A.  That's correct.

18  Q.  When you searched the white pickup in Colorado, did you

19  find any video equipment or any photographic equipment inside

20  the car?

21  A.  No, sir.

22          MR. FALLER:  If I might have a moment, Your Honor.

23          THE COURT:  Yes.

24          MR. FALLER:  That's all I have.  Thank you, Your

25  Honor.

1          THE COURT:  Okay.  And redirect.

2          MS. CAIN:  No redirect, Your Honor.

3          THE COURT:  Either party wish this witness remain

4    subject to recall?

5          MS. CAIN:  Yes, Your Honor.  From the government's

6    point of view.

7          THE COURT:  Either side may still call you back to

8    testify.  I'll leave it to the attorneys to let you know the

9    date and time if necessary.  You can go ahead and step down.

10         THE WITNESS:  Yes, sir.

11         MS. CAIN:  The United States calls its next witness,

12   Andrew.

13         THE COURT:  Okay.  And before Andrew comes in, I'm

14   going to remind the jury that as to Andrew and Ashley Karen,

15   the reason we're only using their first names is the privacy

16   requirements for minors, not the adults.  But it sort of

17   spills over in terms of last names.  So they're not being

18   disrespectful or too casual to these witnesses, that's

19   basically a requirement of the privacy interests of the

20   minors.

21                            **ANDREW**,

22   called as a witness on behalf of the Government, having been

23   first duly sworn, testified as follows:

24         THE CLERK:  Please have a seat.  State your first

25   name only for the record and then spell it.

1          THE WITNESS:  My name is Andrew, A-N-D-R-E-W.

2                    DIRECT EXAMINATION

3    BY MS. CAIN:

4    Q.   Good morning, how are you?

5    A.   Good.  How you doing?

6    Q.   What city and state do you currently live in?

7    A.   Paso Robles, California.

8    Q.   And how many years have you lived there?

9    A.   Going on two years, a little over two years now.

10   Q.   And prior to living in Paso Robles, what city did you live

11   in?

12   A.   Bakersfield, California.

13   Q.   And approximately how many years were you living in

14   Bakersfield prior to moving to Paso Robles?

15   A.   About seven years, eight years.

16   Q.   And do you have any children?

17   A.   I do.  I have two children.

18   Q.   And what are your children's names?

19   A.   Ben and Elizabeth.

20   Q.   And how old is Elizabeth right now?

21   A.   She is nine.

22   Q.   And how old is Ben?

23   A.   He's seven.

24   Q.   What date was Elizabeth born?

25   A.   January 26th, 2006.

521

1   Q.   And what date was Ben born?

2   A.   September 16th, 2007.

3   Q.   And providing first name only, who is the mother of Ben

4   and Elizabeth?

5   A.   Ashley.

6   Q.   Does she also go by Ashley Karen?

7   A.   Ashley Karen.

8   Q.   Okay.  And how old were you and Ashley Karen when

9   Elizabeth was born?

10  A.   We were 19 years old.

11  Q.   And how old were you two when Ben was born?

12  A.   We would have been -- just turned 21.

13  Q.   Do you know the defendant Shawn McCormack?

14  A.   Yes, I do.

15  Q.   And how did you meet the defendant Shawn McCormack?

16  A.   Through friends, high school.  I've known him pretty much

17  since school.

18  Q.   And does the defendant have any family relation to you or

19  Ashley Karen?

20  A.   No.

21  Q.   Taking you back to 2007 through 2009.  Did Shawn McCormack

22  ever spend the night at your home while you were living in

23  Bakersfield, California?

24  A.   Yes.  A few times.

25  Q.   And why would he be spending the night at your residence?

1  A.  He'd call.  He lived and worked out of town.  He'd want to

2  hang out and have a place to stay the night at.  You know.

3  And he was my friend.  I let him.

4  Q.  And with respect to his job, do you know what he did for a

5  living?

6  A.  My understanding was he drove around and worked on cell

7  towers.

8  Q.  And prior to coming over to spend the night, would he call

9  you?

10  A.  Yeah, usually he'd call me a day or so in advance.

11  Q.  And how many nights at a time would he stay at your place

12  during these visits?

13  A.  Just one night usually.  Kind of just passing through.

14  Q.  And did you previously live at a residence in Bakersfield

15  on Mary Kay Lane?

16  A.  Yes, I did.

17  Q.  Approximately how many years did you live there?

18  A.  I want to say about three years.  Maybe a little longer.

19  But right around three, four years.

20  Q.  And were your kids born at that point in time?

21  A.  Elizabeth had already been born when we bought the house.

22  We lived there when Ben was born, though.

23  Q.  And so approximately what date did you guys move in to

24  that residence?

25  A.  I want to say it was the later year 2006.  I would have to

523

1  say around October -- around October, I think.

2  Q.  And approximately how many times, if you recall, did the

3  defendant visit you as an overnight guest while at the Mary

4  Kay residence?

5  A.  I'm not for certain exactly, but I would have to say at

6  least three times.

7  Q.  And then was there a point in time when you lived on

8  Wilson Avenue in Bakersfield?

9  A.  Yes.

10  Q.  And what year did your family move into that residence?

11  A.  We left the Mary Kay lane and moved in there, I want to

12  say it was the very beginning of 2009.  I want to say it was

13  January, February.

14  Q.  And did the defendant visit you while at the Wilson Road

15  residence as well?

16  A.  Yes.

17  Q.  As an overnight guest?

18  A.  Yes.

19  Q.  Approximately how many times?

20  A.  I believe twice.

21  Q.  And when the defendant would come and visit you and your

22  family in Bakersfield, would he be driving a vehicle?

23  A.  Yes.

24  Q.  And do you recall any types of vehicles that he would

25  drive when visiting?

524

1   A.   A blue Chevy Silverado, a white Chevy Silverado or a white

2   older Toyota pickup.

3   Q.   And with respect to the white Toyota, do you have an

4   understanding as to whose car that was?

5   A.   I believe it was his mom's.  They had it back when we were

6   in high school, you know, used to take it driving and stuff.

7   Always referred to it as "mom's."

8   Q.   And if we can just focus on the layout of your Wilson Road

9   residence.

10  A.   Uh-huh.

11  Q.   How many floors were on that residence?

12  A.   Just one.

13  Q.   And how many bedrooms were in that house?

14  A.   It was a three bedroom house.

15  Q.   And talk to us about the split up of the bedrooms.  Who

16  was in which room?

17  A.   Me and Karen would have been in the front room.  We had a

18  back guest bedroom my mom was staying in, but she had recently

19  moved out.  And then there would have been a bathroom and then

20  the kids' room.  And all of that led in from the hallway from

21  the living room.

22  Q.   And so did Ben and Elizabeth share a room?

23  A.   Yes, they did.

24  Q.   Did Ben and Elizabeth's room have a window?

25  A.   Yes.

525

1   Q.   And if one wanted to open up the window in Ben and

2   Elizabeth's room, what was required to open up that particular

3   window?

4   A.   Pulling on the window.   There was a latch on it, but it

5   didn't really work very well.

6   Q.   So was it a window you can slide to the side or --

7   A.   Yes.

8   Q.   -- something else?

9   A.   It would be sliding to the side.

10   Q.   And was this window near ground level?

11   A.   About waist height.

12   Q.   Waist height of an adult?

13   A.   Of an adult, yes.

14   Q.   Was there a screen on that window?

15   A.   Yes, there was.

16   Q.   Could you please describe the back yard at your Wilson

17   Road residence?

18   A.   Yeah.   The kids' bedroom, the bathroom and the guest

19   bedroom all shared the wall along the back of the house.   And

20   there was a pool leading right out and there was a gate in

21   between the house and the pool.   And then there's another gate

22   that led out to the actual driveway that led out to the back

23   alley.

24   Q.   And did Ben and Elizabeth's window look out at the back

25   yard?

1    A.  Yes, it did.

2    Q.  And then did you have a driveway in the front of your

3    house?

4    A.  Yes, we had a horseshoe driveway in the front.

5    Q.  And then an alley in the back?

6    A.  Alley and a driveway in the back.

7    Q.  And then was there a den in your house?

8    A.  Yes.

9    Q.  And when Shawn McCormack would stay at your house, where

10   would he sleep?

11   A.  He would be in -- the formal living room is in front, he

12   would stay in the back den.

13   Q.  Was there a couch or pullout bed?

14   A.  Couch, TV, yeah.

15   Q.  And then how many showers were in this residence?

16   A.  There was two bathrooms.  But the one located in the guest

17   bedroom in the back corner didn't really work, so we all use

18   the front restroom and shower.

19   Q.  And where was that restroom that everyone used in relation

20   to Ben and Elizabeth's room?

21   A.  It was actually directly between their room and the other

22   guest bedroom.

23   Q.  And if a person were to sleep on the couch in the den and

24   if they wanted to go to Ben and Elizabeth's room, where would

25   the shower that people used be in relation to that?

1   A.  You would have to come through the den, through the

2   kitchen, into the living room and through the hallway door.

3   And as soon as you walk through the hallway door, their room

4   would have been here and the bathroom is right in front of it.

5   You can see the bathroom door from the hallway.

6   Q.  So if a person is standing near Ben and Elizabeth's room,

7   are they within viewing of the bathroom?

8   A.  Two feet of the door, yeah.

9   Q.  Taking you to November 6th of 2009.  Was the defendant

10  Shawn McCormack visiting as an overnight guest at your place

11  on Wilson Road?

12  A.  Yes, he was.

13  Q.  And did you and the defendant spend time together that

14  night catching up?

15  A.  Yes.  Yes, we did.

16  Q.  And what did you guys do while catching up?

17  A.  We went driving, four-wheel driving out in the foothills.

18  I had a couple of beers.  We smoked some pot.  Came back home.

19  I had another couple -- two beers or so.  Played some video

20  games.  Pretty much went to bed.  I went and got in the shower

21  before I went to bed.  And then when I got out, I checked on

22  the kids and realized Ben was not there.

23  Q.  Okay.  And if we can just hold off on that for one moment.

24  So you mentioned that you had some beers.  And both of you had

25  smoked some pot?

528

1    A.   Yes.

2    Q.   And this is before you'd gotten back to the residence?

3    A.   Yes.

4    Q.   And then you mentioned that you guys played some video

5    games.

6    A.   Uh-huh.

7    Q.   Was that a yes?

8    A.   Yes.   Sorry.

9    Q.   And for about how long were you guys playing video games

10   before you took a shower?

11   A.   I'd say an hour or two.

12   Q.   And was the defendant drinking alcohol that night?

13   A.   I do not remember him drinking alcohol.  Mostly Red Bull.

14   Q.   Had he had one Red Bull, several, what do you recall?

15   A.   At least two.  Maybe three.

16   Q.   And what are Red Bulls?

17   A.   Energy drink.

18   Q.   Is there a lot of caffeine --

19   A.   Yeah.

20   Q.   -- in Red Bulls?

21   A.   Uh-huh.

22   Q.   Is that a yes?

23   A.   Yes, it is.  Sorry.

24           THE COURT:  Okay.  Let me do this.  It's 10:30 now.

25   We're going to take our morning recess.  Remember those

529

1   admonishing jury instructions.  We'll return in 15 minutes.

2          (The jury left the courtroom.)

3          THE COURT:  All right.  The jury has left for its

4   morning recess.  Andrew, you can go ahead and step down.  Just

5   come back to the witness stand in 15 minutes.

6          THE WITNESS:  Thank you.

7          THE COURT:  All right.  Any matters we need to take

8   up before the break.  Plaintiff's side, anything?

9          MR. DELAHUNTY:  Not at this time, Your Honor.

10         THE COURT:  Defense?

11         MR. FALLER:  No, Your Honor.

12         THE COURT:  All right.  15 minutes.

13         (Recess.)

14         THE COURT:  We'll have the jury come in.  If we can

15   just have Andrew come and retake the witness stand.

16         (The jury entered the courtroom.)

17         THE COURT:  The jury is present.  Please be seated.

18   We'll continue with testimony.

19   BY MS. CAIN:

20   Q.  So you testified right before the break that you and the

21   defendant had gone off-roading together.

22   A.  Yes.

23   Q.  And then after off-roading, you and the defendant came

24   back to your residence and you were playing video games.  What

25   part of the house were you playing video games in?

1    A.   It would have been the back den.

2    Q.   And you also mentioned that after playing video games, you

3    then went to go take a shower.

4    A.   Yes.

5    Q.   And was this late at night at this point in time?

6    A.   It would have been about 10:30, 11.

7    Q.   At least?

8    A.   At least.  If not 11:30 already.

9    Q.   And were the kids already in bed at this point?

10   A.   Yes.  Ashley Karen and the kids were both already in bed

11   already.

12   Q.   When you got back from off-roading and were going back

13   into the residence to play video games, where did the

14   defendant park his vehicle?

15   A.   He actually parked out at the end of the alley on the

16   street.  And I remember telling him he can pull into the

17   driveway, but he said he was fine and I kind of just left it

18   at that.

19   Q.   Did you think that was unusual?

20   A.   A little.  But didn't really think too much of it at the

21   time.

22   Q.   And so you eventually go take a shower.  And then what

23   happened?

24   A.   Well, you know, I get out of the shower.  Have a routine,

25   make sure that, you know, the kids haven't kicked their

531

1    blankets off of them and they're warm before I go to bed.  And

2    walked in, realized, you know, Ben was not there.  Checked the

3    floor, you know.  He likes to crawl under his bed.  He falls

4    off and kind of tucked under when he was little.  Check.  No.

5    Make sure he didn't get up and go get in mom's bed.  Wasn't

6    there.  You know, and literally searching the house, just

7    wondering if he got up and wandering around.  And couldn't

8    find him.

9          So I woke up Ashley Karen.  And then she started

10   helping me look.  And we just couldn't find him anywhere.  And

11   then about that time, I walked back in the kids' room, I did

12   realize the screen was off the window.  And then it dawned on

13   me that Shawn was not there.

14   Q.   So with respect to the window screen being off, was the

15   window also open?

16   A.   It was open and the screen was off.

17   Q.   And was the screen on the inside of the house or the

18   outside of the house?

19   A.   It was on the outside.

20   Q.   And so after you informed Ashley Karen that you couldn't

21   find Ben, did she end up going anywhere after searching the

22   house with you?

23   A.   Yeah, we were searching.  I walked down the alley to see

24   if I could see Shawn's truck, which was not there.  Started

25   dialing the police on my way back to the house.

532

1    Apparently Ashley Karen had ran out front and there

2  was another incident that had happened down the street and she

3  flagged down the police that were leaving the scene.  And as

4  I'm walking into my back yard, I already have four to six

5  police officers at my house and literally on the phone with

6  dispatch.  And handed it over to the police to let them know

7  that someone was already there.

8    She -- you know, Ashley Karen is looking in the pool

9  for Ben just in case he wandered off and fell in.  You never

10  know.  You know, I tried calling Shawn.  No answer.  Repeated

11  times.  Gave the phone over to the police officer.  When he

12  dialed it, he answered the first try.  And my understanding is

13  he pretty much kept him on the phone and found him from there.

14  Q.  And so once the police were able to successfully make

15  contact with the defendant over the phone, what happened next?

16  A.  They got him to bring my son back.  You know, showed up.

17  Nothing but a diaper.  No car seat.  Not buckled up.  You

18  know, it was cold.  I don't even -- you know, he said he woke

19  up while I was in the shower and he went to take him to the

20  store with him or something.  And literally at the time I

21  didn't even know what to think.  I was just so --

22    MR. FALLER:  Objection, Your Honor.  This is

23  nonresponsive.

24    THE COURT:  Sustained.  Go ahead and ask your next

25  question.

1    BY MS. CAIN:

2    Q.  So once -- so did the defendant make statements in your

3    presence as to why he had Shawn in his car at a late hour?

4    A.  He said that he had woken up and that he took him to the

5    store with him.  He was going to get a drink or something.

6    Q.  Did that make sense to you --

7    A.  No.  Not at all.

8           MR. FALLER:  Your Honor, I'm going to object.  Ask

9    that be stricken.  That's an improper opinion, what made sense

10    to this witness.

11           THE COURT:  Sustained.  Disregard the last question

12    and answer.

13    BY MS. CAIN:

14    Q.  Were there drinks in the house and snacks in the house for

15    Ben?

16    A.  Yes.  Of course.

17    Q.  At this point in time, when you saw Ben, you mentioned he

18    was only in a diaper.

19    A.  Yes.

20    Q.  And was it chilly that night?

21    A.  Yes, it was.

22    Q.  And as a father, would you put your child in some sort of

23    clothing before taking him out?

24    A.  Of course.  And not -- a jacket and blanket as well

25    probably.

534

1   Q.  And did Ben appear injured or upset at that point in time?

2   A.  No.  He did not appear -- really sleepy, aggravated for

3   being awake maybe.

4   Q.  And how were you feeling at this point in time?

5   A.  Honestly, at this point in time I really don't even know

6   what to think.  I want to believe my friend obviously.  Hope

7   nothing -- you know, I want to believe that was the true

8   story.

9   Q.  And during this November 6th, 2009 incident, was there a

10  convenience store that was near your residence?

11  A.  Yeah, there was two.  One about two blocks away and

12  another one about three, four blocks away.

13  Q.  And were those convenience stores within walking distance?

14  A.  Yes, they were.

15  Q.  Do they sell snacks and drinks?

16  A.  Yes, they do.

17  Q.  Did you give the defendant permission to take Ben out that

18  night?

19  A.  No, I did not.

20  Q.  Did you ever give the defendant permission to take Ben out

21  during any of his visits to your house?

22  A.  Never.

23  Q.  Did you ever give the defendant permission to take your

24  daughter Elizabeth outside of the house?

25  A.  No.  Never.

535

1    Q.   After this November 6th, 2009 incident, did you ever have

2    McCormack stay as an overnight guest at your place?

3    A.   No, I did not.

4    Q.   Were you or Ashley Karen friends with the defendant after

5    this incident?

6    A.   No.   After that we pretty much just stopped talking.

7    Q.   And why is that?

8         MR. FALLER:  Objection.  Relevance.

9         THE COURT:  Sustained.

10   BY MS. CAIN:

11   Q.   Do you know the defendant's brother -- or does the

12   defendant have a brother that you know of?

13   A.   Yes.   I actually met his brother before him.

14   Q.   And what is that brother's name?

15   A.   Scott McCormack.

16   Q.   And how do you know Scott McCormack?

17   A.   We all -- I'm not sure if he went to my high school or

18   not, but he was friends with all of my friends and that's how

19   I met him.

20   Q.   And had Scott McCormack ever spent the night at your

21   place?  That you recall.

22   A.   Scott, one time on Mary Kay Lane he came with Shawn once.

23   Q.   And they both spent the night that night?  From what you

24   recall.

25   A.   I want to say they actually had a hotel room that night.

536

1  Q.  Okay.  And have you ever caught Scott taking Ben out in

2  the middle of the night?

3  A.  No.  I mean, that one time was the only time I'd seen

4  Scott since before Elizabeth was born.

5            MS. CAIN:  Court's indulgence.

6            THE COURT:  Yes.

7            MS. CAIN:  I have nothing further.  Thank you.

8            THE COURT:  Cross-examination.

9            MR. FALLER:  Thank you, Your Honor.

10                      CROSS-EXAMINATION

11  BY MR. FALLER:

12  Q.  I believe you testified a few minutes ago that on November

13  6th of '09, that you and Shawn McCormack went four-wheeling?

14  A.  Yes, sir.

15  Q.  Where did you go?

16  A.  Out in the foothills of Bakersfield.

17  Q.  Whereabouts?

18  A.  It's actually off of Morning Drive now.  Um --

19  Q.  Go ahead.

20  A.  It's literally just out in the foothills.  It would be the

21  east side of Bakersfield now.

22  Q.  How long were you out there?

23  A.  Probably no more than three hours or so.  Honestly, I

24  wasn't really keeping track.

25  Q.  So what time did Mr. McCormack arrive at your residence?

1   A.  I want to say it was late afternoon, somewhere between

2   three and five or so.

3   Q.  Okay.  And this was November.  So it got dark about five?

4   A.  Yeah, right around there.

5   Q.  So did you guys go out and four wheel in the dark?

6   A.  I remember it -- well, to be completely honest with you,

7   it wouldn't be farfetched because we did do it a lot.  But I

8   do not remember that day specifically, no.

9   Q.  Now, isn't it true that you talked to law enforcement

10  officers multiple times about this incident on the 6th?

11  A.  I spoke to the officers who responded.

12  Q.  You spoke to the officers who responded.

13  A.  Uh-huh.

14  Q.  You also met with an officer, Bakersfield Police Detective

15  by the name of John Jamison; is that correct?

16  A.  Yes.  Him and Agent Pike actually found me regarding this

17  case.

18  Q.  Okay.  And well, you -- that's right.  And then you met

19  with the prosecutors and Agent Pike on March 19th of this

20  year; correct?

21  A.  I believe so, yes.

22  Q.  And isn't it true that in none of those interviews did you

23  ever mention that on November 6th of 2009 that you went

24  four-wheeling with Mr. McCormack?

25  A.  I don't believe I did.  Honestly, I don't think I was ever

538

1    asked.

2    Q.  Well, they asked you what happened on November 6th, didn't

3    they?

4    A.  Pertaining to the night time, yes.  No one ever asked if

5    he was, you know, there hanging out during the day or what we

6    did.  Everything was always revolved around what actually

7    happened that night.

8    Q.  Okay.  So you're telling us today that they never asked

9    you what happened or what time Mr. McCormack arrived at your

10   house?

11   A.  No, not really.

12   Q.  I just want to make sure I understand this.  That these

13   officers -- the officers in multiple interviews with you, it

14   is your testimony that they never asked you what time Mr.

15   McCormack arrived at your house; is that correct?

16   A.  Not that I can remember.

17   Q.  And in addition, you -- I think you've testified that you

18   were drinking and smoking marijuana that evening?

19   A.  Yes, sir.

20   Q.  And you never told any of the officers in these numerous

21   interviews that you were doing that until your pre-trial

22   interview on March 19th; correct?

23   A.  I believe I had said something about drinking, but no, I

24   never said anything about smoking.

25   Q.  Okay.  Now, so it is your testimony today that Mr.

1   McCormack arrived at your residence at four or five o'clock

2   the afternoon of November 6th.  Do I have that right?

3   A.  It could have been a little earlier, but yes, right around

4   there.

5   Q.  And then what's the first thing that you and Mr. McCormack

6   did after he arrived?

7   A.  I believe he got there.  Honestly can't give you every

8   detail.

9   Q.  Why don't you tell me the best you can.

10  A.  I do remember him getting there.  I do remember us going

11  four-wheeling.  I remember him coming home and parking on the

12  side of the street.  And I remember grabbing Red Bulls out of

13  the truck and going inside and hanging out for a little bit.

14  I really don't know all the full details of that day to be

15  honest with you.

16  Q.  Whose vehicle did you take four-wheeling?

17  A.  Shawn's truck.

18  Q.  Anybody else go with you?

19  A.  No, sir.

20  Q.  Isn't it true that you had gone four-wheeling with him on

21  prior occasions?

22  A.  Yes, sir.

23  Q.  And that you've mentioned in those prior occasions you

24  would drink beer and smoke marijuana?

25  A.  Yes, sir.

540

1   Q.   Now, the -- you testified about discovering the window

2   open in the children's room?

3   A.   Uh-huh.  Yes.

4   Q.   Now, when the police officers got -- were there and when

5   Mr. McCormack came back with Ben, did you show the police

6   officers the open window and the screen sitting outside?

7   A.   I'm not sure if I did to be honest with you.  I'm not sure

8   if I pointed it out.  Everything was happening extremely fast

9   at that point in time.

10  Q.   Did you think that was important?

11  A.   Honestly, I had two police officers with flashlights

12  looking in a pool for my son, another one on the phone trying

13  to call Shawn.  I really wasn't thinking about the window at

14  the time.

15  Q.   I'm talking about after --

16  A.   Uh-huh.

17  Q.   -- Ben was safely back at your house.

18  A.   Yeah.  No, I did not mention -- think to even mention it.

19  Q.   When's the first time that you mentioned that?

20  A.   I believe it is in one of the interviews.  I'm not exactly

21  sure.

22  Q.   Where were you working at this time?

23  A.   At that time, I would be working at Bakersfield Club

24  Locksmithing.

25  Q.   And what time did you get home from work that day?

541

1   A.   Honestly, I don't remember.  My work schedule is

2   completely sporadic.  I'm on call 24 hours a day.  I know I

3   was off that night, so I would have to say I probably got off

4   work probably around four or five that afternoon.

5   Q.   Isn't it true that you asked Mr. McCormack to park his car

6   out of the driveway because you were concerned that you might

7   be called in to work that evening?

8   A.   No.  No.  I knew I was off work that evening because I

9   never drink when I'm on duty.

10   Q.   And what time did this -- this whole event with the police

11   happened approximately 1:40 in the morning; isn't that

12   correct?

13   A.   I believe, yeah, that sounds about right.

14   Q.   And so what time did you go take this shower?

15   A.   I remember it being a little earlier, but it must have

16   been a little later.  I was thinking maybe around 11:30.  But

17   again, I wasn't exactly keeping track of time.  I knew it was

18   late.  I knew everyone was already asleep.

19   Q.   And during this period of time when you were trying to

20   find Ben, where was Elizabeth?

21   A.   She was in bed.

22   Q.   She never woke up?

23   A.   No.  They had separate beds.

24   Q.   And so during the period of time that supposedly this

25   window was being opened, she never woke up?

542

1    A.   No.

2    Q.   How far away from the children's room was the place where

3    Mr. McCormack was sleeping?

4    A.   The door leading from the den is out their back window at

5    the back of the house.  But to get there from inside the

6    house, you would have had to walk through the kitchen, living

7    room and into the hallway to reach the bedroom.

8    Q.   That could be done in a matter of seconds.

9    A.   Uh-huh.

10   Q.   Isn't it true that the pool gate was kept locked?

11   A.   Most of the time.  I had a bad habit of not locking it,

12   but making sure it was shut.

13   Q.   It was locked on that evening; wasn't it?

14   A.   I don't think so.

15   Q.   Do you recall one way or the other?

16   A.   I recall it being open.  Because I remember Karen yelling

17   at me and that was her biggest concern that he didn't run

18   away, that Ben was in the pool.

19   Q.   And is that the first place you checked?

20   A.   That was one of the first places after we got through

21   checking inside, yes.

22   Q.   Isn't it true that the next day you came home and Mr.

23   McCormack was still there and you asked him to spend a second

24   night at the residence?

25   A.   No, I did not.  He came and he got his truck and he left.

543

1   Q.   Is there a room off of the garage where you have some

2   music equipment and things of that nature?

3   A.   The garage had actually been split in half and I did have

4   a room back there to play guitar in and hang out.

5   Q.   Didn't you and Mr. McCormack hang out there part of this

6   evening?

7   A.   Honestly, I believe so.

8   Q.   You believe so?

9   A.   I do believe so.

10  Q.   Was that before or after you say you went four-wheeling?

11  A.   That would have been after.

12  Q.   And when Ben arrived back at the house, he did not appear

13  to be in any distress; correct?

14  A.   He did not seem completely happy, he did not seem injured

15  in any way.  He was very irritable.

16  Q.   And is that something that you told the officers in your

17  interviews?

18  A.   I do not believe I said that he looked irritable.  He did

19  look very cold and upset.

20  Q.   And he -- he looked upset?

21  A.   Looked very cold and miserable, yes.

22  Q.   Okay.  And is that something that you noticed right away?

23  A.   Yeah.  When he -- you know, he got brought out of the

24  truck in nothing but a diaper.  And you could tell he was

25  cold.

544

1  Q.  And he was put to sleep in nothing but a diaper that

2  night; correct?

3  A.  I believe so.

4  Q.  And when -- so that would have been something apparent

5  about him that everybody else there would likely have noticed?

6  A.  Uh-huh.  Yeah.

7  Q.  Now, this took place in November of '09.  And Mr.

8  McCormack had been at the house visiting a few months prior to

9  that; is that correct?

10  A.  Yes, I believe so.

11  Q.  And was that at Wilson or Mary Kay?

12  A.  I believe he visited me twice at Wilson.  And at least

13  four to five times at Mary Kay.

14          MR. FALLER:  That's all I have, Your Honor.

15          THE COURT:  Redirect.

16          MS. CAIN:  Nothing further, Your Honor.

17          THE COURT:  Either party wish this witness to remain

18  subject to recall?

19          MS. CAIN:  Not from the government, Your Honor.

20          MR. FALLER:  No, Your Honor.

21          THE COURT:  All right.  You are excused.  Thank you.

22          THE WITNESS:  Thank you.

23                          **ASHLEY KAREN**,

24  called as a witness on behalf of the Government, having been

25  first duly sworn, testified as follows:

545

1          THE CLERK:  Please have a seat.  State only your

2     first name for the record.

3          THE WITNESS:  Ashley.

4          MS. CAIN:  Your Honor, may I take the binder from the

5     witness.  Thank you.

6                         DIRECT EXAMINATION

7     BY MS. CAIN:

8     Q.   Good morning.  Is Ashley Karen your full first name?

9     A.   Yes.

10    Q.   And what city and state do you currently live in?

11    A.   I live in Paso Robles, California.

12    Q.   Approximately how many years have you lived in Paso

13    Robles?

14    A.   A year and a half.

15    Q.   And prior to living in Paso Robles, what city did you live

16    in?

17    A.   Bakersfield, California.

18    Q.   And approximately how many years were you living in

19    Bakersfield prior to moving to Paso Robles?

20    A.   Nine years.

21    Q.   And do you have any children?

22    A.   Yes.

23    Q.   What are your children's names?

24    A.   Benjamin and Elizabeth.

25    Q.   And what date was Elizabeth born?

1    A.   1-26-06.

2    Q.   And what about Ben?

3    A.   9-16-07.

4    Q.   And by providing first name only, who is the father of Ben

5    and Elizabeth?

6    A.   Andrew.

7    Q.   Do you know the defendant Shawn McCormack?

8    A.   Yes.

9    Q.   How did you meet Shawn McCormack?

10   A.   He was a friend of my husband's.

11   Q.   And if I can take you back to 2007 through 2009.  Did the

12   defendant Shawn McCormack ever spend the night at your

13   family's home while you were living in Bakersfield?

14   A.   Yes.

15   Q.   And why would he spend the night at your residence?

16   A.   It was, to my knowledge, that he was traveling from work

17   and passing through town and he needed somewhere to stay.

18   Q.   And when he would come and stay as an overnight guest at

19   your family's home, how long -- how many nights would he stay

20   typically?

21   A.   Usually one night.

22   Q.   And do you recall approximately how many times he had

23   visited your family and spent the night, approximate number?

24   A.   Three, four times.

25   Q.   And the next morning, would he stay at your house for a

1   while or would he typically just leave?

2   A.  Typically he would leave.

3   Q.  So taking you to November 6th of 2009.  Was there any

4   point in time when you discovered that your son Ben was

5   missing?

6   A.  Yes.

7   Q.  How did you learn that your son Ben was missing?

8   A.  My husband had went to check on the children and he came

9   in to wake me up and ask me if Ben was sleeping with me.  And

10  I told him no.  We went to look for him.

11  Q.  Okay.  Did you first go into his bedroom as soon as your

12  husband woke you up asking?

13  A.  Oh, yes.  Went in the room and flipped the beds and

14  searched for him.  Woke his sister up.

15  Q.  And at some point when you were in the room, did you

16  notice anything about a window?

17  A.  Yes.  When we started looking, we re-checked my room and

18  started looking for him.  And then we noticed the bedroom

19  window was open just a smidge.  And so that brought me to

20  check outside.

21  Q.  And was this the bedroom window of Ben's room?

22  A.  Yes.

23  Q.  And did you notice anything about the screen of that

24  window?

25  A.  The screen was not on.

548

1    Q.  And do you recall whether the screen was on the inside or

2    the outside of the house?

3    A.  The screen is on the outside of the house.  And was on the

4    outside of the house.

5    Q.  So when it was taken off, it was on the outside?

6    A.  Yes.

7    Q.  And so when you couldn't find Ben in the house and you see

8    this window open, what did you do next?

9    A.  Immediately I ran outside.  I went to flip the light

10   switch on to check the swimming pool.  It was a scatter and a

11   panic.  We -- I was afraid -- because the window was open, I

12   was afraid that somehow he had gotten to the pool, which we

13   usually kept everything locked up.  So I was really afraid

14   that he was in the pool.  I continued to run out of

15   desperation when he wasn't in there to the alley.  And I ran

16   out to the street looking for him.  And was met by officers.

17   Q.  Were the officers there for an accident or what were

18   officers doing out there?

19   A.  There was an accident on White Lane down the way and it

20   seemed like they were leaving the scene of that and I was in

21   panic running, looking for Ben and I had yelled at Andrew to

22   call the police.  And so it was by chance that while I was out

23   looking for Ben, that they were there.  Magically.  And then

24   they were like, "Why are you in the street?"

25   Q.  And so what did you tell the officers was going on at that

1  point in time?

2  A.  Well that my son was missing, that he was two years old.

3  And that I couldn't get the light on the pool on.

4  Q.  And so, in your mind at this point in time, you were still

5  thinking Ben somehow got into the pool?

6  A.  I was worried.  We were very conscience of the pool and

7  the busy street in front of the house.  We tried very hard to

8  keep track of all of that.  It was a worry.  Mom's worst fear,

9  right?  So yes, I was worried about it.

10  Q.  And after you told the policeman what was going on, what

11  happened next?

12  A.  Another -- there were a few police cars.  They walked in

13  the back with me.  They started questioning how old Ben was,

14  you know, what are we looking for?  Started looking at the

15  pool, whether we could drain it, get the light on.  And at

16  that point Andrew was -- had called the police.  And then they

17  told him that they were there, I think.  And so then that's

18  when Andrew realized that Shawn was gone as well.

19  Q.  Okay.  And so at a certain point you realized Ben is

20  missing and the defendant Shawn is gone.  The cops are now at

21  your house.  And what do you recall happening next?

22  A.  Um, so -- it was a moment of panic, that's what I recall.

23  But Benjamin -- no, Andrew, excuse me, Andrew was looking

24  for -- or called Shawn twice and he didn't answer.  And then

25  an officer called him.  And he answered and said that he was

1   getting drinks.

2         So at that point everybody moved to the front of the

3   house.  And we had a roundabout up front.  So when Andrew

4   realized that Shawn was gone too and we were expecting him to

5   pull up out front.  So everyone met up front.  And the police

6   said that he had gone to get something to drink at a gas

7   station or something and then they caught him -- or they

8   followed him into my driveway.

9   Q.  So at a certain point, did you see the defendant driving

10  his car towards your house after the police had been called

11  and the police had contacted him?

12  A.  Yes.

13  Q.  And the police were then following the defendant while he

14  was in this car?

15  A.  Yes.

16  Q.  And when the defendant pulled up with the police following

17  him, did you see Ben in the car?

18  A.  Yes.

19  Q.  And where was Ben in the car at the point in time that you

20  saw him?

21  A.  Benjamin was in the front seat leaning on the dashboard.

22  Q.  Was he standing up or sitting and leaning forward?

23  A.  He was -- he was little.  So he was just standing up and

24  he could reach from the dashboard to the chair.

25  Q.  And do you recall if Ben was wearing anything at this

1  point in time?

2  A.  Benjamin was only in a diaper.  He -- we had put him to

3  bed in only a diaper and the warm blankets.  Because our

4  thermostat was broken.  So no, he did not have anything on

5  except for Pampers.

6  Q.  Okay.  And was it chilly out that night?

7  A.  Yes.

8  Q.  As a parent, if you were to have to take your child out in

9  the middle of the night, would you have put clothing on your

10  child to deal with the temperature outside?

11  A.  Yes.

12  Q.  After you saw Ben standing up with his hands on the

13  dashboard in a diaper, what happened next?  Did you take Ben?

14  A.  I went in and got Ben and then I went immediately inside.

15  Q.  Did another police officer come inside with you and Ben?

16  A.  Yes.  And there were -- there were several there, I think.

17  Not think, but there were several there.  And it was a man

18  officer.  And he told me that we had to check Ben.  So we went

19  into the back bedroom and checked to make sure everything was

20  okay.

21  Q.  Okay.  And what did this officer want checked?

22  A.  We had to check to see if Benjamin had been -- had been

23  hurt.  And if his diaper had been removed or -- because there

24  was -- it seemed like stuff didn't add up and we were just

25  trying to cover all the basis, I think, at the time.  And so

1  we had to check his genitals and his rear for any harm.

2  Q.  And at that point in time, did an officer have a

3  flashlight?

4  A.  Yeah.

5  Q.  And are you guys kind of in a dark room at this point in

6  time?

7  A.  Yeah.

8  Q.  And were you or the officer at that point able to spot any

9  signs of harm to Ben?

10  A.  There wasn't much.  There wasn't -- no.  It didn't seem

11  like anything had happened.

12  Q.  When you scooped up Ben, what did his body temperature

13  feel like?

14  A.  The poor baby was chilled.

15  Q.  When you put Ben and Elizabeth to bed that night, was the

16  window shut?

17  A.  Yes.

18  Q.  And how do you know that the window was shut?

19  A.  As a parent with a swimming pool, like I said, this was

20  one of our worst fears.  And my and my husband had spoken

21  about it.  We actually had a wrought iron fence applied.  We

22  were petrified of that swimming pool.  It was a blessing and a

23  curse at the same time.  And so all the windows were

24  constantly closed, the back doors were constantly closed and

25  the gates were constantly closed and checked before we went to

553

1    bed at night.

2    Q.  Did you give permission to the defendant Shawn McCormack

3    to take Ben out that night?

4    A.  No.

5    Q.  In fact, had you been asleep?

6    A.  Yes.

7    Q.  Earlier that night.

8    A.  Everyone had been tucked in well before.  I hadn't even

9    known that he was coming by.

10   Q.  On that particular night --

11   A.  Yeah.

12   Q.  -- you weren't aware?

13   A.  Because my husband worked later than me.  The kids had

14   daycare and we went to bed on a regular schedule.

15   Q.  Did you ever give the defendant Shawn McCormack to

16   take -- did you ever give him permission to take Ben out on

17   any other occasion separate from this November 2009 incident?

18   A.  No.

19   Q.  Did you ever give the defendant permission to take your

20   daughter Elizabeth out during any of his visits to your place?

21   A.  No.

22   Q.  After the police found the defendant with Ben, did

23   McCormack ever have permission to spend the night at your

24   residence again?

25   A.  No.

1   Q.  How did you feel when the defendant -- or let me back up.

2           Were you ever friends with the defendant after this

3   incident?

4   A.  No.

5   Q.  How did you feel when the defendant came back with your

6   son late at night?

7           MR. FALLER:  Objection.  Relevance.

8           THE COURT:  Sustained.

9   BY MS. CAIN:

10  Q.  Did you ever notice, on any of these prior visits, the

11  defendant drink alcohol?

12  A.  No.

13  Q.  Would the defendant bring alcohol to the residence?  I'm

14  sorry?

15  A.  Yes.

16  Q.  And would he offer alcohol to anyone in the house?

17  A.  Yes.

18  Q.  Who would he offer the alcohol to?

19  A.  Usually Andrew or if any of the other friends in town

20  stopped by, his brother.

21  Q.  And do you know his brother?

22  A.  Yes.

23  Q.  What's his brother's name?

24  A.  I don't know him that well.

25  Q.  Does Scott ring a bell?

1  A.  Oh, yes.

2  Q.  Was Scott ever spending the night at your family's home?

3  A.  I think he did once.

4  Q.  And was the defendant present that night as well when they

5  were over?

6  A.  Uh-huh.

7  Q.  Is that a yes?

8  A.  Oh.  Yes.

9  Q.  Okay.  And was there ever any occasion where you woke up

10  in the middle of the night to find Ben missing and Scott come

11  driving up with Ben after the police had been called?

12  A.  No.

13  Q.  Taking you to September of 2011.  Did you receive visits

14  from ICE Special Agent Veronica Pike and from Bakersfield

15  Police Detective Jamison?

16  A.  Yes.

17  Q.  And did you learn that your children had been victims of

18  sexual abuse at that point in time?

19  A.  Yes.

20  Q.  And did Special Agent Pike and Detective Jamison show you

21  some partial images of your children or close-up images of

22  their faces?

23  A.  Yes.

24  Q.  If we can pull up Exhibit 71 previously moved in.  Do you

25  see that picture on the screen?

556

1    A.   Yes.

2    Q.   Do you recognize who that child is?

3    A.   Yes.

4    Q.   Who is that child?

5    A.   That's my baby Ben.

6    Q.   If we can pull up Exhibit 73.  Do you recognize that

7    child?

8    A.   Yes.

9    Q.   And who is that child?

10   A.   That's Benjamin.

11   Q.   We can take that down.  I'm sorry.  You can take a moment.

12   A.   Okay.

13   Q.   Let me know when you're ready.

14   A.   Okay.  Sorry.

15   Q.   No, it's okay.  Take your time.

16        I'm going to be placing what's been marked as

17   Government Exhibit 128 previously moved in on to the Elmo.

18   And it's going to be just a partial photo that I'm going to

19   show.

20        Are you able to see this picture clearly on the

21   monitor?  There's a little bit of a glare.  Are you able to

22   see that?

23   A.   Yes.

24   Q.   And do you recognize that child?

25   A.   Yes.

1   Q.   Who is that child?

2   A.   That's Elizabeth.

3   Q.   So after having these visits with law enforcement in 2011,

4   September of 2011, and learning about these images of your

5   children, and now looking back, was there ever a time where

6   you saw signs of abuse involving Ben?

7   A.   Yes.

8   Q.   And could you please describe signs that you saw, that

9   you're able to now recognize looking back.

10  A.   Sorry.

11  Q.   Take your time.

12  A.   As we go over things in our heads, I think we tend to make

13  connections and see things that weren't there before.  And

14  realize and make realizations.  There were times where I

15  realized that, you know, Benjamin had not wanted to take a

16  bath or, you know, times that in changing his diaper, you

17  know, finding things that were not supposed to be there.

18  Q.   So let's talk about the bath.  What came about with Ben

19  not wanting to take a bath?

20  A.   It seemed like Benjamin developed an anxiety about taking

21  a bath.  I had to be very close and holding on to him when he

22  got in the tub.  He loved baths with mommy.  So then, you

23  know, it's something that brought to my attention when you

24  backtrack and you think about things.  Oh, that's where these

25  fears come from and have been developed.

1  Q.  What residence were you living at when Ben's not wanting
2  to take baths occurred?
3  A.  That was at the house on Wilson Road.
4  Q.  So is that back in 2009?
5  A.  Yes.
6  Q.  You mentioned his diaper, changing a diaper.
7  A.  There was a point where I didn't realize what it was when
8  we had opened -- I had changed his diaper and I had noticed
9  body fluid in there.  And so -- and tenderness.  And I didn't
10 make the connection at the time.
11 Q.  And when you say "body fluid," what color was the body
12 fluid?
13 A.  Clear and white and a little pink.
14 Q.  Now, during this time frame -- let me backtrack.
15       Was this during the time frame when Shawn McCormack
16 would visit the residence?
17 A.  Yes.
18 Q.  During this same time frame, was Ben suffering from any
19 sort of allergies?
20 A.  Yes.
21 Q.  What were his allergies?
22 A.  Milk allergy.
23 Q.  And as a result of the milk allergy, what would his body
24 reaction be?
25 A.  He would get a rash from the milk, you know, upset

559

1 | stomach, throwing up or spitting up.

2 | Q.  And looking back at the time frame when the defendant was

3 | visiting your house on multiple occasions, did you ever

4 | attribute any redness or swelling to diaper rash?

5 | A.  Yeah.  Most likely.

6 | Q.  Was there ever a time where you saw blood or tearing on

7 | Ben?

8 | A.  Just pink.  Not that I would have noticed.  Just passed

9 | off to being a baby in Pampers, you know.  Just --

10 | Q.  So his body appeared pink and irritated?

11 | A.  Yeah.

12 | Q.  But no blood.

13 | A.  No.

14 | Q.  Was there ever a time when you noticed redness or scrapes

15 | on Ben's lips?

16 | A.  Yes.

17 | Q.  Could you please tell the jury about that.  What you

18 | observed.

19 | A.  There was a time that I noticed that Benjamin had had --

20 | you know, seemed like his lips had -- were not quite chapped,

21 | but skinned nearly.  And he had a little bruise on his little

22 | face.  And I thought how did he manage to do that?  You know,

23 | his little -- sorry.

24 | Q.  That's okay.  Was this also during the time frame in which

25 | the defendant would make trips to your house?

560

1    A.   Yes.

2    Q.   Is that a yes?

3    A.   Yes.

4              MS. CAIN:  Court's indulgence, Your Honor.

5              THE COURT:  Sure.

6              MS. CAIN:  I have nothing further for this witness.

7              THE COURT:  Cross-examination.

8              MR. FALLER:  Yes, Your Honor.

9                         CROSS-EXAMINATION

10   BY MR. FALLER:

11   Q.   The night in November when Mr. McCormack came back to your

12   Wilson house with Ben in the car, Ben did not appear to be

13   afraid of him in any way; did he?

14   A.   I didn't know.

15   Q.   And when you're talking about this situation with chapped

16   lips and a small bruise on his face, do you remember

17   exact -- or the time frame when you noticed that exactly?

18   A.   Exactly, no.

19   Q.   Mr. McCormack would come, I don't know, a couple of times

20   a year to visit; is that about right?

21   A.   Sporadically.  I think more -- a couple -- how many is a

22   couple, it would be two.  So more than a couple times a year.

23   Q.   Okay.  How many times did he come total?

24   A.   Well, I would assume it would be -- you know, because you

25   understand that I went to sleep a lot.  So my husband would be

Ashley - X

561

1  more of the judge of that.

2  Q.  Were there times when Mr. McCormack came and you didn't

3  even see him at all?

4  A.  Yes.  Because I would be at work, come home.  Put the kids

5  to bed.  Me to bed.  And then go to work the next day.

6  Q.  What time --

7  A.  So if he came, you know, and I didn't see my husband, then

8  I wouldn't even know.

9  Q.  Okay.  On the night of the incident where Ben turned up

10  missing, I think you went to bed in the eight, nine p.m.

11  framework; is that right?

12  A.  Yes.

13  Q.  And Mr. McCormack had not arrived at the house yet; had

14  he?

15  A.  No.

16  Q.  And you -- had your husband arrived back home from work

17  when you went to bed?

18  A.  No.

19  Q.  And when Andrew came in and woke you up that night in

20  November, I think you told the prosecutors and the agent that

21  you could tell he had been drinking?

22  A.  Andrew?

23  Q.  Yes.

24  A.  (Witness nods head.)

25  Q.  That's yes?

562

1   A.   Yes.

2   Q.   Okay.  How was the window in Ben's room secured?

3   A.   Benjamin's window, they have a stick in the window

4   usually.  On the outside.  So that the children cannot get

5   out.  And a screen on it.

6   Q.   So the stick was on the outside?

7   A.   It's not -- we weren't worried about somebody getting in.

8   We were worried about them getting out into the pool.  So most

9   of the doors, if there was a sliding glass door in the back

10  bedroom, it had a stick in it.

11  Q.   Uh-huh.

12  A.   You know.  So Benjamin's room, I guess their room doesn't

13  have a stick in it because there wouldn't have been room on

14  the outside.

15  Q.   Because the part of the window that slides, it slides on

16  the inside; correct?

17  A.   It slides on the inside.

18  Q.   Right.

19  A.   So their bedroom at that house was just a push lock with

20  the silver button, I'd assume.

21  Q.   And you were pretty conscience to make sure that that push

22  lock stayed locked on the inside; correct?

23  A.   Yes.

24  Q.   Okay.  So that evening, if that window had been opened, it

25  would have had to been open from the inside; correct?

1    A.   You know, honestly, I'm not even sure.  I'm so sorry.

2    Q.   That's okay.

3    A.   I just --

4    Q.   All you can do --

5    A.   I don't even know if it had the push lock on.  And at this

6    point, I'm --

7    Q.   All you can do is tell us what you remember.

8    A.   I'm sorry.

9    Q.   Not a problem.  Now, you saw Shawn McCormack the following

10   day after the incident with police; correct?

11   A.   Yes.

12   Q.   He came back to the house because his truck was still

13   there; correct?

14   A.   Yes.

15   Q.   And you spoke with him?

16   A.   I opened the door a crack, yes.

17   Q.   And did he come in the house?

18   A.   I did not let him in my house.

19   Q.   Uh-huh.

20   A.   He pushed halfway in the door and announced that he wanted

21   to show me pictures of a girlfriend.  "I have a girlfriend."

22   And I called my husband immediately.

23   Q.   And now you told some of the officers that he had come

24   back to get his keys.

25   A.   Yes.

1   Q.  Well, isn't it true he had his keys because he returned in

2   the pickup?

3   A.  No, he did not return in the pickup.  Oh, the night of?

4   Q.  Yeah.

5   A.  That morning, I -- he -- I don't know how he got there.

6   Q.  Okay.

7   A.  I just got a knock on the door.

8   Q.  And Andrew -- Andrew came home?

9   A.  Yes.

10  Q.  And then according to your testimony, then Shawn left?

11  A.  Yes.

12  Q.  After Andrew got there.

13  A.  Andrew got there and talked to him and he left.

14  Q.  He didn't stay with you that night?

15  A.  No.

16          MR. FALLER:  If I could just have a moment, Your

17  Honor.

18          THE COURT:  Yes.

19          MR. FALLER:  That's all, Your Honor.  Thank you.

20          THE COURT:  Redirect.

21          MS. CAIN:  Thank you, Your Honor.

22                      REDIRECT EXAMINATION

23  BY MS. CAIN:

24  Q.  So after the police incident, the defendant came back to

25  your house the next morning?

1    A.   Yes.

2    Q.   Is that correct?

3    A.   Yes.

4    Q.   And he is at your doorstep showing you pictures of an

5    adult girlfriend; is that correct?

6    A.   Trying to.  I didn't even see the screen.

7    Q.   At any point in time, did he try to explain why he had

8    taken Ben the night before?

9    A.   No.

10   Q.   At any point in time, did he apologize to you while

11   standing on that doorstep for taking Ben without your

12   permission?

13   A.   No.

14   Q.   And so what he does is he shows you pictures of a supposed

15   girlfriend?

16   A.   Yes.  Which was weird enough because the whole thing had

17   already been weird.  So I just called my rock.

18   Q.   And you wanted nothing to do with Shawn McCormack?

19   A.   No.

20          MS. CAIN:  I have nothing further.

21          THE COURT:  Recross.

22          MR. FALLER:  Nothing further, Your Honor.

23          THE COURT:  Either party wish this witness remain

24   subject to recall?

25          MR. FALLER:  No, Your Honor.

566

1          MS. CAIN:  I'm sorry, Your Honor.  No.

2          THE COURT:  You are excused.  Thank you very much.

3          THE WITNESS:  Oh, God.

4          THE COURT:  Further evidence on behalf of the

5     government.

6          MR. DELAHUNTY:  The government rests at this time,

7     Your Honor.

8          THE COURT:  All right.  Members of the jury, the

9     plaintiff's side, the government has rested its case in chief.

10    Every time, civil or criminal law cases, whenever a party

11    rests their case in chief, we need to take a break, we need to

12    go over -- you need to take a break because we need to stay in

13    session, we need to look at the exhibits, make sure that what

14    they believe is in evidence is, in fact, consistent with what

15    the Court's understanding is.  There are also other matters we

16    need to address.

17         So what we're going to do is we're going to stay in

18    session, but I'm going to go ahead and excuse you for your

19    noon recess.  Be back here at 1:30 this afternoon.  And again,

20    remember those admonishing jury instructions that I previously

21    read to you.

22         All right.  So we'll see you at 1:30 this afternoon.

23         (The jury left the courtroom.)

24         THE COURT:  All right.  The jury is excused for its

25    noon recess.  As far as any matters, before 1:30 at some point

1    in time I think Ms. Gaumnitz will probably give you a list, an

2    updated list of the exhibits unless she's already provided

3    that and there have been no new exhibits.  Just double check,

4    make sure that those exhibits which you believe are in

5    evidence are, in fact, showing that, reflecting that in the

6    Court's record.

7           And if you believe that there are some that we show

8    admitted that you believe were not admitted, let us know.  If

9    you believe that there are some that should have been admitted

10   but aren't showing, then let me know also.

11          Separate and apart from that, anything further on

12   behalf of the government at this point in time?

13          MR. DELAHUNTY:  Not at this point in time, Your

14   Honor.

15          THE COURT:  Defense?

16          MR. FALLER:  No, Your Honor.

17          THE COURT:  Okay.  So this afternoon, then, Mr.

18   Faller, you would begin defense case in chief; is that

19   correct?

20          MR. FALLER:  That is correct, Your Honor.

21          THE COURT:  All right.  Just for planning purposes,

22   logistically, are you able to disclose the order of the

23   witnesses in which you intend to call in case there are any

24   legal issues that we need to address?

25          MR. FALLER:  I believe -- at this point I believe the

568

1   next witness is going to be Mr. McCormack.  And then Marsha

2   McCormack.  And that should complete our case.

3        THE COURT:  All right.  And thank you for the heads

4   up.  That gives the government an understanding.  Obviously

5   you will not know until after the testimony whether or not

6   there's going to be any rebuttal.  If so, you might need to do

7   that on the fly just in case.

8        Of course, the one witness that you folks need to be

9   concerned about is whether or not either side is going to need

10  Detective Robles to come back.  Meet and confer before we

11  break at the noon hour, because he'll need a couple of hours.

12  That's probably going to work out okay, especially if he's on

13  duty, he could probably be here sometime early this afternoon.

14       If you don't need him and you agree you don't need

15  him, that's fine.  When you come back on the record at 1:30,

16  you can go ahead and formally dismiss him from further

17  testimony at this trial.  Otherwise, if you think you need

18  him, you know, just make sure you contact him right away so he

19  can be here this afternoon.

20       MR. DELAHUNTY:  Your Honor, may I address that?

21       THE COURT:  Sure.

22       MR. DELAHUNTY:  Detective Robles is actually here

23  right now.  I was wondering if we can find out if he needs to

24  stay here or if he can return to duty in Bakersfield.

25       THE COURT:  Well, why don't you folks chat about

569

1    that.

2            MR. FALLER:  Let me just have a minute to think about

3    that.

4            THE COURT:  Obviously if you agree to release him, at

5    1:30 you can put that on the record.  I realize you folks need

6    to think about that.  Anything else before we take our noon

7    recess by either side?

8            MR. FALLER:  No, Your Honor.

9            THE COURT:  I will see you at 1:30 this afternoon

10   then.

11           (Noon recess.)

12           THE COURT:  Convening on the record outside the

13   presence of the jury.  Are there any matters we need to take

14   up before we commence with the defense case in chief?

15           MR. FALLER:  I don't believe -- well, there is one

16   thing.  Would the Court just like for me to -- for purpose of

17   the record, to lodge Rule 29 motions and then the Court can

18   take it under submission and we can -- there may be one of

19   them that has some substantive meat to it that we can argue

20   about at the end of all the cases.  Because I know that's kind

21   of the preferred method of dealing with it, is to do it at the

22   end of both cases.

23           THE COURT:  Yeah.  And that's perfectly fine with me

24   if that's acceptable to the government, to reserve the Rule 29

25   motion until the close of all the evidence.

1          MR. DELAHUNTY:  The government is fine with that,

2     Your Honor.

3          THE COURT:  Okay.  Anything else we need to take up?

4          MR. DELAHUNTY:  Not at this time, Your Honor.

5          THE COURT:  Defense, anything?

6          MR. FALLER:  I don't believe so.  Mr. McCormack is

7     going to be my first witness.

8          THE COURT:  Okay.  So we'll have him up on the

9     witness stand then right now before the jury comes in.

10          And then procedure-wise, once Mr. McCormack has

11     testified, I'm going to send the jury out and then we'll have

12     Mr. McCormack re-take his place at counsel table and then

13     defense can continue with its case in chief.

14          All right.  Anything further then before we have the

15     jury come in, Mr. Faller?

16          MR. FALLER:  No, Your Honor.  Thank you.

17          THE COURT:  Okay.  Let's have the jury come in.

18          (The jury entered the courtroom.)

19          THE COURT:  All right.  The record will reflect that

20     the jury is present.  Please be seated.  We'll now turn to the

21     defense case in chief.  And I believe we're ready to go, so

22     defense may call his first witness.

23          MR. FALLER:  Yes, Your Honor.  Defense calls Shawn

24     McCormack.

25

Shawn McCormack

571

1                            **SHAWN McCORMACK**,

2     called as a witness on behalf of the Defendant, having been

3     first duly sworn, testified as follows:

4            THE CLERK:  Please have a seat.  State your full name

5     for the record and spell it.

6            THE WITNESS:  Shawn McCormack, M-C-C-O-R-M-A-C-K.

7                        DIRECT EXAMINATION.

8     BY MR. FALLER:

9     Q.  Mr. McCormack, you're obviously the defendant in this

10    case; correct?

11    A.  Correct.

12    Q.  And how old are you?

13    A.  31.

14    Q.  And prior to these events that brought you to court today,

15    where were you living?

16    A.  I was living in Colorado Springs, Black Forest actually.

17    Q.  And that is at the Vessey residence that we've heard

18    testimony about here?

19    A.  That's correct.

20    Q.  How long had you lived there?

21    A.  About a year and a half.

22    Q.  Where were you living prior to moving to that address in

23    Colorado?

24    A.  I was living at my brother Tyson Henry's house.

25    Q.  And where is that?

1    A.   It's about three miles down from there off of Shoup Road.

2    Q.   Okay.  And then prior to moving in to the Shoup Road

3    residence, where were you living?

4    A.   I was living in Glendora, California.

5    Q.   That's down in southern California?

6    A.   That's correct.

7    Q.   And were there other members of your family living down

8    there with you?

9    A.   Yes.  I was living with my mother Marsha McCormack and my

10   brother Scott McCormack.

11   Q.   And how long had you lived in Glendora?

12   A.   I lived there about a year and a half, maybe two years.

13   Q.   Now -- and previous to that, had you been where, Arizona?

14   A.   No.  Actually previous to that I was living in Norco.

15   Q.   Norco, California?

16   A.   Correct.

17   Q.   Out in the desert?

18   A.   It's off the 15 near Corona.

19   Q.   At some point you did live in Bakersfield for a time; is

20   that correct?

21   A.   That's correct, that was before the Norco address.

22   Q.   And how long were you in Bakersfield if you can recall?

23   A.   Just over a year.

24   Q.   And was that the place up near White Lane that you talked

25   about in the interview with Detective Romine?

Shane McCormack

573

1    A.   Correct.

2    Q.   And prior to coming to Bakersfield, where had you been?

3    A.   I was living in Tucson, Arizona.

4    Q.   And when you were in Tucson, Arizona, were you living

5    there with any other members of your family?

6    A.   Yes.   I was living with my mother Marsha McCormack and my

7    brother again, Scott McCormack.

8    Q.   When you moved to Bakersfield, did the other two members

9    of your family come with you?

10   A.   Yes.

11   Q.   And then did you move together to Norco?

12   A.   From Tucson or from Bakersfield?

13   Q.   From Bakersfield.

14   A.   Yes.

15   Q.   And then from Norco, it was to Glendora.

16   A.   That's correct.

17   Q.   Now, back in 2007 to 2009, what kind of business were you

18   in?

19   A.   I was doing telecommunications.

20   Q.   And could you explain who you worked for and what

21   your -- what your duties were?

22   A.   At that time I was working for a company called Stratos

23   Pacific.   And my duties were anything from we upgraded,

24   maintained and built the towers themselves.   All the

25   structural equipment and everything, the antennas, the cables

1    and everything.

2    Q.   And was that the company that you were working for at the

3    time that the police contacted you at your residence in

4    Colorado?

5    A.   No.  That's a different company.

6    Q.   Who were you working for then?

7    A.   At the time they contacted me in Colorado, it was Front

8    Range Wireless.

9    Q.   What were you doing for them?

10   A.   Same thing.  Telecommunications.  With them I was the top

11   tower hand.

12   Q.   So you basically worked on cell phone towers?

13   A.   Correct.

14   Q.   Now, at some point did you become acquainted with the

15   person that's testified here today named Andrew?

16   A.   Yes.

17   Q.   How did you get to know Andrew?

18   A.   Got to -- when I lived in Bakersfield, we had got to know

19   him through other acquaintances that we met.

20   Q.   And were you a -- did you like go to school with him or

21   anything like that?

22   A.   No.

23   Q.   When, as far as you can recall, was the first time that

24   you met him?

25   A.   When we first moved out there, which I can't recall the

575

1    year, but it was maybe a few days after we had moved in.  My

2    little brother had actually met some of his friends first and

3    then introduced me and we started hanging out with them.

4    Q.  So you got to know him through Scott?

5    A.  Correct.

6    Q.  Now, so during the time that you were living in

7    Bakersfield, did you spend some time with Andrew?

8    A.  Yes.

9    Q.  Was this on a regular basis or what?

10   A.  Yes.  He'd come over to my house and hang out or I'd go

11   over to his place and hang out.

12   Q.  Was he with Ashley Karen at that time?

13   A.  No, he was not.

14   Q.  And did he have any children yet?

15   A.  No, he did not.

16   Q.  Okay.  Now, at some point you moved away from Bakersfield

17   and began to have intermittent overnight visits to Andrew and

18   Ashley Karen's house; correct?

19   A.  Correct.

20   Q.  When did that kind of thing start?

21   A.  I think the first time I was coming back from Oregon.  I

22   was doing some work out there.  And we were visiting a couple

23   of friends, me and my little brother Scott were visiting a

24   couple of friends out in Bakersfield.  And the guy's name was

25   Phil that we were visiting.  And he had told us that Andrew

Shawn McCormack

576

1    had moved back.  Because I guess for a while Andrew was

2    living -- I can't recall where, but he was out of state.

3    Q.  Uh-huh.

4    A.  And he gave us the number and we gave him a call to see

5    how he was doing and he invited us to come over and visit.

6    Q.  And did you actually stay at his house that trip?

7    A.  No, we did not.

8    Q.  You just had a visit?

9    A.  That's correct.

10   Q.  And do you know, even an approximation of what year this

11   would have been?

12   A.  Maybe 2000 -- probably 2007, 2008.

13   Q.  Okay.  Now, did -- and where did you -- at what house did

14   you see him on that first trip?

15   A.  It was the mobile home, Mary Kay.

16   Q.  And he was living there with Ashley Karen?

17   A.  That's correct.

18   Q.  And did he have any children yet?

19   A.  Yes.

20   Q.  And who -- what children did he have at that point?

21   A.  Both of them.

22   Q.  Both Ben and Elizabeth?

23   A.  That is correct.

24   Q.  Okay.  Now, we have obviously all seen, including

25   yourself, we've seen several videos or a few videos involving

577

1    Ben and some still photographs involving Ben that are sexually

2    explicit in nature; correct?

3    A.  That is correct.

4    Q.  All right.  As far as the videos are concerned, are

5    you -- is that you in those videos?

6    A.  No, it is not.

7    Q.  And as far as the still photographs are concerned, is that

8    you in the still photographs?

9    A.  No, it is not.

10   Q.  Did you take either -- did you take the still photographs?

11   A.  No.

12   Q.  Did you produce or create the videos?

13   A.  No.  I did not.

14   Q.  We've also seen some photographs of Elizabeth in what

15   appears to be an automobile.  Do you recall that?

16   A.  Correct, I recall that.

17   Q.  Did you take those photographs?

18   A.  No, I did not.

19   Q.  Now, after you first began to get reacquainted, so to

20   speak, with Andrew on Mary Kay, how often would you go visit

21   him?

22   A.  Whenever it was convenient, you know.  Maybe once every

23   three, four months when I'd be passing through or I'd have

24   enough time off from work, I'd give him a call and see if he

25   was going to be around or wanted to hang out.

Shawn McCormack - D

578

1   Q.  Because did you sometimes go back and forth through

2   Bakersfield for your work?

3   A.  A couple times, yes.

4   Q.  And on some of those occasions, would you spend the night

5   at their house?

6   A.  Yes.

7   Q.  Now, can you estimate total, up to November 6th of 2009,

8   how many times you stayed overnight by yourself without Scott

9   at their house?

10  A.  Maybe two, maybe three.

11  Q.  And that would be both Mary Kay and the Wilson residence?

12  A.  That's correct.

13  Q.  Total?

14  A.  Correct.

15  Q.  Okay.  Now, you have -- you have heard about and seen the

16  documents indicating that a Shawn McCormack stayed at the

17  California Best Inn in Bakersfield on March 28th and 29th of

18  2009; correct?

19  A.  Yes, I have.

20  Q.  Did -- were you staying at the California Best Inn over

21  that weekend?

22  A.  No, I was not.

23  Q.  Now, you've seen your -- an Arizona driver's license

24  bearing your name and picture that's included in those

25  records; correct?

579

1    A.  Correct.

2    Q.  And did you have that Arizona driver's license, possession

3    of that Arizona driver's license at that point in time?

4    A.  No.  I did not.

5    Q.  Why not?

6    A.  I had lost it and misplaced my wallet and lost that along

7    with a few credit cards.

8    Q.  What were you using to drive with?

9    A.  I had an old one previous to that.  I had -- it got

10   suspended because I didn't pay a traffic ticket in Tucson,

11   Arizona.  And when I went and paid on the ticket to reinstate

12   the license, I had to get a new driver's license.  Well, I had

13   the old card from that so I started using the old card.

14   Q.  And that caused some issues with traffic stops and things

15   of that nature because it was expired or suspended?

16   A.  Yes.  It did.

17   Q.  And during -- and what vehicle were you driving back in

18   this period of time?

19   A.  The only vehicle I had, which was the 1999 Chevy

20   Silverado.

21   Q.  And is that the one we've seen pictures of here that was

22   seized by the officers from the Vessey Road residence?

23   A.  That's correct.

24   Q.  Did you ever have a blue pickup of any type?

25   A.  No.  Never.

580

1   Q.  Never?

2   A.  Never.

3   Q.  Did you ever -- did you ever visit Andrew driving your

4   mother's Toyota pickup?

5   A.  Not when I lived in Glendora.  And at that time, when I

6   lived in Bakersfield, I had the -- I was able to use the

7   Toyota once in a blue moon.  But there was no place to go

8   visit Andrew, he was actually coming to my place.

9   Q.  Now, where on the -- on the weekend of March 27th through

10  the 29th, where was your white Silverado pickup?

11  A.  It was in a police impound.

12  Q.  And how did it get there?

13  A.  The driver's license issue.  When I got pulled over, they

14  found out that the driver's license was suspended.  So they

15  did a mandatory impound for 30 days on it.

16  Q.  And you ended up having to pay to get it out of impound;

17  is that right?

18  A.  Yes.  Quite a bit.

19  Q.  Did you get it out of impound after -- sometime after that

20  weekend?

21  A.  Yes, that's correct.

22          MR. FALLER:  May I approach, Your Honor?

23          THE COURT:  Yes.

24  BY MR. FALLER:

25  Q.  I'd like to show you a document that's been marked Defense

581

1    Exhibit B.  Do you recognize that?

2    A.  Yes.  It's the invoice for the impound.

3    Q.  Okay.  And that's from Jan's Towing in Azusa, California?

4    A.  That's correct.

5    Q.  Does that have an invoice amount on it of $1,475?

6    A.  Yes, that's correct.

7    Q.  Is that what you were required to pay in order to get your

8    truck out of impound?

9    A.  Yes, it is.

10   Q.  And it has on here, it says, "Storage out date, March 30th

11   of '09."

12   A.  That's correct.

13   Q.  Is that -- does that sound about right of when you ended

14   up getting it out of impound?

15   A.  Yes.

16   Q.  Now, that weekend of March 29th through -- or let's say

17   March 27th through the 29th.  The 27th was a Friday.  Correct?

18   A.  I believe so, yes.

19   Q.  And then the 28th was Saturday and the 29th was Sunday.

20   A.  Okay.  Correct.

21   Q.  Now, where were you that weekend?  If you weren't at the

22   California Best Inn, where were you?

23   A.  I was home with my mom and my brother.  I had to do a

24   little bit of work on my mom's truck for her.

25   Q.  And was that the Toyota truck?

Shawn McCormack - D

582

1    A.   That's correct.

2    Q.   What kind of work did you have to do on that?

3    A.   Replace some shocks on it and then it also had some issues

4    with overheating on the radiator, which ended up being a

5    thermostat.

6    Q.   And did you go somewhere and buy parts for the pickup?

7    A.   Yes.  Auto Zone.

8    Q.   And where was the Auto Zone located in comparison to where

9    you were?

10   A.   It was located in Covina, California, which was about four

11   miles, less than five for sure.

12   Q.   And did you have some type of rewards membership or

13   something with Auto Zone?

14   A.   Yes, I did.

15   Q.   Did you do quite a bit of work on automobiles?

16   A.   Yes.

17   Q.   I'd like to show you an exhibit, Defense Exhibit A that

18   includes two what appear to be Auto Zone sales receipts.  Do

19   you recognize that?

20   A.   Yes, I do.

21   Q.   And what is that?

22   A.   Those are for the shocks.

23   Q.   For your mom's pickup?

24   A.   Correct.

25   Q.   And what date is the purchase date on those?

583

1    A.   Oh, okay.  3-27 of 2009.

2    Q.   Okay.  For both the receipts?

3    A.   For both of them, correct.

4    Q.   Now, this appears to be for two sets of shock absorbers;

5    is that correct?

6    A.   That's correct.

7    Q.   Do you have any idea why you would need two sets of

8    different types of shock absorbers?

9    A.   One set's for the front and then one set would be for the

10   rear.

11   Q.   Okay.  And it looks like that they were bought at separate

12   times; is that right?

13   A.   That's correct.

14   Q.   Well, why would that be?

15   A.   Once I had replaced -- or got back to the house with the

16   first set, I checked on the rear.  And when I was looking at

17   the rear, I could see it was blown out, had a lot of fluid

18   leaking out of the shock itself.  So I advised my mom that she

19   needed to replace the rear ones.  So she had sent me and my

20   brother out there to get the other set of shocks.

21   Q.   Okay.  And these receipts actually have your name on both

22   of them; is that correct?

23   A.   That's correct.

24   Q.   Now, there's some highlighting on these and some

25   underlining.  Did you do that?

584

1    A.   No, I did not.

2    Q.   So you also said that you purchased a thermostat for the

3    radiator?

4    A.   That's correct.

5    Q.   Was that also from Auto Zone?

6    A.   Yes, it was.

7    Q.   And I think you have a receipt for that too?

8    A.   Yes.

9    Q.   Now, once you went and purchased the parts items on March

10   27th, what happened the rest of the weekend?

11   A.   On March 27th, by the time I had picked up both shocks, it

12   had become very late.  So I decided not to do it that night.

13   So I ended up doing all the work on it the next day.

14   Q.   Okay.  And after you finished the work with the truck,

15   what did you do?

16   A.   My mom had gone up and rented a couple of movies from the

17   Redbox, those little things or whatever they are.  And she had

18   made some dinner to kind of thank me for doing the work on her

19   truck for her.  And spent the night there.

20   Q.   So that would have been the night of the 28th?

21   A.   That's correct.

22   Q.   So at three o'clock in the morning on the early morning of

23   March 29th, where were you?

24   A.   In bed.

25   Q.   Where?

585

1    A.   In Glendora, California.

2    Q.   And how did you get to Auto Zone if your truck was in

3    impound?

4    A.   My little brother had drove me up in my mom's truck.

5    Q.   Was that the one that you were working on?

6    A.   That's correct.

7    Q.   So it was drivable, but it needed repairs.

8    A.   Correct.  The truck would overheat after so long, but a

9    short distance like four or five miles was obtainable.

10   Q.   Now, on November 6th of 2009, you visited Andrew again in

11   Bakersfield.  Is that right?

12   A.   That is correct.

13   Q.   And where did you come from to come into town into

14   Bakersfield?

15   A.   Colorado.

16   Q.   And do you recall about what time of day that you arrived?

17   A.   I do not.  I'd definitely say later in the day, though.

18   Q.   Was it dark?

19   A.   Yes.

20   Q.   And later in the day or was it evening hours?

21   A.   Evening hours.

22   Q.   And when you arrived at -- had you made arrangements to

23   stay at the house earlier?

24   A.   Yes, I did.

25   Q.   Talk to Andrew?

586

1    A.   Correct.

2    Q.   And after you arrived there, what did you and Andrew do?

3    A.   We had basically just kind of hung out, catching up.  And

4    I had some weed and we went to his -- where he played his

5    guitar and everything, we hung out in there.  Smoked and he

6    had a couple of beers.  I don't drink beer, so I didn't drink.

7    Q.   Was that out in the garage area?

8    A.   That's correct.

9    Q.   You heard him talk about the garage had actually been

10   partitioned?

11   A.   Yes.  And that's correct.

12   Q.   And is that where you were?

13   A.   Yes.

14   Q.   Now, at this point in the evening, whatever time it is,

15   had you seen either of the children?

16   A.   No, I did not.

17   Q.   Had you seen Ashley Karen?

18   A.   She had come out and greeted me and said she was going to

19   go to bed.  But she did come out and greet me.

20   Q.   And then she didn't hang out with you and Andrew?

21   A.   No, she did not.

22   Q.   At some point did you become aware of the fact that Andrew

23   was going to go prepare to go to bed?

24   A.   He said he -- after he finished on the video games, he

25   said he was going to go hit a shower.

587

1   Q.  Do you have any idea about what time that was?

2   A.  Probably about one o'clockish.  It was pretty late in the

3   night, early in the morning.

4   Q.  About one o'clock in the morning?

5   A.  Correct.

6   Q.  Now, did you guys -- once you arrived at the house, did

7   you and Andrew go anyplace else other than the house and the

8   garage?

9   A.  No.  After I had made the drive from Colorado, I was too

10  tired to make any kind of drive.

11  Q.  So you didn't take your truck four-wheeling?

12  A.  No.  Definitely not after a 15-hour drive.

13  Q.  Is that something you and Andrew had done previously?

14  A.  On other occasions, yes, we'd gone off-roading.

15  Q.  But definitely not that night?

16  A.  Definitely not that night.

17  Q.  All right.  At some point did you make a determination

18  that you were going to leave the house after Andrew went to

19  get a shower?

20  A.  Yes.

21  Q.  And why was that?

22  A.  I was kind of thirsty and I had a big thing for the Red

23  Bulls.  So I wanted to go get myself a Red Bull and kind of

24  keep a little energy in me.

25  Q.  Where could -- was there someplace close by where you

1   could go do that?

2   A.   Since I wasn't familiar with the area, there was -- when I

3   hit it on the GPS, it came up with a 7-Eleven and that's where

4   I just sent myself.

5   Q.   Okay.  And were you going to drive there in your truck?

6   A.   Yes.

7   Q.   Now, where had you parked your truck?

8   A.   I parked out on the street.

9   Q.   And why was that?

10  A.   Because he had asked me not to block in his -- he had a

11  locksmith van.  He had asked me not to block it in.

12  Q.   And when you say "he," is that Andrew?

13  A.   That's correct, I'm sorry.

14  Q.   So as you're getting ready to go to the store in your

15  truck, what happened then?

16  A.   Ben had come out and he was kind of crying like, you know,

17  he was lost or wasn't sure what to do.  So as soon as I picked

18  him up, I mean, he seemed to calm down.  So I -- out of a bad

19  judgment, I decided to take him with me.

20  Q.   Did -- so at this point Ben was old enough he was walking?

21  A.   Yes.

22  Q.   So he came walking down the hallway?

23  A.   Correct.

24  Q.   And after you picked him up, then what did you do?

25  A.   I brought him with me to go along on the ride.  I didn't

589

1    want to just kind of walk away and ignore him because the gate

2    for their pool was wide open and it just didn't seem like a

3    good idea to just kind of walk away and leave him.

4    Q.   So you saw that the pool gate was standing open?

5    A.   Correct.

6    Q.   How had you seen that?  What occasioned you to see the

7    pool gate?

8    A.   When I'd come in earlier, the gate was wide open.

9    Q.   Okay.  Did you open a window in Ben's room or anything

10   like that?

11   A.   No, I did not.

12   Q.   And did you see his sister at all that night?

13   A.   No.  I did not.

14   Q.   All right.  Now, and how far away from where you

15   were -- where were you staying in the house?

16   A.   I was staying in the den room, I guess you would call it.

17   Q.   Okay.  Is that the one in the back that they described?

18   A.   Correct.  Right next to the garage.

19   Q.   How far from the children's room were you there in the den

20   room?

21   A.   You can get to it in a matter of seconds.

22   Q.   And so you don't need to go out and try and come in a

23   window to get into the kid's room?

24   A.   No, you would not need to.

25   Q.   And at this point, were you aware of whether Andrew was

1   still in the shower or what was happening?

2   A.   I believe he was still in the shower.

3   Q.   So after you take Ben and you go and get your truck?

4   A.   Yes.

5   Q.   And where did you go?

6   A.   It was a 7-Eleven.

7   Q.   And do you have an estimation of how far away that was?

8   A.   Maybe a mile.

9   Q.   And at some point somebody calls you on the phone; is that

10  right?

11  A.   Correct.

12  Q.   And who was that?

13  A.   That was the -- one of the officers.  Well, first, when I

14  answered the phone, it was Andrew talking and then he had

15  passed it off to the officer.

16  Q.   Okay.  And then you talked to the officer and he requested

17  that you come back to the house?

18  A.   He asked where I was.  And I said I was on my way back to

19  the house.  He asked how long I would be.  I said I'm about a

20  minute or two away.

21  Q.   How long were you gone from the house total?

22  A.   Ten minutes maybe.

23  Q.   Now you've heard -- you've heard descriptions here of you

24  coming back to the house with Ben in the car, that you didn't

25  have him in a car seat; is that right?

1   A.   That's correct.

2   Q.   And how was he dressed when he came down the hallway to

3   you?

4   A.   He was wearing just a diaper.

5   Q.   And is that how you took him in your car?

6   A.   Correct.

7   Q.   Now, you've heard discussions this morning that it was

8   pretty chilly outside.  What's your recollection of that?

9   A.   That would be correct, it was quite chilly.

10  Q.   Okay.  And so why didn't you wrap him up in a blanket or

11  something?

12  A.   I had my -- I have a big Carhartt jacket, which out in

13  cold weather areas like Colorado, they're very warm jackets.

14  And I just wrapped it around him and then carried him out like

15  that.

16  Q.   Okay.  So when you -- when you got back to the -- got back

17  to the house, you were contacted by the police?

18  A.   That's correct.

19  Q.   And you explained to them why you had taken Ben with you?

20  A.   Yes, I did.

21  Q.   And during the time that Ben was with you, did he seem

22  concerned to be in your presence?  Was he afraid?

23  A.   Absolutely not.

24  Q.   Now, when you got -- after that evening, you came back to

25  the house the following morning; correct?

592

1    A.  That's correct.

2    Q.  And when you came back to the house, who was there?

3    A.  Karen was.

4    Q.  And did you talk to her?

5    A.  Yes, I did.

6    Q.  Tell us how that conversation transpired.

7    A.  I had apologized for the whole situation.  And she had

8    opened the door and greeted me and, you know, she was crying

9    and upset over it.  But she said she was sorry.  And I said,

10   "no, no," I was telling her that, you know, "I'm the one that

11   should be sorry.  There's no reason for you to be sorry."  But

12   she was sorry that the whole incident had happened.  And that

13   it was just a misunderstanding.

14   Q.  What happened then?

15   A.  She invited me in and I hung out.  And then I had a

16   bathroom bag that I had there with my toothbrush and all my

17   toiletries in it.  And I told her I was just going to grab it

18   and go.  And she insisted that I stay until Andrew got off

19   work and hang out, you know.

20   Q.  So did you stay at the house?

21   A.  I felt kind of bad that, you know, I had caused that whole

22   situation.  So I kind of felt obligated to stay.  So I ended

23   up staying.

24   Q.  Did Andrew eventually come home?

25   A.  It was about two hours later when he got there.

Shawn McCormack - D

593

1   Q.  Okay.  And did you leave the house at that time?

2   A.  No, I did not.  I stayed there.

3   Q.  That night?

4   A.  Yes.

5   Q.  Did you ever sexually assault Ben?

6   A.  No, I did not.

7   Q.  And did you ever take sexually explicit photographs of

8   either Ben or Elizabeth?

9   A.  Absolutely not.

10  Q.  Now, when the police came and searched your house in

11  Colorado, they found a Toshiba laptop computer; correct?

12  A.  That's correct.

13  Q.  And that was yours?

14  A.  Yes.

15  Q.  And you've heard the description of the material that was

16  on that computer.

17  A.  Yes, I have.

18  Q.  And was that material yours?

19  A.  Everything I had downloaded, yes.

20  Q.  Okay.  So you were in possession of child pornography?

21  A.  That's correct.

22  Q.  And you actually had these chats that have been talked

23  about here.  "Toddlers," is that you?

24  A.  Yes, I have done that.

25  Q.  And you realize that's against the law?

Shawn McCormack - D

594

1    A.   Yes, I do.

2    Q.   And you know, some of those images that were found on your

3    computer were images you've heard of Ben and Elizabeth; is

4    that right?

5    A.   That is correct.

6    Q.   Now, how did you come into possession of those?

7    A.   I had downloaded them off of GigaTribe.

8    Q.   From someone else?

9    A.   That's correct.

10   Q.   One natural question would be, having seen both of those

11   children, did you recognize them in those images on the video?

12   A.   They looked familiar, yes.

13   Q.   Did you send those on to other people?

14   A.   Yes, I did.

15   Q.   And when you would have these chats with folks, you heard

16   that there are instances when you were making reference to

17   friend's children that you could take away from the house and

18   take to a hotel.  You heard that; right?

19   A.   That is correct.

20   Q.   And that was -- those were chats that you were involved

21   in?

22   A.   Yes.

23   Q.   Why were you saying that?

24   A.   I basically would do anything I could to persuade the

25   other people that I was talking to to allow me to download

1    their videos or whatever, materials they may have had.

2    Q.  Was there something about that online community where it

3    was important to be able to act like you had access to

4    children?

5    A.  Yes.  There was.

6    Q.  Why was that?

7    A.  Because if you didn't or if you didn't have that kind of

8    sort of thing, then people wouldn't allow you to download

9    their stuff.  They'd lock you out, block you or delete you.

10   Q.  And you had an interest in this material and you were

11   interested in acquiring as much of it as you could?

12   A.  Yes.

13   Q.  Now, you've seen the clothing that was been placed into

14   evidence here that was seized from your house in Colorado;

15   correct?

16   A.  That's correct.

17   Q.  Okay.  The -- specifically the three shirts, the red ones,

18   are those yours?

19   A.  One of them is.

20   Q.  Which one?

21   A.  The one that's got "HPC" on it.

22   Q.  Okay.  What does "HPC" stand for?

23   A.  High Performance Communications, which was a

24   telecommunications company I worked for.

25   Q.  And that was one of the short sleeved t-shirts?

596

1  A.  Yes, that's correct.

2  Q.  Is the long sleeve t-shirt yours?

3  A.  No, it is not.

4  Q.  How about the other short sleeve t-shirt, the red one?

5  A.  There was two long sleeve and one short sleeve, right?

6  Q.  I think it's just the opposite.

7  A.  Okay.  Only one of the t-shirts was mine.

8  Q.  Okay.  And if those weren't yours, who were they?

9  A.  The other two would have belonged to my little brother

10 Scott.

11 Q.  And was he living with you at the time of the search?

12 A.  Yes, he was.

13 Q.  And how are you and Scott size-wise?

14 A.  We are almost exactly the same.  We can swap shirts out or

15 swap pants out.  So on occasions he grabs some of my clothes

16 if his stuff was all dirty or if my clothes were all dirty,

17 I'd grab a couple of his shirts and wear them.

18 Q.  Now, you saw a couple of gray t-shirts that were placed in

19 evidence.

20 A.  Yes.

21 Q.  Were those yours?

22 A.  I know -- there's two of them, right?

23 Q.  Yes.

24 A.  I know one of them for sure was not mine and the other I'm

25 not sure because we both had the blank ones.

597

1   Q.   How about the belts?

2   A.   One was and one wasn't.

3   Q.   Do you remember which was which?

4   A.   I think the Quicksilver one was mine.

5   Q.   The one that had an actual -- that had a --

6   A.   An emblem on it or whatever you want to call it.

7   Q.   A design on the buckle?

8   A.   Correct.

9   Q.   Okay.  Now, you also saw that you had some of -- or at

10  least in the house, what I call ski masks.

11  A.   Correct.

12  Q.   Why did you have those?

13  A.   Because working on the cell phone towers, we're climbing

14  up in the high altitude, you know, we'll be on towers two, 300

15  feet up in the air.  When it's cold weather out, your eyes and

16  your face freezes up.  And it just -- without those, you're

17  killing yourself.

18  Q.   So you -- do you even remember where you purchased those?

19  A.   Some of them were from places like Wal-Mart or -- I

20  forget, some of the larger outdoor stores that I've purchased

21  them from.  But some of them were from Wal-Mart.

22  Q.   And again, the person, the adult male in those videos, was

23  that you?

24  A.   No, it was not.

25  Q.   Now, I think you heard Detective Romine talk about some

Shawn McCormack - X

598

1    type of scar or some kind of imperfection on the left hand

2    that appears in one of those photographs.  Did you hear that?

3    A.  Correct, I did.

4    Q.  And you've looked at that photograph.

5    A.  Yes, I have.

6    Q.  And you've seen what's on the person's left hand?

7    A.  Yes, I have.

8    Q.  Do you have anything like that on --

9    A.  I do not.

10   Q.  -- your left wrist?

11   A.  No.

12   Q.  You don't have any wart or any imperfection there?

13   A.  Nothing.

14           MR. FALLER:  That's all I have at this time, Your

15   Honor.  Thank you.

16           THE COURT:  And cross-examination.

17           MR. DELAHUNTY:  Yes, Your Honor.

18                      CROSS-EXAMINATION

19   BY MR. DELAHUNTY:

20   Q.  I'm going to ask you some questions about what you just

21   testified to.  Okay?

22   A.  You got it.

23   Q.  You were "Toddlers"; correct?

24   A.  That's correct.

25   Q.  You wrote those things that we saw in this trial; correct?

1   A.   That's correct.

2   Q.   Now let's talk about the night of November 6th.  Okay?

3   A.   Okay.

4   Q.   You said that you arrived that day after a 15-hour drive;

5   correct?

6   A.   That's correct.

7   Q.   And you got there and you hung out with Andrew for awhile;

8   correct?

9   A.   Yes.

10  Q.   You stayed up and you had a couple of beers; correct?

11  A.   I did not have any beers.

12  Q.   Okay.  Did you smoke marijuana?

13  A.   Yes.

14  Q.   And when did you arrive again?

15  A.   Late evening.

16  Q.   Okay.  After a 15-hour drive?

17  A.   That is correct.

18  Q.   And then you decided to go to bed?

19  A.   No, I did not.

20  Q.   You decided to go get Red Bulls?

21  A.   I was laying down on the couch and just kind of fidgeting

22  with myself and, you know, twiddling my thumbs and I couldn't

23  fall asleep so I figured I'd go grab a couple of Red Bulls.

24  Q.   Did you think you needed energy at that point in the night

25  to do something?

600

1    A.   A lot of times after so many of the energy drinks, it

2    actually helps me crash out better.

3    Q.   Now, you said -- you testified that you had had your

4    driver's license stolen; am I right?

5    A.   I had lost it.

6    Q.   You lost it.

7    A.   That's correct.

8    Q.   And did you lose some credit cards as well?

9    A.   Yes, I did.

10   Q.   When did you lose those?

11   A.   Maybe six, seven months prior to that, to the March

12   incident.

13   Q.   So we're talking you lost these items in the fall of 2008?

14   A.   That would be correct.

15   Q.   So had you got replacements for them by the March of 2009

16   time period?

17   A.   I got replacements for the bank cards, that's it.

18   Q.   You had a debit card?

19   A.   Yes.

20   Q.   Did you use that to purchase things?

21   A.   Yes.

22   Q.   Did you use it to withdraw money?

23   A.   Yes, I did.

24   Q.   And I want to make sure I understand where you were in

25   late March of 2009.  Okay?  So you said you were in Glendora,

601

1   California on March 27th; correct?

2   A.   That's correct.

3   Q.   And you even remember going to Auto Zone to buy things; is

4   that correct?

5   A.   That's correct.

6   Q.   And you purchased things there; is that correct?

7   A.   That's correct.

8   Q.   You purchased them with your debit card?

9   A.   No.

10  Q.   What did you purchase them with?

11  A.   I used my mom's credit card.

12  Q.   The shocks that you bought that night you purchased with

13  your mom's credit card?

14  A.   Yes.

15  Q.   Okay.  And then you stayed in Glendora on the 28th;

16  correct?

17  A.   That is correct.

18  Q.   And you stayed in Glendora on the 29th?

19  A.   Yes.

20  Q.   Didn't go to Bakersfield?

21  A.   No, I did not.

22  Q.   When you -- when you lived in -- what was your address in

23  Glendora in the early part of 2009?

24  A.   I don't know the numerical digits.  I just know it was off

25  of Route 66.

602

1   Q.  You lived there for a while; correct?

2   A.  For about a year and a half.

3   Q.  Did you have a bank account while you lived there?

4   A.  Yes, I did.

5   Q.  Does this address ring a bell, 423 West Route 66, Space

6   40.

7   A.  That's correct.

8   Q.  Is that where you lived?

9   A.  Yes.

10  Q.  Did you get bank statements at that address?

11  A.  I think so, yes.

12  Q.  I'm going to show you a document and I'll ask you if you

13  see that Auto Zone purchase on it.  Okay?  May I approach,

14  Your Honor?

15       THE COURT:  Yes.

16  BY MR. DELAHUNTY:

17  Q.  I'm showing you what's been marked as Government's Exhibit

18  160.  Can you take a look at that?

19  A.  The whole thing or --

20  Q.  Just the front page.  Is that your name on the front of

21  that document?

22  A.  Yes, it is.

23  Q.  Is that your address in Glendora, California?

24  A.  Yes.

25  Q.  Now, if you would, please flip a couple of pages in

1    here -- well, let's -- yeah, flip a couple of pages in here

2    until you get to 205 for the March 24th through April 22nd

3    time period.  Do you see that?

4    A.   I see it where -- March 25th.

5    Q.   Yeah.  Look at the entry for March 30th.  Don't tell me

6    what you see there.  Do you see a number right besides March

7    30th?

8    A.   Yes.

9    Q.   Do you see "Auto Zone" beside that?

10   A.   Yes, I do.

11   Q.   So is this your bank statement for that time period?

12   A.   That would appear so, yes.

13        MR. DELAHUNTY:  Your Honor, the government moves into

14   evidence Government's Exhibit 160.

15        MR. FALLER:  Submitted.

16        THE COURT:  It is admitted.

17        (Government's Exhibit 160 was received.)

18   BY MR. DELAHUNTY:

19   Q.   I'm going to put this on the Elmo now so that we can all

20   take a look at it.  Okay?  Do you see that on the screen, Mr.

21   McCormack?

22   A.   Yes, I do.

23   Q.   Do you see where I'm circling "Auto Zone"?

24   A.   Yes, I do.

25   Q.   Do you see that the purchase is in Covina, that's where

604

1   you talked about; right?

2   A.   That's right.

3   Q.   Says it happened on March 27th; correct?

4   A.   It says -- where does it --

5   Q.   Right there.

6   A.   Okay.  I see it.

7   Q.   I'm circling where it says 3-27 right in the middle of the

8   screen; is that correct?

9   A.   That's correct.

10  Q.   And that's accurate; isn't it?  That's what you said

11  happened?

12  A.   That's correct.  But that's only one of the receipts right

13  there.

14  Q.   Okay.  But you don't have a reason to doubt the accuracy

15  of that; do you?

16  A.   No, I don't.

17  Q.   That was the day that transaction happened; isn't it?

18  A.   That's correct.

19  Q.   And it happened in Covina; didn't it?

20  A.   That's correct.

21  Q.   And I want you to just look down two more spots.  Okay?

22  Do you see where I highlighted right there?

23  A.   Yes, I see it.

24  Q.   You see a transaction for 27.36?  You see that?

25  A.   Yes, I do.

1   Q.  You'd agree with me that that was at the 781 Fastrip;

2   correct?

3   A.  That's correct.

4   Q.  You see a date right beside that, it says 3-29?

5   A.  Yes, I see it.

6   Q.  You'd agree with me that was on March 29th; correct?

7   A.  I would agree.

8   Q.  Do you see where it says that transaction occurred?

9   A.  Yes, I do.

10  Q.  You see where it says Bakersfield, California?

11  A.  Yes, I do.

12  Q.  So your card was used in Bakersfield, California on March

13  29th; correct?

14  A.  Correct.

15  Q.  The same card you used three days earlier?

16  A.  That's correct.

17  Q.  You were in -- now, you also said that your car was

18  impounded during that month; correct?

19  A.  That's correct.  It was sitting in a police impound.

20  Q.  So how are you driving around that month?

21  A.  I was not driving around that month.

22  Q.  Were you ever buying gas that month?

23  A.  No.

24  Q.  You never -- why not?

25  A.  Not that I recall.  I mean, this is six years ago, so I

Shawn McCormack - X

606

1   don't recall 100 percent, but not that I recall.

2   Q.  Would you have bought gas if you had a car to drive,

3   though?

4   A.  If I had a car to drive.

5   Q.  You probably would have got gas for it from time to time.

6   Correct?

7   A.  Correct.

8   Q.  So I want you to keep looking at what you've got in front

9   of you, which is Government's Exhibit 160.  I want you to flip

10  back a couple of pages.  And I want you to look at the

11  statement for February 20th through March 23rd, '09.  You see

12  that?  It says page 3 of 5 at the top.

13  A.  I got it.

14  Q.  You would agree with me this is your statement for the

15  time period between February 20th and March 23rd, '09; right?

16  A.  Yes.

17  Q.  Okay.  And you're saying that's the time period you didn't

18  have a car; right?

19  A.  That's correct.

20  Q.  And you wouldn't have been buying gas during that time

21  period without a car; right?  That's what you said, isn't it?

22  A.  That's correct.

23  Q.  So I'm going to put that page of Government's Exhibit 160

24  up on this screen.  You see where I just highlighted March

25  9th.

607

1   A.  Yes, I do see it.

2   Q.  You agree that says -- it's an entry of a purchase at

3   Chevron; correct?

4   A.  Correct.

5   Q.  A gas station; correct?

6   A.  Gas stations sell a lot of things, but yes, I do see it.

7   Q.  You see the next highlighted at 3-10 where it says

8   "Chevron"?

9   A.  Yes, I do.

10  Q.  That's a gas station; isn't it?

11  A.  That's correct.

12  Q.  This one's in Nevada; right?

13  A.  Yes.

14  Q.  Sun Valley?

15  A.  I think both of them are in Nevada.

16  Q.  Take that down.  You also talked -- or you said that you

17  lost your driver's license.  Do you remember saying that?

18  A.  That's correct.

19  Q.  Okay.  And you didn't have it with you in March of 2009.

20  Is that your testimony?

21  A.  I did not say that I did not have it with me.  I had my

22  old ID card.

23  Q.  Was there anything different about your old ID card from

24  the one that you said you lost?

25  A.  I think a couple of the numbers were different, I think.

608

1    Q.  Had a different number, because it was issued at a

2    different time?

3    A.  Correct.

4    Q.  And did you ever get back the license that you lost?

5    A.  No, I did not.

6    Q.  And the license that you're saying somebody used at the

7    hotel in March of 2009, you didn't have access to that again;

8    is that your testimony?

9    A.  That's correct.

10   Q.  Now later on in 2009, though, you moved to Colorado;

11   correct?

12   A.  Yes.  That's correct.

13   Q.  And you got a job there; correct?

14   A.  Yes.

15   Q.  Pretty similar to the job you had before; right?

16   A.  Yes.

17   Q.  Doing electrical work on cell phone towers?

18   A.  Not electrical, but cell phone towers, correct.

19   Q.  You said you had -- you worked on cables and so forth.

20   A.  Cables, not electric.

21   Q.  Okay.  And this was -- how big was this company you got a

22   job with?

23   A.  The one in Colorado?

24   Q.  Yeah.

25   A.  There were about 60, 70 employees.

609

1   Q.  And they mailed you paychecks from time to time?

2   A.  They mailed me my paycheck statements.  Bank statements.

3   Q.  When you applied to work with them, did you have to fill

4   out some paperwork?

5   A.  I don't think I really filled out anything.  I'm not sure.

6   Q.  You just showed up and they gave you a job?

7   A.  Through references.

8   Q.  Let me make sure I understand.  Your employer in Colorado

9   is Front Range Wireless.  And was that out of Centennial,

10  Colorado?

11  A.  Centennial, yes.

12          MR. DELAHUNTY:  So I'd like to approach, Your Honor.

13          THE COURT:  Yes.

14  BY MR. DELAHUNTY:

15  Q.  Showing you what's been marked 161.

16          MR. FALLER:  What was the number?

17          MR. DELAHUNTY:  161.

18  Q.  Do you have in front of you a document that's been marked

19  Government's Exhibit 161, Mr. McCormack?

20  A.  Yes, I do.

21  Q.  Do you recognize that as your handwriting on it?

22  A.  Yes, I do.

23          MR. DELAHUNTY:  Your Honor, the government would move

24  into evidence Government's Exhibit 161.

25          MR. FALLER:  No objection.

Shawn McCormack - X

610

1          THE COURT:  It is admitted.

2          (Government's Exhibit 161 was received.)

3    BY MR. DELAHUNTY:

4    Q.  I'm going to put this on the Elmo.  That's your

5    handwriting; right?

6    A.  It looks very much like it, yes.

7    Q.  That's your signature; isn't it?

8    A.  It looks like it.

9    Q.  Do you have any reason to doubt that's your signature?

10   A.  Not from what it's being signed, no.

11          MR. DELAHUNTY:  Permission to approach again, Your

12   Honor.

13          THE COURT:  Yes.

14          MR. FALLER:  162?

15          MR. DELAHUNTY:  Yes.

16   Q.  Showing you what's been marked 162.  Take a look at that.

17          Is that your signature on that document?

18   A.  Yes.

19          MR. DELAHUNTY:  Government would move into evidence

20   Government's 162, Your Honor.

21          MR. FALLER:  Relevance?

22          THE COURT:  Relevance?

23          MR. DELAHUNTY:  To establish the time, where he was,

24   his signature.

25          THE COURT:  Anything else then?

Shaun McCormack - X

611

1           MR. FALLER:  No.

2           THE COURT:  It is admitted subject to motion to

3    strike.

4           (Government's Exhibit 162 was received.)

5    BY MR. DELAHUNTY:

6    Q.  That's your handwriting, isn't it, Mr. McCormack?

7    A.  Yes.

8    Q.  That's your signature; isn't it?

9    A.  Yes.

10   Q.  Now, when you worked at Front Range Wireless, you drove a

11   vehicle; right?

12   A.  Not when I first worked there.

13   Q.  Was that part of your job at some point in time?

14   A.  It wasn't part of the job, it was basically, I guess,

15   easier because I could have rode along with anybody else

16   there.

17          MR. DELAHUNTY:  Permission to approach, Your Honor.

18          THE COURT:  Yes.

19   BY MR. DELAHUNTY:

20   Q.  Showing you what's been marked 163.  Do you have that in

21   front of you?

22   A.  Yes, I do.

23   Q.  That's your signature on that; isn't it?

24   A.  Yes.

25   Q.  Okay.  You filled this out; didn't you?

Shawn McCormack - X

612

1   A.   Looks like it, yeah.

2   Q.   Okay.  When -- and you filled it out on -- well, you'd

3   agree that the date of this document on the bottom right is

4   6-8-09; correct?

5   A.   Yes.  Correct.

6   Q.   And this is after -- three months after March of 2009;

7   correct?

8   A.   Correct.

9   Q.   When you said you'd lost your driver's license.

10  A.   Correct.

11  Q.   And you see in the middle of this document where the

12  driver's license is listed?

13  A.   Yes, I do.

14  Q.   Do you understand that to be referring to your driver's

15  license?

16  A.   Yes.

17  Q.   And you see where it says the state of the license is

18  Arizona?

19  A.   Yes.

20  Q.   And it lists a driver's license number?

21  A.   Yes, I see it.

22  Q.   You'd agree that number is D00129651.

23  A.   Yes.

24  Q.   With an expiration date of 9-23-48.

25  A.   Yes.

Shawn McCormack - X

613

1    Q.  Take a look at the picture, the next page of government's

2    163.  Let me put this on the Elmo first.  What we just talked

3    about, was that right in the middle of the document right

4    there, Mr. McCormack?

5            THE JURY:  We can't see.

6            THE CLERK:  Was 163 admitted?

7            MR. DELAHUNTY:  I -- no?  Excuse me.

8            THE CLERK:  Sorry.

9            MR. DELAHUNTY:  No problem.  I apologize.  Government

10   moves into evidence Government's 163, Your Honor.

11           MR. FALLER:  Submitted.

12           THE COURT:  It is admitted.

13           (Government's Exhibit 163 was received.)

14   BY MR. DELAHUNTY:

15   Q.  The number in the driver's license we just talked about is

16   being highlighted in the middle of the screen; correct?

17   A.  Correct.

18   Q.  That's the license information you gave your employer at

19   that point in time; correct?

20   A.  Correct.

21   Q.  And if you look at the second page of this document, it

22   looks like this; doesn't it?

23   A.  Yes.

24   Q.  That's your drivers license that you handed your employer

25   at that point in time; correct?

Shawn McCormack - X

614

1    A.  Correct.

2    Q.  It still has the drivers license number D00129651?

3    A.  That's correct.

4    Q.  And that's your Arizona driver's license?

5    A.  Yes.

6    Q.  Let's look at the third page too.  Do you see that?

7    A.  Yes, I do.

8    Q.  That's your handwriting?

9    A.  Yes.

10   Q.  Your signature?

11   A.  Yes.

12   Q.  That's your driver's license number?

13   A.  Yes.

14   Q.  Now let's look at -- can we get on the screen Government's

15   Exhibit 104, please.  You see that?

16   A.  Yes, I do see it.

17   Q.  You see any difference in that driver's license there than

18   the one we just looked at?  There is none; is there?

19   A.  Not that I can see.

20   Q.  That's your handwriting on the top of that document; isn't

21   it?

22   A.  No.

23   Q.  You would agree with me that the driver's license -- well,

24   you'd agree the driver's license there has the same number,

25   D00129651, that we looked at as the driver's license you

615

1   presented three months later for your employment; correct?

2   A.  Correct.

3   Q.  Can we take that down, please.

4           May I have a moment to confer, Your Honor?

5           THE COURT:  Yes.

6           MR. DELAHUNTY:  I have no further questions at this

7   point in time, Your Honor.  Actually -- no, I have no further

8   questions.

9           MR. FALLER:  What was the number of the banking

10  documents?  The exhibit number?

11          THE CLERK:  163.

12          MR. DELAHUNTY:  The bank statements.

13          THE CLERK:  160.

14          MR. DELAHUNTY:  Thank you.

15          THE COURT:  Redirect.

16          MR. FALLER:  Thank you, Your Honor.

17          Might I have just a moment, Your Honor.  I've got to

18  find a page in the exhibits.

19          THE COURT:  Yes.

20                    REDIRECT EXAMINATION

21  BY MR. FALLER:

22  Q.  Okay.  Putting on the overhead a page of Exhibit Number

23  160 that is in evidence.  Showing some dates there.  3-4 to

24  3-20.  Do you see that on your screen, Mr. McCormack?

25  A.  Yes, I do.

616

1   Q.  And this is the page prosecutor was just asking you some

2   questions about you buying gas.

3   A.  That's correct.

4   Q.  If we go down here and we start looking at some of these

5   Chevron purchases.  On March 9th, there's a Chevron purchase

6   for, what, $4.57?

7   A.  That's correct.

8   Q.  And then there's -- it looks like another Chevron purchase

9   for $10.06.  Is that right?

10  A.  That's correct.

11  Q.  There's an ARCO for $4.52.

12  A.  That's correct.

13  Q.  Looking back on the cost of gas back then, those amounts

14  wouldn't have purchased much gas, now, would they?

15  A.  No, not at all.

16  Q.  So is it your belief that you were buying items at

17  those -- at those stations other than gasoline?

18  A.  That's correct.

19  Q.  And did you often go and buy items at gasoline/convenience

20  stores that were other than gasoline themselves?

21  A.  Yes.

22  Q.  Now, and this was during that period when your truck was

23  impounded?

24  A.  Yes, that's correct.

25  Q.  Now, the prosecutor also asked you some questions

1  regarding the driver's license on this employment application.

2  A.  That's correct.

3  Q.  What is the explanation for that?

4  A.  Like I said, I had the two cards.  I don't know what would

5  change about them or if they're identical or anything.

6  But --

7  Q.  And let's see.  Let's look at -- let's look at 104, which

8  is on the screen.  And that's the copy that's in the hotel

9  records.  Is that correct?

10  A.  That's correct.

11  Q.  Now, is that the same card that you gave a copy of to your

12  employer?

13  A.  It appears to be.

14  Q.  Okay.  But is it the same card that you had in your

15  possession?

16  A.  Yes.

17  Q.  Okay.  You testified before that you had lost it.

18  A.  That's correct.

19  Q.  But you had another copy?

20  A.  That's correct.

21  Q.  And that was the old one?

22  A.  Yes.

23  Q.  And is that the one that's on the employment document 163?

24  A.  I think so.

25  Q.  Again, Mr. McCormack, is that you in those videos?

618

1   A.   No, sir, it is not.

2   Q.   Did you take those photographs of the children?

3   A.   No, I did not.

4   Q.   Is that the front seat of your truck?

5   A.   No, it is not.

6           MR. FALLER:  I have nothing further, Your Honor.

7   Thank you.

8           THE COURT:  And recross.

9           MR. DELAHUNTY:  Nothing further for this witness

10  right now, Your Honor.

11          THE COURT:  All right.  Members of the jury, we're

12  going to take the afternoon recess.  It's almost 3 o'clock.

13  Remember that admonition and we'll see you in 15 minutes.

14          (The jury left the courtroom.)

15          THE COURT:  The jury has left for its recess.  We'll

16  allow Mr. McCormack to re-take his place at the counsel table.

17          And then while he's doing that, are there any issues

18  that we need to take up?  We'll take -- well, we'll take a

19  break because I told the jury we would.  And then I understand

20  that Mrs. McCormack would testify right after the break.

21          MR. FALLER:  Yes.

22          THE COURT:  And then would that conclude the defense

23  case in chief?

24          MR. FALLER:  I will need to call Agent Pike for just

25  a couple of short questions and that will be it.

1          THE COURT:  Okay.  All right.  So logistically then,
2     once you're done with your case in chief, we can take a break.
3          Without committing yourself, is the government
4     planning on doing rebuttal?  The only reason I'm asking is
5     just so I'll know logistically what to tell the jury.
6          MR. DELAHUNTY:  I don't anticipate it right now, Your
7     Honor.
8          THE COURT:  Okay.  And again, you're not committed to
9     that obviously.  We still have the testimony of Mrs.
10     McCormack.  So you can obviously do that.
11          What I may do is just ask -- the reason I'm asking
12     about rebuttal is if both sides -- once defense completes the
13     case in chief, both sides rest their entire case, then I can
14     tell the jury process-wise what happens when both sides rest
15     their entire case.
16          And I'll let them take a break for a while while we
17     run through the exhibits, do the Rule 29 motion and any other
18     matters that need to be taken up.  And then go from there.
19     See about taking -- determining the jury instructions, verdict
20     form and how we wish to proceed for the rest of the day.
21          All right.  So right now, let's go ahead and take a
22     15-minute recess.
23          (Recess.)
24          THE COURT:  All right.  Before we have the jury come
25     in, one of the proposed jury instructions is instruction 2.10,

1    other crimes, wrongs or acts of defendant.  I can either give

2    that now or I can incorporate it as part of the final

3    instructions.  Mr. Faller, your preference on that?

4            MR. FALLER:  I'd just incorporate it in the final

5    instructions.

6            THE COURT:  I will do that.  It's instruction 2.10.

7    And we'll just change the wording.

8            All right.  Anything else, then, before we have the

9    jury come back in?

10           MR. DELAHUNTY:  Not at this time, Your Honor.

11           MR. FALLER:  Yeah, I -- just a matter of scheduling.

12   I would imagine that we'll end up arguing in the morning?

13           THE COURT:  Yeah, I would -- if the parties prefer

14   that, no matter what time we finish, I suppose we could send

15   the jury home early and then start up at nine o'clock

16   with -- if we want to try to do the jury instructions to them

17   tonight or the instructions tomorrow, depending on how you

18   folks want to deal with that.

19           MR. FALLER:  I don't know.

20           MS. RICHARDS:  I'd prefer to do closing tomorrow.

21           THE COURT:  Okay.  And that's fine.  So we'll do the

22   closing -- regardless of what time we're done, we'll send the

23   jury home for closing.

24           Now, do you want me to give the instructions tonight

25   or do you just want me to go ahead and do it first thing

1  tomorrow morning?

2       MS. RICHARDS:  The government would prefer

3  instructions tomorrow so that the instructions are with the

4  closings.

5       MR. FALLER:  I certainly have no objection to that.

6       THE COURT:  All right.  So once we're done with all

7  the evidence, we'll send the jury home.  Obviously, I'll tell

8  them we need to work on jury instructions, verdict forms, take

9  care of legal issues, et cetera, et cetera.

10       So, okay, with that, anything else then, Mr. Faller?

11       MR. FALLER:  No, Your Honor.

12       THE COURT:  By the government, anything else?

13       MR. DELAHUNTY:  Nothing further now.

14       THE COURT:  All right.  We'll have the jury come in

15  then.

16       (The jury entered the courtroom.)

17       (Off the record.)

18       THE COURT:  The jury is present.  Please be seated.

19  Defense may continue defense case in chief.

20       MR. FALLER:  Yes.  The defense next witness is Marsha

21  McCormack.

22                    **MARSHA McCORMACK**,

23  called as a witness on behalf of the Defendant, having been

24  first duly sworn, testified as follows:

25       THE CLERK:  Please have a seat.  State your full name

Marsha McCormack

622

1   for the record and spell it.

2           THE WITNESS:  Marsha McCormack.

3           THE CLERK:  I'm sorry.  Your full name and spell it.

4           THE WITNESS:  Marsha McCormack.

5                       DIRECT EXAMINATION

6   BY MR. FALLER:

7   Q.  Could you spell your last name, please.

8   A.  The last name M-C-C-O-R-M-A-C-K.

9           THE CLERK:  Thank you.

10  BY MR. FALLER:

11  Q.  Could you pull that down a little bit towards you there.

12  Good.  All right.  Ms. McCormack, you are the mother of Shawn

13  McCormack, the defendant in this case?

14  A.  Yes.

15  Q.  And what part of the country do you currently live in?

16  A.  Colorado.

17  Q.  Now, back in the spring of 2009, were you living in

18  California?

19  A.  Yep.

20  Q.  And where was that?

21  A.  Glendora.

22  Q.  And who was living with you?

23  A.  Shawn and Scott.

24  Q.  And Scott is Shawn's younger brother?

25  A.  Yes.

Marshall McCormack

623

1  Q.  Okay.  Now, after -- at some point did you become aware of

2  the relevant dates in this case in regards to some of the

3  allegations?

4  A.  Yes.

5  Q.  And did you go back and try and put together some evidence

6  as to what might have been going on in your family during

7  particular relevant periods?

8  A.  Absolutely, yes.

9  Q.  Okay.  And did -- one of those relevant periods was a

10  weekend in March of '09, from roughly Friday the 27th through

11  Sunday the 29th.

12  A.  Yes.

13  Q.  Is that right?

14  A.  Yes.

15  Q.  And did you go to some effort to recall where Shawn was

16  that weekend and what was going on in your family?

17  A.  Yes.

18  Q.  Now, I'd like to show you a document that's been marked

19  Defense Exhibit A and has two what appear to be Auto Zone

20  sales receipts on it.  Are those copies of receipts that you

21  compiled?

22  A.  Yes, it is.

23  Q.  Okay.  And this is actually a copy.  But did you have the

24  original of those receipts?

25  A.  I did.

624

1   Q.   And what happened to those originals?

2   A.   They were in a fire.

3   Q.   And that was the big fire in Colorado?

4   A.   The big -- yes.

5   Q.   What, two years ago?

6   A.   Two years ago, took everything.

7   Q.   Okay.  Now, on this exhibit, on the receipts, there's some

8   highlighting and underlining.  Do you know who put that on

9   there?

10  A.   I did.

11  Q.   And that was in regards to the particular date involved?

12  A.   Yes.

13  Q.   Now, on March 27th, 2009, where was your son Shawn?

14  A.   Shawn was with me and his brother.

15  Q.   And where would that have been?

16  A.   That was in Glendora.

17  Q.   And was there something particular that was going on with

18  Shawn and your family over that weekend that you particularly

19  recall?

20  A.   Absolutely I recall.

21  Q.   And what was going on?

22  A.   He was working on the vehicle, on my vehicle.

23  Q.   That was your truck?

24  A.   Yes.

25  Q.   What kind of truck was that?

Marsha McCormack

625

1    A.   Toyota.

2    Q.   And are you aware of -- or were you aware of something

3    that was going on with Shawn's truck at that time?

4    A.   Oh, yes.

5    Q.   What was that?

6    A.   It was impounded.

7    Q.   So he had no personal transportation?

8    A.   No.

9    Q.   Would you loan him your truck to drive anywhere of any

10   consequence?

11   A.   No.

12   Q.   Why not?

13   A.   Because mine could have been impounded and we couldn't

14   have that.

15   Q.   So that weekend, you didn't give him your truck to, say,

16   drive to Bakersfield?

17   A.   No.

18   Q.   Now, what kind of work, if you recall, was being done on

19   your truck?

20   A.   Shocks were being done.  And I believe he did a few other

21   minor things, like changing oil I think.

22   Q.   Was there an overheating problem also?

23   A.   I believe there was.  I know he's very technical and goes

24   over the vehicles.  So I'm not exactly sure of all the things

25   that he was doing, but maintenance pretty much.

1   Q.   Now, the receipts that you compiled that are part of

2   Exhibit A, those indicate a purchase date of March 27th, which

3   would have been Friday?

4   A.   Yes.

5   Q.   And do you recall when Shawn actually did the work on your

6   truck?

7   A.   He was working on the truck on Friday, but he actually did

8   not put the shocks together until the next day.

9   Q.   And that would have been Saturday, the 28th?

10  A.   Yes.

11  Q.   And do you recall Saturday, the 28th, what happened after

12  he -- do you recall what time he finished working on your

13  truck on Saturday?

14  A.   I don't exactly know, but I know it was late in the

15  evening.

16  Q.   Late on Saturday evening?

17  A.   Yes.

18  Q.   Okay.  And after he finished working on your truck, do you

19  recall what you did that evening?

20  A.   We watched TV.  We had already been making homemade pizza,

21  all of us.  Because we're very close and we do things

22  together.  So it was making homemade pizza and we watched a

23  little TV because they were in and out while they

24  were -- Scott was with him while they were working on the

25  vehicle.

Marshall McCormack - D

627

1  Q.  Okay.  And that night, do you recall who slept at the

2  house?

3  A.  Yes.

4  Q.  Who was that?

5  A.  Me.  Shawn.  And Scott.

6  Q.  And so he -- was he there on Sunday morning when you all

7  got up?

8  A.  Oh, yeah.  Yes.

9  Q.  So at three o'clock on Sunday morning, you have personal

10 knowledge he was not in Bakersfield?

11 A.  No.  I would have known.

12 Q.  Now, some time later in -- it was actually probably 2011,

13 were you present at Shawn's residence when some officers came

14 and searched it?

15 A.  In another state, yes.

16 Q.  In Colorado.

17 A.  Yes.

18 Q.  And was that a pleasant experience?

19 A.  No.  I kind of got beat up.

20 Q.  And did you have some words with the officers that

21 afternoon?

22 A.  I was crying profusely and distraught, especially after I

23 was thrown across the table because he got in my face and

24 telling me all kinds of names about my son that is not

25 true --

Marshall McCormack - X

628

 1              MS. RICHARDS:  Objection, relevance.

 2              THE COURT:  Sustained.

 3    BY MR. FALLER:

 4    Q.  So but you are -- you are as certain as you can be that

 5    Shawn was with you on the weekend of March 27th through March

 6    29th of 2009?

 7    A.  Yes.

 8              MR. FALLER:  That's all I have, Your Honor.  Thank

 9    you.

10              THE COURT:  Cross-examination.

11                        CROSS-EXAMINATION

12    BY MS. RICHARDS:

13    Q.  Good morning -- or good afternoon, Ms. McCormack.

14    A.  Hi.

15    Q.  Are you here for your son today?

16    A.  I am.

17    Q.  And is your son over here at the defendant's table?

18    A.  Of course.

19    Q.  Okay.  You mentioned a search warrant at the defendant's

20    house.  Were you also there for a search warrant on June 8th,

21    2010 at the defendant's house?

22    A.  Actually I was living there too.  If that matters.

23    Q.  In 2010 you were living there with the defendant?

24    A.  Yes.

25    Q.  Did you have a separate bed in 2010?

629

1    A.   Yes.

2    Q.   Okay.  And in June 2010, were there two beds in the

3    household?

4    A.   Yes.

5    Q.   And were you there for the search warrant?

6    A.   Yes.

7    Q.   Okay.  And did you talk to a detective there?

8    A.   Yes.

9    Q.   And did you tell the detective that if you thought your

10   kids were up to anything, you would tell on them?

11   A.   Oh, yes.

12   Q.   But the -- and the detective asked you for your phone

13   number?

14   A.   I don't remember that.

15   Q.   And you told him you didn't have a phone number.

16   A.   I don't remember that.

17   Q.   Well, did you have a phone at the time?

18   A.   I don't remember if I had a phone at the time because I

19   was not working.

20   Q.   Okay.  But then you proceeded to make phone calls on that

21   occasion after you told him you didn't have a phone number?

22   A.   Possibly somebody else's phone.  Could have been Shawn's.

23   Q.   Did the defendant -- did the detective also ask you if you

24   had Shawn's phone number?

25   A.   I don't remember everything the detective said.  I was

630

1    pretty distraught.

2    Q.   Okay.  But you told him that you didn't know the

3    defendant's phone number?

4    A.   I don't remember.  Because I don't remember everything he

5    said.

6    Q.   Okay.

7    A.   I was thrown around, so I was pretty upset.

8    Q.   But in 2010, you would have known the defendant's phone

9    number?

10   A.   Not by heart.  A lot of numbers -- I don't even know my

11   own number by heart.

12   Q.   You're close with your son?

13   A.   I'm close with my son.

14   Q.   And you do call him?

15   A.   I have called him, yes.

16   Q.   In 2010, did you also tell the detective that you didn't

17   know where your son worked?

18   A.   I don't remember that question from him.

19   Q.   But you did know where he worked?

20   A.   I didn't exactly know where he was working, no.

21   Q.   All right.  In March -- on March 16th, 2015, you got a

22   call from a private investigator named Garza?

23   A.   Say that again?

24   Q.   Do you recall on March 16th of this year talking to a

25   private investigator with the last name Garza?

631

1   A.  Osi -- something --

2   Q.  A private investigator for your son's attorney.

3   A.  Yes.  I don't remember the date, but yes.

4   Q.  And you talked to him?

5   A.  I did talk to him.

6   Q.  And he asked you questions?

7   A.  He asked me questions.

8   Q.  And he asked you questions about this case?

9   A.  Yes.

10  Q.  And those questions were for your son's defense?

11  A.  Yes.

12  Q.  And you answered those questions?

13  A.  Yes.

14  Q.  And you answered those questions truthfully?

15  A.  Yes.

16  Q.  Because you wanted to help your son.

17  A.  Because I want to tell the truth.

18  Q.  Okay.  And you knew, when you were answering his

19  questions, that he was a private investigator for your son's

20  attorney?

21  A.  Yes.

22  Q.  Did you tell him you remember where you were on

23  March -- you remembered where you were on March 27th, 2009?

24  A.  I do remember.

25  Q.  And do you agree that that was six years before now?

1  A.  Yes.

2  Q.  And it was six years before March 27th -- it was six years

3  before March 16th, 2015?  It was six years ago.

4  A.  I don't --

5  Q.  You answered that.

6  A.  I told him the dates.

7  Q.  Okay.  And you told him on that day that he had gone to

8  the store to buy car parts on the 27th; is that correct?

9  A.  Say that again?

10  Q.  You told the private investigator that your son Shawn had

11  gone to Auto Zone to buy car parts on the 27th.

12  A.  Yeah, he went to the Auto Zone, yes.

13  Q.  Okay.  And you told -- you told him that he worked on your

14  car that night.  Didn't you?

15  A.  I believe he did some work.  I wasn't outside when he was

16  out there.  But his brother was.

17  Q.  Okay.  And you told the investigator that you made chili

18  that night?

19  A.  Yes, I did.

20  Q.  And you told the investigator that you ate between five

21  o'clock and six o'clock p.m. that night.

22  A.  About.

23  Q.  Okay.  And do you agree that that was six years later that

24  you were recalling what you had for dinner that night.

25  A.  Yes.

Marsha McCormack - RD

633

1   Q.  And that was six years later that you were recalling the
2   specific time that you ate that night?
3   A.  We eat always around that time, so yes.
4   Q.  Okay.  Do you recall what you had for dinner on March 3rd
5   of this year?
6   A.  Don't always remember because I don't always have a car
7   that's impounded or a truck that needed shocks.
8   Q.  Okay.  You agree that you love your son?
9   A.  Of course.
10  Q.  And you would do what you needed to do to help your son?
11  A.  That's kind of open-ended.  What are you asking me?  Would
12  I say anything?  Or what are you -- what are you asking me?
13  Q.  I don't think that answers the question.
14  A.  Well, I -- I want you to be more clear about what you're
15  asking me.
16  Q.  I'm asking you if you would do -- yes, I'm asking you if
17  you would -- if you are -- sorry.  I'll retract the question.
18  I have no further questions.
19          THE COURT:  And redirect.
20          MR. FALLER:  Just briefly, Your Honor.
21                      REDIRECT EXAMINATION
22  BY MR. FALLER:
23  Q.  Ms. McCormack, even though 2009 was six years ago, those
24  dates have become very important in your life and your
25  family's life; correct?

634

1   A.  Yes.

2   Q.  And so you specifically focused on what happened back then

3   once you found out about the allegations in this case?

4   A.  Yes.  I remember for particular reasons.

5   Q.  Yes.

6   A.  Other than just because these are dates in question.

7   Q.  Right.  And -- that's all I have.  Thank you.

8          THE COURT:  And recross?

9          MS. RICHARDS:  No, Your Honor.  Thank you.

10         THE COURT:  Either party wish this witness remain

11  subject to recall?

12         MR. FALLER:  No, Your Honor.

13         MS. RICHARDS:  No, Your Honor.

14         THE COURT:  All right.  You are excused.  Thank you

15  very much.

16         MR. FALLER:  Defense would call Agent Veronica Pike.

17         THE COURT:  I'll remind you that you're still under

18  oath.  But if you'd please restate your name for the record.

19                    **VERONICA PIKE**,

20  called as a witness on behalf of the Defendant, having been

21  previously sworn, testified as follows:

22         THE WITNESS:  Yes.  It's Veronica Pike, last name

23  spelled P-I-K-E.

24  ///

25  ///

635

1                         DIRECT EXAMINATION

2    BY MR. FALLER:

3    Q.  Agent Pike, how many different times were you either

4    present for an interview or actually conducted an interview

5    with Andrew?

6    A.  I believe I met with him probably three times in 2011.

7    And then recently again in March of 2015.  To the best of my

8    memory.

9    Q.  And during any of those -- and those interviews had to do

10   with, among other things, the events of November 6th of '09?

11   A.  Yes.

12   Q.  And during all of those interviews, did Andrew ever tell

13   you that he had gone four-wheeling with Mr. McCormack on the

14   night of -- or on the day of November 6th?

15   A.  I remember him telling me that he had been four-wheeling

16   with McCormack on occasions.  I don't remember him

17   specifically stating on the night of November 6th of 2009.

18   Q.  Well, I'll represent to you there's nothing in your

19   reports about him going on November 6th.  Does -- I just want

20   to make sure that we're -- that you're clear that he never

21   talked about -- he talked about going four-wheeling on other

22   occasions.

23   A.  Yes, I'm sorry.  I misunderstood your testimony.  On

24   November 6th, 2009 he did not present to me that they had gone

25   four-wheeling.

636

1  Q.  And actually today in court that was the first time you

2  had ever heard that; correct?

3  A.  Yes.

4  Q.  Now -- and up until the final interview that you had with

5  him, I believe it was on March 19th of this year, had he ever

6  revealed to you that he had been drinking and smoking

7  marijuana with Mr. McCormack on the evening of November 6th?

8  A.  Not to me, no.

9  Q.  And after the -- after you became aware of what you

10  perceived as a connection between events of November 6th and

11  the overall investigation, did you or anyone that you're aware

12  of conduct any investigation of motels in the area close to

13  the Wilson residence to see if Mr. McCormack had -- was

14  registered in any of them on the evening of November 6th?

15  A.  Yes.  I did not, however.  Detective Jamison of

16  Bakersfield Police Department did.

17  Q.  And that was negative; correct?

18  A.  To the best of my knowledge, yes.

19        MR. FALLER:  That's all I have, Your Honor.  Thank

20  you.

21        THE COURT:  Cross-examination.

22        MS. RICHARDS:  No cross.  Thank you.

23        THE COURT:  You can step down.  Thank you.

24        MR. FALLER:  Your Honor, at this time I move Defense

25  Exhibits A and B into evidence.

1          THE COURT:  Government response?

2          MS. RICHARDS:  No objection.

3          THE COURT:  They are admitted.

4          (Defendant's Exhibits A and B were received.)

5          MR. FALLER:  Defense rests, Your Honor.

6          THE COURT:  Rebuttal?

7          MR. DELAHUNTY:  May we have a moment, Your Honor?

8          THE COURT:  Yes.

9          MR. DELAHUNTY:  The government will not call any

10    rebuttal witnesses and rest.

11          THE COURT:  All right.  So as I understand it, the

12    plaintiff government rests its entire case; is that correct?

13          MR. DELAHUNTY:  Correct, Your Honor.

14          MR. FALLER:  Correct, Your Honor.

15          THE COURT:  All right.  Members of the jury, both

16    sides have rested their entire case.  What that means is all

17    the evidence that you are going to consider, in terms of

18    determining the facts in this case and ultimately applying to

19    the law that I will give you in terms of jury instructions,

20    has been presented to you.

21          At this point in time, it is almost 3:30.  At the

22    conclusion of a case, as in every trial, I need to then go

23    over with the attorneys the jury instructions, the verdict

24    forms, going over the exhibits, seeing what is in and what is

25    not in, see if there are any issues there, and then take up

638

1    any other procedural matters.  This will take a little bit of

2    time.  So we're not really going to be able to get to the

3    closing arguments this evening.

4         So what I'm going to do is I'm going to go ahead and

5    let you folks go this evening.  Tomorrow morning, when you

6    come in at nine o'clock, I will read you the concluding jury

7    instructions, we will then have closing arguments.  The

8    closing arguments will be as follows.  The government

9    plaintiff will present their closing argument, then defense

10   may present a closing argument, and then the government,

11   because they have the burden of proof, has the last say and so

12   they will be able to present rebuttal evidence -- I'm sorry,

13   rebuttal argument and then I'll read you the last few jury

14   instructions and you will begin your deliberations.

15        Now, the cautionary instructions still apply.  You've

16   heard the evidence, you obviously have not heard the law in

17   terms of the jury instructions, you haven't heard the closing

18   arguments, which will be informative to you as to what the

19   parties believe the evidence has or has not shown.

20        So please, again, remember, do not form or express

21   opinions about the case, do not discuss the case with anyone,

22   including your fellow jurors.  The best thing to do is just,

23   to the extent you can, put this out of your mind.

24        Tomorrow morning we'll conclude the matter in terms

25   of the presentation to you as far as the law, the closing

1   arguments, you will begin your deliberations tomorrow.

2          So with that, we'll go ahead and excuse you for the

3   evening and we'll see you tomorrow morning at nine o'clock.

4          (The jury left the courtroom.)

5          THE COURT:  All right.  Go ahead and have a seat.

6   The jury has left for the evening.  I think when we take the

7   break, Renee will give you the update as far as the exhibit

8   list.  You can go ahead and check those.  Compare that with

9   your own notes, see if there are any issues which we'll take

10  up this evening.

11         And then I think what we'll do is also take a brief

12  break, have you take a look at the proposed jury instructions

13  and the verdict form.  I'll come back in, resolve any issues.

14  As I mentioned a little bit earlier, I would like to get the

15  jury instructions and the verdict form resolved tonight so

16  that final copies can be given to you this evening.  And then

17  tomorrow morning it's just simply a matter of my reading the

18  jury instructions at nine and then beginning closing

19  arguments.

20         Obviously, in closing arguments, you can make

21  reference to and display any items that have been admitted

22  into evidence.  Also if you're going to use otherwise any

23  visual aids that are not exhibits in evidence, make sure you

24  show it to the other side before you present your closing

25  arguments.

1          Okay.  So with that, at this time I'll take up other

2     issues.  And then I'll take a break, take a look at the jury

3     instructions, verdict form and the exhibits to see if there

4     are any issues and then we'll come back on the record.

5          So with that, then, okay, if there are any issues, we

6     can go ahead and take them up.  First on behalf of plaintiff's

7     side, any issues we need to take up?

8          MR. DELAHUNTY:  Not right now, Your Honor.

9          THE COURT:  All right.  Defense.

10         MR. FALLER:  Your Honor, would the Court want to

11    handle the Rule 29 issues now or --

12         THE COURT:  Yes.

13         MR. FALLER:  Okay.  I would, for the purpose of the

14    record, make a Rule 29 motion for a directed verdict of

15    acquittal as to all counts, but specifically as to Count Two.

16         Count Two is the count that involves images of the

17    child but is fully clothed that appears to be sleeping.  There

18    is an adult who displayed his -- is displaying his genitals in

19    the photograph.  However, there is no involvement of the

20    child.  The child is apparently asleep, not even aware of

21    what's going on.  And it's our contention that as such, that

22    does not qualify as sexual exploitation of a child because the

23    child is not involved in the event or any of the activity

24    that's going on.

25         THE COURT:  All right.  Anything else with respect to

1 | the motion in any other counts?

2 | MR. FALLER:  No.

3 | THE COURT:  Government response?

4 | MS. CAIN:  Your Honor, 2251 and the code talks about

5 | "lascivious exhibition of the genitals of any person."  You

6 | can also find that in 2256 with the definition of "sexually

7 | explicit conduct."  And when looking at the images in Count

8 | Two, it is lascivious exhibition of any person's genitals

9 | which we contend are the defendant's genitals.  You see erect

10 | genitals near the sleeping baby.

11 | And in *United States versus Lohse*, I believe, we

12 | cited to it in our papers.  The courts, district court out of

13 | the Ninth Circuit held that under very similar circumstances

14 | lascivious exhibition of genitals of any person, including a

15 | baby or a child who's unaware while a defendant places his

16 | genitals, especially erect genitals near the baby, is

17 | sufficient.

18 | And at this point, we believe it's a fact question

19 | for the jury as to whether it constitutes lascivious

20 | exhibition of the genitals and that it was intended to arouse,

21 | sexually arouse the viewer of such photographs.

22 | So we submit that for purposes of Rule 29, we have

23 | presented sufficient evidence to allow it to go to the jury.

24 | THE COURT:  All right.  And on behalf of defense,

25 | anything further?

642

1          MR. FALLER:  Submitted.

2          THE COURT:  Okay.  In this case, yes, I have reviewed

3    the government's trial brief.  Also the jury instruction,

4    although it's a proposed jury instruction, it does set forth

5    the various elements with respect to Counts One through Four,

6    in particular Count Two through Four and honing in on Count

7    Two.

8          The elements -- certainly in this case, there's

9    certainly enough evidence for the jury to conclude that Ben

10   was under the age of 18.  Whether or not the visual depiction

11   was transported across state lines or interstate commerce is a

12   technical question for which is not an issue here, at least

13   for the purpose of the motion.  Obviously there's been

14   testimony regarding the use of the internet computer system,

15   et cetera.

16         Obviously key here is whether or not, on the second

17   elements, the defendant knowingly employed, used, persuaded,

18   induced, enticed or coerced victim 2, Ben, to take part in

19   sexually explicit conduct for the purpose of producing a

20   sexually explicit depiction of such conduct.

21         And then there's a definition or at least factors

22   that a trier of fact would consider with respect to whether or

23   not there was sexually explicit conduct.  And it does -- as

24   the government has pointed out, a number of factors for the

25   trier of fact.  Whether or not the focal point is on the

1    child's genitals or the pubic area.

2            Here, we have a child who appears to be asleep and in

3    diapers.  That would be up to the jury to determine whether or

4    not that picture is suggestive of the child's genital or pubic

5    area, whether or not it's sexually suggestive, et cetera.

6    Whether the child is fully or partially clothed.  And whether

7    the picture or image is intended or designed to elicit a

8    sexual response in the viewer.

9            So I think this is really a question for the jury to

10   make a determination based on the photos as to whether or not

11   that photo, even though the child may appear to be asleep or

12   unaware of what is occurring with respect to the adult, that

13   the jury could utilize one or more of those factors to

14   determine sexually explicit conduct as to the second element.

15           So in this case, it is a matter for the jury to

16   determine.  Again taking into consideration their role as far

17   as deciding what the facts are, any reasonable inferences to

18   be drawn from the facts and, of course, the factors that the

19   jury, as the trier of fact, would consider.

20           So in this case, I would deny the Rule 29 motion

21   simply because this is an issue for the jury, it is not a

22   matter for which I can say, as the Court, that the evidence is

23   insufficient to sustain a conviction as to Count Two.

24           MR. FALLER:  And I neglected to mention one other

25   thing, Your Honor, in regards to Count Six.  That is the

644

1  kidnapping -- allegation of kidnapping or attempted kidnapping

2  on November 6th, 2009.  It's our position there's been no

3  evidence presented about the use or involvement of any

4  instrumentality or movement in or affecting interstate

5  commerce.  And that there is no evidence of that.  And that,

6  therefore, it's a fatal jurisdictional element as far as Count

7  Six is concerned.

8            THE COURT:  And government's response?

9            MS. CAIN:  Your Honor, the testimony from both the

10 defendant today and in his tape recorded interview, he talked

11 about traveling from Colorado to Bakersfield in order to

12 ultimately obtain access to this child.  So he did cross state

13 lines as part of this course of conduct in his offense.

14            Additionally, Andrew testified today that the

15 defendant would routinely call him at least a day before

16 coming over.  And it's the government's position that the use

17 of the phone to obtain access to the child in order for him to

18 then kidnap the child is the use of a facility or

19 instrumentality or means of interstate or foreign commerce.

20            And additionally, the facts from Count Six, we heard

21 testimony that Andrew and the police called the defendant and

22 he informed them, oh, I was just going out to get a drink.

23 Which the United States believes is him attempting to conceal

24 the offense, which in effect allows him to facilitate the

25 commission of the offense, which again is the use of a means,

1    facility or instrumentality of interstate or foreign commerce.

2            So we believe we have presented sufficient evidence

3    for the jurisdictional aspect of Count Six on multiple fronts.

4            MR. FALLER:  Your Honor, I would just point out, Your

5    Honor, I don't think that the government initiating a phone

6    call can be used as the jurisdictional element of something

7    being done by the defendant.

8            And I would just point out that, you know, it's on or

9    about November 6th.  And during the actual commission of the

10   offense as alleged in the indictment and the elements, there

11   is nothing that occurred on the evening of November 6th within

12   the transportation of the minor that satisfies the interstate

13   commerce element.

14           MS. CAIN:  And respectfully, Your Honor, the

15   testimony from Andrew was that he would call a day prior.  And

16   so we're talking about on or about November 6th, 2009.  With

17   that type of testimony in the record, that would put us at

18   November 5th that he used the phone to get in touch with

19   Andrew to obtain access to Ben.  And so we submit that that is

20   sufficient for purposes of how we charged it.

21           THE COURT:  All right.  Okay.  Anything else on

22   behalf of the defense then?

23           MR. FALLER:  No, Your Honor.

24           THE COURT:  Okay.  Again, and this really is a

25   factual issue for the jury.  Both to determine what the facts

646

1   are and the inference from the facts regarding any allegations

2   that Mr. McCormack in this case made a prior phone call and

3   actually crossed state lines, if you will, in order to commit

4   the alleged offense of kidnapping or attempted kidnapping.

5   It's up to the jury to make that determination in terms of

6   inferences.

7           The Court -- the jury could certainly find that,

8   well, no, it's a spur of the moment sort of thing and that he

9   was on his way to another work assignment and it was just a

10  situation where the opportunity arose right at that moment

11  when he was at the residence.  But that's something the jury

12  is going to have to decide, it's not a matter that I can

13  decide as a matter of law.

14          So I'll deny the Rule 29 motion as to Count Six also.

15          All right.  Anything else for defense then?

16          MR. FALLER:  No, Your Honor.

17          THE COURT:  Anything else for the government?

18          MR. DELAHUNTY:  No, Your Honor.

19          THE COURT:  Okay.  I'm going to take a brief break

20  then.  Double check with Ms. Gaumnitz as far as exhibits.  And

21  then meet and confer on the instructions.  And again, I'm

22  going to have to do a real quick modification of the jury

23  instruction 2.10.  And then we'll -- if you have any other

24  issues, we can take those up.

25          But I would like to get a final copy to you folks.

1    And it will be pretty much in the order that was submitted,

2    which, you know, pretty much tracks the model instructions

3    where possible.  But I'll tell you, once we get it agreed upon

4    and I make all the rulings as far as the instructions, I may

5    move them around a little bit just in what I think is maybe a

6    little better sequence.  But again, I will give the

7    instructions, but it may not necessarily be in that order.

8    But I will keep them in the order -- I'll have them in order

9    so that we can follow along if there are any concerns or

10   issues.  So we'll get that other modified instruction.

11          Also on the verdict form, if you have any issues on

12   the verdict form, let me know.

13          I'll just step off the bench.  As soon as you're

14   ready, just let me know, I'll come on back and you can tell me

15   what your thoughts are regarding the exhibits, the jury

16   instructions and the verdict form.  And then anything else we

17   need to cover tonight.

18          I would like to get it all resolved so that at nine

19   o'clock tomorrow morning, there are no issues to resolve.

20   Simply a matter of my giving the jury instructions and turning

21   it over to counsel to give your closing arguments.  So we'll

22   take a brief recess.  Just let me know when you're ready.

23          (Recess.)

24          THE COURT:  All right.  Back on the record.  Now,

25   with respect to the exhibits.  Any issues with respect to the

648

1   exhibits?

2           MR. DELAHUNTY:  No, Your Honor.

3           MR. FALLER:  No, Your Honor.

4           THE COURT:  All right.  Now, I understand there was

5   some discussion regarding what we show to the jury in terms of

6   some of the visual depictions, et cetera.  I don't know if you

7   talked about how you're going to address that.  In terms of

8   being able to show them, I don't know whether we've got a

9   laptop available or how that's going to work.

10          (Off the record.)

11          THE COURT:  It's my understanding the parties have

12  resolved how to address that; is that correct?

13          MR. FALLER:  That is.

14          MS. CAIN:  And just so the record is clear, make sure

15  we're on the same page.  What we are currently doing, Your

16  Honor, is taking all of our exhibits from -- all of our

17  exhibits and putting them on to a disk.  And to the extent

18  they're physical items, the jury will get the physical items.

19  But we just wanted the jury to be able to pop in a disk and

20  see different specific folders for all of the exhibits that

21  are in digital format.  Because there were resolution issues

22  with the print job with our binders.

23          MR. FALLER:  That's true, Your Honor.

24          THE COURT:  All right.  So that's agreeable.  That's

25  fine.

1          MS. CAIN:  Thank you.

2          THE COURT:  Now, with respect -- then that takes care

3     of the exhibits and how the jury is going to deal with them.

4          And then the next question is with respect to the

5     jury instructions.  And we did a modification of instruction

6     2.10.  Any issues regarding the jury instructions?

7          MR. DELAHUNTY:  Not from the government's

8     perspective.

9          MR. FALLER:  No, Your Honor.

10         THE COURT:  Fine.  So the parties agree, then, that

11    the end of trial jury instructions that basically you folks

12    have submitted to the Court, and other than a few minor

13    changes, those are the proper and correct instructions to be

14    given to the jury; is that correct?  For plaintiff's side?

15         MR. DELAHUNTY:  That's correct.

16         THE COURT:  And defense side?

17         MR. FALLER:  Yes, Your Honor.

18         THE COURT:  Good.  Now, as I indicated, I may move

19    the order around a little bit.  But probably not too much.

20    But obviously I'm going to give all the instructions.  And

21    you'll get a complete packet tomorrow morning.  They'll pretty

22    much reflect that you've already seen -- they will reflect

23    what you've already seen.

24         There are three specific instructions that I reserve

25    after you've given your closing arguments.  And they are

1    instructions 7.1, duty to deliberate.  7.5, verdict form.  And

2    then when I read that instruction, 7.5, verdict form, I sort

3    of just wave the jury form to indicate basically what it

4    constitutes.  And then 7.6, which is communication with the

5    Court.  So those three I will give at the very end.  But the

6    others, of course, I'll give first thing tomorrow morning.

7              Okay.  Now, with respect to the verdict forms.  Any

8    issue there for plaintiff's side?

9              MR. DELAHUNTY:  No, Your Honor.

10             THE COURT:  Defense side?

11             MR. FALLER:  No.

12             THE COURT:  All right.  Both sides agree, then, that

13   the verdict forms that you both submitted, both sides

14   submitted, are the proper and correct verdict forms that will

15   be given to the jury; is that correct?  On plaintiff's side?

16             MR. DELAHUNTY:  That's correct, Your Honor.

17             THE COURT:  Defense side?

18             MR. FALLER:  It is.

19             THE COURT:  Okay.  We'll go ahead and do that.

20             Now, just as a reminder, when the jury begins their

21   deliberations, once they leave, we'll make sure that you have

22   a chance to take a look at the exhibits, the jury

23   instructions, the verdict forms will go in.  And if any of you

24   have any concerns about those before we send them back to the

25   jury, you can always let me know.  Otherwise, that's what's

651

1    going to go back to the jury.

2           Okay.  Now, is there anything else this evening that

3    we need to take up for plaintiff's side?  The government,

4    anything else?

5           MR. DELAHUNTY:  No, Your Honor.

6           THE COURT:  All right.  Defense, anything else?

7           MR. FALLER:  No, Your Honor.

8           THE COURT:  Okay.  If you'd be here a little before

9    nine o'clock, I'll just check with you, see if there are any

10   last minute issues that we need to take up.  Otherwise what

11   I'd like to do, obviously, is promptly at nine o'clock have

12   the jury come in, I'll read the jury instructions and we'll do

13   closing arguments.

14          All right.  So we'll see you tomorrow morning at

15   about 8:30, let's say.

16          (The proceedings were concluded at 4:04 p.m.)

17

18          I, KAREN HOOVEN, Official Reporter, do hereby certify

19   that the foregoing transcript as true and correct.

20

21   DATED:  13th of May, 2015          /s/  Karen Hooven
                                        KAREN HOOVEN, RMR-CRR
22

23

24

25