UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII, JUDGE

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff,                 )  No. 11-CR-324-AWI
                                   )
vs.                                )  JURY TRIAL
                                   )     DAY 4
SHAWN JOSEPH McCORMACK,            )
                                   )
        Defendant.                 )
_____)

Fresno, California              Friday, April 10, 2015


REPORTER'S TRANSCRIPT OF PROCEEDINGS


Volume 4, Pages 651 through 729, inclusive


KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:        United States Attorney's Office
                          BY: **PATRICK R. DELAHUNTY**
                          and **MEGAN A.S. RICHARDS**
                          2500 Tulare Street
                          Suite 4401
                          Fresno, California 93721

                          U.S. Department of Justice
                          BY:  **MAUREEN C. CAIN**
                          1400 New York Avenue
                          Suite 600
                          Washington, D.C. 20540


For the Defendant:        **CARL M. FALLER**
                          Attorney at Law
                          Post Office Box 912
                          Fresno, California 93714

653

1                          <u>INDEX OF EXHIBITS</u>

2
<u>COURT</u>                                              **Marked**
3    1 and 2                                          721

4

5                              * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

654

1    Friday, April 10, 2015                    Fresno, California

2    9:02 a.m.

3            THE COURT:  On the record.  Before we have the jury

4    come in, let me just indicate on the jury instructions that

5    you received, I'm going to give all of those instructions.  I

6    did change the order a little bit, so if you're going to try

7    to follow along, they have -- I have moved them around.  But I

8    will be giving all the instructions.  The last three, duty to

9    deliberate, verdict form and communication with the Court,

10   I'll give after your closing.  But other than that, I will

11   give the totality of the instructions.

12           Okay.  Before I have the jury come in, anything

13   further on behalf of plaintiff before the jury comes in?

14           MR. DELAHUNTY:  Not at this time, Your Honor.  Thank

15   you.

16           THE COURT:  Defense, anything?

17           MR. FALLER:  No, Your Honor.

18           THE COURT:  Okay.  Again, you can obviously display

19   exhibits, jury instruction, verdict form and any visual aids

20   as long as you've cleared those with the other side.

21           Okay.  We'll have the jury come in.

22           (The jury entered the courtroom.)

23           THE COURT:  All right.  The record will reflect that

24   the jury is present.  Please be seated.

25           All right.  Good morning, members of the jury.  As I

655

1    mentioned last night, we'll begin the concluding portion of

2    the presentation to you, which will start out with my jury

3    instructions and then the closing arguments.

4         As I mentioned at the outset with the preliminary

5    jury instructions, I literally do have to read them to you.

6    And again, if I mess up any word or phrase, it throws the

7    whole instruction off.  Now, you will be getting a couple of

8    copies of the instructions when you begin your deliberations.

9         Members of the jury, now that you've heard all the

10   evidence, it is my duty to instruct you on the law that

11   applies to this case.  A copy of these instructions will be

12   available in the jury room for you to consult.

13        It is your duty to weigh and to evaluate all the

14   evidence received in the case and, in that process, to decide

15   the facts.  It is also your duty to apply the law as I give it

16   to you to the facts as you find them, whether you agree with

17   the law or not.

18        You must decide the case solely on the evidence and

19   the law and you must not be influenced by any personal likes

20   or dislikes, opinions, prejudices or sympathy.  You will

21   recall that you took an oath promising to do so at the

22   beginning of the case.

23        You must follow all of these instructions and not

24   single out some and ignore others.  They are all important.

25        Please do not read into these instructions or

1    anything -- or into anything I may have said or done any

2    suggestion as to what verdict you should return.  That is a

3    matter entirely up to you.

4         The charges in the indictment are not evidence.  The

5    defendant has pleaded not guilty to the charges.  The

6    defendant is presumed to be innocent unless and until the

7    government proves the defendant guilty beyond a reasonable

8    doubt.

9         In addition, the defendant does not have to testify

10   or present any evidence to prove innocence.  The government

11   has the burden of proving every element of the charge beyond a

12   reasonable doubt.

13        Proof beyond a reasonable doubt is proof that leaves

14   you firmly convinced that the defendant is guilty.  It is not

15   required that the government prove guilt beyond all possible

16   doubt.

17        A reasonable doubt is a doubt based upon reason and

18   common sense and is not based purely on speculation.  It may

19   arise from a careful and impartial consideration of all of the

20   evidence or from the lack of evidence.

21        If, after a careful and impartial consideration of

22   all the evidence, you are not convinced beyond a reasonable

23   doubt that the defendant is guilty, it is your duty to find

24   the defendant not guilty.

25        On the other hand, if after a careful and impartial

1    consideration of all the evidence, you are convinced beyond a

2    reasonable doubt that the defendant is guilty, it is your duty

3    to find the defendant guilty.

4            The indictment charges that the offense alleged in

5    the indictment was committed on or about certain dates.

6    Although it is necessary for the government to prove beyond a

7    reasonable doubt that the offense was committed on a date

8    reasonably near the date alleged in the indictment, it's not

9    necessary for the government to prove that the offense was

10   committed precisely on the dates charged.

11           The evidence from which you are to decide what the

12   facts are consist of:  One, the sworn testimony of any

13   witness; two, the exhibits which have been received into

14   evidence; and three, any facts to which all the lawyers have

15   stipulated.

16           Certain charts and summaries have been received into

17   evidence.  Charts and summaries are only as good as the

18   underlying supporting material.  You should, therefore, give

19   them only such weight as you think the underlying material

20   deserve.

21           In reaching your verdict, you may consider only the

22   testimony and exhibits received in evidence.  The following

23   things are not evidence and you may not consider them in

24   deciding what the facts are:

25           One.  Questions, statements, objections and arguments

1    by the lawyers are not evidence.  The lawyers are not

2    witnesses.  Although you may consider a lawyer's question to

3    understand the answer of a witness, the lawyer's questions are

4    not evidence.

5          Similarly, what the lawyers have said in their

6    opening statement and will say in their closing arguments and

7    at other times is intended to help you interpret the evidence,

8    but it is not evidence.  If the facts as you remember them

9    differ from the way the lawyers state them, your memory of

10   them controls.

11         Two.  Any testimony that I have excluded, stricken or

12   instructed you to disregard is not evidence.  In addition,

13   some evidence was received only for a limited purpose.  When

14   I've instructed you to consider certain evidence in a limited

15   way, you must do so.

16         Three.  Anything you may have seen or heard when the

17   Court was not in session is not evidence.  You are to decide

18   the case solely on the evidence received at the trial.

19         You have heard evidence that the user of the

20   shawns525@yahoo.com email account engaged in sexually explicit

21   conversations regarding children and discussed sharing and

22   receiving sexually explicit images of children.  I instruct

23   you that this evidence is admitted only for the limited

24   purpose of proving identity and, therefore, you may consider

25   it only for that limited purpose and not for any other

659

1    purpose.

2          You have heard evidence that the defendant's

3    committed other crimes, wrongs or acts not charged here.  You

4    may consider this evidence only for its bearing, if any, on

5    the question of the defendant's intent, motive, opportunity,

6    preparation, plan, knowledge, identity and absence of mistake

7    or accident and for no other purpose.

8          Evidence may be direct or circumstantial.  Direct

9    evidence is direct proof of a fact, such as testimony by a

10   witness about what that witness personally saw or heard or

11   did.  Circumstantial evidence is indirect evidence.  That is,

12   proof of one or more facts from which one can find another

13   fact.

14         You are to consider both direct and circumstantial

15   evidence.  Either can be used to prove any fact.  The law

16   makes no distinction between the weight to be given to either

17   direct or circumstantial evidence.  It is for you to decide

18   how much weight to give to any evidence.

19         In deciding the facts in this case, you may have to

20   decide which testimony to believe and which testimony not to

21   believe.  You may believe everything a witness says or part of

22   it or none of it.

23         In considering the testimony of any witness, you may

24   take into account:  One, the witness' opportunity and ability

25   to see or hear or know the things testified to; two, the

1    witness' memory; three, the witness' manner while testifying;

2    four, the witness' interest in the outcome of the case, if

3    any; five, the witness' bias or prejudice, if any; six,

4    whether other evidence contradicted the witness' testimony;

5    seven, the reasonableness of the witness' testimony in light

6    of all the evidence; and eight, any other factors that bear on

7    believability.

8        The weight of the evidence as to the fact does not

9    necessarily depend on the number of witnesses who testify.

10   What is important is how believable the witnesses were and how

11   much weight you think their testimony deserves.

12        The defendant has testified.  You should treat this

13   testimony just as you would the testimony of any other

14   witness.

15        You have heard testimony that the defendant made a

16   statement.  It is for you to decide, one, whether the

17   defendant made the statement; and, two, if so, how much weight

18   to give to it.  In making those decisions, you should consider

19   all of the evidence about the statement, including the

20   circumstances under which the defendant may have made it.

21        You are here only to determine whether the defendant

22   is guilty or not guilty of the charges in the indictment.  The

23   defendant is not on trial for any conduct or offense not

24   charged in the indictment.

25        A separate crime is charged against defendant in each

661

1　count.  You must decide each count separately.  Your verdict

2　on one count should not control your verdict on any other

3　count.

4　　　　　The defendant's charged in Counts One through Four of

5　the indictment with sexual exploitation of a child in

6　violation of Section 2251(a) of Title 18 of the United States

7　Code.

8　　　　　In order for the defendant to be found guilty of

9　sexual exploitation of a child in Count One, the government

10　must prove each of the following elements beyond a reasonable

11　doubt:

12　　　　　One.  At the time, victim one, Elizabeth, was under

13　the age of 18 years old.

14　　　　　Two.  The defendant knowingly employed, used,

15　persuaded, induced, enticed or coerced victim one, Elizabeth,

16　to take part in sexually explicit conduct for the purpose of

17　producing a visual depiction of such conduct.

18　　　　　And three.  The visual depiction was actually

19　transported or transmitted using the means or facility of

20　interstate or foreign commerce or in or affecting interstate

21　or foreign commerce and such transportation or transmission

22　occurred after October 2008.

23　　　　　In order for the defendant to be found guilty of

24　sexual exploitation of a child in Counts Two, Three and Four,

25　the government must prove each of the following elements

662

1    beyond a reasonable doubt:

2         One.  At the time victim two, Ben, was under the age

3    of 18 years old.

4         Two.  The defendant knowingly employed, used,

5    persuaded, induced, enticed or coerced victim two, Ben, to

6    take part in sexually explicit conduct for the purpose of

7    producing a visual depiction of such conduct.

8         And three.  The visual depiction was actually

9    transported across state lines or in foreign commerce.

10        An act is knowingly done if the defendant is aware of

11   the act and does not act through ignorance, mistake or

12   accident.  The government is not required to prove that the

13   defendant knew that his acts or omissions were unlawful.  You

14   may consider evidence of the defendant's words, acts,

15   omissions along with all the other evidence in deciding

16   whether the defendant acted knowingly.

17        With respect to the offense of sexual exploitation of

18   a child, the following additional definitions and

19   clarifications apply.

20        "Visual depiction" includes undeveloped film and

21   videotape and data stored on computer disk or by electronic

22   means which is capable of conversion into a visual image.

23        A "minor" is any person under the age of 18.

24        The internet is a facility of interstate or foreign

25   commerce.

1        Transportation across state lines or in interstate or

2   foreign commerce can be accomplished by any means, including

3   by a computer.

4        "Producing" means producing, directing,

5   manufacturing, issuing, publishing or advertising.

6        "Sexually explicit conduct" means actual or simulated

7   sexual intercourse, including genital/genital, oral/genital,

8   anal/genital or oral/anal, whether between persons of the same

9   or opposite sex, masturbation, sadistic or masochistic abuse

10  or lascivious exhibition of the genitals or pubic area of any

11  person.

12       With respect to "lascivious exhibition of the

13  genitals or pubic area of any person" as contained in the

14  preceding definition of sexually explicit conduct, whether a

15  picture or image of the genitals or pubic area constitutes

16  such a lascivious exhibition requires a consideration of

17  overall context of the material.

18       It is for you to decide the weight or lack of weight

19  to be given to any of the following factors.  A picture or

20  image need not involve all of these factors to constitute a

21  lascivious exhibition of the genitals or pubic area of any

22  person.  And you may find that the image is a lascivious

23  exhibition of the genitals even if only one or more of the

24  factors is present.

25       You may consider such factors as:

1          One.  Whether the focal point of the picture or image
2    is on the child's genitals or pubic area.
3          Two.  Whether the setting of the picture or image is
4    sexually suggestive; that is, in a place or pose generally
5    associated with sexual activity.
6          Three.  Whether the child is depicted in an unnatural
7    pose or in inappropriate attire considering the age of the
8    minor.
9          Four.  Whether the child is fully or partially
10   clothed or nude.
11         Five.  Whether the picture or image suggests sexual
12   coyness or a willingness to engage in sexual activity.
13         And six.  Whether the picture or image is intended or
14   designed to elicit a sexual response in the viewer.
15         The defendant's charged in Counts Five and Six of the
16   indictment with kidnapping in violation of Section 1201(a) and
17   (g) of Title 18 of the United States Code.
18         In order for the defendant to be found guilty of
19   kidnapping in Counts Five and Six, the government must prove
20   each of the following elements beyond a reasonable doubt.
21         I'm sorry.  For each count.
22         One.  The defendant willfully and unlawfully
23   kidnapped, seized, confined, inveigled, decoyed, abducted or
24   carried away victim 2, Ben; and, two, the defendant held
25   victim two, Ben, for ransom, reward or other benefit.

1          Three.  Sub one, the defendant traveled in interstate

2     or foreign commerce.  Or sub two, the defendant used the mail

3     or any means, facility or instrumentality of interstate or

4     foreign commerce in committing or in furtherance of the

5     commission of the offense.

6          Four.  Victim two, Ben, had not attained the age of

7     18 years old.

8          And five.  The defendant had attained the age of 18

9     years old.

10          And six, the defendant was not a parent, grandparent,

11    brother, sister, aunt, uncle or an individual having legal

12    custody of victim two, Ben.

13          The following definitions and clarifications apply to

14    the offense of kidnapping:

15          "Willful" means to act voluntarily with the intent to

16    violate the law.

17          The government is not required to prove that the

18    defendant willfully used any means, facility or

19    instrumentality of interstate or foreign commerce, but it is

20    required to show that the defendant willfully kidnapped,

21    seized, confined, inveigled, decoyed, abducted or carried away

22    the victim.

23          "Benefit" can include sexual gratification.

24          Use of a telephone or motel advertising on the

25    internet and/or servicing out of state customers can

666

1   constitute a means, facility or instrumentality of interstate

2   commerce.

3        In some cases, it is a crime to attempt to commit an

4   offense, even if the attempt to complete the offense fails.

5        In this case, the defendant is charged in Count Six

6   with both committing and attempting to commit the crime of

7   kidnapping.

8        In order for the defendant to be found guilty of

9   attempted kidnapping, the government must prove:  One, the

10  defendant intended to commit the crime of kidnapping; and two,

11  the defendant did something that was a substantial step toward

12  committing the crime.

13       In determining whether the defendant intended to

14  commit the crime of kidnapping and took a substantial step

15  toward committing the crime, you may refer back to the

16  elements of kidnapping described in the previous instruction.

17       Mere preparation is not a substantial step toward

18  committing the crime.  To constitute a substantial step, a

19  defendant's acts or actions must demonstrate that the crime

20  will take place unless interrupted by independent

21  circumstances.

22       Because you must base your verdict only on the

23  evidence received in the case and on these instructions, I

24  remind you that you must not be exposed to any other

25  information about the case or to the issues it involves.

1          Except for discussing the case with your fellow

2     jurors during the deliberations, do not communicate with

3     anyone in any way and do not let anyone else communicate with

4     you in any way about the merits of the case or anything to do

5     with it.

6          This includes discussing the case in person, in

7     writing, by phone or electronic means, via email, text

8     messaging or any internet chatroom, blog, website or other

9     feature.  This applies to communicating with your family

10    members, your employer, the media or press and the people

11    involved in the trial.

12         If you are asked or approached in any way about your

13    jury service or anything about this case, you must respond

14    that you've been ordered not to discuss the matter and to

15    report the contact to the Court.

16         Do not read, watch or listen to any news or media

17    accounts or commentary about the case or anything to do with

18    it.  Do not do any research, such as consulting dictionaries,

19    searching the internet or using other reference materials.

20    And do not make any investigation or in any other way try to

21    learn about the case on your own.

22         The law requires these restrictions to ensure the

23    parties have a fair trial based on the same evidence that each

24    party has had an opportunity to address.

25         A juror who violates these restrictions jeopardizes

1  the fairness of these proceedings and a mistrial could result,

2  which would require the entire trial process to start over.

3          If any juror is exposed to any outside information,

4  please notify the Court immediately.

5          Some of you have taken notes during the trial.

6  Whether or not you took notes, you should rely on your own

7  memory of what was said.  Notes are only to assist your

8  memory.  You should not be overly influenced by the notes or

9  those of your fellow jurors.

10          The punishment provided by law for the crimes is for

11  the Court to decide.  You may not consider punishment in

12  deciding whether the government has proved its case against

13  the defendant beyond a reasonable doubt.

14          All right.  At this time, then, the parties will be

15  entitled to make a closing argument.  So we'll start off with

16  the plaintiff's side.  Closing argument.

17          MS. RICHARDS:  Good morning, members of the jury.

18  Thank you for serving on the jury this week.

19          In closing right now, I'd like to go over some of the

20  evidence that you've heard over the course of the week and

21  show you the elements again that you just heard about and then

22  show you how the evidence applies to those elements of the six

23  charges in the indictment.

24          And you'll recall that the first four charges are for

25  sexual exploitation of a child and the second -- the last two

Closing Argument by Mr. Richards

669

1    charges are for kidnapping.

2         Before we get into that, I want to talk about the

3    defendant Shawn McCormack and the other names that the

4    defendant used.  You heard the defendant take the stand

5    yesterday and he said that he did use the name "Toddlers."

6    And you saw the name "Toddlers" used throughout this trial as

7    a name used on GigaTribe, which is a peer-to-peer file sharing

8    network that sometimes people use to share child pornography

9    and also discuss child pornography.

10        You also saw forensic evidence that the defendant was

11   Toddlers.  You heard the testimony of Scott Hall, who said

12   that he served a search warrant at the defendant's house on

13   14275 Vessey Circle in Colorado Springs, Colorado.  And he

14   testified that when he went to the house in Colorado Springs,

15   he found one bedroom that looked like it was occupied.  He

16   referred to it as the south bedroom.  And he found the

17   defendant's name tag there.  He also found mail for the

18   defendant.  He found a receipt for the defendant.  And he also

19   found the defendant's Toshiba laptop computer.

20        You heard about the forensic analysis of that laptop

21   computer.  You heard Detective Rogers testify.  Detective

22   Rogers is a forensic expert and he showed you how he went

23   through the defendant's computer and was able to see the files

24   on his computer through a software called EnCase.

25        I'm going to zoom out here.  This is one of the

670

1    exhibits you saw from Detective Rogers.  And in this exhibit,

2    you can see that GigaTribe was installed on the defendant's

3    computer and that his name was Toddlers.

4         You also saw that on the computer, the defendant also

5    had Yahoo messenger.  And his name in Yahoo messenger was

6    "toddlers24."  That was another alias that you heard that the

7    defendant used, toddlers24.  You heard not only did he have

8    Yahoo messenger, but he also had a Yahoo email address, which

9    was toddlers24@yahoo.com.  And you know that because in his

10   Toddlers GigaTribe account, he told people to email him at

11   toddlers24.

12        So we'll start with toddlers24, because that is where

13   the images of Elizabeth were found in the defendant's

14   possession on his email -- in his email account.

15        So we'll start with charge one.  Charge one alleges

16   that the defendant used a minor, Elizabeth, to engage in

17   sexually explicit conduct for the purpose of producing a

18   visual depiction of such conduct.  And it shows -- and the

19   indictment alleged two visual depictions, IMG_1199.jpg and

20   IMG_1204.jpg.  And such visual depiction was transported or

21   transmitted using any means or facility of interstate or

22   foreign commerce or in or affecting interstate commerce.

23        And you just heard the elements for that offense.

24   And I'll put them up while I talk about some of the evidence

25   that you heard that corresponds to this count.

Closing Argument by Mr. Richards

671

1    So the first element is that the victim was under the

2  age of 18.  And you saw the pictures of Elizabeth and you can

3  use your judgment as to her age, but she is clearly well below

4  18 years old.

5    And for the third count, you know -- you know that if

6  the items were emailed after October 2008, then they -- then

7  they traveled on the internet and therefore the defendant used

8  a means or facility of interstate commerce.

9    So let me put up one of the exhibits that you saw two

10  days ago.  This is Government's Exhibit 128.  This is an

11  email.  I'll zoom in so that you can see it a little bit

12  better.

13    It says it's from David Brown, but you know from the

14  evidence in this case that there was no person named David

15  Brown in this case.  David Brown was actually the defendant

16  emailing from his toddlers24@yahoo.com account.  And in this

17  email, on December 2nd, 2008, he emailed kinder_lover and he

18  emailed kinder_lover two images.

19    The first image you saw was of Elizabeth.  And you

20  heard Elizabeth's mom identify her in the picture yesterday.

21  You also saw that he emailed image 1199.jpg.

22    And that takes us back to Count Two.  And Count Two

23  really has two parts.  First, is the image sexually explicit

24  and is it the defendant who -- is it the defendant who sent

25  it?  Or who made it?

1         So let's start first with whether the image is

2    sexually explicit.  And I'm not going to show you the whole

3    image here.  I covered up part of it.  We'll zoom out.  And

4    I'm only going to leave it up very briefly.

5         As you can see from that image, it depicts a nude

6    minor and the focal point is on her private area.  And you'll

7    recall from the definition that lascivious exhibition of

8    genitals qualifies as child pornography under the definitions.

9         And you can look at the different factors for

10   determining whether something is child pornography.  You

11   had -- you were just given these factors in your jury

12   instruction.  And as a jury, you'll have to go through the

13   factors and decide whether you think different images do

14   constitute child pornography.

15        And there are six factors, but not every factor needs

16   to be met.  For certain images, you may focus in on one

17   particular factor and decide that that factor is enough for

18   you to believe that the image depicts sexually explicit

19   conduct.

20        So for this image that you just saw, you see that the

21   focal point is on the child's genital.  You see that the child

22   is fully nude, which corresponds to number four, and you see

23   in number six that the picture is intended or designed to

24   elicit a sexual response in the viewer.

25        You saw also that the defendant emailed another image

Closing Argument by Mr. Richards

673

1   of Elizabeth on December 2008.  This image is also alleged in

2   the first count and it's IMG_1204.jpg.  You'll recall that

3   this image actually depicted actual intercourse between a man

4   and a child.  And I'm not going to show it again.  But you can

5   compare the image to the factors in the jury instruction.

6           How do we know that it was the defendant who actually

7   created these images?  Sorry.  How do you know that it was the

8   defendant who created these images?  You are the jury.  You

9   have to decide.

10          But let me walk you through a little bit more of the

11   evidence.  So for these pictures, you'll recall that the

12   detectives thought that they may have been photographed in a

13   car.

14          And if we could put up on Sanction -- if we could

15   switch over to sanction, I'd like to show you the second page

16   of Exhibit 128.  And next to Exhibit 148.  And if we could

17   zoom in to this corner on the right on 128.

18          You can compare the background of these images to the

19   background of the defendant's truck.  You heard testimony that

20   Exhibit 148 was a picture that Detective Romine took of the

21   defendant's truck.  So you know the defendant had these

22   pictures in his email.  And you know that the background of

23   the pictures matches the defendant's truck.

24          You also know, from the testimony, that the defendant

25   actually admitted that he took these images.  He ad -- or he

1   admitted that he took images like this of Elizabeth.  You saw

2   that in a chat between Toddlers and Filetradermom.  And that

3   was in Government's Exhibit 77.

4           If we could switch back now to the overhead

5   projector.  Thank you.

6           You see at the bottom of this exhibit that the

7   defendant had been talking about how he -- how he had sexual

8   contact with two children.  He says that they're one and

9   three.

10          Near the bottom of the page, Filetradermom asks:

11  "Are they both boys?"

12          Toddlers says:  "Three year old is a girl."

13          And then he says -- or Filetradermom asks:  "You do

14  her in the butt too?"

15          Toddlers says:  "I did but not anymore."

16          Filetradermom asks:  "How come."

17          Toddlers says:  "LOL, she got potty trained and I

18  lost interest when she was out of diapers."

19          So you see that the defendant had the images, he

20  admitted that he had abused the child in the images.  And his

21  truck also matches the background of the images.

22          So I'm going to move on to Count Two.

23          Count Two is another child exploitation count.  And

24  it charges four images, PICT0276.jpg, 277.jpg, 278.jpg, and

25  279.jpg.

675

1          And the elements are similar to in Count One, but

2     they're a little bit different.  The third element in Counts

3     Two through Four requires you to find that the depiction was

4     actually transported across state boundaries.

5          But if you'll recall, all of the images in Counts Two

6     through Four were found on the defendant's computer and that

7     computer was seized in Colorado.  We know that from

8     detective -- we know that from Agent Hall's testimony and

9     Detective Rogers' testimony.  And you know from the testimony

10    of Ben and Elizabeth's parents that these pictures were taken

11    in Bakersfield.

12         So for Counts Two through Four, you know that all of

13    the images traveled out of state from California to Colorado.

14         And you also know, based on looking at the images,

15    that the children in the images are minors.

16         So I'm going to focus on the second element for

17    Counts Two through Four, and that is how do you know that it's

18    child pornography and how do you know that the defendant

19    actually is the one who made it.

20         So we'll start with how do you know that it's child

21    pornography.  So if you'll recall this image had the

22    defendant's penis with the child in the background.  And you

23    might ask how is this sexually explicit if the child is

24    wearing clothes?

25         But you'll recall that -- you'll recall the six

1    factors that you can look at.  And that the bottom

2    factor -- let me put that back up on the overhead.  The bottom

3    factor is whether the picture or image is intended or designed

4    to elicit a sexual response in the viewer.

5            And in this particular -- in this particular series,

6    you can look -- you can judge this -- you can judge the sixth

7    factor, what the intent of the photo is by the whole context

8    of this case.  And that is a decision that is up to you as a

9    jury to make.

10           And how do we know that it was the defendant -- how

11   do we know it was the defendant who actually created this

12   image?  If you'll recall the first person that you heard

13   testify was Detective Krawcyzk.  And Detective Krawcyzk went

14   undercover in his investigation all the way from Canada.  And

15   he had a name that he would conduct his investigation under.

16   And that was Toddlercumdaddy.

17           And under that name, he received friend requests.

18   And one of the friend requests that he received was from the

19   defendant using the name Toddlers.  When he accepted the

20   friend request, he could see what Toddlers was sharing the

21   next time that they were online together.  And you saw, during

22   his testimony, some of the images that Toddlers actually

23   shared with him.  And you saw some of the chats that Detective

24   Krawcyzk had with Toddlers.

25           You saw that Toddlers said that he had privates.  And

1    you'll recall that Detective Krawcyzk said that usually people

2    use the term "privates" in this context to mean children that

3    they are abusing, children that they've taken pictures of.

4         After saying that he had privates, the defendant made

5    available a number of photos.  And you can see in a

6    screenshot, which is Government's Exhibit 6, that all four of

7    the images in Count Two were shared by the defendant.  There's

8    also an image in here from Count Three, down here at the

9    corner.  But we'll come back to that next.

10        I'm going to put this image back up here and try to

11   zoom in a little bit.  It's a little tough to see on this

12   image, it will be better in the digital images that you have

13   when you go back to deliberate.  But you'll also see, if you

14   look at his wrist -- and let me point to it with a pen.

15   You'll see, if you look at his wrist, there's a little bump

16   there.  I don't know if it's a wart or scar, but you heard

17   testimony from Detective Romine that when the defendant was

18   arrested back in 2011, he saw a bump or scar on the

19   defendant's wrist in that position.

20        Let's move on to Count Three.

21        Count Three alleges that the defendant engaged in

22   sexually explicit conduct with Ben on or about March 27, 2009

23   to on or about July 2010.  And it alleges that he created four

24   different files.  Three of these are AVI files, which means

25   they are the movies that you saw two days ago.  And one of

1    them is a JPG, so that's a still image.  And that still image

2    is the photo that I pointed out to you that's in the second

3    row of Detective Krawcyzk's -- I'll just put it up again.

4    That's the image that you see here in the second row of

5    Detective Krawcyzk's screenshot.

6            And you'll also recall the three videos that you saw.

7    I know you remember them.  I'm not going to show them again.

8    You'll have to look at the definitions of sexually explicit

9    conduct as the Court instructed you and decide whether you

10   believe that those videos and the image that you just saw

11   depict sexually explicit conduct.

12           And you'll see that in the definition, that sadistic

13   and masochistic abuse can also -- can also be sexually

14   explicit conduct.  So, for example, in the image where you saw

15   a man urinating on a child.  If you find that that's sadistic

16   and masochistic abuse of the child, you can find that that

17   image -- that that image is sexually explicit conduct.

18           And how do we know that it was the defendant that

19   made those images?  You'll recall that those images were all

20   from a hotel room.  And you heard testimony from Agent Squire

21   from Boston HSI.  And you heard about his victim

22   identification analysis that he conducted with his team.  You

23   heard that -- you heard that he watched that video over and

24   over again to try to find clues as to where it was made and

25   when it was made.

1          And you learned that he traced that video back to a

2    particular hotel room with the help of Agent Pike in

3    Bakersfield.  And he traced it back to even a particular time

4    and a particular day.  And you saw evidence that who was there

5    that particular time in that particular place?  The defendant

6    was there.

7          You saw that -- you saw from the testimony of Viacom

8    how the date of the video could be determined.  You heard the

9    stipulation read that in the background of that video, which

10   you did not hear, there's an episode of Family Matters

11   playing, the sitcom from the '90s.  And you heard that that

12   evidence was episode 131.

13         And Agent Squire obtained records from Viacom and he

14   learned that the episode had aired in March of 2009.  And then

15   you heard the testimony of Viacom as to air dates and how an

16   air date runs from six a.m. to six a.m.  So something that

17   airs after midnight on this sheet, it actually is airing on

18   the next calendar date.

19         So you can see right here, the episode of Family

20   Matters airing after the night of March 28, 2009, after

21   midnight, which is actually March 29th, 2009.

22         And you also saw, in these more detailed Viacom

23   records, that it aired with the Pepperidge Farms commercial at

24   3:19 that night.  And you heard testimony that that was the

25   only time that those two programs aired together during the

680

1    date range when this video could possibly have been made.

2           And lastly, you heard testimony of Mr. Shihora, the

3    hotel owner of California Best Inn.  He testified that at his

4    hotel, when a guest checks in he fills out a guest

5    registration card.  And you see right here, Shawn McCormack

6    guest registration card for room 221, checking in on March

7    28th, checking out on March 29th, signing his name and giving

8    over his Arizona driver's license so that it could be copied

9    per the hotel policy.

10          And yesterday you even saw bank records in Exhibit

11   160 showing that, in fact, the defendant was in Bakersfield on

12   March 29th, 2009.  He was in Bakersfield at the Fastrip and he

13   was in Bakersfield at a Bank of America ATM on 3-29

14   withdrawing $20.

15          But that's not all the evidence there is for this

16   count.  You also saw that the defendant actually admitted on

17   multiple occasions to taking Ben and his sister to the

18   California -- well, he didn't say the name of the hotel.  He

19   admitted to taking children to a hotel to abuse them.

20          And you saw those admissions through the Toddlers

21   account on GigaTribe.  He told Filetradermom, "I stay the

22   night there" -- talking about his friend's house.  "I stay the

23   night there, then sneak them out at night time."

24          He told Jessietac, "Their my friend's son.  I take

25   him to a hotel every once in a while."

1    Jessietac asked him, "are you the masked guy?"

2    He said, "yes."

3    He also said, "I took him to a hotel."

4    He even refers to one of the videos that he created

5    by name.  Jessietac asked him, "Which is the finger one?"

6    He responded "283."

7    You'll recall that one of the videos that you watched

8    from that hotel had "283" in the file name.

9    He told Youngdaddy, another person on GigaTribe, "I

10    stay the night there and take him out at night.  I take him to

11    a hotel at night and then I have fun with him."

12    And you heard that he made the same types of

13    admissions to Detective Krawczyk on GigaTribe.  And he even

14    referred to the little boy that he abused by name.  And he

15    referred to him by the name Ben.  Because he knew who Ben was.

16    Because he knew Ben's parents and he is the one who made the

17    videos.

18    Let's go now to the last of the child exploitation

19    counts.  This is Count Four.  And it alleges that the

20    defendant used Ben to create sexually explicit images and it

21    alleges that there are four different jpg files, PICT0303,

22    PICT0304, PICT0307 and PICT0308.

23    And again, the same elements will apply to Count Four

24    as to Counts Two and Three.  So we'll focus in, again, on the

25    second element, which is is the image child pornography and

Closing Argument by Mr. Richards

682

1    did the defendant create the image?

2           And if we could pull this one up on Sanction.  It's

3    Exhibit 62.  All right.  And this is another redacted image.

4    And you'll see from the top that this image was from the

5    defendant's computer.  There were other images in the same

6    scene where you can see the grass in the background.  You'll

7    recall there was another image where Ben is laying in the

8    grass partially nude and the camera is focused on his

9    genitals.

10          But I put this image up because I want to focus in

11   not on -- I want to focus in on how you know that this is the

12   defendant.  And you know this is the defendant, first because

13   this was on his computer.

14          Second, because you heard testimony that these file

15   names appeared to all have been taken from the same device and

16   they correspond to all of the other files that you've seen

17   where there's strong evidence that the defendant created them.

18          But thirdly, you see his -- you see clothes that the

19   defendant owns in this picture.  And I'm going to pull those

20   out right now.  I'll just take them around so you can kind of

21   compare while it's up on the screen.

22          But you can see the belt.  It looks very similar to

23   the one that's in this video.  As do these boxer shorts.

24   Well, I'll just come by.  And you'll have them back in your

25   deliberation room.  And you can look at them next to the

Closing Argument by Mr. Richards

683

1   images.  And you can decide if you think that they might be a

2   match.

3          All right.  We'll go on to Count Five now.  Count

4   Five charges the defendant with kidnapping on or about March

5   27th, 2009.  And it alleges that the defendant willfully and

6   unlawfully seized, confined, inveigled, decoyed, kidnapped,

7   abducted or carried away Ben, an individual who had not

8   attained the age of 18, and he traveled in interstate commerce

9   or used any means, facility or instrumentality of interstate

10  or foreign commerce in committing or in furtherance of the

11  commission of the offense, and he held Ben for ransom, reward

12  or other benefit while the defendant was over the age of 18

13  years old and he had no legal custody or familial relationship

14  with Ben.

15         And I'll put up the elements for that Count Two.

16  You'll recall that this count corresponds to Count Three.

17  Those are the hotel videos.

18         On March 29th, the evidence showed that the defendant

19  was in a hotel room with Ben in Bakersfield.  And you heard

20  testimony from Ben's parents that they did not give permission

21  for the defendant to ever take Ben out of their house, to ever

22  take him anywhere.  And you also heard testimony that the

23  defendant has no familial relationship to Ben and that he

24  never had custody of Ben.

25         You'll also recall that for the second element of

1    kidnapping, the child has to be held for ransom, reward or

2    other benefit.  Other benefit can include sexual

3    gratification.  So if you believe that the defendant took Ben

4    to the hotel for sexual gratification, you can find that he

5    took him for other benefit.

6         I'm going to focus in on the third element also,

7    which is that the defendant used a facility or instrumentality

8    of interstate or foreign commerce.  That element is a little

9    bit technical.  So I'll tell you a few different ways that you

10   can find from the evidence presented at trial that that

11   element has been met.

12        The first way that you can find that it's been met is

13   that you heard testimony that the defendant would use a cell

14   phone to call Andrew before he would come to the house to

15   visit.  And that's a use of an instrumentality of interstate

16   commerce.  Because a cell phone is an instrumentality of

17   interstate commerce.

18        You also heard testimony that -- from the motel

19   owner, that the motel advertised to out-of-state customers,

20   advertised in, I think it was a book that included other

21   states.  And you also heard testimony that there would

22   frequently be out-of-state guests at the hotel.  So that hotel

23   is also a facility of interstate commerce.

24        So those are two ways that that element can be met

25   with this count.

1       You also know that the defendant was over the age of

2  18 because you heard testimony from several witnesses that the

3  defendant was born in 1983, which would have made him in his

4  20s.  Actually, I'll leave this up here.

5       And we're going to talk now about Count Six.  Count

6  Six is the final count.  It's also a kidnapping count.  And

7  that's -- and it's a kidnapping count that applies to November

8  6th, 2009.  And you'll recall that that's the day that the

9  defendant stayed with Andrew and Ashley.  And that's the day

10  that Andrew hung out with the defendant and that he went to

11  take a shower and then after that he decided to go check on

12  Ben, and then he saw that Ben was missing.

13       And you'll recall the testimony of the parents, that

14  they were frantically trying to find Ben.  And you'll recall

15  that at some point they noticed that the window in the bedroom

16  was open and they also noticed that the defendant was gone.

17  And the defendant eventually did return with Ben.

18       You know from that testimony that the parents did not

19  give the defendant any permission to take their child outside

20  of the house.

21       You know also that the defendant moved -- or that the

22  defendant came from Colorado that day to visit the family.  So

23  you know that the third element of kidnapping is met because

24  he actually came from Colorado to California to stay with the

25  family that night.  And you also know that he called

Closing Argument by Mr. Richards

686

1   beforehand.

2           I'm going to focus in, for this element, on number

3   two.  Whether the defendant held Ben for ransom, reward or

4   other benefit.

5           In determining whether the elements are met with this

6   count, you're going to have to look at all of the evidence in

7   this case to determine what the defendant was doing that

8   night.  Why was the defendant taking Ben outside the house at

9   1:30 in the morning?  Was it because he needed to get Red Bull

10  from the store down the street?  Or was it for some other

11  reason?

12          And if you find that that reason is for sexual

13  gratification and it's not just because he wanted company at

14  the store to get Red Bull, then you can find that that element

15  for number two is met.

16          So those are the elements -- actually, let me stop

17  there.  We actually also have charged attempt kidnapping for

18  Count Six.  So if you find that the elements are not

19  completely satisfied for kidnapping, you can go on to decide

20  if you believe that the defendant actually attempted to commit

21  all of the elements.

22          And I'll put up the -- I'll put up the instruction

23  for attempt.  In order to find the defendant guilty of

24  attempted kidnapping, you will have to find that the defendant

25  intended to do all of the elements that you saw for

1    kidnapping, intended to commit all of those six elements, and

2    that he did something that was a substantial step towards

3    committing the crime.

4          And in determining whether the defendant intended to

5    commit the crime of kidnapping and took a substantial step,

6    you may refer back to the elements of kidnapping.  And I'll

7    leave you to do that and to decide whether you believe he

8    committed kidnapping or attempted kidnapping.

9          So those are the elements of the offenses.  And I

10   know that we went into a little bit of detail on some of the

11   elements.

12         But I want you to keep in mind the big picture in

13   this case.  And the big picture in this case is that the

14   defendant had all of these images on his computer.  The

15   defendant knew these children.  The defendant admitted to

16   abusing these children.  The defendant was in the very

17   location where some of these images were taken.  And he was

18   there at the very time that they were created.  And when the

19   defendant was confronted with this evidence, he made

20   statements that appear to be incriminating.

21         All of the evidence in this case points to the

22   defendant.  And for that reason, I'd ask you to find the

23   defendant guilty of all six counts in the indictment.  Thank

24   you.

25         THE COURT:  Members of the jury, we'll take a 15

1  minute of the recess.  When you come back, we'll have defense

2  closing argument and rebuttal by the government and the last

3  jury instructions.  Please remember the admonitions still.

4  And we'll see you in 15 minutes.

5          (The jury left the courtroom.)

6          THE COURT:  All right.  The jury has left for its

7  recess.  We'll take a 15 minute recess.  We'll come back with

8  defense closing and right after that we'll do the government's

9  rebuttal.  15 minutes.

10          (Recess.)

11          THE COURT:  We'll have the jury come in.  I just want

12  to mention to you folks, you might have already caught it.  In

13  the jury instructions I gave, I gave the instruction that's

14  labeled 2.10, other crimes, wrongs or acts of defendant.

15  There was another duplicate in there, instruction 4.3, same

16  thing.  So I pulled that out.  So if you have it -- and I'll

17  pull that out for the jury.  But basically I gave 2.10, I did

18  not give 4.3 because they're identical.  One was page 9; one

19  was page 16.

20          All right.  We'll have the jury come in.  Maybe

21  just -- I think I mentioned, once Mr. Faller is done,

22  depending on the time frame, I'll probably have you go right

23  into rebuttal.

24          (The jury entered the courtroom.)

25          THE COURT:  The jury is present.  Please be seated.

1   We'll continue the closing arguments.  Defense.

2           MR. FALLER:  Thank you, Your Honor.

3           Good morning, ladies and gentlemen.  When we started

4   our journey here several days ago, I told you up front some

5   things about which this case was not.  That it was not about

6   whether Shawn McCormack had possessed child pornography.  It

7   was not about whether he had even transmitted or distributed

8   it.  It was only about whether he produced it.  Whether he

9   created it.

10          Because as you heard, when Shawn testified, he was

11  very forthcoming about the fact that he had done things.  And

12  he had possessed materials, he had sent materials, he had

13  engaged in chats that the law prohibits.  And he had done

14  things that were against the law.  And he admitted that.  And

15  he subjected himself to legal jeopardy by doing that.

16          But he was honest and straightforward about that and

17  has only contested one thing in this case and one thing about

18  these images.  And that is that he did not produce them, he

19  did not create them.

20          And that is really the only thing that you have to

21  decide.  And after all of the evidence, all of the facts, all

22  of the noise is cut through, there is reasonable doubt about

23  whether he was the one that produced these images, whether he

24  is the masked man in the video and whether he is the one that

25  took the other photographs of Ben and Elizabeth that are part

1  of this case.

2          There are obviously two dates and two series of

3  events that are at the cornerstone of whether Shawn has been

4  proven guilty or remains not guilty as he was at the beginning

5  of this case.  And those are March 28th and 29th of 2009 and

6  then later, November 6th of 2009.  And that is the evening

7  when the video was apparently made at the California Best Inn

8  and when supposedly Shawn was attempting to kidnap Ben in

9  order to take him to some supposedly unknown location to

10  commit some type of sexual exploitation with him.

11          And in order to analyze both of those dates, we have

12  to step back a little bit and see what the evidence is that

13  Shawn actually committed those acts.

14          And let's take a look at the California Best Inn

15  first.  Now, we know that there was a record at California

16  Best Inn that was produced that was in his name.  We know that

17  supposedly, from the owner, the employees were told to have

18  the guest fill out the registration card with all the personal

19  information of the guest on the registration card.  We know

20  that that was not done.

21          So they did not follow their procedures in recording

22  whoever the guest was that checked in as Shawn McCormack

23  apparently that night.  We have the attachment of a copy of an

24  Arizona driver's license that appears to be that of Shawn

25  McCormack.

1          It's an interesting copy when you look at it.  It
2     almost looks like a copy of a copy.  And I thought -- I invite
3     you to take a look at that exhibit that was supposedly
4     attached to the registration card at the California Best Inn.
5     It's very difficult to see.

6          You can contrast it with the copy of the driver's
7     license that's in the employment documents from his employer
8     in Colorado.  In that one, you can see the edges of the
9     driver's license card, you can see some of the detail.  The
10    California Best Inn record is not that way.

11         It really brings in to question whether that was
12    really copied from an actual driver's license or whether
13    someone simply provided a paper copy of the driver's license
14    and they made a copy of that.  And even if that was done,
15    because you just don't -- you don't know because the record
16    sat in a box for years before this case got around to being
17    prosecuted.

18         Now, what do we also know about the 28th and 29th of
19    March?  Number one, we know that Shawn's truck, the white
20    Silverado, was in impound.  That's undisputed.  As a matter of
21    fact, in the bank records we talked about, in addition to the
22    receipt for his getting it out of hock after these events took
23    place, there's actually an entry in there about paying off
24    Jan's Towing that matches the receipt that is in evidence as
25    Defense B.

1        You heard his mother.  He did not have any

2   transportation to get to Bakersfield.  You also, even from

3   Andrew -- and we'll talk about Andrew a little bit later -- he

4   said that Shawn would arrive in the white pickup.  That's what

5   he had when he came in November.

6        So we know that his transportation was in impound.

7   We know that on the 27th, he made purchases at Auto Zone in

8   order to work on his mom's old Toyota pickup.  We know that

9   because the receipts are -- the receipts are in evidence.  And

10  you can rely on those receipts as being accurate

11  representations of transactions that took place because they

12  have not been challenged.

13        And rest assured that if there was anything wrong

14  with them and if there was anything that in the least called

15  into question whether they were authentic and whether they

16  represented actual transactions, you would have heard about

17  it.  And you didn't.

18        So we know that he purchased the parts to work on his

19  mom's pickup in the latter part of the 27th.  I think at least

20  one of them was around five o'clock in the afternoon.  Then

21  his mom, Marsha, testified that he was there the entire

22  weekend.  That he didn't work on the truck until the 28th,

23  that he stayed there the night of the 29th -- or the 28th and

24  got up on the 29th.

25        And the other evidence shows that the video at the

693

California Best Inn in Bakersfield was apparently made
somewhat after three o'clock a.m. on the 29th of March.  And
the evidence you have before you is that Shawn was not there.
And he was with his mom in southern California and he was
working on his truck.

        Now, what other kinds of things do we know about the
28th that call into question the version of events that you're
being asked to accept?  Well, let's talk -- oh, and just for a
moment, yes, there are two small transactions on the bank
records that appear to have taken place in Bakersfield.

        However, if you'll look at the bank records, there
are indications of transactions that took place in Nevada, in
New York, in Georgia.  Remember Shawn said he lost his wallet,
including his driver's license, and some other things.  That
bank card, the numbers on that bank card apparently got
around.

        Now, here's what you have to believe in order to find
beyond a reasonable doubt that Shawn McCormack was in that
room abusing Ben on the night and early morning of March 28th
and 29th.

        First of all, that in the middle of the night he was
able to sneak in to the bedroom that Ben shared with his
sister Elizabeth while the parents were sleeping and
apparently, without making any noise whatsoever with a young
toddler, he was able to gather him up, spirit him out of the

Closing Argument by Mr. Galler

694

1    house and take him to another location for what appears to be

2    an extended period of time.  All of that happened silently,

3    secretly and without his sister that's sleeping in the same

4    bedroom being disturbed.

5             Then he physically abuses Ben at this motel room over

6    an extended period of time.  And the abuse is kind of brutal.

7    It involves him having electrical tape around his arms and

8    legs and the other things that you viewed in that clip of the

9    video.

10            Then you have to accept that after all that has gone

11   on, that Shawn took him back again and was able to sneak back

12   into the house, place Ben back in his crib, again making no

13   noise, again having Ben make no noise after this horrendous

14   experience and not disturb Elizabeth who was sleeping in the

15   same bedroom.  That's what you have to believe happened.

16            And I submit to you that that just doesn't make

17   sense.  The jury instruction that the judge read to you about

18   proof beyond a reasonable doubt says that "A reasonable doubt

19   is a doubt based on reason and common sense."

20            And our common sense tells us that that could not

21   have happened that way.  It just couldn't happen.  We don't

22   know what happened.  We don't know who was in that motel room.

23   We don't know under what circumstances Ben arrived there.  But

24   what we do know is there is a story about these images and

25   about these videos that we don't know.  Because what we do

1  know doesn't make any sense.  And when something doesn't make

2  any sense, that is a reasonable doubt.

3          And remember that after this horrendous experience

4  and after all this abuse, the next morning Shawn is still

5  there in the house with Ben.  No reaction that we have been

6  told about from Ben to Shawn after this apparently happened to

7  him with the monster that's still in the house?

8          No injuries being observed, or at least reported on

9  the part of Ben.  Now, there's some after the fact stuff that

10  was talked about by Elizabeth, but nothing is apparently

11  observed or reported after this brutality?  That doesn't make

12  any sense.  That fails the common sense test.  And you're not

13  required to leave your common sense outside the courthouse

14  door.  As a matter of fact, you're required to bring it with

15  you and to use it.

16          Whatever was done to produce that video by whomever

17  did it, we don't know.  Because the story that we've been told

18  about it just does not make sense.  There's another story.

19  And we don't know what it is.  I don't know if it involves

20  Andrew, and we'll talk about Andrew a little bit later.  I

21  don't know if it involves another family member or an

22  acquaintance of theirs.  But there's another story here.

23  Because the story that they are trying to tell us just does

24  not make sense.

25          Let's jump ahead now a little bit to November 6th.

1   Because all of these events and the facts and recitations of

2   what we are being told about these events, they're all

3   intertwined.  And the truth or lack of truth or reliability

4   having to do with each of them affects our judgment as to all

5   of them.

6          On November 6th, 2009, a few months after the March

7   dates, Shawn arrives at Andrew and Elizabeth's house.  We know

8   that's true because Shawn told us he went there.  We know it

9   was true because -- we know it's true because he was contacted

10  by the police that night.  Okay?

11         Initially, the police are told that Shawn got there

12  late at night.  That Elizabeth went to bed.  She was already

13  in bed.  The children are in bed.  And Andrew talks about how

14  they were hanging out together and then he went to get a

15  shower.  And when he came out of the shower, Ben was gone,

16  Shawn was gone and then everything kind of erupted.

17         Now, Andrew, who is the only one to rely upon about

18  how this event happened between Ben and Shawn that evening,

19  suddenly tells us -- after multiple interviews, he suddenly

20  comes up with in court, oh, we went four-wheeling that

21  afternoon.  Shawn arrived early in the day, we went

22  four-wheeling, we drank beer, we smoked dope, we had a great

23  afternoon.  Then we came back to the house and hung out a

24  little bit more.  And then I took a shower and everything

25  else.

1    Where did that come from?  He's the one we have to

2  rely on to tell us what happened that night.  And his story

3  made a significant left turn once he got to court.

4    You heard from Agent Pike that he was last talked to

5  on, I believe it was March 19th of this year about the events

6  of that night.  And none of that was discussed, none of that

7  came out.

8    Well, the thing of it is, ladies and gentlemen, about

9  the truth, it doesn't change.  It's always the same.  Okay?

10  And all of a sudden the person we have to rely on to make a

11  decision about what Shawn McCormack is accused of doing is no

12  longer reliable.  It's no longer consistent.  You know.  He

13  hid from the police the fact that they were smoking marijuana.

14  I understand that, why he would do that.  But again, he's the

15  one we have to rely on about how this happened.

16    Here's what you have to accept to believe that Shawn

17  was kid -- either kidnapped or tried to kidnap Ben on that

18  evening to engage in some kind of sexual exploitation of

19  abuse.

20    Number one, you have to believe that he came all the

21  way from Colorado with that in mind.

22    Number two, you have to believe that he consciously

23  decided to take Ben away from the house when Andrew was just

24  in the shower.  He wasn't in bed.  He was still up.  You have

25  to believe that Shawn decided, made a plan that he was going

1    to take Ben away from the house, engage in some kind of

2    despicable sexual conduct with him and then at some point

3    after a long period of time, bring him back.

4              What test does that not pass?  The common sense test.

5    It doesn't make any sense.  It doesn't make any sense.

6              Then you roll in this thing about the window being

7    open.  And it opens from the inside, not the outside.  The

8    screen is -- I don't know what that's all about.  You know.

9    Apparently they're saying that they thought he -- Ben had

10   climbed out the window and had gone toward the swimming pool.

11             I don't know what the thing about the window is.  But

12   it sure is strange.  Because if Shawn was going to go in there

13   and scoop up Ben without disturbing Elizabeth, who was also,

14   again, sleeping in exactly the same bedroom, wow, it sure

15   makes sense that he would go through all the noise and the

16   effort to open a window when all he had to do was walk down

17   the hallway and walk back out.  What is more logical?  What is

18   more reasonable?

19             Strangely enough, what is more reasonable is that Ben

20   came out of the room himself and that how Shawn said it

21   happened is exactly how it happened.  Because that's no

22   manipulation of the window, that's no waking up a sleeping

23   child.  I don't know how many of you have toddlers, they don't

24   like to be jerked out of a sleep at 1:30 in the morning.  They

25   tend to make noise.  They tend to get upset.  They tend to

1    wake up other siblings sleeping in the same room.  None of

2    that happened.  Again, it just doesn't make sense.

3         What makes sense is that there's a story here that

4    we're not being told.  And it makes one suspicious because of

5    the changes in his versions of events that Andrew has had.

6    And again, when it doesn't make sense, when it's not

7    reasonable, that's reasonable doubt.

8         And let's think again about what happened when Shawn

9    brings Ben back to the house.  Remember, this is within a few

10   months of the apparent brutal attack by Shawn on Ben in the

11   motel room.  Ben, according to the police, he's just fine

12   being with Shawn.  He's a little cold.  But he's not scared,

13   he's not acting out, he's not exhibiting any type of emotional

14   trauma.  And supposedly they want you to believe that he is

15   then in the presence of the monster who brutalized him not

16   that long before.

17        It doesn't make sense.  It's not a reasonable

18   conclusion of what the known facts are.  And when it doesn't

19   make sense and when it's not reasonable, that is reasonable

20   doubt.

21        And, you know, Shawn didn't have to testify here.

22   You know, the judge would have read you an instruction that

23   said that he had an absolute right to remain silent.  And if

24   he had chose to do that, you could not consider it, you could

25   not discuss it, you could not hold it against him.  Because

1   it's a right.  And a right is that you can exercise it without

2   being penalized.

3          So he made a choice.  He made a choice to get up here

4   and tell you his story.  He made a choice to get up here and

5   admit things that subject him to criminal prosecution.  And to

6   being vilified probably in your eyes and anyone that heard

7   about what he had done.

8          He got up and admitted he's Toddlers.  He admitted

9   that's his computer.  He didn't hedge.  He didn't minimize.

10  He laid himself out for you.  And in the midst of admitting

11  all this stuff, he wouldn't admit one thing.  That he actually

12  manufactured those images.  Because he didn't do that.  That

13  is something that he couldn't admit to.

14         Again, when we look about what we know about the

15  interaction and the events involving Andrew, Elizabeth and

16  Shawn, it just doesn't make sense.  It is -- it is an

17  unreasonable conclusion based upon the facts that we know.

18  And again, if it's not reasonable and if it doesn't make

19  sense, then that is reasonable doubt.

20         Let's talk briefly about some of the other evidence.

21  There was talk here about the -- about what Detective Romine

22  said that he saw on Shawn's left wrist a scar, a wart,

23  something.  He was right there, he showed you his wrist.  That

24  is not there.  And if you want to see it and want to see his

25  wrist again, you can.  It's not there.  That is not his left

701

1   hand.

2            Whatever the clothes are, you can change your

3   clothes, but you can't change your skin.  That is not his left

4   hand.  I don't know whose it is.  I do not know whose it is.

5   You don't know whose it is.  But the one person that it's not

6   is Shawn McCormack.

7            Regardless of everything he's done, everything he's

8   admitted to, everything that he has talked about himself,

9   that's not his hand.  And if that's not his hand, then he's

10  not guilty of those counts, that count.  It's as plain and

11  simple as that.  And they're the ones that brought that up.

12  And they're still clinging to it even though they've seen the

13  wrist that doesn't match.

14           Now, there are photographs of Elizabeth in a vehicle.

15  Not absolutely clear if the seats are identical or not.  You

16  will recall that there's nothing else inside that vehicle that

17  can be pointed to to identify it -- because what they're

18  saying it is, they're saying it's the white pickup truck.

19  They're saying it's the white pickup truck and that he took

20  pictures of her in the white pickup truck, one of them

21  extremely graphic and troubling.

22           She's the older of the siblings.  And again, you have

23  to accept the fact that if Shawn did that to her, then he was

24  received back in the home and was around the children and they

25  were just fine with that.  The children were just fine with

1    him.  That doesn't make sense.

2           It may be the Silverado or other kind of GM seat

3    truck.  There's hundreds of thousands of those around.  I

4    don't know.

5           But I do know that for him to commit an act with her

6    like that and then to have returned multiple times to the home

7    with absolutely no fallout or no reaction from her about

8    having him there does not make sense.  It just doesn't make

9    sense.  And if it doesn't make sense and it's not reasonable,

10   there's reasonable doubt.

11          You know, none of the clothing is totally unique or

12   distinct when you look at the photographs.  You know.

13   Agent -- or excuse me, Detective Romine didn't even really

14   know what kind of red shirt it was, he just scooped up all the

15   red shirts that were there because he couldn't identify any of

16   them as having been in the photographs.

17          The ski masks, none of them are of a unique character

18   that they can be identified as being the ones in the video.

19   He -- Detective Romine even took one that wasn't even the

20   right color.  They just scooped up all the stuff.  Because

21   they can't be identified.

22          And of all of the people in the world that could have

23   ski masks, wow, it's a guy that works up on cell towers in the

24   winter in the state of Colorado.  Now that is reasonable.

25   That is a reasonable fact leading to a reasonable conclusion

1   that he had those articles of clothing for a legitimate

2   purpose and not for the purpose that they say he used them

3   for.

4           Again, there's a lot of -- there's a lot of things

5   that we're batting around this case.  It all comes down -- it

6   all comes down to the question of identity.  Is the person who

7   took those images, who created those videos, who abused those

8   children, is that Shawn McCormack?  That's the bottom line

9   here.  That's the bottom line here.

10          And the reasonable interpretation of the facts, based

11  upon all of the circumstances involving the family and their

12  relationship with Shawn and his presence with those children

13  indicates that he did not.

14          It was somebody.  We don't know who.  But there's a

15  story out there that we don't know.  I don't know what the

16  secret is with that family.  I have no clue what is really

17  going on here.

18          The one thing I do know is, based upon what we have

19  heard in this courtroom from that witness stand, that it has

20  not been shown beyond a reasonable doubt that it's Shawn

21  McCormack.  And based upon that, you are required under the

22  law to find him not guilty.  Thank you.

23          THE COURT:  And rebuttal.

24          MS. CAIN:  Ladies and gentlemen, the defendant's

25  version of offense does not make sense.  For the past couple

1   of days, you have sat and listened to several agents

2   experienced in child pornography investigations testify to the

3   evidence that they recovered connected to this defendant.

4         You heard the defendant's taped interview where he

5   admits to having demons and those demons involved Ben because

6   that is what they had been talking about throughout that

7   interview.

8         The undisputed evidence shows that the defendant was

9   the user Toddlers on GigaTribe.  How do we know that?  We know

10  that through the IP address, the forensics done on his Toshiba

11  laptop showing all of the chats.  We heard it from the

12  defendant's own mouth yesterday.  He admitted to being

13  Toddlers.

14        Where does that get us?  You saw evidence where the

15  defendant told Detective Krawcyzk from the Toronto Police

16  Services that he takes Ben out at night.  He takes Ben out to

17  a hotel to sexually abuse him.  He does this without the

18  parents knowing.

19        While the defendant is telling Detective Krawcyzk

20  this, he is sharing images, child pornography images of Ben.

21  Some of those images relate to Ben in his crib.  Others of

22  those images and video file names relate to Ben and the sexual

23  abuse he endured at the California Best Inn.

24        In other GigaTribe chats that were presented to you,

25  the defendant told other users that he would sexually abuse

1  Ben.  He said this on multiple occasions.  And that he would

2  abuse Ben's sister.

3       He was consistent.  He was consistent with what he

4  was telling these users.  He discussed the sex acts that he

5  engaged in, including the anal rape, the digital penetration

6  and the urination on these children.

7       The videos and the images found on the defendant's

8  laptop and in his toddlers24 email account show Ben and

9  Elizabeth being subjected to those exact same sex acts that

10  this defendant has claimed credit for.

11       The defendant also admitted, in those GigaTribe chats

12  that were presented to you, to being the masked guy.  You saw

13  the video of a man in a mask raping Ben at the California Best

14  Inn.

15       The defendant also admits in those GigaTribe chats to

16  taping up Ben while raping him.  Again, ladies and gentlemen,

17  you saw him taped up while being raped and this defendant took

18  credit for those sex acts.

19       When law enforcement executed a search warrant on his

20  residence in June 2010, they found the Toshiba laptop with

21  those exact same GigaTribe chats and those exact same videos

22  and those exact same images on his computer.

23       Law enforcement also executed an additional search

24  warrant on his house in 2011.  And what did they find?  They

25  found face masks that match up to those rape scenes in the

1   California Best Inn.

2           They found gray t-shirts that match up to the t-shirt

3   worn by this defendant while raping Ben at the California Best

4   Inn.  They found red t-shirts that match up to some of the

5   child pornography scenes, the still images that you saw.

6           They found this unique cloth belt that's almost like

7   an airport seat belt with the silver buckle you pull the cloth

8   through.  Where did they find that belt?  It the defendant's

9   bedroom.

10          Law enforcement also recovered hotel records placing

11  this defendant at the exact scene of the crime shown in those

12  videos at the California Best Inn.  Those records show him

13  there from March 28th to March 29th of 2009.

14          And you heard undisputed testimony from the agents

15  and from Viacom that the TV show played in the background

16  aired in the wee hours of the morning on March 29th at three

17  a.m.  And the commercial played at 3:19 a.m.  Who was at the

18  California Best Inn on that date and time?  This defendant.

19  He was there.

20          The undisputed evidence in this case also shows that

21  the defendant had repeated access to Ben and Elizabeth while

22  pretending to be friends with Andrew.  He was an overnight

23  guest on multiple occasions.  And he was caught taking Ben out

24  in the middle of the night without anyone's permission when

25  Ben was just a toddler.

1      You saw the search warrant photos of defendant's car.

2  They were taken during the daylight so they're a little bit

3  lighter.  And you got to compare those search warrant photos

4  of the defendant's car to the crime scene photos where

5  Elizabeth is being sexually abused by a pale Caucasian male

6  who looks just like this defendant.

7      The upholstery matches what Detective Romine captured

8  in his photographs.  The only difference is that the

9  upholstery in the emailed pictures is a little bit darker

10  because those images were taken at night.  Again, we are

11  placing the defendant at the scene of the crime.

12      Now, despite all of this evidence, ladies and

13  gentlemen, the defense is now trying to argue around it

14  somehow.  And quite frankly, these are red herrings.

15      One of the red herrings that the defense raises, he

16  focuses on the children's reactions and he says, "Oh,

17  Elizabeth remained asleep the night that Ben was taken out of

18  his room."  If any of you have young children, you know that

19  children can sleep through pretty much anything because when

20  they clonk out, they clonk out.  And if you're being smart and

21  you're trying to get a kid out of the house, you can quickly

22  get the kid out while not waking up Elizabeth.

23      The window.  You only had to slide it open.  It was

24  ground level.  If he wanted to get Ben out that window, he

25  could have done it and he did do that.  Elizabeth was just a

1    toddler herself.  She doesn't know to call 911 if she were to

2    wake up during that incident.  She doesn't know to tell mom

3    and dad that something strange is happening.

4          The defense also tries to focus on the children's

5    reactions by saying that, "Oh, they didn't act terrified when

6    the defendant was around."

7          Well, sadly, when you look at those images, those

8    still images of child pornography, in some of those pictures

9    when those children are being sexually abused or about to be

10   sexually abused, there's a smile on their face.  Elizabeth is

11   smiling while she is laid out in a diaper on the defendant's

12   car seat.  Shortly thereafter we see close-up images of her

13   genitals, shortly thereafter that we see the penetration.  But

14   children can be manipulated.  And those photos show that.

15         Additionally, you see still images of Ben when he's

16   in the grass.  And there's an image where you can see the

17   lascivious exhibition of his genitals and the defendant's

18   genitals.  And in one of those images, it almost appears that

19   Ben is smiling.  Just because you can manipulate children does

20   not mean that they were not -- does not mean that they cannot

21   be then the victims of sexual abuse.

22         Now, the defendant has attempted to raise an alibi

23   defense that pertains to Count Three of our indictment.  Count

24   Three is where Ben was taped up and brutally raped at the

25   California Best Inn by this defendant.

1          And in attempting to create an alibi defense, the

2    defendant's mother of all people gets up on the stand to say,

3    "Oh, yes, several years later I can tell you that my son was

4    with me from March 27th, 2009 through March 29th of 2009.  And

5    I remember several years later what we ate for dinner.  We had

6    homemade pizza."  And then later, during the

7    cross-examination, she says, "Oh, we had homemade chili."

8          Ladies and gentlemen, is that credible to you?  That

9    someone's going to remember that much detail from so many

10   years later?  Do you remember what you had one month ago for

11   dinner?

12         You also saw these Auto Zone receipts that supposedly

13   place the defendant in Glendora, California on March 27th.

14   That's a red herring.  Because you heard the undisputed

15   testimony that the crime occurred March 28th to March 29th.

16         Now, in our indictment, we say on or about March 27th

17   and you received a jury instruction that it doesn't have to be

18   the exact dates.  You are permitted to look at March 28th and

19   March 29th.  And that's what our witness' testimony went to.

20         And that's what the documents relate to at the

21   California Best Inn.  This defendant checked in there on the

22   28th.  He checked out on the 29th.

23         And in further support of that, we presented bank

24   records that show this defendant in Bakersfield, California on

25   March 29th.  And what did those records show?  We see a

1  withdrawal from an ATM for $20.

2          Now, the defense is trying to claim, ooh, someone

3  else must have been using his bank card.  Well, how did they

4  have his pin number if it's an ATM withdrawal?  Furthermore,

5  if someone else is unlawfully using his ATM card, why is that

6  person only taking out $20?  Why aren't they draining the

7  entire account?

8          Is it credible to you, ladies and gentlemen, that

9  someone was unlawfully using his card or was it really the

10 defendant in Bakersfield, California the day that we say he

11 was there when Ben was taped up and raped?  The government

12 submits that he was there.  And the evidence shows that.

13         The defendant has also created another red herring by

14 introducing a document that the white Chevy Silverado was

15 impounded and that it was impounded the entire month of March

16 2009.  And they're trying to get you to believe that somehow

17 because this white Chevy Silverado was not in the

18 defendant's -- he didn't have access to it, that the defendant

19 no longer had a car.

20         But you heard, ladies and gentlemen, that this

21 defendant routinely traveled for work.  And you also heard,

22 through Andrew when he testified, that when this defendant

23 would come over to visit him at Bakersfield, California, he

24 would drive multiple vehicles.  Sometimes he drove his mom's

25 Toyota.  Sometimes he drove a blue Chevy Silverado.  Other

1     times he drove a white Chevy Silverado.

2              And if I can just pull up Exhibit 160, I'm going to

3     put this on the Elmo quickly.  We can see that the defendant

4     was, in fact, in possession of a car.  And he was traveling

5     around.  Some of those dates he's in Reno, Nevada.  Others

6     dates he's in other cities of Nevada.  We also see him in

7     various parts of California.

8              Now, this new theory that, "Oh, someone had my credit

9     card or my ATM card" that they're now concocting at trial is

10    interesting; because when the defendant was interviewed back

11    in 2011, that tape recorded interview that you saw, and when

12    he was confronted with "we know you were at the California

13    Best Inn and we know you were with Ben," the defendant's

14    response was "I have no idea why it was in my name."

15             At no point did the defendant tell the agents, when

16    he agreed to talk to them, that, "Oh, my license and my ATM

17    card were stolen or missing."  At no point did he say that.

18    We heard that for the first time in trial.

19             We also heard for the first time during trial that

20    the defendant's driver's license also went missing,

21    coincidentally, the exact same weekend when Ben was being

22    taped up and raped in the California Best Inn.  It was that

23    Arizona driver's license, and you saw the exhibit, you saw it

24    moved in through the California Best Inn co-owner.  And you

25    see his picture on that exhibit through his driver's license.

1      The defendant took the stand and said, "Oh, well I

2  lost it around that time."  But then on cross-examination, he

3  was confronted with some employee documents from his new

4  employer with Front Range Wireless in Colorado.  It was two

5  months later.  And when he was confronted with that exact same

6  license, the defendant says, "Oh, I had a copy."  I had a copy

7  of a license.  I was able to give them this exact same Arizona

8  license that was supposedly missing to my employer two months

9  later.  Does that make sense, ladies and gentlemen?

10      If his license went missing in March of 2009, when

11  he's supposedly in California, and then he shortly thereafter

12  moves to Colorado, why is he going to go stand in the line of

13  the DMV at Arizona and get a new driver's license from Arizona

14  when he no longer lives there?  It simply doesn't add up.

15      The defense tries to raise an inference that perhaps

16  someone within the family, perhaps its Andrew who's really the

17  masked man taping up Ben and raping him at the California Best

18  Inn.

19      Why would a father who is so concerned about his son

20  when he wakes -- when he gets out of the shower and Ben is

21  missing, call the police immediately, wake up his wife

22  immediately and say, "Hey, Ben is missing, do you know where

23  he's at?"

24      If Andrew is such a monster that he's willing to rape

25  his own child, why would Andrew really care if Ben was missing

1   one night.  Would he be that stressed?  Would he be that

2   upset?  That's for you to determine.

3           You also saw Andrew's skin color.  He's got a tanner

4   look to him.  When you look at the images and videos, the

5   perpetrator, the defendant is very pale.  He's a pale

6   Caucasian man, which matches up directly to the man sitting

7   behind me.

8           For the November 6th, 2009 kidnapping incident which

9   is Count Six of our indictment.  The defense is trying to

10  argue that, you know, he really did have permission to take

11  Ben out or he really was just going to go get a drink with

12  Ben.

13          Does that make sense, ladies and gentlemen?  Who

14  takes out a toddler in the middle of the night in just a

15  diaper to go get him a drink?  Aren't there drinks in the

16  house for the kid?

17          And why is it that when the defendant took the stand,

18  he said, "Oh, I had a hard time sleeping that night and I was

19  fidgety."  So what does he do?  He wants to go out and get

20  more Red Bulls?  Isn't that the opposite of getting yourself

21  to go to sleep at night.

22          Another inconsistency with the defendant's statements

23  on that, in his tape recorded interview that you watched when

24  he was interviewed by police in 2011, he claimed that Andrew

25  kind of sort of knew about it and kind of sort of gave him

714

1    permission to take Ben out.

2          When he testified here yesterday on the stand, he

3    said that, "No, Andrew was in the shower.  And so then when

4    Ben came up to me, he was kind of crying, I decided to take

5    Ben out and take Ben to go get some drinks."  There are

6    inconsistencies with what was going on and who knew what.

7          But at the end of the day, what has always been

8    consistent is that the second Andrew realized his son was

9    missing, Andrew went into Ashley Karen's bedroom frantic to

10   wake her up and find out where their son was.  That's always

11   been consistent.  And Ashley Karen testified to that and

12   Andrew testified to that.

13         And then you heard from Officer Robles that he came

14   across frantic parents worried about their son.  That Andrew

15   ever gave permission to this defendant is simply not supported

16   by the record if that's what the defense is trying to claim.

17         And when you look at the grand scheme of things, the

18   videos of child pornography, the admissions that he's raping

19   these children.  Why in God's name would he only be taking him

20   out to get drinks?  We know he was taking these kids out to

21   motels and trucks to rape them and sexually abuse them.

22   That's the course of conduct here.  Does it make sense that he

23   was really taking Ben out just to get him a drink at night?

24   The government submits not.

25         Again, the defense tries to say when Ben came back,

Final Closing Argument by Ms. Gappa

715

he was not terrified or upset.  But again, when you're dealing with toddlers, if you've had children, you know you can coo them.  Right?  You can entice them.  You can soothe them.  We can't be looking at what Ben's reactions were that night, particularly when you go back and look at those images and see his facial expressions in some of them where he's not terrified, he's not crying.  Including the video where he's urinated on.  You don't see him crying.

Additionally, there was some evidence that, oh, well there was no signs of abuse on that particular night.  But when it comes to sexual exploitation of children, lascivious exhibition of genitals, oral sex, masturbation, you're not necessarily going to see those signs of abuse.  So the fact that those signs of abuse were not spotted on that particular night means nothing.  In the grand scheme of things, we know what the defendant's intent was when he took Ben out without the parents' permission that night.

Court's indulgence, Your Honor.

The defense has tried to challenge the interstate commerce prong with our kidnapping counts.  The evidence on this point is clear.  Andrew testified that prior to this defendant coming over for his overnight visits, he would call him the day before.  Why is that significant?  The phone call is a means, facility or instrumentality of interstate commerce and the phone call was his way of facilitating the offense.

1          If he can't spend the night at Ben -- at Ben's house,

2     he doesn't have access to Ben or Elizabeth.  He needs to get

3     permission to spend the night at that house in order to

4     sexually abuse those kids, kidnap them and produce child

5     pornography.

6          And the evidence is also incredibly clear, even

7     through the defendant's own mouth yesterday, that he is

8     sexually attracted to children.  He will stop at nothing.

9          And so when he is driving to Colorado to Ben's house

10    and Elizabeth's house, you can infer he's doing that in order

11    to get access to Ben and Elizabeth.  Otherwise he could just

12    stay at his mom's house.  Otherwise he could get a motel and

13    stay there by himself.  But he is purposely going over to

14    their house so that he can get access to the kids.

15         Court's indulgence.

16         I have nothing further.  Thank you.

17         THE COURT:  All right.  Members of the jury, I'm

18    going to go ahead and read you the concluding instructions.

19         When you begin your deliberations, you should elect

20    one member of the jury as your foreperson.  That person will

21    preside over the deliberations and speak for you here in

22    court.  You will then discuss the case with your fellow jurors

23    to reach agreement if you can do so.

24         Your verdict, whether guilty or not guilty, must be

25    unanimous.  Each of you must decide the case for yourself, but

1    you should do so only after you have considered all the

2    evidence, discussed it fully with the other jurors and

3    listened to the views of your fellow jurors.  Do not be afraid

4    to change your opinion if the discussion persuades you that

5    you should.  But do not come to a decision simply because

6    other jurors think it is right.

7              It is important that you attempt to reach a unanimous

8    verdict, but, of course, only if each of you can do so after

9    having made your own conscientious decision.  Do not change an

10   honest belief about the weight and effect of the evidence

11   simply to reach a verdict.

12             A verdict form has been prepared for you.  After you

13   reach unanimous agreement on a verdict, your foreperson will

14   complete the verdict according to your deliberation, sign and

15   date it and advise the Court staff that you're ready to return

16   to the courtroom.

17             Very briefly, the verdict form is relatively

18   self-explanatory.  There's obviously one section for each of

19   the separate counts, that is the separate charges as you have

20   heard throughout.  There are six separate counts or charges.

21   So you would view each one, Count One, Count Two, Count Three,

22   Count Four, Count Five and Count Six.  So there's a separate

23   page for each one.  Your presiding juror will simply mark if

24   you have arrived at a unanimous verdict whether or not the

25   jury has unanimously found Mr. McCormack guilty or not guilty.

1      Now, with respect to Count Six, as already indicated,

2  the charge in that one is kidnapping.  But the jury

3  instruction does advise you that if you found the defendant

4  guilty of the completed offense of kidnapping, you do not go

5  further.

6      However, if you do not find him guilty of kidnapping,

7  you can consider whether or not there was an attempted kidnap.

8  And again, there's provision for that.  And then there's a

9  place at the end for your presiding juror to date and sign the

10  verdict form.

11      If it becomes necessary during your deliberations to

12  communicate with me, you may send a note through my court

13  staff signed by any one or more of you.  No member of the jury

14  should ever attempt to communicate with me except by a signed

15  writing.  And I will respond to the jury concerning the case

16  only in writing or here in open court.

17      If you send out a question, I will consult with the

18  lawyers before answering it, which may take some time.  You

19  may continue deliberations while waiting for the answer to any

20  question.

21      Remember that you're not to tell anyone, including

22  me, how the jury stands, numerically or otherwise, on any

23  questions submitted to you, including the question of guilt of

24  the defendant, until after you have reached a unanimous

25  verdict or you have been discharged.

1          All right.  At this time I'm going to ask Ms.

2   Gaumnitz to administer an oath to my staff.

3          (The CSO and Law Clerk Sowards were sworn.)

4          THE COURT:  Okay.  Members of the jury, you'll begin

5   your deliberations.  We'll bring -- send back to you the jury

6   instructions, the verdict form and the exhibits.

7          Now, the exhibits are in digital format.  And so if

8   you want to take a look at them, obviously you can do so.

9   They have them numbered, categorized, et cetera.  We will have

10  our technical folks come back there, set the equipment up for

11  you.  If you want to take a look at any of the exhibits, you

12  can do so.  We do have the physical exhibits also that of

13  course will be sent back to you also.

14         So at this time, I'm going to ask Juror 032 and Juror

15  035 to remain.  But if the twelve of you could follow our

16  staff, you'll begin your deliberations.

17         (The jury left the courtroom.)

18         THE COURT:  In a moment I'm going to have our two

19  alternate jurors come back there to get their things.

20         All right.  Juror 032 and Juror 035, you're still

21  very much a part of the jury process.  If for whatever reason,

22  during deliberations, any of the jurors are not able to

23  continue, then you would take their place.  But the law

24  requires that the 12 would be deliberating.

25         We do have a separate jury room for you to wait.

720

1    We'll keep you in touch as to what's going on.  And they'll

2    start deliberations.  We'll check with you regarding lunch

3    arrangements.

4              And then if you need to go back, if you have property

5    or anything you wish to pick up, you can do that.  Mr. Sowards

6    will go ahead and escort you to the other jury room.  And then

7    again, we'll try to keep you in touch as to what's going on

8    here.  But with that, then we'll go ahead and have you step

9    out also with Mr. Sowards.

10             (The alternate jurors left the courtroom.)

11             THE COURT:  All right.  The jury and the alternate

12   jurors have left the courtroom.  Is there anything that we

13   need to address.  Plaintiff's side, anything?

14             MR. DELAHUNTY:  Nothing for us, no.

15             THE COURT:  Defense side?

16             MR. FALLER:  No, Your Honor.

17             THE COURT:  If you folks will stand by.  What we'll

18   probably do is make lunch arrangements for the jury.  And so

19   they'll be taking a break.  Obviously you don't have to stay

20   in the courtroom, but please be close by in case they have a

21   question or a verdict so we can get you back here right away.

22   But other than that, we'll stand in recess and await further

23   word from the jury.

24             Oh, I'm sorry.  And before, as I mentioned earlier,

25   double check with Ms. Gaumnitz before we send back the jury

1    instructions, the verdict forms and then the equipment.  And I

2    understand that our technical folks are going to be going back

3    there to set up the equipment for them to view any of the

4    exhibits if they choose to do so.  Other than that, we'll be

5    in recess.  Thank you.

6            (Recess from 11:23 a.m. to 12:22 p.m.)

7            THE COURT:  Back on the record outside the presence

8    of the jury.  We did receive a note from the jury.  And I

9    believe counsel have gotten copies.  Basically they're

10   requesting a list.  I thought there was some discussion about

11   how that was going to be handled.  Obviously Ms. Gaumnitz has

12   the exhibit list which you have.  And so I'm certainly open

13   to -- volume two.

14           Okay.  The first note was "Requesting a list of how

15   to find specific evidence on the CD.  Is there an index to

16   reference?"

17           The second note, which just came in, is "Please

18   disregard last note."

19           Oh, they figured it out.  Okay.  So I'm going to have

20   these two notes marked as Court Exhibits 1 and 2.  I guess

21   false alarm.

22           (Court Exhibits 1 and 2 were marked for

23            identification.)

24           THE COURT:  Okay.  While we're on the record,

25   anything by either side?

1          MR. DELAHUNTY:  Not from the government.

2          THE COURT:  Okay.  We'll continue to wait word from

3     the jury then.  We'll be in recess until then.

4          (Recess from 12:23 p.m. to 1:18 p.m.)

5          THE COURT:  Back on the record.  I will note that we

6     have had the alternate jurors come into the courtroom so they

7     are present in the courtroom.  It's my understanding that they

8     have arrived at an unanimous verdict, so I'm going to have the

9     jury come in.

10         What I'll do is I'll get the verdict, I'll read the

11    verdict and then I'll poll the jury.  I will ask counsel if

12    there's anything further of the jury before they're

13    discharged.  If there is, let me know.  If there's not, then

14    I'll go ahead and let the jury go.

15         And then I'll go back and I just want to thank the

16    jurors.  I just basically give them certificates and thank

17    them for their service.

18         So with that, before we have the jury come in, is

19    there anything further on behalf of the plaintiff?

20         MR. DELAHUNTY:  Nothing from the government, Your

21    Honor.

22         THE COURT:  Anything further on behalf of defense?

23         MR. FALLER:  No, Your Honor.

24         THE COURT:  We'll have the jury come in.

25         (The jury entered the courtroom.)

1    THE COURT:  The record will reflect the jury has

2 returned.  Please be seated.

3    All right.  Members of the jury, we received notice

4 from you that the jury has arrived at a unanimous verdict in

5 this case.  Who is the presiding juror?

6    All right.  Juror 012, in this case has the jury

7 arrived at a unanimous verdict as to each of the counts.

8    JUROR SEAT NUMBER TWELVE:  We have.

9    THE COURT:  If you could hand the verdict forms to my

10 staff, who will hand it to me.

11    Members of the jury, I'm going to read the verdict

12 that's been handed back to me.  And then I will ask your

13 presiding juror whether the verdict as read by the Court

14 reflects the unanimous verdict of the jury.

15    If she responds yes, then I will poll the jury.  That

16 is, I will ask each one of you whether or not the verdict as

17 read reflects your individual verdict in all respects.  If it

18 does, just say "yes."  If it doesn't or if you have any

19 questions, just say "no."  It's not a problem at all, you

20 would just continue with your deliberations.

21    All right.  In this case, I have received the

22 document titled Verdict Form from the presiding juror.  And

23 the verdict is as I'm going to read it.

24    One.  Count One of the indictment.  As to offense of

25 sexual exploitation of a child in violation of Title 18,

724

1   United States Code, Section 2251(a), we the jury find the

2   defendant Shawn Joseph McCormack guilty.

3       Count Two of the indictment. As to the offense of

4   sexual exploitation of a child in violation of Title 18,

5   United States Code, Section 2251(a), we the jury find the

6   defendant Shawn Joseph McCormack guilty.

7       Count Three of the indictment. As to the offense of

8   sexual exploitation of a child in violation of Title 18,

9   United States Code, Section 2251(a), we the jury find the

10  defendant Shawn Joseph McCormack guilty.

11      Count Four of the indictment. As to the offense of

12  sexual exploitation of a child in violation of Title 18,

13  United States Code, Section 2251(a), we the jury find the

14  defendant Shawn Joseph McCormack guilty.

15      Count Five of the indictment. As to the offense of

16  kidnapping in violation of Title 18, United States Code,

17  Section 1201(a) and (g), we the jury find the defendant Shawn

18  Joseph McCormack guilty.

19      Count Six of the indictment. As to the offense of

20  kidnapping in violation of Title 18, United States Code,

21  Section 1201(a) and (g), we the jury find the defendant Shawn

22  Joseph McCormack guilty.

23      And then Juror 012, is this dated and signed by you?

24      JUROR SEAT NUMBER TWELVE: It is.

25      THE COURT: Does that verdict as read by the Court

1    reflect the unanimous verdict of the jury in this case?

2              JUROR SEAT NUMBER TWELVE:  It does.

3              THE COURT:  Very well.  I'm going to go ahead and

4    poll the jury.  And I'm going to ask you whether or not the

5    verdict as read by the Court reflects your individual verdict

6    in all reflects.  And again, the answer is either yes or no.

7              So, first, Juror 028?

8              JUROR SEAT NUMBER ONE:  Yes.

9              THE COURT:  Juror 014?

10             JUROR SEAT NUMBER TWO:  Yes.

11             THE COURT:  Juror 003?

12             JUROR SEAT NUMBER THREE:  Yes.

13             THE COURT:  Juror 004?

14             JUROR SEAT NUMBER FOUR:  Yes.

15             THE COURT:  Juror 005?

16             JUROR SEAT NUMBER FIVE:  Yes.

17             THE COURT:  Juror 025?

18             JUROR SEAT NUMBER SIX:  Yes.

19             THE COURT:  Juror 015?

20             JUROR SEAT NUMBER SEVEN:  Yes.

21             THE COURT:  Juror 008?

22             JUROR SEAT NUMBER EIGHT:  Yes.

23             THE COURT:  Juror 016?

24             JUROR SEAT NUMBER NINE:  Yes.

25             THE COURT:  Juror 010?

1    JUROR SEAT NUMBER TEN:  Yes.

2    THE COURT:  Juror 011?

3    JUROR SEAT NUMBER ELEVEN:  Yes.

4    THE COURT:  And Juror 012?

5    JUROR SEAT NUMBER TWELVE:  Yes.

6    THE COURT:  Very well.  All right.  I'm going to ask

7    the courtroom deputy to go ahead and then file the verdict.

8    And let me ask before I discharge the jury, then, is

9    there anything further by either side?  First plaintiff's

10   side, anything?

11   MR. DELAHUNTY:  Nothing from the government, Your

12   Honor.

13   THE COURT:  Defense side?

14   MR. FALLER:  No, Your Honor.

15   THE COURT:  Members of the jury, I'm now going to

16   discharge you from your service as jurors.  You are free to

17   leave.

18   In a moment, we'll send you back to the jury room.

19   I'll come there in just a few minutes just to say thank you

20   and give you a certificate of the Court's appreciation for

21   your serving as jurors.

22   The notes, you can leave in the jury room.  They will

23   be destroyed because they're not part of the official record.

24   And now, as far as your admonition of not discussing

25   with anyone on the outside, you certainly can if you wish.

1    You certainly don't have to.

2          If you want to talk to the lawyers about the case,

3    you can do so.  They'll be downstairs if they wish to speak

4    with you, by the entry area there.  If you don't wish to speak

5    with anyone, you're free to leave and they will respect that.

6          With that, then, you are discharged from service as

7    jurors in this case.  And we thank you very much.  And then

8    the two alternate jurors will also accompany the jury back to

9    the jury room.

10          (The jury left the courtroom.)

11          THE COURT:  All right.  The jury and the alternate

12   jurors have been discharged by the Court.  Go ahead and have a

13   seat.

14          Just very briefly, if you wish to speak with the

15   jurors, you can do that.  If they're willing to speak with

16   you, they'll be downstairs in the lobby area.  I'll be meeting

17   with them very briefly just to thank them, hand out

18   certificates and then send them on their way.

19          In this case, given the verdict of the jury, Mr.

20   McCormack, I'll going to refer your case to the Probation

21   Office.  They will prepare a written presentence report.

22   You'll be asked to give information for this report.

23          You are to have your attorney present at any contact

24   that you have with the probation office.  You and your

25   attorney will be permitted to read the report and file any

1  objections to the report before your sentencing hearing.

2        At your sentencing hearing, both you and your

3  attorney will have the opportunity to speak on your behalf.

4        And we'll set consideration of the report and

5  sentencing.

6        THE CLERK:  July 6th, 2015 at 10 a.m. in this

7  courtroom.

8        MR. FALLER:  Excuse me, Your Honor, can we have the

9  following week, please?  July 13th would be the date.

10        THE CLERK:  That's not a good date for you, judge.

11        THE COURT:  That's right.  I think that's the Ninth

12  Circuit conference.  We could do it the week after that, if

13  that --

14        MR. FALLER:  That would be fine.

15        MR. DELAHUNTY:  Your Honor, may I request actually

16  the week after that.  I expect to potentially have a baby that

17  week.  Not me, but --

18        THE COURT:  Okay.

19        THE CLERK:  July 27th, Your Honor.

20        MR. FALLER:  That's fine.  Thank you.

21        THE COURT:  If it turns out that it needs to be moved

22  either up forward or back and it works out with everyone's

23  schedule, that's fine with me.  Otherwise it will be July 27th

24  at 10 o'clock in the morning here in this Court.

25        And what I'm going to do, at least because they are

729

1   technically contraband, my copy of the exhibits will be

2   returned to the government obviously with the right of

3   reasonable inspection for defense.

4           With that, then, is there anything further on behalf

5   of the government side then?

6           MR. DELAHUNTY:  Not at this time, Your Honor.

7           THE COURT:  Defense side, anything?

8           Anything further on behalf of defense then?

9           MR. FALLER:   No.  I'm sorry, Your Honor.

10          THE COURT:  All right.  We'll be adjourned then.

11  Thank you.

12          (The proceedings were concluded at 1:29 p.m.)

13

14          I, KAREN HOOVEN, Official Reporter, do hereby certify

15  that the foregoing transcript as true and correct.

16

17  DATED:  14th of May, 2015          /s/  Karen Hooven
                                       KAREN HOOVEN, RMR-CRR
18

19

20

21

22

23

24

25